IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

BOBBY WAYNE WALDROP,       )
                          )
        Petitioner,        )
                          )
    v.                     )        CASE NO. 3:08-CV-515-WKW
                          )               [WO]
KIM T. THOMAS,             )
Commissioner, Alabama Department  )
of Corrections, *et al.*,  )
                          )
        Respondents.[1]    )

**<u>MEMORANDUM OPINION AND ORDER</u>**

Petitioner is a death-sentenced inmate seeking habeas corpus relief from his conviction and sentence in the state courts of Alabama.  Petitioner filed his petition on June 30, 2008, raising sixteen separately numbered claims for relief, many of which include additional sub-claims.  Respondents contend that several of petitioner's claims are procedurally barred and that those claims not so barred should be denied pursuant to the applicable standard of review.  The parties have submitted all briefing and the matter is ripe for decision.  After considering the parties' arguments, the state court record, and all relevant law, the court finds that the petition for habeas corpus relief is due to be denied.

---

[1]  At the time the habeas petition was filed , petitioner named Richard Allen, the Commissioner of the Alabama Department of Corrections, Troy King, the Attorney General for the State of Alabama, and Grant Culliver, Warden of Holman Prison, as respondents.  These individuals have been replaced in their positions by Kim T. Thomas, Luther Strange, and Gary Hetzel, respectively.  Accordingly, pursuant to Fed. R. Civ. P. 25(d), Thomas, Strange, and Hetzel are substituted as respondents in this action.

# I. BACKGROUND

The following factual summary of the events leading to petitioner's conviction and sentence

is excerpted from the opinion of the Alabama Supreme Court affirming his conviction and sentence.

The evidence at trial revealed the following. Waldrop and his wife, Clara, resided with Waldrop's grandparents, Sherrell Prestridge and Irene Prestridge. Sherrell had heart and hip problems and had difficulty walking. Irene was bedridden, blind, and suffered from diabetes. Because of the Prestridges' numerous medical problems, the living room of their house had been converted into a bedroom with two hospital beds. Testimony at trial indicated that Waldrop knew that his grandmother and grandfather received Social Security checks before the third day of each month.

Between 10:30 a.m. and 2:00 p.m. on April 5, 1998, Waldrop and Clara left the Prestridges' house and checked into a hotel in Anniston. That same day, Waldrop and Clara pawned Sherrell's lawn mower and Waldrop smoked an undetermined amount of crack cocaine. Later that evening, Waldrop and Clara returned to the Prestridges' house. Testimony at trial indicated that Waldrop was not high on crack cocaine when he and Clara returned to the house. While Waldrop was in his grandparents' bedroom, Waldrop and Sherrell began arguing over money. In a statement Waldrop made to the police, which was introduced at trial, Waldrop stated:

> "I went into the kitchen and got the knife and [came] back. [Sherrell] pushed me and he saw the knife and that's when I [swung] the knife at his throat and he started to bleed from the throat real bad. [Sherrell] was at the foot of the bed and I started to stab him and I had the knife in my left hand and I cut myself in the hand. I got on top of him [on] the floor and started to choke him, and he wouldn't stop breathing, so I cut a little more on both sides of his neck. It was [too] late. I stuck the knife into his back and I figured it would hit his lungs and he'd stop breathing. I just wanted to finish what I started. It looked like he was suffering."

Sherrell suffered 43 stab wounds to his head, neck, back, and chest; he died as a result of his injuries.

Waldrop's grandmother, Irene, had been lying in her bed in the same room while Waldrop attacked his grandfather. She heard Waldrop kill her husband, and she was screaming throughout the incident. After he killed Sherrell, Waldrop instructed Clara to kill Irene. Clara cut and stabbed Irene twice. Waldrop then took the knife from Clara. Testimony at trial indicated that Irene told Waldrop that she loved him before he placed a pillow over her face and stabbed her in the chest, throat,

2

and shoulders until she died.  Irene suffered a total of 38 stab and cut wounds. Waldrop and Clara took Sherrell's wallet, and they left to buy drugs, ultimately driving to Georgia where they were apprehended.

Waldrop was charged with two counts of murder made capital because the murder was committed during a robbery in the first degree and one count of murder made capital because two or more persons were murdered by one act or pursuant to one scheme or course of conduct. At trial, the jury found Waldrop guilty of all three counts. Subsequently, the trial court conducted a sentencing hearing pursuant to Ala. Code 1975, § 13A-5-46. After the sentencing hearing, the jury, by a vote of 10-2, recommended that Waldrop be sentenced to life imprisonment without the possibility of parole.  Circuit Judge Dale Segrest overrode the jury's recommendation and sentenced Waldrop to death.

*Ex parte Waldrop*, 859 So. 2d  1181, 1184-85 (Ala. 2002) (citations omitted).  On direct appeal, the Alabama Court of Criminal Appeals ("Court of Criminal Appeals" or "CCA") "remanded the case for the trial court to reweigh mitigating circumstances and the aggravating circumstances and to issue a new sentencing order."  *Id.* (citing *Waldrop v. State*, 859 So. 2d  1138 (Ala. Crim. App. 2000)). On return to remand, the Court of Criminal Appeals affirmed petitioner's conviction and sentence. *Waldrop*, 859 So. 2d  at 1181.  The Alabama Supreme Court granted petitioner's request for certiorari review "to determine whether the trial court's sentencing order stated sufficient reasons for overriding the jury's recommendation of life imprisonment without the possibility of parole" and, in addition, to determine the effect, if any, of the United States Supreme Court's then-recent decision in *Ring v. Arizona*, 536 U.S. 584 (2002), on petitioner's conviction or sentence.  *Ex parte Waldrop*, 859 So. 2d  at 1184.  The Alabama Supreme Court affirmed petitioner's conviction and sentence. *Id.* at 1193.  The United States Supreme Court denied petitioner's request for certiorari review of that decision.  *Waldrop v. Alabama*, 540 U.S. 968 (2003).

On April 23, 2004, petitioner filed a petition for relief from his conviction and sentence pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Randolph

County, Alabama. St. Ct. R. Vol. 14, Tab R-52.[2] On March 18, 2005, the circuit court entered an order granting the State's motion for summary dismissal of several of petitioner's Rule 32 claims and ordering an evidentiary hearing with respect to the remaining claims. R-73 at 21. The circuit court conducted the evidentiary hearing on November 21 and 22, 2005. Rule 32 Tr. (R-60) at 1. After the hearing, the Circuit court entered an order denying petitioner's remaining claims. R-74 at 13. Petitioner appealed the circuit court's judgment to the Alabama Court of Criminal Appeals, which affirmed. *Waldrop v. State*, 987 So. 2d 1186, 1208 (Ala. Crim. App. 2007). On January 18, 2008, the Alabama Supreme Court denied petitioner's request for certiorari review of this decision. R-76 at 1. On June 30, 2008, petitioner filed the instant petition for federal habeas corpus relief.

## II. PETITIONER'S CLAIMS

Petitioner presents the following claims for relief in his habeas petition:

A.    The trial court illegally refused to consider undisputed mitigating evidence.

B.    The trial court sentenced Bobby Waldrop to death on the basis of race in violation of the United States Constitution.

C.    The trial court sentenced Bobby Waldrop to death in violation of the Sixth Amendment's command that the jury, not the judge, make the findings necessary to impose death.

D.    It was unconstitutional for the trial court to impose a sentence of death upon Mr. Waldrop after the jury sentenced him to life without parole.

E.    Bobby Waldrop was denied the effective assistance of counsel.

---

[2]   The court will utilize the following citation conventions throughout this order. Citations to the records of petitioner's state court trial, direct appeal, and Rule 32 proceedings will refer to the tab and page number within the given tab containing the cited material ("R-# at #"). Where necessary for purposes of clarity, citations to the record on appeal of petitioner's Rule 32 proceedings will cite the page number of the cumulative record ("Rule 32 C.R. at #"). Citations to the transcripts of petitioner's trial and the evidentiary hearing in the Rule 32 proceedings will identify the proceeding and refer, where practicable, to the page number of the reporter's transcript ("Trial Tr. at #" or "Rule 32 Tr. at #").

F.      The trial judge failed to recuse himself on the basis of personal bias.

G.      The trial court improperly acted to intimidate defense witnesses and thereby interfered with Mr. Waldrop's right to present a defense.

H.      The trial court violated Bobby Waldrop's rights by using evidence not admitted at trial to override the jury's life verdict.

I.      Mr. Waldrop was denied a jury drawn from a fair cross section of the community.

J.      The admission of hearsay statements from Bobby Waldrop's co-defendant violated his constitutional rights to confrontation, due process, and a fair trial.

K.      The trial court impermissibly restricted the defense expert's testimony.

L.      The trial court erred in giving the jury misleading and incorrect instructions on the law.

M.      The trial court erred in admitting Bobby Waldrop's statement.

N.      Mr. Waldrop's right to a fair and impartial jury was violated by jurors' failure to disclose truthfully on voir dire.

O.      The double counting of robbery as an element of the capital offense and as an aggravating circumstance violated Mr. Waldrop's right to an individualized sentence.

P.      The state failed to turn over exculpatory evidence to the defense.

### III.  STANDARDS OF REVIEW

Respondents argue that several of petitioner's claims are procedurally barred from federal habeas review while others cannot survive the deferential review required by 28 U.S.C. § 2254(d). The court will below discuss the standards and criteria to be applied in evaluating these defenses.

### A.      Procedural Defenses

Respondents' procedural defenses entail the related but distinct concepts of exhaustion and procedural default.  A state prisoner seeking habeas corpus relief must first exhaust the remedies available to him in the state courts before seeking relief in federal court.  § 2254(b)(1)(A).  "The

prisoner exhausts his remedies by presenting his constitutional claim to the State courts, to afford them an opportunity to correct any error that may have occurred." *Hardy v. Comm'r, Ala. Dep't of Corr.*, 684 F.3d 1066, 1074 (11th Cir. 2012) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*per curiam*)).  Courts generally require that the "opportunity" to resolve federal constitutional claims in the state courts be "full and fair." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  Hence, the state prisoner must generally alert the state courts to the federal nature of a given claim. *Duncan*, 513 U.S. at 365-66 ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.").  To do this, "a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).  In addition, the state prisoner must "invok[e] one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845.  This requirement obliges the state prisoner to seek even discretionary review in the State's highest court, provided that such "review is part of the ordinary appellate review procedure in the State[,]" in order to exhaust federal habeas corpus claims in the State courts. *Id.* at 847.

Because a federal court ordinarily may not grant habeas corpus relief when the petitioner has not exhausted available state remedies, "[i]f a petitioner fails to exhaust his state remedies, a district court must dismiss the petition without prejudice to allow for such exhaustion." *Gore v. Crews*, 720 F.3d 811, 815 (11th Cir. 2013).  If state remedies are no longer available to the state prisoner due to state procedural limitations, the unexhausted claim is generally treated as exhausted but procedurally defaulted from federal habeas review. *Id.* at 816 ("An unexhausted claim is not procedurally

defaulted unless it is evident that any future attempts at exhaustion would be futile due to the existence of a state procedural bar."). *See also McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005) ("It is well established that when a petitioner has failed to exhaust his claim by failing to fairly present it to the state courts and the state court remedy is no longer available, the failure also constitutes a procedural bar.").

A claim may be deemed procedurally barred in federal habeas review, even if it was presented in the state courts, for other reasons. For example, "[a]s a general rule, a federal habeas court may not review state court decisions on federal claims that rest on state law grounds, including procedural default grounds, that are 'independent and adequate' to support the judgment." *Boyd v. Comm'r, Alabama Dep't of Corr.*, 697 F.3d 1320, 1335 (4th Cir. 2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). The Eleventh Circuit applies a

> three-part test to . . . determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. First, the last state court rendering a judgment in the case must clearly and expressly say that it is relying on state procedural rules to resolve the federal claim without reaching the merits of the claim. Second, the state court decision must rest solidly on state law grounds, and may not be intertwined with an interpretation of federal law. Finally, the state procedural rule must be adequate; i.e., it may not be applied in an arbitrary or unprecedented fashion. The state court's procedural rule cannot be manifestly unfair in its treatment of the petitioner's federal constitutional claim to be considered adequate for purposes of the procedural default doctrine. In other words, a state procedural rule cannot bar federal habeas review of a claim unless the rule is firmly established and regularly followed.

*Id.* at 1335-36 (quotations and citations omitted).

A federal court may consider a procedurally defaulted claim only if the petitioner can show (1) cause for the procedural default in the state courts and prejudice flowing from the asserted federal violation, or (2) that a fundamental miscarriage of justice will result if the federal claim is not

considered on its merits. *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1258 (11th Cir. 2013). "As a general matter, 'cause' for procedural default exists if 'the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). A petitioner may achieve this threshold by showing, for instance, that "the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." *Murray*, 477 U.S. at 488 (citations and quotations omitted). Likewise, the ineffective assistance of counsel may constitute "cause" for a procedural default of a federal claim in the state courts. *Id.*

In addition to cause, the habeas petitioner must demonstrate actual prejudice to overcome a procedural default. "Actual prejudice means more than just the possibility of prejudice; it requires that the error 'worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Ward v. Hall*, 592 F.3d 1144, 1178 (11th Cir. 2010) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Finally, a federal court may review a procedurally defaulted habeas claim on the merits, even in the absence of cause or prejudice, if necessary to remedy a "fundamental miscarriage of justice." A fundamental miscarriage of justice occurs if a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. To show a fundamental miscarriage of justice based on asserted actual innocence, the petitioner must "support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

**B.**    **Review Pursuant to 28 U.S.C. § 2254(d)**

For those claims presented and decided on the merits in the state courts, this court is to apply

the standard of review set out in § 2254(d)(1) and (2), as modified by the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104, 132, 110 Stat. 1214 (1996).  Section

2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable
> > application of, clearly established Federal law, as determined by the Supreme
> > Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of
> > the facts in light of the evidence presented in the State court proceeding.

The phrase "'clearly established Federal law, as determined by the Supreme Court of the

United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions

as of the time of the relevant state-court decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a

conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court

decides a case differently than [the Supreme] Court has on a set of materially indistinguishable

facts." *Id.* at 412-13.  A state court decision "involve[s] an unreasonable application of" clearly

established federal law "if the state court identifies the correct governing legal principle from [the

Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's

case." *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly

9

established federal law erroneously or incorrectly.   Rather, that application must also be unreasonable." *Id.* at 411.

Likewise, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  "In reviewing whether a state court's decision was based on an 'unreasonable determination of the facts' under § 2254(d)(2), [the court] presume[s] the state court's factual findings are correct, and the petitioner has the burden to rebut those facts by clear and convincing evidence." *Wellons v. Warden, GA Diagnostic & Classification Prison*, 695 F.3d 1202, 1206 (11th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)).  "This statutory presumption of correctness applies to the factual determinations of both state trial and appellate courts." *Id.* (citing *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003)).

Given all of the above, while "deference [in the habeas context] does not imply abandonment or abdication of judicial review" and does not "preclude relief," *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), the deferential standard imposed by § 2254(d), as to both legal conclusions and factual determinations by the state courts, erects a substantial bar for state inmates seeking habeas relief in federal court.[3]

---

[3]        In this vein, the Supreme Court recently observed as follows:

> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin*, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  It preserves authority to issue the writ in cases where there is no probability fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J.,
>
> (continued...)

## IV.  DISCUSSION

The court will first examine whether respondents' assertions of procedural defenses to certain claims are meritorious and then proceed to apply § 2254(d) or conduct a *de novo* merits review of any remaining claims.

**A.     Procedural defenses as to claims raised for the first and only time in discretionary review before the Alabama Supreme Court**[4]

**1.        *Claims A, B, G, H, I, J, K, L, & O***

Respondents first contend that eleven of petitioner's claims are procedurally barred because they were not "fairly presented," and thus were not exhausted, in the state courts.[5]  Specifically, respondents assert that, because the subject claims were first raised in petitioner's petition for certiorari review to the Alabama Supreme Court on direct review of his conviction, he failed to invoke one full round of Alabama's ordinary review process as to these claims, and he may not now

---

[3](...continued)
concurring in judgment).  As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 562 U.S. __, __, 131 S.Ct. 770, 786-87 (2011).  *See also Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011) ("[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied.  However it is phrased, the deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear.").

[4]  In this section, the court will discuss those claims which may be entirely disposed of by virtue of certain procedural defenses.  Claims which respondents contend are only partially procedurally barred and are otherwise subject to review under § 2254(d), will be reviewed–as to both procedural defenses and the merits–in a subsequent section of this opinion.

[5]  The eleven claims respondents contend are so procedurally barred are claims A, B, D, F, G, H, I, J, K, L, and O (hereinafter, the "subject claims").  With two exceptions–claims D and F, which the court will discuss separately–petitioner does not contest respondents' description of when and how these claims were presented in the state courts.  Pet'r's Reply (Doc. # 53) 1.

return to state court to exhaust the claims due to state procedural limitations.  *See* Resps.' Br. (Doc.
# 41) at 2-8; Resps.' Reply (Doc. # 50) at 7-18.

As discussed above, in order to exhaust claims in the state courts, "state prisoners must give
the state courts one full opportunity to resolve any constitutional issues by invoking one complete
round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 845.  In *Castille*
*v. Peoples*, 489 U.S. 346, 349 (1989), the United States Supreme Court denied that "the presentation
of claims to a State's highest court on discretionary review, without more, satisfies the exhaustion
requirement."  In *Castille*, the habeas petitioner, Peoples, was convicted of several offenses in the
state courts of Pennsylvania.  After his convictions were affirmed in Pennsylvania's intermediate
appellate court, he sought discretionary review in the Pennsylvania Supreme Court by means of a
petition for allocatur, which raised various claims that, apparently, were not raised in the lower
courts.  *Id.* at 347.  The Court observed that, "[u]nder Pennsylvania law, such allocatur review 'is
not a matter of right, but of sound judicial discretion, and an appeal will be allowed only when there
are special and important reasons therefor.'"  *Id.* (citing Pa. R. App. P. 1114).  Peoples did not
succeed in obtaining further review in the Pennsylvania Supreme Court, and he subsequently filed
a federal habeas corpus petition raising at least two claims that had only been raised in the state
courts in his petition for allocatur.  *Id.* at 348.

Contrasting "exceptions" where a state court exercises discretion to rule on a presented claim
it could procedurally reject or where a state court simply fails to address a presented claim during
mandatory review, the Supreme Court held that "where the claim has been presented for the first and
only time in a procedural context in which its merits will not be considered unless 'there are special
and important reasons therefor[,]'" the claim has not been fairly presented to the state courts and,

therefore, will not satisfy the exhaustion requirement. *Id.* at 351 (quoting Pa. Rule App. P. 1114).

The Eleventh Circuit applied *Castille* in holding that a habeas petitioner failed to fairly present his

claims in the state courts because his "first and only presentation of his federal claims . . . came in

his petition for writ of certiorari before the Georgia Supreme Court." *Mauk v. Lanier*, 484 F.3d

1352, 1358 (11th Cir. 2007).  The Eleventh Circuit explained as follows:

> Because the Georgia Supreme Court's decision to grant certiorari is discretionary,
> *see, e.g., Adair v. Traco Div.*, 192 Ga. 59, 14 S.E.2d 466, 469 (Ga. 1941), and
> because certiorari can only be granted in cases "which are of gravity or great public
> importance," Ga. Const. art. VI, § 6, ¶ 5, we cannot say, in light of *Castille*, that
> Mauk has fairly presented his claims.  Mauk's claims were presented in a procedural
> context in which the merits were not considered, as the Georgia Supreme Court's
> denial of certiorari does not constitute a ruling on the merits. *See Adair*, 14 S.E.2d
> at 469 (explaining that the Georgia Supreme Court's denial of a petition for certiorari
> "'shall not be taken as an adjudication that the decision or judgment of the Court of
> Appeals is correct'") (citation omitted); *Ezor v. Thompson*, 241 Ga.App. 275, 526
> S.E.2d 609, 610-11 (Ga. Ct. App.1999) (same).  We thus must conclude that Mauk
> has not fairly presented his federal constitutional claims to the Georgia courts and
> thus has failed to exhaust his state remedies.

*Id.*

Respondents contend that *Castille* and *Mauk* foreclose consideration of all claims that were

raised for the first and only time in Waldrop's petition for certiorari in the Alabama Supreme Court

on direct appeal and that were not actually considered by that court.  Respondents reason that

because, as in *Castille* and *Mauk*, "Waldrop raised [these claims] in a procedural context in which

the merits of a claim are not considered unless special reasons exist."  Resps.' Br. (Doc. # 41) at 5.

Indeed, as respondents emphasize, the standard guiding the Supreme Court of Alabama's exercise

of discretion in granting certiorari is essentially identical to that employed by the Pennsylvania

Supreme Court, as described in *Castille*.  *Compare Castille*, 489 U.S. at 347 (citing Pa. R. App. P.

1114) ("Under Pennsylvania law, such allocatur review 'is not a matter of right, but of sound judicial

discretion, and an appeal will be allowed only when there are special and important reasons therefor.'"), *with* Ala. R. App. P. 39(a) ("Certiorari review is not a matter of right, but of judicial discretion.   A petition for a writ of certiorari will be granted only when there are special and important reasons for the issuance of the writ.").   Moreover, as the Eleventh Circuit found with respect to Georgia in *Mauk*, the Alabama Supreme Court's denial of certiorari review does not reflect that court's judgment on the merits of a particular claim or case.  *See Ex parte McDaniel*, 418 So. 2d  934, 935 (Ala. 1982).

Petitioner proffers a number of reasons why he believes his claims were fairly presented in the state courts, *Castille* and *Mauk* notwithstanding.  First, citing *Trawick v. Allen*, 520 F.3d 1264, 1266 (11th Cir. 2008), he asserts that "Eleventh Circuit precedent recognizes that claims presented in a certiorari petition at the Alabama Supreme Court *are* fairly presented in state court and thus cognizable in federal court."  Pet'r's Br. (Doc. # 44) at 9-10.  Second, he contends, "the State's argument is undermined by the fact that it conceded elsewhere in its Answer that this Court must review the merits of claims that were raised for the first time at the Alabama Supreme Court."  *Id.* at 10.  Specifically, he argues that, because respondents do not contend that his claim based upon *Ring* is procedurally barred, the State has conceded that his other claims which were presented to, but not decided by, the Alabama Supreme Court are subject to merits review.  *Id.* at 10.  Third, petitioner asserts that respondents' argument improperly predicates the exhaustion issue on whether the Alabama Supreme Court opted to consider a given claim, rather than whether he simply afforded the state courts the opportunity to consider the claim.  *Id.* at 10-13.  Finally, petitioner argues that certain unique characteristics of Alabama's appellate review procedure in capital cases materially distinguish his case from *Mauk* and, by extension, *Castille*.  Petitioner specifically identifies two

14

such characteristics: first, in Alabama, after the Court of Criminal Appeals has affirmed a conviction and death sentence, Alabama's Rules of Appellate Procedure require the defendant-appellant's attorney to file a petition for certiorari review in the Supreme Court of Alabama; and second, those same rules further empower the Supreme Court to consider granting certiorari "from a decision failing to recognize as prejudicial any plain error or defect in the proceeding under review whether or not the error or defect was brought to the attention of the trial court or the Court of Criminal Appeals." Ala. R. App. P. 39(a)(2)(A). *See* Pet'r's Br. (Doc. # 44) at 13-14; Pet'r's Reply (Doc. # 53) at 3, 5-6.

Petitioner's arguments are unpersuasive. First, *Trawick* simply does not hold, or even imply, that *all* claims presented in a certiorari petition to the Alabama Supreme Court, whether considered by that court or not, are fairly presented for purposes of applying the exhaustion requirement. In *Trawick*, the Eleventh Circuit merely affirmed the district court's judgment on Trawick's claim that the prosecution engaged in unlawful gender discrimination during jury selection at his trial. 520 F.3d at 1266. The Eleventh Circuit noted that, "[a]lthough Trawick did not raise any objection to gender-biased striking during trial, he did argue that claim on direct appeal to the Alabama Supreme Court on the basis of *J.E.B. [v. Alabama*, 511 U.S. 127 (1994)], which the U.S. Supreme Court decided several weeks after Trawick's conviction. The Alabama Supreme Court held that Trawick failed to establish a prima facie case of gender discrimination." *Id.* Thus, in *Trawick*, the Eleventh Circuit affirmed the district court's application of § 2254(d) review to a claim that had been decided on the merits during discretionary review by the state's highest court.[6] The Eleventh Circuit did not even

---

[6] The circumstances in *Trawick* are similar to this case with respect to petitioner's *Ring* claim. *Ring* was decided shortly after the Alabama Supreme Court had granted petitioner's request for certiorari review (continued...)

arguably endorse the proposition that a claim first presented in discretionary review to the state's highest court is fairly presented, and thus exhausted, even if the state court does not consider the claim. Petitioner does not cite any case, much less one involving Alabama, in which a habeas court has found a claim fairly presented, and thus exhausted, where it was first presented in discretionary review in the state's highest court and the state court explicitly limited its consideration to unrelated claims. Thus, *Trawick* is inapplicable.[7]

Petitioner next contends that "the State's argument is undermined by the fact that it conceded elsewhere in its Answer that this Court must review the merits of claims that were raised for the first time at the Alabama Supreme Court" because respondents do not contend that petitioner's claim based upon *Ring* is procedurally barred despite that it too was first presented in discretionary review before the Alabama Supreme Court. Pet'r's Br. (Doc. # 44) at 10. However, respondents merely

---

[6](...continued)
but had expressly limited its consideration to the separate issue of "whether the trial court's sentencing order stated sufficient reasons for overriding the jury's recommendation of life imprisonment." *Waldrop*, 859 So. 2d at 1184. Thus, the Alabama Supreme Court requested that the parties, as well as *amicus curiae*, "submit supplemental briefs addressing the impact of *Ring*." *Id.* In *Trawick* and in this case, the Alabama Supreme Court simply took note of the release of potentially applicable intervening United States Supreme Court authority and endeavored to apply the new authority in the first instance in a case already pending before it.

[7]   Indeed, closer review of the Alabama Supreme Court's opinion in *Trawick* only further distinguishes that case from petitioner's. In *Trawick* the Alabama Supreme Court clarified that it had "carefully reviewed the many issues Trawick raises in his brief" but that it was addressing "only the primary issues and those issues that were not discussed in the opinion of the Court of Criminal Appeals." *Ex parte Trawick*, 698 So. 2d  162, 167 (Ala. 1997). Moreover, the court explained that it had "reviewed the record and the briefs . . . in regard to all the issues raised by Trawick, not just those specifically discussed above." *Id.* at 178-79. Ultimately, the court found "no error, 'plain' or otherwise." *Id.* at 179. Thus, the Alabama Supreme Court made clear that, even as to claims not specifically addressed in its opinion, it had considered all of the claims in Trawick's briefing and rejected them. By contrast, in this case the Alabama Supreme Court expressly limited its consideration of Waldrop's petition for certiorari review to his claim concerning whether the trial court sufficiently stated its reasons for overriding the jury's recommended sentence and then subsequently expanded its consideration in light of *Ring*. Nowhere does the Supreme Court of Alabama suggest that it considered any matter other than these two issues during the course of its discretionary review in *Waldrop*.

16

recognize that a claim that is first raised in discretionary review but is nevertheless considered and adjudicated on its merits by the reviewing state court should not be treated as unexhausted, even if it was not fairly presented, by the federal courts. *Castille* itself appears to support this distinction as a "reasonabl[y] infer[red]" "exception" to a narrow interpretation of the statutory exhaustion requirement that would otherwise require a petitioner to seek collateral relief in the state courts on a claim that has already been decided on direct review. *See* 489 U.S. at 351; *id.* at 350 ("Read narrowly, [§ 2254(c)] appears to preclude a finding of exhaustion if there exists any possibility of further state-court review. We have, however, expressly rejected such a construction, *Brown v. Allen*, 344 U.S. 443, 448-449, n.3 (1953), holding instead that once the state courts have ruled upon a claim, it is not necessary for a petitioner 'to ask the state for collateral relief, based upon the same evidence and issues already decided by direct review.'"). Other appellate courts have recognized this exception explicitly. *See, e.g., Casey v. Moore*, 386 F.3d 896, 916 n.18 (9th Cir. 2004) ("Of course, a claim is exhausted if the State's highest court expressly addresses the claim, whether or not it was fairly presented.") (citing *Castille*, 489 U.S. at 351).

Because the exhaustion requirement is itself "grounded in principles of comity[,]" *Mauk*, 484 F.3d at 1357, federal courts may reasonably infer that a claim already decided on the merits by the state's highest court, whether fairly presented or not, is exhausted for purposes of federal habeas review and is therefore not subject to the procedural bars potentially applicable to claims that were similarly presented, but not considered, in discretionary review. *See Castle v. Schriro*, 414 F. App'x 924, 926 (9th Cir. 2011) ("Only if the appellate court goes ahead and considers the new issue on its merits are the interests of comity satisfied such that the federal court can properly consider the issue

under 28 U.S.C. § 2254(b)(1)(A).").  Accordingly, respondents' failure to assert a similar procedural

defense against petitioner's *Ring* claim is immaterial.

Petitioner next asserts that "this Court should reject the State's fair presentation contention

because the [sic] it is predicated on the fact that the Alabama Supreme Court did not address the

claim." Pet'r's Br. (Doc. # 44) at 10.  Petitioner goes on to argue that "federal habeas law recognizes

that the proper inquiry under the 'fair presentation' doctrine is not whether the state courts actually

reviewed the merits of a claim but instead on whether the state court had *an opportunity* to review

it." *Id.* at 10-11.  In this respect petitioner's argument wholly ignores *Castille* and its obvious

instruction that the context surrounding the "opportunity" afforded the state court is important.

While there is undeniably a tension between the general requirement that a habeas petitioner must

at some point merely provide the state courts with the opportunity to resolve his federal claim and

*Castille*'s more exacting requirement that he not provide such opportunity for the first and only time

in discretionary review, there is no doubt that *Castille* materially contributes to the Court's

exhaustion jurisprudence and is as much a part of "federal habeas law" as the more general cases

cited by petitioner.  Thus, it is not enough simply to argue that the existence of some "opportunity"

afforded the state courts is the only pertinent consideration.  As *Castille* and subsequent cases

applying it have made clear, the timing and circumstances of the "opportunity" and, indeed, the state

court's response, are highly relevant to a federal court's analysis.  Petitioner's argument that only

the "opportunity" is determinative fails to explain away the Supreme Court's clear holding that the

"opportunity" Peoples afforded the Pennsylvania Supreme Court to address the federal claims in his

petition for allocatur, in a procedural context similar to that before the Alabama Supreme Court in

this case, was not sufficient to constitute "fair presentation."

18

Petitioner's final argument that the subject claims were "fairly presented" by virtue of his petition for discretionary review relies upon the "unique" circumstances that he asserts distinguish capital appellate review in Alabama's state courts from the state appellate review processes which were at issue in *Castille* or *Mauk*. Pet'r's Br. (Doc. # 44) at 13-14. As discussed above, these traits include the requirement that counsel for a capital defendant file a petition for discretionary review upon the conclusion of direct review by the Alabama Court of Criminal Appeals (*see* Ala. R. App. P. 39(a)(2)), and the ability of the Alabama Supreme Court "to review *any* claim in a death penalty case, regardless of whether it was raised at the Court of Criminal Appeals" (*see* Ala. R. App. P. (a)(2)(A)). Pet'r's Br. (Doc. # 44) at 13. According to petitioner, these provisions of the Alabama Rules of Appellate Procedure work to "ensure[] the state supreme court's ability to review all claims, including those not raised below." *Id.*

The court fails to see how these rules, even acting in concert, effect a sufficiently "fair presentation" of claims in discretionary review to satisfy *Castille*. While Alabama has taken commendable steps to enhance the ability and likelihood of its Supreme Court to notice and correct error in capital cases, it has not established a materially different standard of review guiding the Court's discretion in considering whether to grant certiorari. Even if the measures identified by petitioner have the perceived effect of making certiorari review in capital cases more robust than that for non-capital cases, this is a reflection of the stakes for the parties, not of any intent to make it easier for appellants to preserve claims for subsequent federal review. Nor does it otherwise transform what remains essentially a discretionary exercise by the Alabama Supreme Court. Even in capital cases, certiorari review remains "not a matter of right, but of judicial discretion[,]" and, even in a capital case, certiorari "will be granted only when there are special and important reasons

for the issuance of the writ." Ala. R. App. P. 39(a). Thus, although the Alabama Supreme Court requires the filing of a petition for certiorari review by the defendant's attorney and although it has carved out for itself the ability to consider granting certiorari on issues that were not raised at trial or in the Court of Criminal Appeals, or even in the petition itself,[8] the Rule provisions highlighted by petitioner do not fundamentally transform the Alabama Supreme Court's certiorari review into a sort of quasi appeal as-of-right in which all claims presented receive mandatory consideration. Accordingly, the provisions cited by petitioner do not materially distinguish Alabama's discretionary review in capital cases from the appellate procedures at issue in *Castille* and *Mauk*.[9]

*Castille*'s holding is simple: "[W]here the claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor," it has not been fairly presented to the state courts. 489 U.S. at 351 (citations and quotation omitted). Because petitioner presented a number of claims for the first and only time in his petition for certiorari review to the Alabama Supreme Court, and that court will not grant such petitions unless "there are special and important reasons for the issuance of the writ," Ala. R. App. P. 39(a), he failed to fairly present those claims to the state courts irrespective of whether

_____

[8] *See* Ala. R. App. P. 39(a)(2)(D) ("The scope of review . . . is modified only to the extent necessary to permit the Supreme Court to notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court or the Court of Criminal Appeals or set forth in the petition, and to take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected substantial rights of the petitioner."). The fact that the Supreme Court can "notice any plain error" in the record, even if it is not "set forth in the petition" illustrates that the Rule has little to do with whether and how a claim is presented to the court, which is the crux of a federal court's subsequent analysis in the fair presentation inquiry. Rather, it affirms that the Rule is designed to enhance the Court's ability to correct error, not to broaden or displace the "special and important" circumstances under which it might grant discretionary review.

[9] Indeed, the Rule preserves the essentially discretionary character of certiorari review by making clear that the Alabama Supreme Court is not required "to conduct an independent review for the purpose for determining the existence of plain error." Ala. R. App. P. 39(a)(2)(D).

the Supreme Court of Alabama may have chosen in its discretion to consider one or more of his other claims in the petition for discretionary review.

Apart from the above flaws in petitioner's reasoning, his argument–that claims he presented for the first and only time in his certiorari petition that were not considered by the state court are nonetheless fairly presented for purposes of habeas review–evinces a disregard for comity, which this court is not permitted to indulge.  Comity is not just the reason for the exhaustion requirement; it also accounts for the AEDPA's restriction on the scope of federal habeas review.  *See Frazier v. Bouchard*, 661 F.3d 519, 527 (11th Cir. 2011) ("AEDPA limits the scope of federal habeas review of state court judgments in the spirit of furthering 'comity, finality, and federalism.'") (quoting *Michael Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  Petitioner would have this court repeatedly apply the AEDPA's highly deferential standard of review to, essentially, the Alabama Supreme Court's denial of certiorari review on certain of his claims under the theory that the state court "failed to recognize" the merits of his claims when it denied certiorari.  *See, e.g.,* Pet'r's Br. (Doc. # 44) at 14 ("The state court's failure to recognize this constitutional error [Claim A - petitioner's *Lockett* claim] is contrary to, and an unreasonable application of, . . . Supreme Court precedent."); *see also id.* at 108-09, 113, 114, 119, 122, 133, and 147.  However, the AEDPA's standard of review is reserved for claims decided on their merits in the state courts.  § 2254(d).  As noted above, the Supreme Court of Alabama has stated repeatedly that its denial of certiorari review "should never be considered as an expression . . . on the merits of the controversy."  *Ex parte McDaniel*, 418 So. 2d  at 935.  It is for this reason that a federal court generally should not rely upon a state court's simple denial of certiorari or discretionary review as the relevant decision for purposes of applying the AEDPA.

In the rare circumstance where there is some reason to emphasize to which of the various state court decisions a federal court should apply § 2254(d), courts have recognized that a state court's denial of discretionary review is not relevant for § 2254(d) purposes. *See, e.g., Frazer v. South Carolina*, 430 F.3d 696, 726 (4th Cir. 2005) (Luttig, J., dissenting) ("However, the majority correctly acknowledges, as it must, that the state PCR court decision is the relevant state court decision for purposes of section 2254(d). Under no circumstances can a discretionary denial of certiorari be relevant to the inquiry mandated by section 2254(d).").

In the conventional case–where the petitioner has invoked one complete round of state court review by properly raising his federal claims before each applicable level of the state court system but was denied discretionary review in the state's highest court–applying § 2254(d) review to trial or intermediate level appellate court judgments is routine. However, in this case there is no lower court judgment on the merits of the subject claims to which this court could apply § 2254(d) because petitioner raised them for the first and only time in discretionary review before the Alabama Supreme Court. If that court has specifically, and repeatedly, admonished that its denial of certiorari should not be construed as a statement on the merits of a given claim, issue, or case, then neither the AEDPA nor comity is served by construing such a decision as a judgment on the merits and proceeding to apply § 2254(d). Nevertheless, in repeatedly encouraging this court to apply § 2254(d) review to the Alabama Supreme Court's "failure to recognize" the merit of his various claims when it rejected certiorari review, petitioner seeks precisely this result.

An additional troubling implication of petitioner's argument is the incentive it possibly could set for capital defendants appealing their conviction and sentence. If a claim is exhausted but not subject to the standard of review in § 2254(d) because the state court did not decide the claim on its

22

merits, then it must be decided on its merits *de novo* in federal court.  *Muhammad v. Sec'y, Fla. Dep't of Corr.*, 733 F.3d 1065, 1071 (11th Cir. 2013).  As set forth above, AEDPA's highly deferential standard of review is extremely difficult for a petitioner to surmount.  A petitioner should not be allowed to circumvent this exacting standard of review and obtain a *de novo* review of the merits of his federal claims merely because he failed to properly raise all of his claims at each level of the state court system and the state's highest court declined to grant discretionary review of the claims.  Adopting petitioner's reasoning would only encourage state court appellants to forego presenting their claims at all levels of the state court system in hopes of later obtaining discretionary review in the state's highest court or, failing that, unencumbered merits review in federal court.  This would be a perverse result considering the AEDPA's objective of upholding comity and federalism.

For all of the foregoing reasons, the court finds that those claims that petitioner raised for the first and only time in his petition for discretionary review in the Alabama Supreme Court were not "fairly presented" to the state courts because petitioner did not invoke one complete round of review by properly raising the claims at each level of the state court system or in a context in which their merits would necessarily be considered by the state courts.  Thus, the court must determine whether the claims are procedurally barred in federal habeas review.

As discussed above, "when a petitioner has failed to exhaust his claim by failing to fairly present it to the state courts and the state court remedy is no longer available, the failure also constitutes a procedural bar."  *McNair*, 416 F.3d at 1305.  Thus, the court must determine whether any state court remedy remains available for those claims which petitioner failed to fairly present to the state courts.  For each of the claims petitioner first raised in his petition for discretionary review in the Alabama Supreme Court, state law procedural limitations would preclude petitioner from

returning to state court to exhaust remedies.  Among other possibly relevant limitations, Rule 32.2(b) of the Alabama Rules of Criminal Procedure prohibits a successive petition raising grounds for relief different from a previous petition, except in limited circumstances that are not applicable in this case. *See Hunt v. Comm'r, Ala. Dep't of Corr.*, 666 F.3d 708, 730 (11th Cir. 2012) (holding that a claim raised in a prior Rule 32 petition but not appealed to the Alabama Court of Criminal Appeals was "unexhausted" and procedurally barred because "Alabama's bar against successive Rule 32 petitions would make exhaustion unavailable").  Likewise, Rule 32.2(c) imposes a one-year limitation on the filing of Rule 32 petitions that precludes petitioner from filing a new Rule 32 petition raising the subject claims.  *See Henderson v. Campbell*, 353 F.3d 880, 891 n.16 (11th Cir. 2003) (noting that claims that were not exhausted in state court would be barred in a subsequent Rule 32 petition due to the Rule's provision forbidding successive petitions and limitations period).  Accordingly, no state remedies remain available to petitioner for any of the subject claims, and they are procedurally defaulted from federal habeas review unless he can show cause or prejudice for his failure to exhaust the claims in state court.

As recounted above, the court may consider procedurally defaulted claims only if petitioner can show cause for the procedural default in the state courts and resulting prejudice or a fundamental miscarriage of justice. *Bishop*, 726 F.3d at 1258.  Petitioner makes no attempt to satisfy this rigorous standard, instead maintaining that each of the subject claims was fairly presented in the state courts. *See* Pet'r's Reply (Doc. # 53) 1-6.  The court finds that petitioner cannot show "cause" for his failure to exhaust his claims in the state courts, or that a fundamental miscarriage of justice will result if the court fails to consider the merits of the subject claims.

For all of the foregoing reasons, the court finds that those claims which petitioner raised for the first and only time in his petition for discretionary review in the Alabama Supreme Court are procedurally defaulted for purposes of federal habeas corpus review.  Petitioner's brief concedes that the following claims were raised in this fashion: Claim A (*see* Pet'r's Br. [Doc. # 44] at 9); Claim B (*see id.* at 19); Claim G (*see id.* at 108-09); Claim H (*see id.* at 112-13); Claim I (*see id.* at 114-15); Claim J (*see id.* at 118); Claim K (*see id.* at 122); Claim L (*see id.* at 132); and Claim O (*see id.* at 146-47).  Accordingly, these claims are due to be dismissed.

### 2.    *Other claims subject to procedural defenses*

Claim D is petitioner's claim that Alabama's capital sentencing system violates the Equal Protection Clause because it permits judicial override of the jury's advisory verdict without providing "guidance for weighing and considering the jury's verdict[,]" "because of the disproportionate application of the death penalty in Alabama against defendants convicted of killing white victims[,]" and because, "at the time Bobby Waldrop was sentenced, Alabama appellate courts did not review the appropriateness, reliability, or equal exercise of judicial overrides."  *See* Pet. ¶¶ 55, 58, and 59.  Respondents contend that petitioner failed to raise this claim at trial or on direct appeal, except to the extent he raised a state law claim in his petition for discretionary review in the Alabama Supreme Court which argued that the trial court failed to adequately state its reasons for overriding the jury's sentencing recommendation.  Resps.' Ans. (Doc. # 16) at 19-20; Resps.' Br. (Doc. # 41) at 10-11.  Petitioner states that he did raise this claim "as Claim XXVII in his certiorari petition and Claim XXI in his supporting brief to the Alabama Supreme Court[,]" and he maintains that "the Alabama Supreme Court addressed Mr. Waldrop's arguments pertaining to the

25

unconstitutionality of Alabama's standardless override system[,]" including his federal Equal Protection claim.  Pet'r's Br. (Doc. # 44) 45-46; *id.* at n.10.

As the court discussed in the previous section of this opinion, claims which petitioner raised for the first and only time in his petition for discretionary review before the Alabama Supreme Court were not "fairly presented" to the state courts and, hence, are procedurally defaulted in federal habeas corpus if the state court declined to consider the claim.  Thus, petitioner's concession that he first raised the claim in his certiorari petition in the Alabama Supreme Court is dispositive of the fair presentation inquiry and the claim is procedurally barred unless, as he contends, the Alabama Supreme Court considered and decided this claim on its merits despite his failure to "fairly present" it.  Upon review of the record, the court finds that the Alabama Supreme Court did not consider, much less decide, petitioner's claim that Alabama's judicial override sentencing scheme violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution for the reasons set forth in ¶¶ 55, 58, and 59 of the petition.

The claim petitioner proffers as having "fairly presented" his federal Equal Protection claim to the Alabama Supreme Court, Claim XXVII, reads as follows:

> The trial court's override of the jury's sentencing recommendation was erroneous because it was based on a statute which does not specify what weight the trial court should have given to the jury's recommendation that Mr. Waldrop be sentenced to life imprisonment without parole.  Thus, the court's override violated the constitutional requirement that there be 'measured, consistent application' of the death penalty and 'fairness to the accused,' *Eddings v. Oklahoma*, 455 U.S. 104, 110-11 (1982), and the correlative command of the Equal Protection Clause.

R-38 at 78-79.  Petitioner presented a separate claim in his petition for certiorari review that also challenged Alabama's judicial override on distinct grounds. Claim XVI of the petition argued that certiorari should be granted to review petitioner's claim that the trial court's final sentencing order

failed to provide "the court's reasons for giving the jury's sentencing recommendation the consideration that it was given" as required by *Ex parte Taylor*, 808 So. 2d 1215, (Ala. 2001).  R-38 at 68.  Petitioner argued that the "trial court's error violated Mr. Waldrop's right to due process and a reliable sentencing under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law."  *Id.* at 68-69.  The Alabama Supreme Court's order granting certiorari review concisely states that "consideration of the petition for writ of certiorari, and briefing, shall be limited to whether the trial court's order states sufficient reasons for overriding the jury's sentencing recommendation.  *See Ex parte Taylor*[]."  *See also Ex parte Waldrop*, 859 So. 2d  at 1184 ("On April 25, 2002, this Court granted Waldrop's petition for certiorari review to determine whether the trial court's sentencing order stated sufficient reasons for overriding the jury's recommendation of life imprisonment without the possibility of parole, as required by this Court's instructions in *Ex parte Taylor*[].").

It is clear in comparing the two claims raised in the petition and the Alabama Supreme Court's opinion that the Court granted certiorari only as to petitioner's claim concerning whether the content of the trial court's sentencing order complied with *Ex parte Taylor*, a claim that even petitioner describes as "a state-law-based claim challenging the court's override," Pet'r's Br. (Doc. # 44) at 45-46 n.10, not his separate Equal Protection challenge to the statute's failure to instruct the trial court what weight to afford a jury's life recommendation.  Moreover, the portion of the Alabama Supreme Court's opinion cited by petitioner as having addressed his Equal Protection challenge, *see id.* (citing *Ex parte Waldrop*, 859 So. 2d  at 1191, and referring, broadly, to petitioner's "state and federal challenges"), simply does not evince any such consideration.  The portion cited by petitioner consists almost entirely of the Court's description of the issue before it in *Ex parte Taylor*, a lengthy

27

quote from that opinion, and a description of when *Ex parte Taylor* was released relative to the procedural developments in petitioner's case. *Ex parte Waldrop*, 859 So. 2d at 1191. Notably, it does not include any description or analysis of an Equal Protection challenge to judicial override.[10]

Further review of the opinion in *Ex parte Waldrop* underscores that the Alabama Supreme Court did not charge itself with considering or deciding the merit of petitioner's instant Equal Protection challenge to the statute authorizing judicial override. What the Court did decide in *Ex parte Waldrop* was simply that, because *Ex parte Taylor* was released after the trial court had entered its revised sentencing order and the Court of Criminal Appeals had affirmed on return to remand, the sentencing order failed to comply with *Ex parte Taylor*'s requirement that the trial court sufficiently state its reasons for overriding the jury's sentencing recommendation, but that the normal remedy of remand to the trial court was unavailable because the trial judge had retired. *Id.* at 1191-92. Thus, "in order to ensure that the death penalty in this case was not imposed in an arbitrary an capricious manner," the Alabama Supreme Court endeavored to "perform its own review of the propriety of the death sentence and determine whether the aggravating circumstances outweigh the mitigating circumstances." *Id.* at 1192. After reviewing the circumstances of petitioner's crime and

---

[10]   To the extent *Ex parte Taylor* addresses any Equal Protection claim, it does so summarily in a footnote, which is not in that part of the opinion later excerpted in *Ex parte Waldrop* and proffered by petitioner as indicative that his Equal Protection claim was addressed among his "federal challenges" to Alabama's judicial override.  *See Ex parte Taylor*, 808 So. 2d at 1217 n.2 ("Taylor argues that the trial judge's override of the jury's recommended sentence violations the Equal Protection Clause because, he says, similarly situated capital defendants have not been sentenced to death by an order overriding a jury's recommendation of a life sentence without parole and because, he says, the death penalty is imposed disproportionately in Alabama on defendants who are convicted of killing white persons.  However, Taylor presents no evidence, and cites no authority, to support these arguments, and we have found no evidence in the record to support them.  Therefore, we conclude that these arguments are without merit.").  Thus, there is simply no support for petitioner's assertion that, in discussing and quoting from a different part of its decision in *Ex parte Taylor*, the Alabama Supreme Court somehow addressed his instant Equal Protection claim among his "federal challenges."

the mitigation evidence offered at trial, the Court concluded that "the trial court gave the mitigating circumstances the correct weight." *Id.* at 1193. Nowhere in the opinion does the Court purport to consider, much less decide, any claim that Alabama's judicial override violates Equal Protection because "it was based on a statute which does not specify what weight the trial court should have given the jury's recommendation that Mr. Waldrop be sentenced to life imprisonment without parole." R.-38 at 78. In sum, then, the Alabama Supreme Court did not purport to grant certiorari review of any "federal challenge[]" to Alabama's judicial override based upon the Equal Protection argument presented in the instant petition, and, in describing the context of *Ex parte Taylor* and how the trial court failed to comply with that decision, did not decide any such claim on its merits.

Accordingly, Claim XXVII of petitioner's certiorari petition to the Alabama Supreme Court simply could not have served as the vehicle through which his present Equal Protection claim was "fairly presented" and exhausted in the state courts because the Alabama Supreme Court did not grant certiorari on that claim or otherwise consider it in discretionary review. As petitioner concedes that this is the only forum in which he raised this claim in the state courts, for the reasons stated above, he failed to "fairly present" and exhaust Claim D in the state courts and it is therefore procedurally defaulted in federal habeas review and is due to be dismissed.

**B.    Claims Wholly or Partially Subject to Review Under § 2254(d) or *De Novo* Merits Review**

    **1.    *Claim C***

Claim C is petitioner's claim that his Sixth Amendment rights were violated because the trial judge, rather than the jury, sentenced him to death. The claim is based largely upon the Supreme Court's decision in *Ring*, in which, applying its holding in *Apprendi v. New Jersey*, 530 U.S. 466

(2000), the Court held that capital defendants "are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589. Petitioner asserts that, before a death sentence may be imposed, Alabama's capital sentencing statute requires a number of findings of fact which, under *Ring*, must be reserved for the jury. These factual findings include (1) a finding concerning what, if any, [statutory] aggravating circumstances . . . exist; (2) a finding concerning what statutory and non-statutory mitigating circumstances exist; and (3) a finding that the statutory aggravating circumstances outweigh the mitigating circumstances." Pet.¶ 35. Petitioner argues that, contrary to *Ring*, the judge made these essential fact findings rather than the jury: "The *judge* found that two aggravating circumstances existed; the *judge* made findings concerning the existence of mitigating circumstances; the *judge* found that the aggravating circumstances outweighed the mitigating circumstances." *Id.* at ¶ 36 (emphasis in original). Petitioner argues that, in permitting the judge to make these findings, Alabama's capital sentencing scheme unconstitutionally diminished the role of the jury in his case because "[t]he jury made no reviewable fact-findings that any aggravating circumstances existed at the penalty phase[,]" and nor did the jury "find the 'heinous, atrocious, or cruel' aggravating circumstance on which the judge relied in imposing death" or "make the required finding that aggravating circumstances outweighed the mitigating circumstances." *Id.* at ¶ 37. Accordingly, petitioner claims, Alabama's "judicial override . . . is unconstitutional in light of *Ring*[,]" and the "state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent." *Id.*

In elaboration on his Sixth Amendment *Ring* claim, petitioner divides the claim into several numbered sub-arguments. First, he argues that, because the jury's sentencing verdict form does not

require the jury to indicate its factual findings regarding aggravating circumstances, and instead only requires the jury to indicate its recommendation of death or life without parole, there is no indication that the jury found the existence of any aggravating circumstance in this case. *See* Pet. ¶¶ 38-43.[11] Second, he argues that his Sixth Amendment rights were violated when, contrary to *Ring*, the trial judge alone found and relied upon the existence of Alabama's statutory aggravating circumstance that the murder was heinous, atrocious, or cruel in sentencing him to death. *Id.* at ¶¶ 44-46. As petitioner asserts, there is no indication in the record that the jury found the existence of this aggravating circumstance. Third, Petitioner argues that his death sentence violates his Sixth Amendment rights because the jury's advisory verdict of life without parole indicates its finding "that the aggravating circumstances, if any existed, *did not outweigh* the mitigating circumstances." *Id.* at ¶ 47 (emphasis in original). However, he asserts, by overriding the jury's verdict, the trial court, contrary to *Ring*, "necessarily made a finding that the aggravating circumstances outweighed the mitigating circumstances, and thus relied on a factual determination that the jury specifically rejected." *Id.* Fourth, petitioner argues *Ring* invalidates Alabama's capital sentencing statute to the extent the statute permits a trial judge to override a jury's sentencing verdict despite that "the jury did not find beyond a reasonable doubt the facts necessary to impose the death penalty." *Id.* at ¶ 48.

Respondents concede that petitioner exhausted his claims based upon *Ring* in the state courts. Resps.' Ans. (Doc. # 16) 14-16. Indeed, as set forth above, because *Ring* was decided after the Alabama Supreme Court granted petitioner's request for discretionary review on a separate claim,

---

[11]   As a component of this sub-argument, petitioner maintains that the Alabama Supreme Court's "judicial reconstruction" of Alabama's capital murder statute, by which it determined that the jury's verdict that petitioner was guilty of capital murder in the course of a robbery constitutes a factual finding of the existence of at least one aggravating circumstance, *see Waldrop*, 859 So. 2d at 1187-88, is incorrect as a matter of state and federal law and itself constitutes a violation of his constitutional rights. *See* Pet. ¶¶ 41-43.

and in view of its potential ramifications for Alabama, the Court thereafter requested that the parties

and *amicus curiae* submit briefs on *Ring*'s effect on petitioner's case.   Ultimately, the Alabama

Supreme Court denied relief.   The state court first rejected petitioner's claim that the trial judge,

rather than the jury, rendered factual findings that made petitioner eligible for the death penalty:

> Because the jury convicted Waldrop of two counts of murder during a robbery in the
> first degree, a violation of Ala. Code 1975, § 13A-5-40(a)(2), the statutory
> aggravating circumstance of committing a capital offense while engaged in the
> commission of a robbery, Ala. Code 1975, § 13A-5-49(4), was "proven beyond a
> reasonable doubt."  Ala. Code 1975, § 13A-5-45(e); Ala. Code 1975, § 13A-5-50.
> Only one aggravating circumstance must exist in order to impose a sentence of death.
> Ala. Code 1975, § 13A-5-45(f).  Thus, in Waldrop's case, the jury, and not the trial
> judge, determined the existence of the "aggravating circumstance necessary for
> imposition of the death penalty."  *Ring*, 536 U.S. at 609.  Therefore, the findings
> reflected in the jury's verdict alone exposed Waldrop to a range of punishment that
> had as its maximum the death penalty.  This is all *Ring* and *Apprendi* require.

*Waldrop*, 859 So. 2d at 1188.   The state court also rejected petitioner's claim that *Ring* requires that

the jury, rather than the judge, "determine whether the aggravating circumstances outweigh the

mitigating circumstances."   *Id.*   The court held that the weighing of aggravating and mitigating

circumstances does not require a factual determination.   Rather, "it is a moral or legal judgment that

takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific

formula or the discovery of a discrete, observable datum."  *Id.* at 1189.   Accordingly, the court held,

"*Ring* and *Apprendi* do not require that a jury weigh the aggravating circumstances and the

mitigating circumstances."  *Id.* at 1190.   Finally, the Alabama Supreme Court rejected petitioner's

claim that the trial judge's exclusive finding of the existence of the heinous, atrocious, or cruel

aggravating circumstance violated *Ring*.   The court held as follows:

> However, *Ring* and *Apprendi* do not require that the jury make every factual
> determination; instead, those cases require the jury to find beyond a reasonable doubt
> only those facts that result in "an increase in a defendant's authorized punishment ..."

32

> or "'expose[ ] [a defendant] to a greater punishment . . . .'" *Ring*, 536 U.S. at 602,
> 604 (quoting *Apprendi*, 530 U.S. at 494). Alabama law requires the existence of only
> one aggravating circumstance in order for a defendant to be sentenced to death. Ala.
> Code 1975, § 13A-5-45(f). The jury in this case found the existence of that one
> aggravating circumstance: that the murders were committed while Waldrop was
> engaged in the commission of a robbery. At that point, Waldrop became "exposed"
> to, or eligible for, the death penalty. The trial court's subsequent determination that
> the murders were especially heinous, atrocious, or cruel is a factor that has
> application only in weighing the mitigating circumstances and the aggravating
> circumstances, a process that we held earlier is not an "element" of the offense.

*Id.* at 1190. Respondents submit that, in all relevant aspects, the Alabama Supreme Court's decision

on petitioner's *Ring* claim is neither contrary to, or an unreasonable application of, United States

Supreme Court precedent. Resps.' Ans. (Doc. # 16) 15-16; Resps.' Br. (Doc. # 50) 19-30.

In *Lee v. Commissioner, Alabama Department of Corrections*, 726 F.3d 1172 (11th Cir.

2013), the Eleventh Circuit addressed a claim very similar to petitioner's *Ring* claim. Lee, like

petitioner, was convicted of murder during the course of a robbery and sentenced to death. *Id.* at

1197. Like petitioner, Lee argued "that his death sentence is unconstitutional under *Ring* because

the state trial judge in his case, not the jury: (1) found the specific aggravating fact that authorized

the death penalty; and (2) concluded that the aggravating fact outweighed the mitigating

circumstances." *Id.* The state courts in *Lee*, relying upon the Alabama Supreme Court's decision

in *Ex parte Waldrop*, *see Lee v. State*, 898 So. 2d 790, 858 (Ala. Crim. App. 2001), determined that

*Ring* did not invalidate Lee's sentence or Alabama's capital sentencing scheme. *Id.* The Court of

Appeals held that the state courts' decision was neither contrary to nor an unreasonable application

of Supreme Court precedent:

> We can easily dispose of Lee's claim in light of the narrowness of the
> Supreme Court's holding in *Ring*. As the state appellate court . . . concluded, the
> jury's guilty verdict on the capital offense of robbery-murder established the
> existence of an aggravating circumstance sufficient to support a death sentence. In

33

Alabama, a statutory aggravating circumstance is that "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit . . . robbery." Ala. Code § 13A-5-49(4).  In the guilt phase, the jury convicted Lee of the capital offense of "[m]urder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant." Ala. Code § 13A-5-40(a)(2).  A jury's guilt-phase finding of conviction under § 13A-5-40(a)(2) necessarily includes a finding that the aggravating circumstance in § 13A-5-49(4) is present.  Alabama statute requires interpreting the jury verdict in this manner.  *See* Ala. Code § 13A-5-45(e) ("[A]ny aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.").  Nothing in *Ring*–or any other Supreme Court decision—forbids the use of an aggravating circumstance implicit in a jury's verdict.  Indeed, *Ring* itself specifically left open and did not decide the question of whether the aggravator used to impose a death sentence could be implicit in the jury's verdict.  *See Ring*, 536 U.S. at 609 n.7 ("We do not reach the State's assertion that any error was harmless because a pecuniary gain finding was implicit in the jury's guilty verdict.").

　　Furthermore, *Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances. As the *Ring* Court also made clear, it was not deciding whether the Sixth Amendment: (1) required the jury to make findings as to mitigating circumstances; (2) required the jury to make the ultimate determination as to whether to impose the death penalty; or (3) forbade the state court from reweighing aggravating and mitigating circumstances. *Id.* at 597 n. 4.

　　The holding of *Ring* is narrow:  the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury.  That occurred in Lee's case by virtue of the jury's capital robbery-murder verdict.  *Ring* goes no further, and Lee points to no Supreme Court precedent that has extended *Ring*'s holding to forbid the aggravating circumstance being implicit in the jury's verdict or to require that the jury weigh the aggravating and mitigating circumstances.

　　Accordingly, we must conclude that the state appellate court's decision is not contrary to or an unreasonable application of *Ring*, and Lee is not entitled to habeas relief on this claim.

*Id.* at 1197-98.

In consideration of this authority, the court must conclude that petitioner's *Ring* claim is due to be denied.[12]   Because *Ring* does not preclude the trial court from finding and applying an aggravating circumstance that is implicit in the jury's verdict, and it further does not preclude the trial court from finding that aggravating circumstances outweigh mitigating circumstances, the state court's decision on this claim is not contrary to, or an unreasonable application of, Supreme Court precedent.   This conclusion disposes of the first, third, and fourth of the numbered sub-headings of the Sixth Amendment/*Ring* claim stated in the petition.   Likewise, "in light of the narrowness of the Supreme Court's holding in *Ring*," *Lee*, 726 F.3d at 1197, the court concludes that, because the jury had already found sufficient facts to render petitioner eligible for the death penalty, the trial court's additional finding and application of Alabama's heinous, atrocious, or cruel aggravating circumstance did not violate petitioner's Sixth Amendment rights.   The state court's decision as to this aspect of petitioner's *Ring* claim, therefore, is not contrary to, or an unreasonable application of, Supreme Court precedent.   This disposes of the second numbered sub-heading comprising

---

[12]  Of course, the Court of Appeals' decision in *Lee* is not "clearly established federal law"–meaning it is not a decision of the United States Supreme Court–for the purposes of review or granting habeas relief pursuant to § 2254(d).  But it is precedent as to the interpretation of *Ring*, especially as it applies to the similar fact pattern in this case.  *See, e.g., Meriwether v. Chatman*, 292 F. App'x 806, 822 (11th Cir. 2008) ("However, [two relevant Courts of Appeals decisions] are precedent as to what Supreme Court law is regarding waiver of the Sixth Amendment right to counsel and thus aid our analysis of whether the state court's decision was 'contrary to, or an unreasonable application of' Supreme Court precedent.") (citing *Phoenix v. Matesanz*, 233 F.3d 77, 83 (1st Cir. 2000)).  Indeed, the district court in *Lee* itself recognized that opinions of the intermediate appellate courts are valuable to the district courts both in determining whether a state court decision is contrary to clearly established federal law and, more fundamentally, "obtaining guidance . . . concerning what the Supreme Court meant . . . as to a particular point."  *Lee v. Thomas*, 2012 WL 3137901 *12 n.23 (S.D. Ala. Aug. 1, 2012).  Thus, while "Circuit precedent may not be used 'to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced[,]" *Lee*, 726 F.3d at 1192, it is nonetheless valuable to the district courts in interpreting "clearly established federal law" for purposes of its application in habeas corpus proceedings.

petitioner's claim.  Because all components of petitioner's Sixth Amendment/*Ring* claim cannot

surmount the standard of review pursuant to § 2254(d)(1), Claim C is denied.[13]

## 2.   *Claim E*

Claim E is petitioner's claim that he was denied the effective assistance of counsel at trial.

It is petitioner's lengthiest claim, spanning several pages of the petition and consisting of numerous

sub-parts and arguments.  *See* Pet. ¶¶ 63-93.  Respondents submit that the petition raises thirteen

separate claims of ineffective assistance, and that several of these discrete claims are procedurally

barred.  Resps.' Ans. (Doc. # 16) at 21-55; Resp.'s Br. (Doc. # 41) at 12-29.  To the extent the claims

---

[13]   The petition arguably suggests that additional sub-claims are intended to be raised in conjunction with petitioner's *Ring* claim.  For instance, petitioner appears to allege a claim charging the Alabama Supreme Court with having violated his constitutional rights:

> The state supreme court's retroactive revision of Alabama law impermissibly eases the State's burden of proving that the death penalty is appropriate by ensuring that jurors are unaware that their guilt-innocence phase finding will authorize the trial judge to impose the death penalty without additional process in violation of the requirements of the Due Process Clause and the Sixth, Eighth and Fourteenth Amendments.  It likewise violated Bobby Waldrop's rights to confrontation, due process, effective assistance of counsel, and to a fair trial and reliable sentencing determination by a jury, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Pet. ¶ 19.  For the reasons given above, to the extent this allegation supports or is a component of petitioner's *Ring* claim, it fails.  To the extent petitioner actually intends to present a discrete claim of constitutional error inflicted on him by the "judicial reconstruction" of the Alabama Supreme Court, it is unclear why he did not separately allege such a claim in the petition.  What is clear is that he did not exhaust any such claim in the state courts by, for instance, alleging the claim in his Rule 32 petition.  Moreover, to the extent he argues that the purported "judicial reconstruction" was contrary to Supreme Court precedent, *see* Pet'r's Br. (Doc. # 44) 25-29, he fails to cite any authority holding that a jury's findings of fact at the guilt phase cannot, alone, establish an aggravating circumstance which is implicit in the jury's verdict and is subsequently applied by the trial judge.  Thus, any such claim, to the extent it is even  intended and is somehow not procedurally defaulted, is due to be denied.

Petitioner also arguably presents a claim that Alabama's robbery-murder aggravating circumstance is constitutionally invalid.  *See* Pet. ¶ 41 n.6 ("The robbery-murder aggravating circumstance, standing alone, cannot make a defendant subject to the death penalty in a constitutionally meaningful way because the circumstance is so pervasive.").  However, for the same reasons identified above, to the extent any discrete claim was indeed intended and is not procedurally defaulted, it is due to be denied.

are not procedurally barred, respondents assert, they are due to be dismissed as insufficiently pleaded pursuant to Rule 2(c) of the Rules Governing § 2254 Cases in the United States District Courts ("the Habeas Rules"), or, alternatively, they are due to be denied pursuant to the standard of review of § 2254(d). The court will examine each of petitioner's claims and allegations of ineffective assistance in-turn to determine whether respondents' assertion of procedural default applies or whether the claim or allegation is subject to review under § 2254(d) or *de novo* review of its merits. To best facilitate this process, the court will divide petitioner's claims into categories related to counsel's investigation and preparation for the guilt phase, investigation and preparation for the penalty phase, specific allegations concerning counsel's performance at trial, and petitioner's claim of cumulative error.

Claims that are not procedurally defaulted are subject to review on their merits or pursuant to the deferential standard of the AEDPA. A petitioner claiming that his constitutional rights were violated by the ineffective assistance of counsel must satisfy the familiar two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984), by showing both that his counsel performed deficiently and that he was prejudiced by counsel's deficient performance. The Eleventh Circuit recently described such a petitioner's burden as follows:

> The performance prong is satisfied only if the petitioner "show[s] that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In other words, the petitioner "must establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc). Under the prejudice prong, the petitioner must show a "reasonable probability" that, but for counsel's errors, the outcome of his trial would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Furthermore, "[b]ecause the failure to demonstrate either deficient performance or prejudice is dispositive . . . there is no reason for a court deciding an ineffective assistance claim to address both

37

components of the inquiry if the defendant makes an insufficient showing on one." *Windom v. Sec'y, Dep't of Corr.*, 578 F.3d 1227, 1248 (11th Cir. 2009) (internal quotation marks and alteration omitted).

*McNabb v. Comm'r, Ala. Dep't of Corr.*, 727 F.3d 1334, 1339 (11th Cir. 2013).

To the extent petitioner's claims were exhausted and decided on the merits in the state courts and are now subject to the AEDPA, his burden in obtaining relief is significantly enhanced. In *Harrington*, the Supreme Court discussed the interplay of the *Strickland* standard and § 2254(d).

The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, *supra*, at 410. A state court must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
. . .
"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689; *see also Bell v. Cone*, 535 U.S. 685, 702 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," id., at 689; *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles[*

> *v. Mirzayance*, 556 U.S. 111, 123 (2009)].  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  556 U.S., at 123.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at __, 131 S.Ct. at 785, 788 (emphasis in original).  In other words, as the

Eleventh Circuit recently explained,

> [w]here the highly deferential standards mandated by *Strickland* and AEDPA both apply, they combine to produce a doubly deferential form of review that asks only whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.  This [d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.

*Gissendaner v. Seaboldt*, 735 F.3d 1311, 1323 (11th Cir. 2013) (quotations and citations omitted).

It is through these layered deferential standards that the court must consider any of petitioner's

ineffective assistance claims that were decided on their merits in the state courts.

### a.    *Failure to investigate and prepare for the guilt phase*

Petitioner claims that counsel was ineffective in his investigation and preparation for the guilt

phase of trial.  As best the court can tell, petitioner complains that counsel failed to investigate "the

circumstances surrounding the crime, the nature of Mr. Waldrop's relationship with his co-

defendant, and the conditions of Mr. Waldrop's interrogation" because he did not sufficiently discuss

these matters with petitioner.  Pet. ¶¶ 66, 68.  Petitioner also alleges that counsel was ineffective in

investigating and presenting the defense theory that petitioner "lacked the requisite intent to support

a capital murder conviction because he had no intent to commit robbery at the time of the murder

and because intoxication prevented him from forming an intent to kill."  Pet. ¶ 68.  *See also id.* at

¶ 82 (alleging counsel "failed to investigate mental health evidence vital to Mr. Waldrop's defense at both phases"); *id.* at ¶ 83 (faulting counsel for failing to "seek funds for an independent psychologist who would have testified during the guilt/innocence phase about Mr. Waldrop's inability to form the requisite intent to be convicted of capital murder or to competently and voluntarily waiv[e] his rights while being interrogated by police").

Respondents argue that petitioner's claims alleging that counsel failed to adequately investigate and prepare for the guilt phase and failed to adequately investigate mental health evidence, including securing an independent psychologist, are procedurally defaulted because he failed to exhaust the claims by raising them in his direct appeal of the Rule 32 court's denial of his Rule 32 petition and he may not now return to state court in order to exhaust them. *See id.* at 12-16.[14]   Petitioner argues that his claims were exhausted.  Pet'r's Br. (Doc. # 44) at 95-96.  In order to resolve respondents' procedural defenses, the court must first clearly delineate petitioner's allegations of ineffective assistance and survey the state court record for each of the allegations.

Petitioner's first claim is that counsel failed to "adequately investigate and prepare Mr. Waldrop's defense, including the circumstances surrounding the crime, the nature of Mr. Waldrop's relationship with his co-defendant, and the conditions of Mr. Waldrop's interrogation."  Pet. ¶ 68. The only allegation in the petition which appears to specifically state what counsel failed to do or what more counsel could have done to investigate these circumstances, other than to more

---

[14]   To be clear, in order to exhaust those claims presented in his Rule 32 petition, petitioner was obliged to fairly present such claims at all levels of the state court system, not just the intermediate Court of Criminal Appeals.  *See Hunt*, 666 F.3d at 729-30 (citations omitted) ("In the context of this case, the prisoner must appeal the Rule 32 court's denial of his claim to the court of criminal appeals in order to satisfy the exhaustion requirement. . . .  Moreover, after the court of criminal appeals affirms the Rule 32 court's denial of a claim, the prisoner, to exhaust all available remedies, must petition the Alabama Supreme Court for certiorari review.").

thoroughly investigate mental health evidence and procure expert assistance, separate allegations that will be considered separately below, is petitioner's claim that counsel should have asked him "about his relationship with the victims and with his co-defendant, about the circumstances of the crime, including Mr. Waldrop's state of mind, or about the circumstances of his arrest and interrogation." *Id.* at ¶ 66.[15]  However, petitioner does not allege that his counsel completely failed to speak with him prior to trial, and he does not explain why he did not volunteer any of the information he believes counsel should have extracted from him.  Petitioner does not state with any clarity the content of the information counsel failed to obtain from him regarding "the circumstances of the crime,"[16] so that the court can evaluate prejudice.[17]

---

[15]  Although petitioner also claims–presumably in connection with his guilt-phase investigation and preparation claim given the location of the paragraph in the petition–that counsel should have spoken with his family members and others before trial, the "information and testimony" to be offered by these persons concerned his "violent and impoverished upbringing, devotion to church and to his grandparents, good behavior at school, and that he was a hard worker." Pet. ¶ 67.  Even if relevant to his penalty phase defense, petitioner fails to explain how any of this information would have benefitted his guilt phase defense.

[16]  To be sure, petitioner states that "[e]ffective trial counsel would have discussed with Bobby Waldrop topics including his childhood; relationships with his parents, grandparents, siblings, and co-defendants; childhood exposure to violence and abuse; crack cocaine dependency; and educational, medical and employment history." Pet. ¶ 66.  Even if taken as a true and fair comment on the expectations for a reasonable and effective counsel, petitioner does not explain how any of this information would have been relevant to his case at the guilt phase.  At first blush, information of the sort described by petitioner would have far more relevance to the penalty phase of the trial.  Even to the extent that petitioner's telling counsel about his relationships, hard upbringing, and drug addiction could have informed trial strategy at the guilt phase, it is clear that counsel was not oblivious to such matters.  As the court will discuss *infra*, elements of these issues were in fact adduced in the guilt phase testimonies of petitioner's mother and his expert witness.

[17]  This general lack of specificity arguably constitutes a pleading deficiency and supports respondents' argument that, in addition to being procedurally barred, this claim is "due to be dismissed because it fails to comply with Rule 2(c)" of the Habeas Rules.  *See* Resps.' Br. (Doc. # 50) at 57-58.  Petitioner's briefing in support of this claim does not clarify or expand upon the claims in the petition.  In fact, in the portion of his merits briefing related to his claim that counsel was ineffective at the guilt phase of trial, he stated simply that he "relies for his merits argument on his Petition for Writ of Habeas Corpus, at ¶ 63-68, 82-93." Pet'r's Br. (Doc. # 44) at 95.  Ultimately, the court need not dismiss the claim on the basis of the sufficiency of petitioner's pleading because, even assuming the claim is adequately pleaded, (continued...)

41

Petitioner presented the same general allegations in his Rule 32 petition.  He claimed that counsel failed to adequately interview him about guilt phase issues like "the circumstances of the crime, including Mr. Waldrop's state of mind, or about the circumstances of his arrest and interrogation."  R.-52 at 6.  Also, as with his federal petition, Waldrop argued generally in his Rule 32 petition that counsel "did not adequately investigate the circumstances surrounding the crime, the nature of Mr. Waldrop's relationship with his co-defendant, or the conditions of Mr. Waldrop's interrogation.  Trial counsel did not adequately investigate or present the theory that Mr. Waldrop lacked the requisite intent to support a capital murder conviction because he had no intent to commit robbery at the time of the murder and because intoxication prevented him from forming an intent to kill."  R.-52 at 8-9.  He alleged that counsel's failure to adequately investigate prejudiced him at the guilt phase of trial because it "prevented him from making reasonable strategic decisions." *Id.* at 43.  However, except to the extent that he alleged a number of separate instances of counsel's alleged ineffectiveness during the guilt phase, petitioner did not explain what "reasonable strategic decisions" counsel should have made.  When the State first asserted that petitioner consequently failed to sufficiently articulate facts establishing prejudice due to counsel's alleged insufficient investigation and preparation for the guilt phase, petitioner answered simply that his "pleading is sufficiently specific in that he alleges that considering the totality of trial counsel's errors, there is a reasonable probability that the outcome of his trial would have been different."  R.-54 at 10-11.

Ultimately, for purposes of review in this court, the trial court found that the claim lacked merit, either as a matter of substance or because it was not sufficiently pleaded.  The court first ruled

[17](...continued)
petitioner is not entitled to relief.

that petitioner's claim about counsel's insufficient interviews with petitioner was without merit.  R.-73 at 5-6.  Next, the court determined that petitioner's more general claim about counsel's guilt phase investigation and preparation was to be dismissed pursuant to Rules 32.6(b) and 32.7(d) because it was "insufficiently specific" and devoid of any "material issue of fact or law which would entitle the petitioner to relief."  R.-73 at 6.[18]

On appeal, petitioner challenged the summary nature of the Rule 32 court's denial of his ineffective assistance claims concerning counsel's preparation for the guilt phase.  He argued that the circuit court's "order failed to respond to the claim as a whole and ignored the cumulative nature of the ineffectiveness analysis" and that the circuit court improperly "took as true the State's assertions and assumptions and denied claims on the merits without" providing petitioner the opportunity to prove facts.  R.-63 at 77-78.  For instance, he argued that the circuit court erred in concluding that he had failed to specifically allege how he was "prejudiced by counsel's failure to investigate" because "the petition contains hundreds of paragraphs alleging the facts counsel should have discovered and presented."  R.-63 at 77.  After noting that much of Waldrop's appellate brief consisted of "general assertions but only specifically identifies a few claims," the Court of Criminal

---

[18]   The Eleventh Circuit has "held repeatedly that a state court's rejection of a claim under the state's heightened-fact pleading rule in Alabama Rule of Criminal Procedure 32.6(b) is a ruling on the merits."  *Lee*, 726 F.3d at 1208 (footnote omitted).

> In short, an Alabama court's consideration of the sufficiency of the pleadings concerning a federal constitutional claim contained in a Rule 32 petition necessarily entails a determination on the merits of the underlying claim; we cannot construe such a rule to be a state procedural bar that would preclude our review. We therefore must review the merits determination of the Court of Criminal Appeals under the deferential standards set forth in AEDPA.

*Borden v. Allen*, 646 F.3d 785, 816 (11th Cir. 2011).

Appeals affirmed the circuit court's dismissal, but only discussed those claims specifically identified in Waldrop's brief. *Waldrop*, 987 So. 2d at 1205-07.

In his petition for certiorari review in the Alabama Supreme Court, petitioner continued to challenge the summary nature of the circuit court's denial of his claim, rather than squarely restating the ineffective assistance claim that was denied by the circuit court. The only portion of Waldrop's petition for certiorari review which purports to concern counsel's ineffectiveness in his guilt-phase investigation argues that the "summary dismissal of Mr. Waldrop's allegations in part I of his petition specifying counsel's failures to investigate and his allegations regarding counsel's first-phase failures" contravenes state decisional law clarifying the pleading requirements in a Rule 32 petition. *See* R.-67 at 66. The Alabama Supreme Court denied certiorari. R.-76.

To the extent the instant claim alleges simply that counsel failed to adequately investigate and prepare for the guilt phase of trial because counsel did not adequately interview petitioner, the court finds that the claim was not exhausted in the state courts because, although the circuit court denied this claim on its merits, petitioner did not present the claim "'face-up and squarely'" in his brief to the Court of Criminal Appeals or in his petition for certiorari in the Alabama Supreme Court. *See Hunt*, 666 F.3d at 731 (quoting *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1345 (11th Cir. 2004)). Instead, petitioner presented a more general challenge to the summary nature of the circuit court's denial of several of his ineffective assistance claims, and argued that the circuit court improperly applied Alabama law by requiring him to "prove" his allegations at the pleading stage. Although, as will be discussed below, petitioner specifically raised other guilt-phase ineffective assistance claims in his appellate filings, his briefing cannot be construed as having raised and exhausted any claim that counsel failed to adequately interview him before trial. Because petitioner

44

would now be barred from returning to state court to exhaust the claim, and because he has not shown cause or prejudice for his failure to exhaust this claim in the state courts, or that a fundamental miscarriage of justice will result if the claim is not adjudicated on its merits, the claim is procedurally defaulted from federal habeas review.[19]

To the extent that petitioner intends the instant claim as a more generalized allegation about counsel's failure to investigate–similar to the general allegation presented in his Rule 32 petition– the court finds that petitioner is not entitled to relief. In failing to allege what more counsel could have done to investigate the matters described in ¶ 68 of the petition–again, apart from more strenuously interviewing petitioner, investigating mental health evidence, and procuring appropriate expert assistance, the latter two of which are considered separately below–petitioner has failed to properly allege deficient performance on the part of counsel.

Petitioner's next claim concerning counsel's guilt-phase preparation and investigation is premised on counsel's alleged failure to "investigate mental health evidence" Pet. ¶ 82. Petitioner only alleges that "mental health evidence," consisting of his "exposure to violence and trauma; family and personal history of chemical dependency; constant displacement and unstable familial relationships caused by his mother's infidelity; and his mother's history of depression and suicide

---

[19]   Were the claim not procedurally defaulted, the court would nevertheless deny it on its merits. The record indicates that petitioner was interviewed by his counsel "numerous times" while awaiting trial. Rule 32 Tr. (R.-60) at 48. Based upon these interviews and other available evidence, counsel believed that petitioner was addicted to cocaine, that he committed the murders as a result of his addiction, and that this would be the core of his defense to the charges. *Id.* at 61. Both in state court and in this court, petitioner has failed to allege, much less demonstrate, how, if counsel had conducted more rigorous interviews with petitioner, there is a reasonable likelihood that he would not have been convicted of capital murder. Indeed, the "hundreds of paragraphs" alleging facts which counsel could have discovered upon a more thorough investigation that petitioner alluded to in his appeal to the Court of Criminal Appeals pertain, almost entirely, to the penalty phase of trial. Accordingly, petitioner has not demonstrated deficient performance or prejudice and he is not entitled to habeas relief on this claim.

attempts" was "vital to [his] defense at both phases."  Pet. ¶ 82.  However, neither the petition nor petitioner's briefing materially attempts to relate such information to petitioner's guilt phase defense. Instead, "mental health evidence" of the sort described by petitioner is repeatedly described as "mitigating" and extensively linked to petitioner's penalty phase ineffective assistance claims.  *See* Pet. ¶¶ 73, 76-78; Pet'r's Br. (Doc. # 44) at 54-69.  Respondents contend that this claim is procedurally barred because petitioner did not raise it in his appeal of the denial of his Rule 32 petition.  Resps.' Br. (Doc. # 41) at 15-16.

Petitioner first raised his claim that counsel failed to adequately investigate mental health evidence for use at the guilt phase in his Rule 32 petition.  R.-52 at 31.  Specifically, he argued that, had counsel spoken with his family members prior to trial,

> he would have discovered evidence vital to Mr. Waldrop's defense at both the guilt/innocence and penalty phases, including but not limited to: Mr. Waldrop's exposure to violence and trauma; family and personal history of chemical dependency; constant displacement and unstable familial relationships caused by his mother's infidelity; and his mother's history of depression and suicide attempts.

R.-52 at 31.  Like his federal petition, petitioner's Rule 32 petition was similarly vague about the import of evidence of this sort to his guilt-phase defense.  *See* R.-52 at 31.  Moreover, when the State first challenged petitioner's allegation about counsel's failure to investigate mental health evidence for use at the guilt phase as insufficiently specific, petitioner, as he has done in this court, only relied on allegations in the petition discussing such evidence in the context of his penalty phase ineffectiveness claim.  *See* R.-54-7-8; R.-56 at 5 (once again describing the relevant "mental health evidence" as "mitigating").

The Rule 32 court dismissed petitioner's general claim about the failure to investigate mental health evidence as both procedurally barred pursuant to Rule 32.2(a), because it was raised and

addressed on direct appeal, and without merit.  R.-73 at 7-8.  As to the merits, the court found that counsel had conducted an adequate investigation into mental health evidence because counsel had considered a pretrial psychological evaluation of petitioner's competency to stand trial and mental state at the time of offense, as well as a report on petitioner's request for youthful offender status. The court found that counsel was entitled to rely upon the information contained in these reports in making his strategic determinations about what evidence to investigate and present at the guilt phase of trial, and that, therefore, counsel had acted reasonably in his investigation of mental health evidence.  R.-73 at 8.

On appeal, petitioner argued that the circuit court improperly denied this claim because it made "merits determinations that are simply unsupported by the record and base[d] its conclusions on assumptions and errors that Mr. Waldrop was entitled to rebut factually at an evidentiary hearing."  R.-63 at 77.  Specifically, he argued that the circuit court erroneously found the claim without merit because it effectively absolved counsel of the duty to further investigate mental health evidence based merely upon counsel's review of a court-ordered competency evaluation and youthful offender report.  *Id.* at 77-78.  Nevertheless, the Court of Criminal Appeals affirmed, holding that the "record supports the court's findings."  987 So. 2d at 1206-07.  Petitioner then sought certiorari review in the Alabama Supreme Court, arguing that the "appeals court's finding that a competency evaluation and youthful offender report stating that Mr. Waldrop had never been in a mental institution sufficed as a reasonable investigation into Bobby's mental health contravenes precedent finding it unreasonable for counsel to rely on a competency evaluation to rule out mental health evidence . . . ."  R.-67 at 67-68.  The Alabama Supreme Court, however, denied certiorari review. R.-76.  Accordingly, because petitioner presented this claim at all levels of the state courts and it was

decided on its merits in the Court of Criminal Appeals, the claim is not procedurally defaulted, as argued by respondents, and the court must determine whether the Court of Criminal Appeals' decision survives review pursuant to § 2254(d).

Because the state court decided this issue on *Strickland*'s performance prong and did not reach whether petitioner was prejudiced, the court considers only that prong in its analysis under § 2254(d).  After reviewing the record, the court cannot conclude that petitioner has shown that the state court's decision denying his claim that counsel failed to adequately investigate mental health evidence for use at the guilt phase of trial was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable factual determination in light of the record before the state courts.

Before counsel was appointed to represent petitioner at trial, petitioner was subject to an Outpatient Forensic Psychological Evaluation to determine "his competency to stand trial and mental state at the time of the alleged offense."  R.-31 at 1.  The examiner interviewed petitioner and administered the Competency to Stand Trial Assessment Instrument.  *Id.* at 1-3. He observed "normal motor activity, normal eye contact," no "unusual mannerisms," logical thought structure, normal affect, coherence, and comprehension, excellent memory, accurate orientation to place and time, no reported "hallucinations, delusions, depersonalization, nor derealization," and he described petitioner's responses as "good to excellent."  *Id.* at 3.  As to petitioner's mental state at the time of the offense, the examiner found as follows:

> All the information available to me indicates quite clearly that at the time of the alleged offense of Capital Murder, Mr. Waldrop had a fairly lengthy history of dependence on crack cocaine and marijuana as well as narcotics.  While he may have been voluntarily intoxicated at the time of the alleged offense, he was suffering no serious mental illness or mental defect that would render him incapable of

48

> understanding the nature an quality of his actions or the consequences of his behaviors.

*Id.* at 4.  This evaluation was reported on January 27, 1999.  *Id.* at 1.  When counsel was appointed in mid to late March of 1999, with a trial date in early August, counsel had to determine, based on his own impressions of the case as reflected in the evidence and his interviews with petitioner, how best to use expert evidence, if any, to explain petitioner's actions.  Counsel was aware of and had considered the pretrial forensic psychological exam.  Rule 32 Tr. (R.-60) at 74.  Counsel queried petitioner at the outset about issues related to mental health, but did not perceive any signs of mental illness.  *Id.* at 75.  Rather, the evidence and his discussions with petitioner quickly led him to believe that explaining to the jury petitioner's cocaine addiction, and how it motivated his behavior, was imperative for both the guilt and penalty phases of trial.  *See id.* at 61-63, 73.  Moreover, apart from his reliance on the pretrial reports and his own impressions of petitioner's mental health, counsel's strategy related to the investigation and presentation of mental health evidence was informed by his own prior experience in front of Judge Segrest in a separate capital murder case.  In that case, which also involved "cocaine addiction," counsel believed his client to be severely mentally ill and, accordingly, retained a "mental health expert" to present a coordinated mental health defense.  *Id.* at 70.  Counsel obtained a recommendation for a life sentence from the jury which Judge Segrest overrode in sentencing his client to death.  *Id.*

Given all of these concerns, counsel determined that his investigation into mental health evidence should be focused on explaining to the jury the effects of petitioner's cocaine addiction in relatable but authoritative terms.  Thus, on the advice of counsel from the Southern Center for Human Rights ("SCHR"), a well-regarded advocacy group with substantial experience litigating

capital cases in Alabama, counsel hired Dr. Randall Tackett, a professor of pharmacology and toxicology at the University of Georgia, to offer expert opinion about how crack cocaine affects the brain and influences behavior. *Id.* at 63-64. As Dr. Hackett explained to the trial judge in-chambers, he has considerable knowledge and training in neuroanatomy and neuropharmacology, that is, "how drugs work by interacting with certain neurotransmitter systems in the brain." Trial Tr. (R.-10) at 782-83. His work in the field won an award from the Georgia Psychological Association and he consulted with the National Psychological Association on its licensing exam. *Id.* at 783. Thus, while Dr. Hackett was not experienced with clinical psychological analysis, he was eminently qualified to testify about how drugs like crack cocaine affect the brain and influence behavior. At the guilt phase of trial, counsel offered Dr. Tackett's testimony about how crack cocaine affects brain chemistry in hopes of showing the jury that petitioner lacked sufficient intent to be convicted of capital murder as a consequence of his addiction. *See* Rule 32 Tr. (R.-60) at 73 ("Well, I think not only his testimony spoke of the cocaine addiction, but it gave the jury some pause as to whether or not he could form the intent to kill his grandparents.")

Based upon this record, the court cannot conclude that the state court's determination that counsel's investigation into mental health evidence was not deficient is contrary to, or an unreasonable application of, Supreme Court precedent. Counsel reviewed the available reports on petitioner's mental health,[20] interviewed petitioner about mental health issues, and determined, based upon these observations and his own prior experience in front of Judge Segrest,[21] that he should

---

[20] In general, attorneys are permitted to rely upon the findings of an expert psychological evaluation in formulating trial strategy. *Darling v. Sec'y, Dep't of Corr.*, 619 F.3d 1279, 1284 (11th Cir. 2010).

[21] Notably, *Strickland* recognizes that, in evaluating counsel's performance, counsel's "selection
(continued...)

50

focus the defense on explaining petitioner's drug addiction and its effects on his behavior to the jury. To that end, he consulted with an organization of experienced capital attorneys about how best to do this and settled upon presenting the testimony of an expert in neuropharmacology and toxicology to show how crack cocaine affects brain chemistry and behavior. While counsel certainly might have done more to discover mental health evidence, reasonable jurists can debate whether no competent counsel would have done as counsel did in this instance. Accordingly, the state court's conclusion that counsel did not render deficient performance is not unreasonable, and petitioner is not entitled to habeas corpus relief on his claim that counsel was ineffective in his investigation of mental health evidence for use at the guilt phase of trial.

Petitioner's final allegation arguably included within the ambit of his guilt phase investigation and preparation ineffectiveness claim is at least related to, if not a part of, his claim about counsel's failure to investigate mental health evidence. He alleges that counsel failed to "seek funds for an independent psychologist, who would have testified during the guilt/innocence phase about Mr. Waldrop's inability to form the requisite intent to be convicted of capital murder or to competently and voluntarily waiv[e] his rights while being interrogated by police." Pet. ¶ 83. To the extent that this claim is intended as a separate allegation of ineffective assistance, the court finds it is unexhausted and procedurally defaulted.

Petitioner first presented this claim in his Rule 32 petition, arguing that counsel should have retained a psychological expert capable of informing the jury about his purported inability to form the requisite intent to commit murder or voluntarily waive his rights as a result of his addiction to

---

[21](...continued)
of strategies" might reasonably be influenced by "the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency." *Strickland*, 466 U.S. at 695.

cocaine, as well as explain why petitioner was susceptible to "chemical dependency." *See* R.-52 at 31-34. The circuit court found the claim to be without merit because trial evidence indicated that petitioner was not intoxicated at the time of his confession and because petitioner's pharmacology expert testified at trial about cocaine's effects on the brain and offered his opinion that petitioner committed the murders to facilitate feeding his addiction. R.-73 at 8-10.

In that portion of his appellate brief challenging the circuit court's dismissal of his other guilt phase ineffectiveness claims, petitioner did not discuss the circuit court's judgment that his claim about counsel's failure to hire an independent psychologist for use at the guilt phase of trial was without merit. *See* R.-63 at 76-80. However, in an earlier portion of the brief he argued that the circuit court improperly precluded him at the evidentiary hearing from offering expert opinion in support of his claim that counsel was ineffective for failing to retain an independent psychologist for purposes of presenting "mitigating evidence." *See* R.-63 at 12, 15-17.[22] Petitioner further stated that the circuit court's dismissal of his claim about counsel's failure to obtain expert psychological assistance for the guilt phase was erroneous for the reasons discussed in the subsequent portion of his brief dealing with his other guilt phase ineffectiveness claims. *Id.* at 17. The Court of Criminal Appeals affirmed the circuit court's exclusion of the testimony of petitioner's psychologist because it agreed with the circuit court's conclusion that petitioner's underlying ineffective assistance claim was without merit, and because petitioner "failed to comply with the circuit court's order to submit

---

[22]   At the evidentiary hearing in the circuit court, he expressly argued that he should be allowed to present the expert testimony of a clinical neuropsychologist to show what counsel should have presented during the sentencing phase of trial. *See* Rule 32 Tr. (R.-60) at 403-04, 406-08, 420-21.

a statement of the experts' expected testimony." *Waldrop*, 987 So. 2d at 1191-93.[23]  On the merit

of the claim, the Court of Criminal Appeals held as follows:

> The transcript of Waldrop's trial shows that a mental evaluation was conducted on Waldrop before trial to determine his mental competency to stand trial and his mental state at the time of the murders.  Waldrop was evaluated by a clinical psychologist.  It was this expert's opinion that Waldrop was competent to stand trial and that he was not suffering from a mental disease at the time that he committed the murders.  The trial record also shows that Waldrop's attorney at trial, Charles Gillenwaters, specifically stated that he was not going to pursue a mental-disease defense, because if he did the State said it was ready to rebut any evidence presented on this claim.  Thus, trial counsel had no reason to retain another psychologist to dispute the first expert's findings.  A postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial.  Counsel is not ineffective for failing to shop around for additional experts.  Counsel is not required to continue looking for experts just because the one he has consulted gave an unfavorable opinion.  Thus, we agree with the court that there was no "material issue of fact or law that would entitle [Waldrop] to relief" on this issue.  Therefore, the court did not err in excluding [petitioner's expert psychologist's] testimony at the Rule 32 hearing.

*Id.* at 1193 (citations and quotations omitted).  Thus, in effect, as with petitioner's claim about

counsel's failure to investigate mental health evidence, the state court determined that he failed to

show counsel's deficient performance in failing to retain an independent psychologist.

---

[23]    In making this determination, the Court of Criminal Appeals ("CCA")may have conflated petitioner's separate guilt and penalty phase ineffective assistance claims concerning counsel's failure to retain a psychological expert.  The claim was ostensibly presented to the CCA as a challenge to the circuit court's failure to allow petitioner's expert psychologist to testify at the Rule 32 evidentiary hearing about the applicability of mitigating circumstances.  The CCA affirmed the circuit court, utilizing the lower court's reasoning as to the guilt phase issue–that petitioner had not stated a viable claim for relief–to deny petitioner's argument about the exclusion of the testimony on penalty phase issues.  *Waldrop*, 987 So. 2d at 1193.  Thus, it is not entirely clear that the CCA intended to address this claim as it relates to the guilt phase.  However, considering that it also is not entirely clear that petitioner intended to present the claim as a guilt phase issue, and further mindful of the deference owed a state court in adjudicating the issues before it, prudence and comity counsel construing the CCA's judgment as affecting both the guilt and penalty phase components of this claim.  *See Harrington*, 133 S.Ct. at 1095-96 ("While it is preferable for an appellate court in a criminal case to list all of the arguments that the court recognizes as having been properly presented, federal courts have no authority to impose mandatory opinion-writing standards on state courts.").  *See also Lee*, 726 F.3d at 1210-12.

In his petition for certiorari review in the Alabama Supreme Court, petitioner distinguished his guilt and penalty phase ineffectiveness claims predicated on counsel's failure to hire an independent psychologist. R.-76 at 11-14. He argued that the lower courts erroneously relied upon the determination that, as a guilt phase claim, the issue lacked merit when deciding whether he was entitled to present the expert's testimony at his Rule 32 evidentiary hearing on his penalty phase claims. *Id.*[24] The remainder of the petition for certiorari deals mostly with petitioner's penalty phase ineffectiveness claim. *See id.* at 22-53. In the subsequent portion of the petition addressing his guilt phase ineffective assistance claims, he argued that the circuit court's summary dismissal of his guilt phase claims violated state law precedents clarifying Rule 32's pleading burdens. *Id.* at 66. Petitioner did not specifically challenge or even discuss the lower courts' treatment of his guilt phase ineffectiveness claim concerning counsel's failure to retain an independent psychological expert. Thus, while petitioner clearly challenged the exclusion of his expert psychologist's testimony on penalty phase ineffective assistance issues, he did not appeal the CCA's judgment to the extent it disposed of his corresponding guilt phase claim, despite what arguably served as judgment on the merits of the claim. Petitioner failed to exhaust, therefore, this claim in the state courts. *Hunt*, 666 F.3d at 729-30. Because he may not now return to the state courts to exhaust the claim, it is procedurally defaulted in federal habeas corpus review. Moreover, because petitioner has not shown

---

[24]   *See also* R.-76 at 18 (citation omitted) (emphasis in original) ("The appeals courts' decision provides no legal basis for barring this patently mitigating evidence. It merely parrots the circuit's order denying on the merits the allegations that counsel was ineffective at the **first phase** for failing to obtain expert assistance on issues related solely to first-phase determinations (namely, whether mental health problems prevented Mr. Waldrop from forming the requisite intent to be convicted of capital murder and from making a knowing and voluntary statement). The record is clear that Mr. Waldrop was not attempting to present expert testimony on first-phase issues at the Rule 32 hearing.").

cause or prejudice for his failure to exhaust the claim, or that he will suffer a fundamental miscarriage of justice if the claim is not adjudicated on its merits, the claim is due to be dismissed as procedurally defaulted.[25]

_____

[25]  Were this claim not subject to procedural default, the court would still deny relief. Based upon a review of the record, the court concludes that petitioner cannot show deficient performance or prejudice on this claim as it relates to the guilt phase. As to deficient performance, which would be reviewed pursuant to the AEDPA given that the CCA decided the claim on that prong, the court cannot conclude that the state court's judgment was unreasonable. The state court recognized the expert opinion evidence which counsel already had respecting petitioner's mental health at the time of the offense and determined that he was not required to go searching for a separate expert who might offer a contrary opinion. Moreover, as this court recounted with respect to petitioner's claim about counsel's investigation of mental health evidence, counsel's strategy was informed by his own recent experiences in a death penalty case in front of Judge Segrest in which he had presented expert mental health evidence, in a case he judged more amenable to that kind of evidence, and had watched as Judge Segrest overrode the jury's recommendation for a life sentence. It thus was not unreasonable for counsel to attempt to establish important evidence about petitioner's ability to form intent through his pharmacology expert. While counsel might have fared better with an independent expert psychologist, reasonable jurists could debate whether any competent counsel would have done the same given the circumstances confronting counsel.

As to prejudice, which this court would review *de novo* because the CCA did not reach that prong of the *Strickland* inquiry, the court finds that there is not a reasonable probability that the result of the guilt phase of trial would have been different had counsel retained an independent psychologist. Petitioner alleges that such an expert "would have testified during the guilt/innocence phase about Mr. Waldrop's inability to form the requisite intent to be convicted of capital murder or to competently and voluntarily waiving [sic] his rights while being interrogated by police[.]" Pet ¶ 83. Indeed, petitioner alleges that counsel should have better developed the theory that he lacked the requisite intent "because intoxication prevented him from forming the intent to kill." *Id.* at ¶ 68. But in order to show that he lacked sufficient intent due to his voluntary intoxication, petitioner would have had to show that his voluntary intoxication was so severe that it amounted to insanity. *See Ex parte McWhorter*, 781 So. 2d 330, 340-41 (Ala. 2000). Nothing in the record or the petition and petitioner's briefs indicates that petitioner could have satisfied this rigorous requirement. The petition does not posit any other theory under which he might have negated the intent element of capital murder with the aid of an independent psychological expert. Moreover, the expert psychologist petitioner retained in Rule 32 proceedings does not unequivocally opine that petitioner was incapable of forming the intent to commit murder. *See* Rule 32 C.R. at 351-57. While the expert clearly opines about the applicability of certain statutory mitigating circumstances based upon petitioner's mental state at the time of the offense, his affidavit does not speak with the same force about petitioner's ability to form intent as a legal matter. Rather, his observations about petitioner's intent are more vague and general. He opines that petitioner had "diminished" "cognitive functioning and self-control of behavior," an "overwhelmed" "capacity to control emotions and behavior," and that he "lacked the cognitive resources to constrain his behavior." *Id.* Nor does the expert opine that petitioner was incapable of voluntarily submitting to questioning after his arrest. He only states that petitioner was "distraught and emotional and unable to withhold information," but that he "answered every question posed by the interviewer, was not evasive, and

(continued...)

55

### b.    *Failure to investigate and prepare for the penalty phase of trial*

Petitioner's lengthiest claim concerns counsel's alleged ineffectiveness with respect to his investigation and preparation for the penalty phase of trial.  He faults counsel for failing to, *inter alia*, hire an "investigator, mitigation specialist, or social worker to obtain a family or social history," obtain important "medical, educational, divorce, or social history records," interview people other than petitioner and his mother, "assemble a defense team, obtain co-counsel, or seek assistance from a mental health expert," further investigate leads uncovered by his meager investigation, and prepare for the judicial sentencing hearing after he obtained the jury's recommendation for a life sentence. Pet. ¶¶ 72-74.

Petitioner claims that a wealth of mitigation evidence was left unused or undiscovered due to counsel's insufficient investigation and preparation for the penalty phase.  The court need not, for present purposes, recite all of the mitigation evidence petitioner argues should have been presented at the penalty phase.  Petitioner has ably recounted the evidence in his briefing in this court, *see* Pet'r's Br. (Doc. # 44) at 55-76, as well as in his briefing in the state courts in support of this claim, all of which the court has reviewed extensively.  The federal habeas petition summarizes this evidence as follows:

> 76.    The jury or sentencing judge should have learned that Bobby Waldrop experienced a nightmarish childhood characterized by physical and emotional abuse, violence perpetrated by and among family members, neglect and abandonment, his mother's infidelity and suicide attempts, poverty, and a family history and environment that left him uniquely vulnerable to addiction.  In spite of the factors set against him, Bobby Waldrop started working at an early age to help his family

---

[25](...continued)

demonstrated appropriate emotional response." *Id.* at 356.  Based upon this record, the court cannot conclude that petitioner could show prejudice due to counsel's failure to retain an independent psychologist for use at the guilt phase of trial.

purchase food and was a hard worker and respectful student who was active in church and nursed his beloved grandparents.  A series of crises overwhelmed Bobby's limited capacity to cope - he spiraled into depression and began using crack cocaine after his wife lost their baby, the couple's belongings burned right before his eyes, and, for the first time, he was arrested and taken to jail.  By Christmas 1997, just prior to the offense, he was gaunt and unrecognizable to his own mother - he was not himself at all. [. . .]

77.    Counsel failed to discover or present readily available mitigating evidence about Bobby's mother, her treatment of him, her multiple suicide attempts, her sexual indiscretions and their effect on her family, and her illegal, violent behavior.  Trial counsel failed utterly to discover and present available mitigating evidence about the nightmarish violence and abuse that characterized Bobby's family and life history, including the fact that Bobby's mother held him and his sister at gunpoint and threatened to kill them.

78.    Trial counsel failed to discover and present readily available mitigating evidence that Bobby's addiction was the product of genetics and a tragic, neglectful environment.  Counsel presented no evidence about the causes of Mr. Waldrop's cocaine addiction.  Readily available evidence shows that Bobby became addicted while reeling from a series of traumatic events, including his wife's miscarriage of their baby, with which he could not otherwise cope.

79.    Trial counsel failed to discover readily available evidence about Bobby Waldrop's generous character in the face of hardship, ability to do well in structured environments, and caring behavior towards his grandparents.  Trial counsel did not present testimony from Bobby's family members or friends about their close and loving relationships with him.

Pet. ¶¶ 76-79 (citations omitted).  Petitioner concludes that counsel's

failure to conduct a reasonable and complete investigation and to present powerful mitigating evidence that would have convinced the sentencer to sentence Bobby Waldrop to life without parole in accordance with the jury's recommendation denied Mr. Waldrop his right to effective assistance of counsel and a reliable sentencing proceeding as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  The state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent.

*Id.* at ¶ 81.

Respondents contend that, to the extent petitioner's claim is predicated on his allegations about counsel's failure to investigate mental health evidence or retain an independent psychologist for use at the penalty phase and failure to hire a social worker to prepare a social history in advance of the penalty phase, the claim is procedurally barred because these allegations were not raised in petitioner's appeal of the denial of his Rule 32 petition.  Resp.'s Br. (Doc. # 41) at 15-18.  In all other respects, respondents argue, petitioner is not entitled to relief because the CCA's adjudication of his claim is not contrary to, and does not involve an unreasonable application of, clearly established federal law, and is not based upon an unreasonable factual determination in light of the record before the state courts.  Resps.' Reply (Doc. # 50) at 34-55.  The court will first examine respondents' procedural default argument.

### i.    Procedural default

Respondents contend that petitioner's allegations respecting counsel's failure to sufficiently investigate mental health evidence, retain an independent psychologist, and hire a social worker in preparation for the penalty phase are procedurally defaulted because they were not raised in petitioner's appeal of the circuit court's denial of his Rule 32 petition.  Resp.'s Br. (Doc. # 41) at 15-18.  Petitioner raised these claims in his appeal of the denial of his Rule 32 petition.  Under the heading "Counsel's Investigation was Deficient" in his brief before the Court of Criminal Appeals, petitioner faulted counsel for failing to "engage an investigator, mitigation specialist, or social worker to obtain a family or social history even though the circuit court granted funds" and for failing to "seek the assistance of a defense mental health expert" for purposes of presenting mitigation evidence.  R.-63 at 25-26.  The brief describes much of the evidence proper investigation and utilization of these sources would have allowed counsel to present in the penalty phase.  *Id.* at

58

29-54. The Court of Criminal Appeals concluded that the circuit court's exclusion of testimony by petitioner's expert witnesses, a social worker and a neuropsychologist, was not erroneous because petitioner's claim that counsel was ineffective for retaining a psychologist was without merit and the testimony he would have offered through his social worker was cumulative of the testimony of his other witnesses. *Waldrop* 987 So. 2d at 1193. The Court of Criminal Appeals also determined that counsel was not ineffective for failing to present much of the evidence that would have been cultivated and explained by an expert social worker and neuropsycholgist, including evidence about petitioner's family history of abuse and neglect, genetic predisposition to substance abuse and addiction, and the effects of his addiction on his actions because petitioner could not show prejudice. *Id.* at 1194-1202. Petitioner presented these same claims in his petition for certiorari review in the Alabama Supreme Court. *See* R.-67 at 26-27, 29-48. Accordingly, the court finds that, because petitioner presented his penalty phase ineffectiveness claims related to counsels' failure to hire a social worker, investigate mental health evidence, and retain an independent psychologist in the state courts and, indeed, exhausted those claims, the claims are not procedurally defaulted from review in federal habeas corpus.

### ii.  Application of § 2254(d) or *de novo* merits review

As the court has determined that no portion of this claim is procedurally defaulted and respondents concede that the remainder of petitioner's penalty phase investigation and preparation claim was exhausted and decided on its merits in the state courts, the court must review the Court of Criminal Appeals' decision pursuant to the AEDPA. The court will first summarize the state court's decision and then discuss the petitioner's specific arguments about the application of § 2254(d).

**(a)        The Court of Criminal Appeals' Decision**

In denying this claim, the CCA first articulated the *Strickland* standard and, in pertinent part, correctly recited the prejudice inquiry as it is set out in *Wiggins v. Smith*, 539 U.S. 510 (2003). *Waldrop*, 987 So. 2d at 1194-95. The CCA then examined, apart from petitioner's allegations about what counsel failed to do, all of the things counsel affirmatively did in preparation for the penalty phase of trial, including speaking with petitioner, his mother, one of his sisters, and his employer, examining petitioner's prison records, attending portions of petitioner's co-defendant's trial and obtaining a transcript of the trial, and retaining Dr. Tackett "to testify about the effects of cocaine addiction." *Id.* at 1195. The CCA noted counsel's belief, as expressed at the evidentiary hearing, that, after reviewing the evidence and speaking with petitioner, his best hope to avoid a death sentence was to explain and emphasize how petitioner's addiction motivated his actions. *Id.* at 1196. Thus, although counsel argued before the jury that other mitigating circumstances were applicable, including that petitioner was "'from a broken family, his age, and the fact that he had no prior criminal record[,]'" *id.*, counsel limited his presentation on those issues because he believed the fact that petitioner so violently killed his grandparents–whom had often provided him with a sort of refuge from the dysfunction and iniquities of his own parents–would likely militate against any feelings of sympathy for petitioner. Rather, counsel believed that "'cocaine addiction was the strongest mitigator that [he] should focus on,'" and he therefore sought to persuasively explain that circumstance to the jury by, *inter alia*, presenting the expert testimony commended to him by SCHR. *Id.* The CCA summarized counsel's presentation of mitigating evidence during both phases of trial:

> "Although Petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact." *Chandler v. United States*, 218 F.3d 1305, 1320 (11th Cir. 2000). A review of the record shows that at the guilt

phase [counsel] called Waldrop's mother and several other witnesses to testify. Waldrop's mother said that she had had Waldrop when she was 14 years old, that she did not know how to care for a child, that Waldrop's father was not responsible, and that Waldrop lived the majority of his life with her parents, the victims.

At the sentencing hearing, [counsel] asserted that Waldrop had no significant history of criminal activity, that Waldrop had been under the influence of cocaine when he committed the murders, that he could not appreciate the criminality of his actions, that he was only 19 years of age at the time of the murders, that he came from a broken home, that he worked well with others, and that he was remorseful for his actions.

Dr. Tackett testified at sentencing that the use of crack cocaine changes a person's brain chemistry and that it was his opinion that Waldrop was on cocaine when he committed the murders. He said that Waldrop was suffering extreme mental or emotional disturbance at the time of the murders because of his addiction to cocaine. Bobby Waldrop testified at sentencing that at the time of the murders he was under the influence of cocaine and heroin. The following occurred:

> "[Defense counsel]: Why did you kill them?
> "[Waldrop]: On account of the drugs I was using. I love my grandparents very much and at that time I was on these drugs—I mean I was not—I wasn't the person that I am now. I mean, it was like this was all I cared about. I didn't care about my family. I didn't care about my wife. I didn't care if I hurt myself or anybody else."

(R. 1030.) Sheriff Jeff Fuller also testified that he was responsible for the Randolph County jail and that for the four months Waldrop had been in jail awaiting trial Waldrop had caused no problems.

*Id.* at 1196-97.

After reviewing counsel's investigation and presentation of mitigating evidence at trial, the

CCA evaluated whether the additional evidence petitioner presented during the Rule 32 evidentiary

hearing in the circuit court established prejudice. The CCA quoted from the circuit court's findings

of fact respecting the value of this evidence. *Id.* at 1197-1200. For the most part, the circuit court

found the evidence alluded to in ¶¶ 76-79 of the petition and meticulously detailed in petitioner's

briefing uncorroborated, incredible, irrelevant, unpersuasive, or insufficiently compelling to

undermine confidence in the outcome of petitioner's sentencing.  Moreover, the CCA, by way of the

circuit court, questioned whether, had counsel presented the mitigation case offered by petitioner

during Rule 32 proceedings, the jury might have still recommended a life sentence.

> "If [counsel] had presented the testimony that Mr. Waldrop offered at the Rule 32
> evidentiary hearing it is conceivable to this Court that the jury would have lost the
> significance of the cocaine addiction and become angered that Mr. Waldrop was
> trying to blame his actions on one of the deceased victims (Sherrell Prestridge), his
> mother, his father, or his 'family's history' of alcohol and drug use.   Thus,
> [counsel's] strategic decision to focus on his 'strongest jury argument' was not
> unreasonable and was effective with the jury.  Based on the evidence produced at the
> hearing, [counsel] had discovered most of the information that Mr. Waldrop claims
> he did not have and therefore his investigation was not unreasonable. It is this
> Court's opinion that Mr. Gillenwaters acted reasonably and that the result of Mr.
> Waldrop's trial would not have been different."

*Waldrop*, 987 So. 2d  at 1200.  The CCA accordingly adopted the circuit court's findings of fact in

concluding that petitioner was not prejudiced.

> The circuit court's findings are supported by the record, and we adopt them as part
> of this opinion.  Few witnesses at the evidentiary hearing offered any negative insight
> into Waldrop's upbringing except his mother.   The majority of her testimony
> consisted of detailing the abuse that she had suffered at the hands of her father, one
> of the victims, and her husband.  Furthermore . . . it is conceivable that evidence of
> an abusive childhood environment would have hurt Waldrop given that he was
> charged with killing his grandparents—the two people who were his primary
> caregivers during his childhood.

*Id.*

Having surveyed counsel's investigation and preparation for the penalty phase and adopted

the circuit court's findings on prejudice, the Court of Criminal Appeals next distinguished

petitioner's case from *Wiggins*, upon which petitioner had relied in challenging counsel's penalty

phase investigation.  The court held that, unlike in *Wiggins*, in this case counsel "conducted a

reasonable investigation and chose not to concentrate on Waldrop's childhood.  However some

evidence of Waldrop's childhood was introduced at trial.  This case is distinguishable from *Wiggins*, and that case does not mandate reversal."  *Waldrop*, 987 So. 2d at 1201.  Ultimately, the Court of Criminal Appeals concluded as follows:

> Clearly, this is not a case where counsel failed to investigate, a case where counsel was ignorant of what evidence could be presented in mitigation, or a case where counsel presented no mitigation evidence. [Counsel] was also aware that the sentencing judge, the same judge who had sentenced Waldrop's wife for the murders, had evidence of Clara Waldrop's abusive childhood and stated in his sentencing order that he afforded it little weight.[] [Counsel] made a reasoned strategic decision to portray Waldrop as the victim of his cocaine addiction.  This defense was so effective that the jury recommended that Waldrop be sentenced to life imprisonment with the possibility of parole.  Under the unique circumstances of this case, we hold that [counsel]'s performance was not ineffective and that the court correctly denied relief on this claim.

*Id.* at 1202 (footnote omitted).  Accordingly, the CCA determined that counsel's performance was not deficient and that petitioner was not prejudiced by counsel's investigation and preparation for the penalty phase.

> ### (b)      Petitioner's arguments about the Court of Criminal Appeals' application of *Strickland*'s deficient Performance and prejudice prongs

Petitioner contends that the Court of Criminal Appeals' decision is contrary to, and an unreasonable application of, clearly established federal law.  Pet. ¶ 81; Pet'r's Br. (Doc. # 44) at 46, 88 (as to deficient performance) and 94 (as to prejudice).  On counsel's performance, petitioner portrays the Court of Criminal Appeals' decision as holding that "because counsel had *some* information about Bobby Waldrop's background, he therefore 'conducted a reasonable investigation' and 'made a reasoned strategic decision' to exclusively 'portray Waldrop as the victim of his cocaine addiction.'"  Pet'r's Br. (Doc. # 44) at 79 (emphasis in original).  He argues that, "[i]n holding that defense counsel in a capital trial provides effective assistance as guaranteed by the Sixth Amendment

so long as he learns *some* information about the defendant's background and presents *some* evidence at the penalty phase," the state court's decision is contrary to and an unreasonable application of numerous Supreme Court precedents which hold generally that counsel are not insulated from a finding of ineffectiveness merely because counsel performed a cursory investigation and presented some evidence during the penalty phase. *Id.* at 80 (emphasis in original). Petitioner also argues that the state court's decision is contrary to, or an unreasonable application of, *Strickland* and its progeny because it tacitly approves of counsel's admission that he did little or nothing to prepare for the judicial sentencing hearing following the jury's recommendation of a life sentence. *Id.* at 85-86. Petitioner describes counsel's conduct in this regard as a "total abdication of his duty to his client." *Id.* at 86. Finally, petitioner argues that the state court's decision was contrary to and unreasonably applied *Strickland* because it relied upon counsel's testimony that petitioner never informed him of any abuse from his childhood in finding that counsel made a reasonable strategic decision not to further investigate petitioner's background. *Id.* at 86-87. Petitioner concludes his argument about counsel's deficient performance as follows:

> The Alabama Court of Criminal Appeals's decision focusing entirely on counsel's decision not to present additional mitigating evidence at sentencing, and failing to address whether counsel's investigation was adequate under prevailing professional norms, is contrary to and an unreasonable application of *Strickland*. Trial counsel abandoned his investigation at an unreasonable point, particularly in light of the information about Bobby's background that was known to counsel. By simply assuming that trial counsel's investigation was adequate, without considering the reasonableness of counsel's decision to limit the scope of their inquiry, the Alabama court unreasonably applied *Strickland*.

*Id.* at 87-88 (citations and internal quotations omitted).

Ultimately, the court need not determine whether the Court of Criminal Appeals' judgment that counsel did not perform deficiently is contrary to, or involved an unreasonable application of,

clearly established federal law, or whether it was based upon an unreasonable determination of the facts in light of the evidence before the state courts.  Even assuming that the CCA's judgment about counsel's performance is unreasonable, the court finds that the state court's judgment that petitioner was not prejudiced by counsel's performance is not contrary to, or an unreasonable application of, clearly established federal law.  On the issue of prejudice, petitioner contends that he is entitled to habeas corpus relief because

> the state court unreasonably discounted mitigating evidence because it was presented through family member witnesses, speculated that evidence about Bobby Waldrop's disadvantaged and abusive background was not mitigating because the victims in this case were his grandparents, weighed *against* a finding of prejudice the jury's life verdict, failed to evaluate prejudice using the reasonable sentencer standard, and failed to consider the totality of the relevant mitigating evidence to determine whether there is a reasonable probability that a reasonable sentencer would have sentenced Bobby Waldrop to life instead of death.

Pet'r's Br. (Doc. # 44) at 88 (emphasis in original).  The court will examine each of these points in evaluating the state court's judgment pursuant to § 2254(d).

### (c)    Application of § 2254(d) to the state court's analysis of prejudice

Petitioner's first argument is that the Court of Criminal Appeals, by virtue of adopting the circuit court's findings of fact, unreasonably found that he had "failed to prove any additional mitigating circumstances at the Rule 32 hearing" because the court did not fully "credit the testimony of family members because they are related to Bobby[.]" Pet'r's Br. (Doc. # 44) at 88-89.  He argues that "[e]very major Supreme Court decision addressing a claim of ineffectiveness at the penalty phase relies on the testimony of the defendant's family members, especially to prove facts about the defendant's childhood (such as abuse, neglect, and domestic violence) that are unlikely to be provable through non-family witnesses who are not privy to what happens inside a family's home."

*Id.* at 89.  Petitioner also points to other evidence, including the testimony of non-family witnesses, the proffered testimony of his two experts, and "over 350 pages of documentary evidence, all of which established a considerable amount of mitigation that was never rebutted by the State." *Id.* at 89-90.  He maintains that the family member testimony "discredited" by the state courts "was corroborated by other witnesses who testified about the frequent police calls to the Waldrop household, seeing bruises on Bobby and his siblings, and witnessing criminally violent behavior by Bobby's parents." *Id.* at 90.

Petitioner's first argument is flawed in several respects.  To begin with, petitioner exaggerates the extent to which the state courts discredited the testimony of his family member witnesses.  Petitioner cites to a single sentence in the entirety of the CCA's opinion to support his contention that the state courts "refus[ed] to credit the testimony of family members because they are related to Bobby[.]" *See id.* at 89.  That sentence, which is found in one of the portions of the opinion in which the CCA is quoting from the circuit court's order, reads as follows: "'Regardless, the Court did not find Mrs. Irelan's testimony credible on this issue.  She clearly has an interest in the outcome of this hearing–Mr. Waldrop is her son and she already lost her parents.'" *Waldrop*, 987 So. 2d at 1197-98.  What petitioner omits is that the state court's credibility "finding" on "this issue" is preceded by the court's discussion of petitioner's allegation that counsel failed to introduce evidence that petitioner's grandfather–Mrs. Irelan's father and one of the victims–"'beat her on many occasions, even while [she was] pregnant.'" *Id.* at 1197.  In questioning the reliability of this portion of Mrs. Irelan's testimony, the state court did not somehow refuse to credit the entirety of the testimony of petitioner's family member witnesses, including the remaining aspects of Mrs. Irelan's testimony.  The court did not, for example, question the veracity of any testimony about Mrs. Irelan's

adultery or promiscuity, her violent outbursts against others, her suicide attempts, or whether petitioner loved and was loved by his grandparents, all of which were important points in petitioner's case during Rule 32 proceedings, and much of which was established by the testimony of petitioner's family members.  Elsewhere, the court questioned the relevance of testimony about the violence inflicted on petitioner's family members, but not the credibility of the witnesses.  *See id.* at 1198.

A closer review of the decision indicates that the state court's trepidation on this point is the reasonable product of the state court's obligation to balance competing interests when assessing credibility.  While petitioner is indisputably correct that the testimony of family members is often the crux of any effort to establish the unpleasant facets of a person's childhood and family history for mitigation purposes, courts are not required to accept all such testimony without scrutiny.  The CCA's opinion reflects the circuit court's searching on this point, not merely a categorical rejection of the testimony of *all* of petitioner's family member witnesses, when it questions why petitioner offered little to nothing to corroborate Mrs. Irelan's testimony about the very serious abuse she claims she suffered at the hands of her father.   In the sentences immediately succeeding the credibility finding cited by petitioner, the CCA, by way of the circuit court, remarked as follows:

> Mr. Waldrop's own witness, the Prestridges' and Waldrop's neighbor, Phyllis Lipham, testified that she never saw Mr. Prestridge hit his children.  Mr. Waldrop did not produce any corroborating documents of Mrs. Irelan's claim that she lost a baby after one of the alleged beatings or her claim that a teacher observed blood on her dress while at school.  Additionally, Mr. Waldrop did not call to testify Mrs. Irelan's two sisters who were present in court the day of the hearing and on his witness list, one of whom Mrs. Irelan also testified, was also 'beat' by their father to corroborate Mrs. Irelan's testimony.

*Id.* at 1198.  Thus, to the extent the state courts made any explicit credibility determination against his family member witnesses, it related to the much narrower issue of whether the victim, Mr.

Prestridge, so severely and regularly beat his children, including petitioner's mother, to the point that he terminated Mrs. Irelan's pregnancy and left her with noticeable bruising and wounds that openly bled even while Mrs. Irelan was at school.  And even to that extent, the state courts' findings are reasonable given that petitioner failed to offer the sort of corroborating evidence one might reasonably expect to support the allegations.  In this case, the court finds it particularly salient that Mrs. Irelan's siblings, including Nancy Rostofer, who was also allegedly subject to beatings by Mr. Prestridge, *see* Rule 32 Tr. (R.-60) at 354-55, did not corroborate her testimony.  The testimony of another family member who experienced Mr. Prestridge's beatings, but was not also as objectively motivated to support petitioner's case as was his mother, would have been especially powerful evidence in support of petitioner's allegations about Mr. Prestridge.  The state courts did not act unreasonably in questioning Mrs. Irelan's credibility due to the omission of such evidence.

Petitioner's first argument is also undermined by his specious assertion that the state courts overlooked the purported corroboration of the testimony of his family members by other, non-related witnesses.  Petitioner points to three such examples, arguing that non-family witnesses testified about "the frequent police calls to the Waldrop household," "seeing bruises on Bobby and his siblings," and "witnessing criminally violent behavior by Bobby's parents."  Pet'r's Br. (Doc. # 44) at 90. However, the corroboration described by petitioner is not as conclusive or as probative as he portrays it to be.  For example, petitioner points to the testimony of the Prestridges' neighbor, Phyllis Lipham, about "the frequent police calls to the Waldrop household," supposedly as corroboration of unspecified portions of his family members' testimonies about violence perpetrated by petitioner's family members.  First, to the extent a distinction need be drawn here, Mrs. Lipham was asked about her observations of the Prestridges' home, not "the Waldrop household."  Although her subsequent

68

testimony makes clear that the Waldrops lived in a trailer very near the Prestridges' home, *see* Rule 32 Tr. (R.-60) at 234-35, it is important to recognize that Mrs. Lipham did not testify specifically that she had seen police visiting "the Waldrop household."  In any event, Mrs. Lipham simply testified that she had never seen a fight or "conflict" occur at the Prestridges' home, but that she would sometimes hear some sort of commotion emanating from the Prestridges' and would sometimes see law enforcement going out to visit.  *Id.* at 228-29.  Mrs. Lipham's testimony is not related temporally by petitioner to any of the specific events described in the petition.  As to the frequency of law enforcement visits, she testified that they occurred "[s]ometimes pretty often.  Sometimes it would be a couple times a week."  *Id.* at 229.  She thought the visits might have been more frequent on Friday and Saturday nights, but could not remember because it had been so long.  *Id.* at 230.  Thus, her testimony about police visits was vague at best and, even if indicative of recurrent problems at the Prestridge household, is of limited use in assessing the value of petitioner's specific allegations of violence by his family members that he observed or experienced.  More importantly, her testimony in no way corroborates the specific allegations about Mr. Prestridge's beatings of petitioner's mother that the state courts found incredible.

Petitioner also points to Mrs. Lipham's testimony about "seeing bruises on Bobby and his siblings" as supposed corroboration of his family members' testimony about abuse he and his siblings endured.  However, Mrs. Lipham's testimony on this point is equivocal at most and, more reasonably construed, offers little of the corroboration claimed by petitioner.  Mrs. Lipham testified that she never observed fights or conflicts at the Prestridges' home (*id.* at 228), that the Waldrop children always appeared nourished and clothed (*id.* at 258), and that she never saw any signs of abuse or beatings on the Waldrop children (*id.* at 258).  When asked specifically about her

69

observation of bruises on the Waldrop children, she testified as follows: "I never saw any, nothing other than the normal childhood play.  You know, kids get out in the yard and play, and they're going to get a few knocks and bruises."  *Id.* at 258.  Thus, Mrs. Lipham, who testified that she saw the Waldrop children a good bit when they were younger (*id.* at 257), clearly saw no signs of abuse or neglect on the children and attributed the minor "knocks and bruises" she may have observed to ordinary "childhood play" in the yard, not abuse by petitioner's parents, grandfather, or other relatives.  Mrs. Lipham's testimony simply does not provide the sort of unequivocal corroboration for which petitioner offers it, and it in no way corroborates his specific allegations about Mr. Prestridge's alleged abuse of petitioner's mother and others.

Finally, petitioner points to the testimony of Johnny Morrison as corroboration for other family members' testimony about "witnessing criminally violent behavior by Bobby's parents."  Mr. Morrison testified that he was shot by petitioner's mother when he was attempting to move a trailer onto property near the Prestridges' home.  *Id.* at 102-04.  While Mr. Morrison's testimony certainly corroborates one particularly egregious act of violence by petitioner's mother, it does not corroborate any of petitioner's other allegations or family witness testimonies about other violent acts by petitioner's mother, much less violent acts by his father or Mr. Prestridge.  Furthermore, as noted above, the state courts did not find any of petitioner's allegations about violent acts by his mother incredible.  Rather, the state courts simply found Mrs. Irelan's testimony about severe beatings inflicted by her father incredible.  Thus, the corroboration offered by Mr. Morrison is of little use in judging the reasonableness of the state court's credibility judgment as to Mrs. Irelan's testimony.

For all of the foregoing reasons, petitioner's claim that the state court unreasonably discredited all of the testimony of his family members is unfounded.  While the state court certainly

found much of the testimony of limited relevance or persuasive value, petitioner has failed to show that the state court acted unreasonably in the narrow instance in which it found Mrs. Irelan's testimony about beatings inflicted on her and her siblings by her father incredible.

Petitioner's second argument in support of his claim that the state courts unreasonably resolved the prejudice inquiry is that "the state court unreasonably discounted all evidence about Bobby's abusive and neglectful childhood based on speculation" that such evidence would have backfired against petitioner because he killed his grandparents, the two persons who often provided for him when his parents were unable to do so. Pet'r's Br. (Doc. # 44) at 90-91. He argues this "points up the state court's failure to consider the totality of the evidence in evaluating prejudice, but also conflicts with Supreme Court precedent" which has found state court decisions unreasonable for disregarding evidence about a petitioner's abusive childhood where such evidence might have offered some insight about the defendant's relationship with the victim. *Id.* at 91. He further argues that "[c]ompetent counsel should have used evidence that Bobby grew up in a family that habitually used extreme violence against each other in response to conflict and stress to help the jury understand Bobby and his acts, which horrified no one so much as Bobby himself." *Id.* at 91.

In speculating about whether, considering his victims, petitioner's mitigation case could have been damaged had counsel offered the childhood abuse and neglect evidence adduced at the Rule 32 hearing, the CCA did not unreasonably "discount" all such evidence, as argued by petitioner. Indeed, by the time the court engaged in the "speculation" challenged by petitioner, it had already endorsed and adopted the circuit court's finding that much of petitioner's childhood abuse and neglect evidence was not "'particularly credible or relevant.'" *Waldrop*, 987 So. 2d at 1199. Thus, the CCA's "speculation" about whether, considering its limited probative value, presenting more of

71

the childhood abuse and neglect evidence would have ultimately benefitted petitioner because of the identity of his victims was not the basis for the court's credibility and relevance findings about that evidence.[26]   The record does not support any contention that the CCA discounted petitioner's mitigating evidence due only to the fact that his victims were his grandparents.[27]

_____

[26]  Importantly, the CCA had already adopted the circuit court's finding that, considering that counsel succeeded in obtaining a life recommendation from the jury, had counsel "presented the testimony that Mr. Waldrop offered at the Rule 32 evidentiary hearing[,] it is conceivable to this Court that the jury would have lost the significance of the cocaine addiction evidence," which counsel perceived as his best jury argument in mitigation.  *Waldrop*, 987 So. 2d  at 1199-1200.

[27]  Nor can the court conclude that any speculation by the state court about the possibility that petitioner's childhood abuse and neglect evidence could have worked as a "double-edged sword" was unreasonable.  The CCA remarked that it was "conceivable" that presenting the childhood abuse and neglect evidence could have backfired because, although petitioner had presented little to no evidence about suffering violence or abuse at their hands, he gruesomely murdered his grandparents.  The evidence adduced in post-conviction proceedings overwhelmingly allocated any blame for petitioner's hardships to his parents.  Indeed, the evidence mostly indicated that petitioner's grandparents provided important nurturing and resources to him throughout his life.  Given these circumstances, it was reasonable to speculate that evidence of petitioner's difficult childhood, mitigated as it was by the considerable evidence of petitioner's grandparents' substantial role in balancing his own parents' failings, might conceivably have angered the jury and distracted from the substance abuse evidence, which counsel reasonably considered his strongest point of mitigation.

  Petitioner asserts that "[c]ompetent counsel should have used evidence that Bobby grew up in a family that habitually used extreme violence against each other in response to conflict and stress to help the jury understand Bobby and his acts, which horrified no one so much as Bobby himself."  Pet'r's Br. (Doc. # 44) at 91.  He reasons that this sort of evidence "is not the type of damaging evidence that counsel could reasonably decide not to present, such as evidence of other crimes committed by the defendant."  *Id.* However, even accepting that evidence of petitioner's family background could be generally mitigating and not objectively damaging to his case, it is reasonable to speculate that in the unique context of this case counsel might have feared the jury would not have connected any "evidence that Bobby grew up in a family that habitually used extreme violence against each other in response to conflict and stress" to his actions.

  Petitioner's manifestation of the "extreme violence" he argues characterizes his family was more gruesome, senseless, and overwhelmingly disproportionate to any act of violence he alleges has been committed by any of his other family members, even considering that his mother once shot a man.  Moreover, there is scant evidence that petitioner's violent actions were the result of any "conflict or stress" involving his grandparents.  Rather, as petitioner's own statement made clear, he killed his grandparents because he wanted their money so he could buy drugs.  *See* R.-2 at 182-83 (petitioner's statement) ("Papa and I got to fussing about me borrowing some money and I was so high *and I knew he was on a monthly income.*  I went into the kitchen and got the knife and came back Papa pushed me and he saw the knife and that's when I
(continued...)

Petitioner's third argument in support of his claim that the state courts unreasonably decided the prejudice prong of his penalty phase ineffectiveness claim is that the state courts "weighed *against* a finding of prejudice the jury's 10-2 verdict for life."  Pet'r's Br. (Doc. # 44) at 92.  He argues this "weighing" "is contrary to and an unreasonable application of *Strickland*, which makes clear that, in assessing prejudice, the reviewing court must acknowledge that a 'verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'"  *Id.* (quoting *Strickland*, 466 U.S. at 696).  Petitioner apparently construes the jury's recommendation of a life sentence as indicating that the trial judge's ultimate verdict of death lacks substantial support in the record and that, therefore, the failure to present the mitigating evidence he offered during Rule 32 proceedings "'*weighs heavily in favor of a finding of prejudice.*'"  *Id.* (quoting *Williams v. Allen*, 542 F.3d 1326, 1343 (11th Cir. 2008)) (emphasis petitioner's).

The court finds petitioner's argument unavailing.  At the outset, the court notes that petitioner's apparent premise–that a jury recommendation of life necessarily weighs in favor of a finding of prejudice–is logically flawed and is not reflexively applied by the Eleventh Circuit.  *See Lee*, 726 F.3d at 1196 ("Indeed, the fact that the jury recommended life imprisonment counsels

---

[27](...continued)
swung the knife at his throat and he started to bleed from the throat real bad.") (emphasis supplied). Confronted with the practical reality of these blunt facts–and charged with trying to persuade a jury to vote to spare his client's life–counsel unsurprisingly, and reasonably, determined that, in order to "help the jury understand Bobby and his acts," he should focus his case on showing the jury how petitioner's addiction controlled and compelled his behavior.  Counsel certainly could have presented more evidence about how petitioner's family often resorted to violent outbursts "in response to conflicts and stress."  Such evidence might even have "help[ed] the jury understand Bobby" and sympathize with him as a person.  But given the unique intimacy and violence of petitioner's actions, it is questionable whether such evidence would have appreciably helped the jury to understand why he stabbed and sliced his grandparents to death.

against a determination that Lee was prejudiced under *Strickland*.").  The jury's life recommendation in this case does not necessarily entail that the purportedly meager childhood and family background evidence offered by counsel at trial was sufficiently compelling that, had counsel only presented more evidence of that ilk, there is a reasonable probability that the jury's life recommendation would have been unanimous or that the trial judge would have accepted the jury's recommendation rather than imposing a death sentence.  The jury's life recommendation just as easily may–and more likely does–reflect that counsel's focus on presenting petitioner's drug addiction as mitigation was persuasive to the jury.

Even setting aside *Lee* and any inherent logical fallacies, however, petitioner does not explain how the state court purportedly determined that the jury's life recommendation precluded a finding of prejudice.  Nor does he provide a quotation from the Court of Criminal Appeals demonstrating the unreasonable "weighing" he attributes to the state courts.  Rather, he merely provides a citation to a single page of the CCA's opinion.  *See* Pet'r's Br. (Doc. # 44) at 92 (citing *Waldrop*, 987 So. 2d at 1202).  In the cited portion of the CCA's opinion, the state court is discussing petitioner's argument on appeal that "he is entitled to a new sentencing hearing" pursuant to a prior CCA decision, *Harris v. State*, 947 So. 2d 1079 (Ala. Crim. App. 2004), in which the CCA "held that counsel was ineffective for failing to investigate Harris's background to obtain mitigation evidence" where Harris's counsel instead "relied on 'residual doubt,' which . . . is not a mitigating circumstance, even though counsel had an abundance of mitigating evidence that he failed to discover and present."  *Waldrop*, 987 So. 2d at 1201-02 (citing *Harris*, 947 So. 2d at 1079 ).  In concluding that petitioner was not entitled to a new sentencing hearing under *Harris*, the CCA remarked that "this is not a case where counsel failed to investigate, a case where counsel was

74

ignorant of what evidence could be presented in mitigation, or a case where counsel presented no mitigation evidence." *Id.* at 1202. In addition, the CCA recognized counsel's judgment that, considering that the trial judge had afforded little weight to evidence of petitioner's co-defendant's "abusive childhood" when offered during her penalty phase case, counsel's best argument in mitigation was to focus on his addiction evidence. The Court of Criminal Appeals concluded as follows:

> Gillenwaters made a reasoned strategic decision to portray Waldrop as the victim of his cocaine addiction. *This defense was so effective that the jury recommended that Waldrop be sentenced to life imprisonment with the possibility of parole.* Under the unique circumstances of this case, we hold that Gillenwaters's performance was not ineffective and that the court correctly denied relief on this claim.

*Id.* (emphasis supplied).

This court does not imbue this passage of the CCA's opinion with the same significance as petitioner. First, it is evident that the point of the section of the CCA's opinion that petitioner cites was merely to contrast petitioner's counsel's *performance* with that of the attorneys in *Harris*. *See id.* (considering that counsel performed some investigation, was not wholly ignorant of available mitigation evidence, and presented some mitigation evidence, "we hold that Gillenwaters's performance was not ineffective"). The CCA was not specifically rendering any findings on the issue of prejudice. The CCA decided that issue earlier in its opinion when it quoted extensively from and approved of the circuit court's findings that petitioner had failed to provide any especially credible or relevant mitigation evidence during the Rule 32 proceedings. *Id.* at 1199-1200. The Court simply observed that the reasonable strategic decision it attributed to counsel was objectively successful before the jury. Up to that point, the entire purpose of the passage had been to distinguish petitioner's counsel's actions from the attorneys in *Harris*, who, rather than investigating and

preparing to present copious and available mitigation evidence, oriented their strategy on arguing residual doubt, which "is not a mitigating circumstance." By contrast, petitioner's counsel presented expert opinion about addiction that was directly pertinent to two statutory mitigating circumstances and that had already conclusively been found as mitigating by the same trial judge in petitioner's co-defendant's case, who did not receive a death sentence.[28]

In any event, this court fails to grasp petitioner's argument that the CCA's reasoning is "contrary to and an unreasonable application of *Strickland*." Pet'r's Br. (Doc. # 44) at 92. While that decision certainly, and unremarkably, observes that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support," 466 U.S. at 696, petitioner does not explain how the verdict in his case is "only weakly supported by the record." *Strickland* does not hold that an advisory jury verdict for life somehow indicates a lack of "record support" for a death sentence imposed by the ultimate sentencer. Nor does petitioner cite any other Supreme Court case with such a holding.

Furthermore, this case is highly aggravated, notwithstanding the jury's recommendation of a life sentence. This point distinguishes petitioner's case from *Williams*, which he cites apparently for the proposition that the jury's recommendation of a life sentence, rendered without the benefit of "'powerful evidence adduced at postconviction, *weighs heavily in favor of a finding of prejudice*.'" Pet'r's Br. (Doc. # 44) at 92 (quoting 542 F.3d at 1343) (emphasis petitioner's). But in *Williams*, which relied upon the same *Strickland* language cited by petitioner, the Eleventh Circuit

---

[28]   *See* Rule 32 C.R. 1268 (the trial court's sentencing order in Clara Waldrop's case) ("The Court finds that the defendant had been smoking crack cocaine prior to the commission of the offense, but she was not so intoxicated that she could not form an intent. There is no question, however, that her ability to appreciate the criminality of her conduct or to conform her conduct to the requirements of law was impaired; and the court finds this to be a mitigating circumstance.").

specifically found that the finding of prejudice due to counsel's failure to present certain mitigating evidence was particularly supported because the "case is not highly aggravated." 542 F.3d at 1343. In *Williams*, "the trial court imposed the death penalty on the basis of a single statutory aggravating circumstance [the robbery-murder aggravator]–one that is an element of the underlying capital murder charge." *Id.* In this case, however, death was imposed based on that aggravator and the additional, "particularly powerful," *see Boyd*, 592 F.3d at 1302-03, "heinous, atrocious, or cruel" aggravator. Indeed, in *Boyd*, without operating in the confines of AEDPA deference, the Eleventh Circuit held that, even in a case where the jury recommended a life sentence, the unique weight of the "heinous, atrocious, or cruel" aggravator in that case was sufficient to overcome any weight in the prejudice inquiry owed to the jury's life recommendation. *See id.* at 1303. Thus, petitioner has failed to show either that CCA unreasonably weighed the jury's life recommendation in its prejudice analysis, or that its decision is contrary to or an unreasonable application of *Strickland*.

Petitioner's fourth argument in support of his claim that the state courts unreasonably resolved the prejudice inquiry against him is his contention that "the Court of Criminal Appeals found no prejudice in part because the particular sentencing judge would not have afforded much weight to evidence of Bobby's abusive childhood." Pet'r's Br. (Doc. # 44) at 93. He argues that the CCA's decision is "contrary to and unreasonably applies *Strickland* because it fails to measure prejudice based on the presumption of a reasonable sentencer." *Id.* In support of this argument, petitioner cites, without any quotation or extended discussion, to the same portion of the CCA opinion discussed in relation to his prior argument about the CCA's purported failure to properly weigh the jury's recommendation of a life sentence in its prejudice findings.

Petitioner's argument is without merit.  As discussed above, the portion of the CCA's opinion upon which petitioner relies was concerned with evaluating the reasonableness of counsel's investigation, especially as compared to two cases cited by petitioner, *Wiggins* and *Harris*, in his appellate brief.  Thus, the CCA was examining counsel's performance, not prejudice, which the court had already resolved against petitioner by that point.  In pertinent part, the CCA observed that, in deciding to focus more on addiction evidence than childhood abuse evidence, counsel "was also aware that the sentencing judge, the same judge who had sentenced Waldrop's wife for the murders, had evidence of Clara Waldrop's abusive childhood and stated in his sentencing order that he afforded it little weight."  *Waldrop*, 987 So.2d at 1202.

As the Supreme Court explained in *Strickland*, the "reasonable sentencer" standard is relevant to a court's reweighing of aggravating and mitigating circumstances in resolving the prejudice inquiry, not determining the reasonableness of counsel's actions under the performance prong.

> The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.  It should not depend on the idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency.  *Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.*

*Strickland*, 466 U.S. at 695 (emphasis supplied).  *See also Ferrell v. Hall*, 640 F.3d 1199, 1234 (11th Cir. 2011).  Thus, in observing that counsel likely opted to focus his penalty phase strategy on presenting evidence about petitioner's drug addiction in light of the trial judge's diminishment of the childhood abuse evidence offered at his co-defendant's trial, the CCA was not unreasonably "fail[ing] to measure prejudice on the presumption of a reasonable sentencer."  Pet'r's Br. (Doc. #

44) at 93. Indeed, the CCA was not measuring prejudice at all, but was instead assessing the reasonableness of the strategic decision the CCA attributed to counsel. There is no clearly established federal law that requires counsel to adopt a trial strategy based upon *Strickland*'s hypothetical "reasonable sentencer." Rather, counsel is permitted to reasonably tailor trial strategy to accommodate the practical reality that the case will be tried before a judge with unique tendencies and sensibilities. The CCA did not unreasonably fail to weigh prejudice pursuant to the "reasonable sentencer" standard of *Strickland*.

Petitioner's final argument in support of his contention that the CCA unreasonably resolved the prejudice inquiry is that the state court failed to "'evaluate the totality of the available mitigating evidence.'" Pet'r's Br. (Doc. # 44) at 93 (quoting *Williams*, 529 U.S. at 397-98). He asserts that the CCA "either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing, and its decision that Bobby Waldrop was not prejudiced by his counsel's failure to conduct a thorough investigation is unreasonable." Pet'r's Br. (Doc. # 44) at 94. Petitioner submits that the CCA's "failure to consider the evidence adduced in post-conviction together with the evidence at trial is apparent from its failure to recognize that its speculative theory about the negative effect of mitigating information was disproven when, in response to hearing just a small amount of the available mitigating evidence about Bobby Waldrop's background–including evidence about his relationship with his grandparents–the jury returned a *life verdict*." *Id.* at 93. Moreover, he maintains that the mitigating evidence he offered in postconviction "contradicts the critical misperceptions on which the sentencing judge apparently relied in rejecting the jury's life verdict, particularly with respect to Bobby's drug addiction." *Id.* at 94. He concludes that the CCA's holding "that Bobby Waldrop failed to meet his burden to show that he was prejudiced by counsel's

deficiency is contrary to and an unreasonable application of clearly established Supreme Court precedent. *Id.*

This argument is, in effect, the most significant of those related to petitioner's penalty phase ineffective assistance of counsel claim because petitioner is challenging the CCA's purported failure to properly recognize and weigh all of the mitigating evidence introduced at trial and in postconviction proceedings when assessing prejudice. In order to determine whether the CCA's decision is contrary to, or involved an unreasonable application of, clearly established federal law, the court will first briefly recount the mitigating evidence introduced at trial and during post conviction proceedings.

### The totality of the mitigating evidence

At trial, counsel began to elicit mitigating evidence about petitioner's family circumstances and his relationship with his grandparents from the State's first witness during the guilt phase, petitioner's aunt. She testified on cross examination that petitioner's mother was "fourteen or fifteen" when petitioner was born, and that the family lived with the Prestridges at that time. Trial Tr. (R.-9) at 373-74. Sherrell Prestridge purchased a trailer for petitioner and his wife to live in because, in effect, petitioner was "the oldest grandson, and he had raised him, . . . because that was his son in other words." *Id.* at 374. Sometimes petitioner's parents would prevent the Prestridges from visiting with the Waldrop children out of spite, but at other times the children would stay with their grandparents "for a time." *Id.* at 374-75. Just prior to the murders, the Prestridges had provided petitioner with money, a place to live, and helped him obtain a car. *Id.* She confirmed that her parents loved petitioner. *Id.* at 375. She also testified that petitioner's mother "left with another man and was living with him" before she and petitioner's father were divorced, and that petitioner

80

was saddened by his parents' divorce. *Id.* at 377-79. She testified that she and her father signed the bond to have petitioner released from jail when he was first arrested on drug possession charges. *Id.* at 379.

Counsel's first witness after the State rested was petitioner's mother, Shirely Irelan, who testified about petitioner's use of drugs around the time of the murders. Trial Tr. (R.-10) at 740-41. She also testified that petitioner loved his grandparents and that they loved him and wanted him to move in with them because they were worried about him. *Id.* at 742. She was fourteen when she married petitioner's father, and they lived with her parents after the marriage. *Id.* at 745. She confirmed that petitioner had spent a substantial part of his nineteen years living with his grandparents because she "didn't know how to take care of a baby, and his father was not really responsible either. So, I knew if I left him with momma and daddy that he would be took care of." *Id.* at 746. When asked specifically when she first noticed that petitioner had a drug problem, Mrs. Irelan responded that it was when petitioner was sixteen, after the divorce and after he dropped-out of school, when he started smoking marijuana. *Id.* at 747. She believed that he was on crack cocaine a few months before her parents were killed. *Id.*

Counsel also presented the testimony of petitioner's former manager at Trintex Corporation, who testified that petitioner "was such a good worker" who was energetic and "got along with his fellow employees[,]" and that he never had "any kind of disciplinary actions . . . other than his absentees[,]" which eventually resulted in his termination. *Id.* at 759. Petitioner's absentees mostly occurred on Mondays, and he was terminated after accruing five unexcused absences. *Id.* at 759-60. A few months after he was first terminated, petitioner was rehired, and again "his performance on

the job was great." *Id.* at 761.  However, he began having unexcused absences again a few months later and was again terminated.  *Id.*

Counsel's next witness was petitioner's great aunt, Irene Prestridge's sister.  She testified that the Prestridges often cared for petitioner and that he lived with them "off and on from the time he was born" such that they "thought of Bobby as their son and not their grandson.  They loved Bobby and Bobby loved them." *Id.* at 765-66.

Counsel's next witness was Dr. Tackett, who, as discussed previously in this opinion, testified generally about drug intoxication and addiction, and about how crack cocaine addiction can influence behavior.  He ultimately surmised that, even if petitioner was not intoxicated at the time of the murders, he committed the murders in order to be able to satisfy his body's craving for the drug.

After petitioner was convicted of capital murder, counsel argued in his opening statement of the penalty phase that, drawing upon much of the evidence already entered during the guilt phase, the jury should consider several mitigating circumstances, including petitioner's lack of criminal history, that he was under the influence of extreme mental or emotional disturbance, that his ability to "appreciate the criminality of his conduct and conform his conduct to the requirements of law was substantially impaired" due to his use of cocaine, his age, "the facts of Bobby's childhood"–including that he "came from a broken home" and that his grandparents essentially raised him due to his parents' failings, that he was a good worker before his addiction caused him to start missing work, and that he demonstrated remorse for his actions.  Trial Tr. (R.-18) at 1010-14. Counsel again called Dr. Tackett, who testified in the penalty phase that he believed petitioner's "brain chemistry was still being influenced by the drug" at the time of the murders in that, "when this

occurred, . . . he was probably on the depressive phase of coming down from being on the effects of crack cocaine." Trial Tr. (R.-20) at 1017.  He testified that withdrawal from crack cocaine can cause someone to "suffer extreme mental or emotional disturbance[,]" and that he believed petitioner was likely experiencing symptoms of that sort at the time of the murders.  *Id.*

After Dr. Tackett's testimony, petitioner testified about his heavy drug use leading up to the day of the murders.  *Id.* at 1026-30.  When asked why he killed his grandparents, he testified as follows:

> On account of the drugs I was using.  I love my grandparents very much and at that time I was on these drugs–I mean I was not–I wasn't the person that I am now.  I mean, it was like this was all I cared about.  I didn't care about my family.  I didn't care about my wife.  I didn't care if I hurt myself or anybody else.

*Id.* at 1030.  Petitioner also testified that his grandparents had raised him since he was a child, that they were good to him, and that he had never had any altercations with either of them.  *Id.* at 1033.  Petitioner's final witness in the penalty phase was Sheriff Fuller, who testified that petitioner had not caused any problems since he was incarcerated in the county jail awaiting trial.  *Id.* at 1042.

At the sentencing hearing before the trial judge, after having obtained the jury's life recommendation, counsel again asserted as mitigating circumstances that petitioner had no prior record of serious criminal offenses, that the murder was committed while petitioner was under the influence of extreme mental or emotional disturbance, that his capacity to appreciate the criminality of his conduct and conform his conduct to the requirements of law was substantially impaired, that his age was mitigating, and "that he was from a broken home, his work record, and the fact that he was remorseful for his actions."  Trial Tr. (R.-25) at 1094-96, 1100-06.  Counsel also argued against the applicability of the heinous, atrocious, or cruel aggravator based on his contention that the State

had failed to prove that petitioner tortured the victims.  *Id.* at 1098-99.  When it became apparent that the trial judge would not assign much weight to any mitigating circumstances that were attributable to petitioner's use of and addiction to cocaine, petitioner's counsel objected strenuously to the court's findings.  *Id.* at 1119-23.

Against this backdrop of the evidence and argument presented to the jury and trial judge, petitioner offered new evidence at the Rule 32 hearing to show that he was prejudiced by counsel's alleged deficient investigation and preparation for the penalty phase.  The bulk of this information concerned the circumstances of petitioner's childhood, including his family's poverty, alleged pervasive violence involving his family members, privation and neglect, and his mother's alleged adultery and promiscuity.  For example, at the Rule 32 evidentiary hearing, Johnny Morrison testified about the time that petitioner's mother shot him while he attempted to deliver a trailer to land near the Waldrop's.  Rule 32 Tr. (R.-60) at 103-04.  Howard House, a manager at Trintex at the time that petitioner and his parents worked there, testified that he had seen petitioner's parents arguing at work, that he had terminated petitioner's mother, and that after she was terminated, she attacked and beat up one of the other Trintex employees before leaving the premises.  *Id.* at 143-46.  Freddie Whitley testified that he was a pastor at a church where the Waldrops attended for about a year while petitioner was a teenager.  *Id.* at 177.  He testified that petitioner participated in Bible readings, played drums, and sang in the church choir.  *Id.* at 178.  Petitioner attended with his parents and siblings, and sometimes with his grandparents as well.  *Id.*  Mr. Whitley believed petitioner and his grandparents loved each other, and that they got along well.  *Id.* at 178-80.

T.J. Morgan, another manager at Trintex who had also testified at trial, reiterated his trial testimony about petitioner's good work and reputation at Trintex.  *Id.* at 188-89.  Barrett Holloway

84

taught petitioner in seventh grade, and testified that he was always respectful and well-behaved in class. *Id.* at 204-05. Petitioner had eight absences that year, which Holloway described as "getting to an excessive amount." *Id.* at 217. As discussed previously, the Prestridges' neighbor, Phyllis Lipham, testified about the occasional commotion and apparent arguing she would hear coming from the Prestridges' from time-to-time, as well as the law enforcement visits. *Id.* at 229-30, 256. Mrs. Lipham also testified about often observing men visiting the Waldrop home–presumably to have sex with petitioner's mother–after petitioner's father had left for work. *Id.* at 250-51. She testified that the children were usually at home or playing out in the yard during these visits. *Id.* at 251.

As much as the above evidence might have hinted at some problematic circumstances surrounding petitioner's family background, other evidence offered by these same witnesses militates against the harshness of many of petitioner's allegations about the circumstances of his life. For instance, Mr. House testified that petitioner's father was even-tempered, that he never saw signs of abuse between petitioner's parents, and that they always appeared well-fed and properly attired. *Id.* at 147. Pastor Whitley similarly saw no signs of abuse or neglect respecting the Waldrop children; petitioner never informed him of any problems at home; petitioner never appeared lacking of food or appropriate clothing; and he appeared appropriately cleaned and groomed. *Id.* at 183-85. Mr. Holloway, petitioner's teacher, also saw no signs of abuse in his year with petitioner, and he never heard of any problems involving petitioner's home life. *Id.* at 221. Mrs. Lipham testified that she never saw any fights at the Prestridges', she never saw Sherrell Prestridge hit one of his children or grandchildren, and that he would yell at them when he needed to get on to them. *Id.* at 226-27. She also testified that Sherrell Prestridge was not a heavy drinker, that he had quit drinking altogether, but that he probably drank more when petitioner was a young boy. *Id.* at 254-55. Finally, as

discussed above and consistent with many other witnesses, Mrs. Lipham–who lived next to the Prestridges from around 1969 until their deaths–testified that she never saw signs of abuse on the Waldrop children, other than ordinary knicks and bruises, which she attributed to child's play, and that she always observed them to be properly fed and clothed.  *Id.* at 257-58.

In addition to the above non-family member witnesses, petitioner presented the testimonies of numerous family members at the Rule 32 evidentiary hearing.  Petitioner's aunt on his father's side, Retha McGehee, testified that she lived with the Waldrops shortly after petitioner was born. *Id.* at 262.  She testified that petitioner's mother made sure that he was "fed and bathed," but that she was not very affectionate with him, "wouldn't get him out of the baby bed much," and would often leave him alone in his crib while she visited her parents.  *Id.* at 263.  She also testified that petitioner's mother had affairs with other men, and that they would fight about it when petitioner's father, Wesley, learned of the affairs. *Id.* at 266-67.  She testified that petitioner's mother was often violent toward and showed little affection for Wesley, and that they often argued over little things that led to physical fighting.  *Id.* at 267-69.  Mrs. McGehee also testified about her and Wesley's own histories of abuse and neglect, which predated petitioner's birth, including that they were taken from their parents and lived with their uncle, that their parents were alcoholics, that she did not know her real mother's identity until her mother died, that her uncle would beat petitioner's father, that her uncle molested her, and that her uncle's children were treated more favorably than she and petitioner's father.  *Id.* at 269-76.  On the subject of Wesley's drinking, Mrs. McGehee testified that he would sometimes drink "two or three beers" after coming home from work during the time that she lived with the Waldrops shortly after petitioner's birth.  *Id.* at 279.  She further testified that

petitioner began using smokeless tobacco, with his parents knowledge, around the age of four. *Id.* at 280.

Petitioner's mother was the focal point of his presentation of mitigating evidence about the circumstances of his childhood and family background. Mrs. Irelan first testified that she was not aware that she was pregnant with petitioner until approximately the seventh month of the pregnancy. *Id.* at 304. In general, due to her age and lack of time to prepare, she did not know how to take care of a baby. *Id.* at 305. She testified that the family sometimes went hungry, that they stole food from a neighbor's garden, that petitioner worked in a chicken house to help provide food, and that Everett Pauley, whom Mrs. Lipham said was one of the men who would visit while Wesley Waldrop was at work, helped them buy groceries. *Id.* at 306. In addition, the Waldrops were once without power for over three months, and were forced to used a propane stove provided by Mr. Prestridge to cook food. *Id.*

Mrs. Irelan testified about the circumstances of her own childhood, including that the family lacked "whole, whole lots" of groceries, her parents often argued and physically fought, and, as discussed above, her father often severely beat her all the way into her twenties. *Id.* at 306-11. Mrs. Irelan testified about other violence around the Prestridge and Waldrop households, including when she threw a sledgehammer at her brother-in-law, fights between her husband and brother-in-law, and fights between her father and her brother-in-law and his brothers. *Id.* at 311-13. She testified about a fight between petitioner's father and petitioner's uncle which petitioner observed. *Id.* at 313. She explained that alcohol was always involved in these fights. *Id.* Her grandfather and uncles were involved in producing and selling moonshine. *Id.* at 315. She testified that petitioner's father would drink on the weekends, "especially when the kids was little." *Id.* at 316. She stated that she drank

87

alcohol and smoked pot while pregnant with petitioner, but did not quantify the amount of this behavior and did not clarify if it occurred only during the time during which she was unaware she was pregnant.  *Id.* at 317.

Mrs. Irelan also testified about the appearance of her son as it became apparent that he was using drugs.  *Id.* at 317.  She explained that, in short succession, petitioner's wife had a miscarriage, a car that he had been working on was lost in a fire, and he was arrested for the first time on drug possession charges.  *Id.* at 317-24.  According to Mrs. Irelan, petitioner seemed unable to cope with these events as he lost a lot of weight and was very unhappy.  *Id.* at 324.  After these events it became clear that petitioner was involved in heavier drug use.  On the topic of petitioner's history of substance abuse, she testified that she saw petitioner "huffing" gasoline around the age of eight or nine and found marijuana in his clothes when he was fifteen or sixteen.  *Id.* at 325.

Mrs. Irelan also vaguely testified about the violence between her and petitioner's father. Within a year of their marriage, they began having physical fights involving hitting, choking, and biting.  *Id.* at 325-27.  She described one instance in which she stabbed Wesley in the leg in front of the children.  *Id.* at 327-28.  She also testified about trying to shoot petitioner's father, again in front of the children, when he attacked her after she had been gone from the home for a couple of days. *Id.* at 328.  The gun did not discharge.  *Id.*  She testified that her fights with Wesley often left her with marks and bruises, which she attempted to hide.  *Id.* at 330.  Law enforcement often visited the home as a result of these fights.  *Id.*

Mrs. Irelan also testified about violence inflicted on petitioner by his father.  She explained that, as he grew, petitioner would try to intervene when she was fighting Wesley.  *Id.* at 331.  This started around the age of seven.  *Id.*  Wesley would usually sling him across the room.  *Id.*  As

88

petitioner matured, these instances turned into fights between petitioner and his father. *Id.* She also described an instance in which petitioner's father threw food at petitioner because he was a picky eater. *Id.* at 332. According to Mrs. Irelan, Wesley sometimes hit and choked petitioner, as well as verbally abused him. *Id.* at 332-33. Mrs. Ireland admitted that she, too, had hit petitioner. She threw an ashtray, which cut him in his back and hit him several times with a broom handle. *Id.* at 333. Mrs. Irelan testified that she attempted suicide on multiple occasions because of all the violence surrounding her. *Id.* at 334-37. She stayed in a hospital for observation over several nights in connection with the shooting of Johnny Morrison. *Id.* at 337. She fought often with her sister. *Id.* at 339. She would leave the children in the care of her parents for days at a time while staying with one of her boyfriends. *Id.* Sometimes her boyfriends would visit the house while the children were there. *Id.* at 340.

After her divorce from petitioner's father, Mrs. Irelan still fought with him. One time she threw a piece of glass and cut him on his head. *Id.* at 340. She testified–without offering any specifics as to timing, frequency, or severity–that she saw her father whip and yell at petitioner. *Id.* at 341. Nevertheless, she maintained that petitioner loved and cared for his grandparents. *Id.* at 341-42.

Petitioner's brother, Joey Waldrop, testified that he had seen his mother hit petitioner, and that his parents were violent toward each other. *Id.* at 366. He saw his mother stab his father in the leg. *Id.* at 370. His father drank when he was growing up. *Id.* Petitioner's sister, Christie Fortenberry, testified that their mother was mean to the children, had held them at gunpoint one time, and had fired at a vehicle occupied by petitioner and his father. *Id.* at 373-74. She saw Mrs. Irelan throw the ashtray at petitioner and hit him with things like belt buckles, belts, brooms, and other

89

things. *Id.* at 374. She saw her mother stab and "severely bite" her father. *Id.* Their mother would leave for hours or weeks at a time, which would upset petitioner. *Id.* at 375-76. The Waldrop children were teased because of their mother's activities with the fathers of other children. *Id.* at 376. She was there when her mother tried to harm herself, and also saw her grandfather threaten to harm himself. *Id.* at 377. She saw her father choke petitioner and hit him with his hands and a belt buckle, as well as throw food at him. *Id.* at 378. She, too, was choked by her father. *Id.* She also observed petitioner caring for his grandparents, including cooking for them and feeding, shaving, and carrying his grandmother. *Id.*

As with some of the non-family member witnesses, petitioner's family member witnesses also offered testimony that, in some instances, dulled the harshness of the allegations in the Rule 32 petition. For example, Mrs. McGehee testified that, although her parents were heavy drinkers, they were not mean to the children when they visited with them at her uncle's house. *Id.* at 277. She also testified that she never observed her brother or Mr. Prestridge strike petitioner at any point in his life, and that she never saw any signs of abuse on petitioner. *Id.* at 291. Although she testified about almost daily fights between petitioner and his father, Mrs. Irelan conceded that she did sign papers conferring custody of the children to petitioner's father as part of her divorce. *Id.* at 351-52. Mrs. Irelan also testified that many of her fights with her sister were the result of her trying to protect her children from Nancy Rostofer's severe discipline of the children, which included slapping. *Id.* at 361. Likewise, she explained that she shot Mr. Morrison because she believed a child molester was planning to live in the trailer he was delivering to the property. *Id.* at 362. Christie Fortenberry testified that her father actually favored petitioner, and that her grandparents "did better" for petitioner than they did for the other grandchildren. *Id.* at 382. She also clarified that the time her

mother left for weeks was after her parents divorced and the children were living with their father. *Id.* at 382-83.

In addition to the above witnesses' testimonies, petitioner made a proffer to the court of the expert testimony he had intended to introduce in support of this claim. He explained that Dr. Loring, a licensed social worker, would have "testified about severe and chronic violence in Bobby's household, the trauma he underwent as a child and during the time of this offense, the neglect and rejection that he suffered as a child, acute crises that predate his cocaine abuse." *Id.* at 419. Dr. Loring would have explained to the court the "significance of" all of the events described by the various witnesses. *Id.* at 420. Dr. Tarter, a clinical neuropsychologist, would have testified about

> statutory mitigating circumstances that Bobby suffered from a mental disease or defect at the time of the offense; namely, substance abuse disorder with dependency on cocaine and explain to the Court that that is a chronic disease of the brain and a neuro psychiatric illness which would have had an effect on Bobby's behavior at the time of the offense. He would explain that effect. He would also be talking about the ways in which Bobby's substance abuse was both indicated by and exacerbated by his compromised mental developmental history which starts from conception onward, and specifically with respect to exposure to psycho affective chemicals and neuro toxins as a child and up through his cocaine abuse.

*Id.* at 420-21.[29]

---

[29] Petitioner also made a written proffer of the evidence he was precluded from introducing at the evidentiary hearing. The proffer included much of the hearsay evidence that the court had excluded at the hearing, as well as the expert opinion evidence he had intended to offer through Drs. Loring and Tarter. Petitioner's experts provided affidavits describing their conclusions from having interviewed and evaluated petitioner, as well as from interviewing family members and reviewing the voluminous records that petitioner also provided with his proffer. *See* Rule 32 C.R. 315-668. In pertinent part, Dr. Loring states in her affidavit that petitioner grew up in an extremely violent environment which "put him at high risk for violent behavior as a young adult." *Id.* at 338. She describes the physical abuse petitioner endured as another risk factor leading to petitioner's own violent behavior. *Id.* at 338-39. Petitioner's trauma and emotional abuse led him to mutilate himself and self-medicate with drugs. *Id.* at 339. Petitioner also endured severe neglect and abandonment by his parents. *Id.* at 339-40. This neglect and abandonment is believed to present a "heightened risk for a host of psychological problems ranging from low self-esteem to truncated moral development to difficulty handling aggression." *Id.* at 340. The abuse, neglect, abandonment, and shame

(continued...)

### *The Court of Criminal Appeals' weighing of aggravating and mitigating evidence*

After considering all of the evidence before the Court of Criminal Appeals, this court cannot

conclude that the CCA's judgment that petitioner was not prejudiced by counsel's purportedly

---

[29](...continued)
owing to his mother's promiscuity left him alienated in the community and among his peers. He was bullied. He was forced to protect his mother from his father's beatings and to care for his siblings when his parents were unable or unwilling. This sort of "role reversal" "heightened the chronic stress and terror that characterized his childhood and predisposed him to react aggressively to threats to his safety." *Id.* at 341-42. Petitioner turned, like many in his family, to substances to cope with the myriad threats to his development, which, in turn, only "contributed to his developmental impairments, exacerbated his deficits in regulating his behavior and coping with environmental threats, and left him particularly vulnerable to addiction." *Id.* 342-43. The trilogy of crises that petitioner endured in rapid succession "overwhelmed [his] minimal coping skills" and sent him on a "downward spiral of depression, anguish, and hopelessness," which led him to consume crack cocaine. *Id.* at 343. All of petitioner's accumulated risk factors combined with the traumatic events he had recently endured and his deepening dependence on drugs to "overwhelm" the "protective factor" that his grandparents had always provided him. *Id.* at 343-44.

Dr. Tarter explained that he was retained "to determine within a developmental perspective the factors underlying and predisposing to the homicide Mr. Waldrop's mental and behavior condition at the time of the crime." *Id.* at 352. Based on his evaluation, Dr. Tarter concluded as follows:

> Mr. Waldrop committed the offense while under the influence of extreme mental disturbance, namely substance use disorder with dependency on cocaine, and that his capacity to conform his conduct to the requirements of law was substantially impaired at the time of the homicide. Mr. Waldrop's cognitive functioning and self-control of behavior were diminished at the time of the offense beyond his usual dispositional low self-regulation due to cocaine withdrawal combined with multiple sources of stress. The factors underlying his dispositionally low capacity for self-regulation can be traced to a multigenerational history of alcoholism and violence in the family, adverse prenatal and postnatal development, and lifelong stress. In other words, a set of cumulative factors starting at Mr. Waldrop's conception resulted in his reduced mental and behavioral competence at the time of the offense.

*Id.* at 352. Dr. Tarter's affidavit describes the numerous cumulative factors which in his opinion combined to make petitioner "dysregulated, highly vulnerable to stress, with limited coping abilities, and predisposed to addiction." *Id.* at 352-55. He explains that, because petitioner was experiencing withdrawal at the time of the murders, his already "low cognitive and behavioral self-regulation," "primed Mr. Waldrop for impulsive aggression precipitated by the rapidly spiraling altercation with his grandfather." *Id.* at 356. Dr. Tarter asserts that the severity of petitioner's "dyscontrol is evidenced by the fact that Mr. Waldrop killed the two people to whom he was most closely attached." *Id.* Dr. Tarter believes "there is no evidence indicating that Mr. Waldrop planned to commit the homicides[, and that] his post-crime behavior, such as having no escape plan or more carefully concealing evidence, illustrates a lack of foresight[.]" *Id.* He concluded from viewing petitioner's interrogation that "Mr. Waldrop had genuine affection for his grandparents" and that petitioner is not "characterologically cruel and has genuine remorse. He does not have a psychopathic personality." *Id.*

deficient investigation is contrary to, or involved an unreasonable application of, clearly established federal law. The court must emphasize at the outset that a court charged with assessing prejudice is required to weigh the mitigating evidence adduced by the petitioner at trial and in collateral proceedings against the aggravating circumstances. *Boyd*, 592 F.3d at 1295. The Eleventh Circuit has described the heinous, atrocious, or cruel aggravator that was established in this case as a "particularly powerful" factor in this weighing process. *Id.* at 1302 n.7; *id.* at 1297 (quoting *Dobbs v. Turpin*, 142 F.3d 1383, 1390 (11th Cir. 1998)) ("With crimes like this one, that are 'carefully planned, or accompanied by torture, rape or kidnapping,' we have often held 'that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence.'"). *See also DeYoung v. Schofield*, 609 F.3d 1260, 1290 (11th Cir. 2010) (describing the "weight of aggravation evidence" as "immense" where the petitioner, who wanted money to start a business, killed his parents in their bed by inflicting over "three dozen slashing, stabbing, cutting, and chopping wounds" on each victim, many of which were "inflicted while the victims were lying down and trying to move around or roll away"). After remand, the trial court explained its finding that the murders were especially heinous, atrocious, or cruel as follows:

> The defendant and his co-defendant entered the victims' home, stabbed the victims and slit the victims' throats. According to the medical examiner, Sherrell Prestridge had forty three stab and cut wounds to the head, neck, back and chest. Irene Prestridge had thirty-eight stab and cut wounds. The evidence indicated that Sherrell had heart and hip problems and had difficulty walking. Irene was blind and bed-ridden. Because of their infirmities, the living room of their house had been converted to a bedroom with two hospital beds where they slept. He repeatedly stabbed and cut both victims. He killed his grandfather by stabbing him to death in the presence of his grandmother. Testimony indicated that Irene was screaming loudly throughout the incident. During a video-taped statement, Waldrop stated that, before he stabbed Irene, she told him that she loved him. The evidence also indicated that Christy Waldrop, Waldrop's sister, made a statement to the police in which she said Waldrop told her that, during the incident, Irene told Sherrell that she loved him

and that she would see him in heaven.  He then killed his grandmother by repeatedly stabbing and cutting her.  He unnecessarily inflicted physical and psychological pain on both victims.  Evidence indicating the intentional killing of more than one victim in each other's presence has long been held to support a finding that the murders were especially heinous, atrocious and cruel.  In this case, no speculation at all is required to find the existence of this aggravating circumstance.  The evidence in this case is that the only victim capable of defending himself, namely, Sherrell Prestridge, was attacked first and that he fought his assailant in a violent struggle taking place only inches away from his wife as she lay helpless in a hospital bed.  The evidence is that even the blind victim, Irene Prestridge, was aware of what was happening, first to her husband and then to herself.  The evidence was supplied by the defendant's own statement and it was self-evident from the physical evidence at the crime scene. He chose the method of killing and deliberately carried it out.  The court finds that the actions of the defendant were cruel and heinous and that they were intended to inflict pain on the victims.  The crime was objectively atrocious.

R.-69 at 6-7.  The Court of Criminal Appeals affirmed the trial court's finding of this aggravating circumstance.  *Waldrop*, 859 So. 2d  at 1180.  Thus, while it is certainly possible that a habeas petitioner can show prejudice even in a case involving the heinous, atrocious, or cruel aggravator or its functional equivalent in another state, it is clear that petitioner's burden in overcoming the powerful aggravating circumstances in this case is substantial.

So, in light of this powerful aggravating circumstance, the court must assess the reasonableness of the CCA's judgment that the totality of petitioner's mitigating evidence does not support a finding of prejudice.  It is clear from the mitigating evidence recounted above that, crediting the evidence as true, petitioner faced substantial adversity in his life due to the confluence of factors described by his lay witnesses and in his proffer of expert opinion evidence.  The record indicates that petitioner was raised in an environment in which he at least occasionally experienced the effects of poverty, and in which he experienced or observed frequent violent interactions among essentially all of his family members.  Appropriate behavioral modeling appears to have been poor to non-existent.  There appear to have been few positive influences in petitioner's home and family

94

life other than his grandparents, and even they–to the extent petitioner alleges that Sherrell Prestridge beat his children or grandchildren and drank excessively–are also alleged to have participated in creating the supposedly toxic milieu that resulted in petitioner's "dispositionally low capacity for self-regulation."  Anecdotal evidence about the severity and frequency of any violence inflicted on petitioner by his family members is mostly vague, but it appears clear that petitioner was sometimes the target of violent actions by his parents.

Nevertheless, the record also bears evidence that petitioner was loved and cared for by his grandparents, and was generally provided for through the efforts of both his parents and grandparents.  Likewise, while petitioner describes the abuse, neglect, and privation he allegedly endured as seemingly constant and pervasive, the court notes that a string of his own witnesses–including his pastor, a teacher, and a lifelong neighbor–all testified that they never observed any objective indicia of such abuse, neglect, or privation.  Moreover, petitioner was not alone in experiencing the circumstances of the "nightmarish childhood" he describes.  The fact that his two younger siblings grew up in the same circumstances and are not alleged to have resorted to similar criminal behavior, or even to have succumbed to the substance abuse which he has described as essentially an inevitable consequence of genetics and environment in his family, further undercuts his claim of prejudice.  *See Kormondy v. Sec'y, Fla. Dep't of Corr.*, 688 F.3d 1244, 1283 (11th Cir. 2012) ("The evidence of Kormondy's impoverished upbringing, lack of parenting, and a father who abandoned him is also problematic.  Kormondy's half-siblings . . . were brought up in the same environment of physical abuse, neglect and poverty, their fathers left their mother to fend for herself and her children, yet the emerged as law abiding citizens.  The mitigating evidence now pressed by Kormondy has its obvious limitations."); *Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1247

95

(11th Cir. 2010) (finding omitted evidence of childhood abuse evidence "damaging" to the extent it revealed that the petitioner's siblings "were affected by the same childhood abuse and neglect, . . . but acknowledged that [petitioner] was the only one of the siblings who had ever been arrested for a violent crime"). In sum, while the court does not intend to minimize the evident adversities faced by petitioner, the court cannot conclude that the CCA's failure to find that the totality of this mitigating evidence is sufficient to undermine confidence in the outcome of petitioner's sentencing is contrary to or an unreasonable application of Supreme Court precedent, especially considering the formidable evidence in aggravation.

Throughout his briefing, petitioner cites to a number of Supreme Court cases that, he argues, show that the CCA's decision on prejudice unreasonably applies Supreme Court precedent. This approach–essentially arguing that his case is factually similar to the cited Supreme Court cases because one case might involve a petitioner's parents' alcoholism, one might involve abuse, one might involve a mother's promiscuity, etc.–does not embrace the full scope of this court's obligation in habeas review. This court must review the reasonableness of the state court's assessment of the totality of the mitigating evidence in this case and its weighing of that evidence against the aggravating evidence. Petitioner cannot meet his burden merely by pointing to stray factual similarities between his case and a number of Supreme Court cases. Nevertheless, while this court is reluctant to endorse as dogma a review methodology that would have each case devolve into a sort of contest of horribles whereby the petitioner strains vigorously to show that certain unfortunate circumstances of his or her life conform with and even exceed the perceived benchmarks set out in a string of Supreme Court cases decided in recent years, there is little for the court to do but compare the cases cited by petitioner with his own in order to show that the CCA's judgment is not contrary

to, or an unreasonable application of, those Supreme Court decisions.  The Eleventh Circuit too has performed this exercise when considering whether a habeas petitioner has shown prejudice.  *See, e.g., Lee*, 726 F.3d at 1194; *Rose v. McNeil*, 634 F.3d 1224, 1245-46 (11th Cir. 2011); and *Boyd*, 592 F.3d at 1299-1300.  For the following reasons, a faithful and more comprehensive review of the cases cited by petitioner does not advance his argument.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court held that the Virginia Supreme Court's decision denying post-conviction relief to Williams was unreasonable because the court "mischaracterized at best the appropriate rule . . . for determining whether counsel's assistance was effective within the meaning of the Constitution[,]" and because it "failed to evaluate the totality of the available mitigation evidence . . . ."  *Id.* at 397-98.  On the latter point, the Supreme Court described the "[s]ignificant mitigating evidence unrelated to dangerousness" which counsel failed to discover and present at sentencing, including "extensive records graphically describing Williams' nightmarish childhood," which were generated in connection with Williams' commitment to state custody at the age of eleven when his parents were incarcerated due to their criminal neglect of Williams and his siblings.  *Id.* at 395.  These records revealed "that Williams had been severely beaten by his father," that Williams' "home was a complete wreck" with feces and urine left on the floors and trash scattered everywhere, and that the Williams children "were all dirty and none of them had on under-pants."  *Id.* at 395 n.19.  In addition, counsel had failed to present "available evidence that Williams was 'borderline mentally retarded[,]'" or that he "had suffered repeated head injuries, and might have mental impairments organic in origin."  *Id.* at 396, 370.

By contrast, in this case petitioner's own mitigating evidence simply does not paint as compelling a picture as that in *Williams v. Taylor*.  There is no evidence that petitioner's parents

were imprisoned due to neglect, or even that social service programs of any sort were required to intervene on behalf of the children due to parental neglect or abuse, even after petitioner's mother was prosecuted for shooting Mr. Morrison.  Nor is there any account of petitioner's home life that describes the circumstances of his home in the dire, explicitly detailed, and squalid terms cited by the Court in *Williams*.  On the contrary, the testimony indicated that petitioner was always properly clothed, cleaned, and attired, and that he enjoyed access to his grandparents' nurturing when his own parents were unable or unwilling.  Moreover, while petitioner's experts opined about the effects of petitioner's substance abuse on his mental health, there is little to no evidence that petitioner is borderline mentally retarded, has suffered repeated head trauma, or possibly suffers from mental impairments that are organic in nature like the petitioner in *Williams*.[30]

In *Wiggins v. Smith*, 539 U.S. 510, 536 (2003), the Supreme Court held, without the constraints of the AEDPA's deference to a state court's judgment,[31] that, "had the jury been confronted with" the powerful mitigating evidence which counsel had failed to offer at trial, "there is a reasonable probability that it would have returned a different sentence."  The mitigating

---

[30]   Dr. Tarter expressed his opinion, based upon petitioner's mother's account of her behavior and other circumstances she experienced while pregnant, that petitioner's "fetal development was compromised, impeding neurologic development," and also remarked that petitioner's "low forceps delivery" is "associated with high risk for neurologic injury."  *See* C.R. 353.  However, Dr. Tarter did not offer any specific opinion about the extent or nature of any actual injury to petitioner's brain, and there is no evidence of any specific testing or imaging that was performed to confirm the existence, and the extent of, any injury or damage to petitioner's brain.  Rather, Dr. Tarter met with petitioner for four hours on one day in 2005.  *Id.* at 352.  He "administered the drug dependence section of the Diagnostic Interview Schedule and a number of psychological tests to gain information about Mr. Waldrop's lifetime exposure to psychoactive drugs and evaluate cognitive, emotion and behavior functioning.  *Id.*

[31]   The fact that a federal court is not bound by AEDPA deference to a state court's judgment is an important factor not to be overlooked in those cases where federal courts have found prejudice without AEDPA deference.  *See Johnson v. Sec'y, DOC*, 643 F.3d 907, 937 (11th Cir. 2011).

evidence, which was drawn from "state social services, medical, and school records, as well as interviews with petitioner and numerous family members" included that

> petitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked.  She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner-an incident that led to petitioner's hospitalization.  At the age of six, the State placed Wiggins in foster care.  Petitioner's first and second foster mothers abused him physically, and . . . the father in his second foster home repeatedly molested and raped him.  At age 16, petitioner ran away from his foster home and began living on the streets.  He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

*Id.* at 517 (citations omitted).

Once again, petitioner's own account of abuse and neglect in this case pales by comparison. There is no evidence that petitioner was often abandoned by all of his caretakers, even if his mother did occasionally leave him in the care of his father or his grandparents.  Nor is there any evidence that, even if the Waldrop family was poor, petitioner was so desperate that he would eat paint chips or trash or other non-food materials to ward off hunger.  Indeed, the evidence indicated that petitioner's grandparents provided for him, that the family sometimes received assistance from others to purchase groceries, and that, in any event, no one ever observed any indication that the Waldrop children were underfed.  Moreover, even if there is general evidence about petitioner's mother's promiscuity, there is no evidence that she had sex with men while her children were in the bed.  Finally, petitioner's allegations of occasional fights with his father or physical abuse by his mother simply are not as compelling as the "physical torment, sexual molestation, and repeated rape," 539 U.S. at 535, described by the Court in *Wiggins*.

In *Rompilla v. Beard*, 545 U.S. 374 (2005), again without the constraints of the AEDPA, the Supreme Court found prejudice due to counsel's failure to investigate and present mitigating evidence. The Court recounted the mitigating evidence counsel could have uncovered:

> "Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags."

545 U.S. at 392 (citations omitted). Had counsel discovered this available mitigating evidence and presented it to the mental health experts that examined Rompilla prior to trial, the "red flags" indicated by this evidence would presumably have led to further testing of Rompilla which, when finally performed during post-conviction proceedings, revealed that "Rompilla suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions[,]" and that his "problems relate back to his childhood, and were likely caused by fetal alcohol syndrome [and that] Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense." *Id.* (citations and internal quotations omitted). Furthermore, according to the Court, this mitigating evidence would have pointed the way to still more evidence available in "school and juvenile records," including that "when Rompilla was 16 his mother was missing from home frequently for a period

of one or several weeks at a time[,]," that "his mother "has been reported . . . frequently under the influence of alcoholic beverages, with the result that the children have always been poorly kept and on the filthy side which was also the condition of the home at all times[,]" and that "Rompilla's IQ was in the mentally retarded range." *Id.* at 393 (citations and internal quotations omitted).

As with the other cases cited by petitioner, the mitigating evidence described in *Rompilla* has some of the same elements of the mitigating evidence in petitioner's case. However, in its totality, it presents a far more compelling mitigation case than petitioner has presented. In particular, there is no evidence in this case that the abuse and neglect allegedly endured by petitioner included anything on the order of being locked in a small, filthy, and excrement-filled dog pen. There is no evidence that petitioner's parents "drank constantly." Instead, the evidence indicated that petitioner's father drank a couple beers after work or moderately on the weekends and was able to maintain regular employment throughout petitioner's childhood. Nor is there any evidence establishing that petitioner's mother was a heavy drinker. Nor is there any compelling evidence that petitioner was not given clothes and was forced to attend school in "rags," that he was "poorly kept and on the filthy side," or that his home could accurately be described in the same terms. On the contrary, a string of petitioner's own witnesses testified that the Waldrop children always appeared well-fed and properly clothed, and that they enjoyed access to their caring grandparents. Finally, there is little compelling evidence, unlike in *Rompilla*, that petitioner suffers any sort of organic brain damage that has affected his cognitive functioning, that he is "mentally retarded," or that he suffered fetal alcohol syndrome. Rather, petitioner has only offered his expert's speculation about possible impeded neurologic development, which he based upon petitioner's mother's account of her own prenatal behavior and possible brain injury at birth due to "a low forceps delivery."

101

In *Porter v. McCollum*, 558 U.S. 30, 42 (2009), the Supreme Court held that the state court's finding that petitioner was not prejudiced by his counsel's failure to investigate and present certain mitigating evidence was unreasonable because the state court "either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing." This evidence would have informed the sentencer about "(1) Porter's heroic military service in two of the most critical–and horrific–battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling." *Id.* at 41. The Court recounted the mitigating evidence adduced in state postconviction proceedings:

> The depositions of his brother and sister described the abuse Porter suffered as a child. Porter routinely witnessed his father beat his mother, one time so severely that she had to go to the hospital and lost a child. Porter's father was violent every weekend, and by his siblings' account, Porter was his father's favorite target, particularly when Porter tried to protect his mother. On one occasion, Porter's father shot at him for coming home late, but missed and just beat Porter instead. According to his brother, Porter attended classes for slow learners and left school when he was 12 or 13.

> To escape his horrible family life, Porter enlisted in the Army at age 17 and fought in the Korean War. His company commander, Lieutenant Colonel Sherman Pratt, testified at Porter's postconviction hearing. Porter was with the 2d Division, which had advanced above the 38th parallel to Kunu-ri when it was attacked by Chinese forces. Porter suffered a gunshot wound to the leg during the advance but was with the unit for the battle at Kunu-ri. While the Eighth Army was withdrawing, the 2d Division was ordered to hold off the Chinese advance, enabling the bulk of the Eighth Army to live to fight another day. As Colonel Pratt described it, the unit "went into position there in bitter cold night, terribly worn out, terribly weary, almost like zombies because we had been in constant—for five days we had been in constant contact with the enemy fighting our way to the rear, little or no sleep, little or no food, literally as I say zombies." The next morning, the unit engaged in a "fierce hand-to-hand fight with the Chinese" and later that day received permission to withdraw, making Porter's regiment the last unit of the Eighth Army to withdraw.

Less than three months later, Porter fought in a second battle, at Chip'yong-ni. His regiment was cut off from the rest of the Eighth Army and defended itself for two days and two nights under constant fire. After the enemy broke through the perimeter and overtook defensive positions on high ground, Porter's company was charged with retaking those positions. In the charge up the hill, the soldiers "were under direct open fire of the enemy forces on top of the hill. They immediately came under mortar, artillery, machine gun, and every other kind of fire you can imagine and they were just dropping like flies as they went along." Porter's company lost all three of its platoon sergeants, and almost all of the officers were wounded. Porter was again wounded and his company sustained the heaviest losses of any troops in the battle, with more than 50% casualties. Colonel Pratt testified that these battles were "very trying, horrifying experiences," particularly for Porter's company at Chip'yong-ni. Porter's unit was awarded the Presidential Unit Citation for the engagement at Chip'yong-ni, and Porter individually received two Purple Hearts and the Combat Infantryman Badge, along with other decorations.

Colonel Pratt testified that Porter went absent without leave (AWOL) for two periods while in Korea. He explained that this was not uncommon, as soldiers sometimes became disoriented and separated from the unit, and that the commander had decided not to impose any punishment for the absences. In Colonel Pratt's experience, an "awful lot of [veterans] come back nervous wrecks. Our [veterans'] hospitals today are filled with people mentally trying to survive the perils and hardships [of] . . . the Korean War," particularly those who fought in the battles he described.

When Porter returned to the United States, he went AWOL for an extended period of time.[] He was sentenced to six months' imprisonment for that infraction, but he received an honorable discharge. After his discharge, he suffered dreadful nightmares and would attempt to climb his bedroom walls with knives at night.[] Porter's family eventually removed all of the knives from the house. According to Porter's brother, Porter developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all.

In addition to this testimony regarding his life history, Porter presented an expert in neuropsychology, Dr. Dee, who had examined Porter and administered a number of psychological assessments. Dr. Dee concluded that Porter suffered from brain damage that could manifest in impulsive, violent behavior. At the time of the crime, Dr. Dee testified, Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance, two statutory mitigating circumstances, Fla. Stat. § 921.141(6). Dr. Dee also testified that Porter had substantial difficulties with reading, writing, and memory, and that these cognitive defects were present when he was evaluated for competency to stand trial. Although the State's experts reached different conclusions regarding the

103

statutory mitigators,[] each expert testified that he could not diagnose Porter or rule
out a brain abnormality.

*Id.* at 33-37 (footnotes and citations to the record omitted).

Once again, while there are common threads in the mitigating evidence adduced by petitioner

and that discussed in *Porter*, the differences in the total mitigation cases presented are substantial

and material. First, in *Porter* the Court observed that "the weight of evidence in aggravation is not

as substantial as the sentencing judge thought" because, of the four aggravating circumstances which

the trial judge found in sentencing Porter to death, two implicitly were not sufficient to tip toward

death because petitioner did not receive a death sentence for a separate murder where those same two

circumstances applied and, of the remaining two aggravating circumstances, the state appellate court

subsequently rejected the heinous, atrocious, or cruel aggravating circumstance, meaning that only

one remaining aggravating circumstance could have warranted death. *Id.* at 41-42.[32] In this case,

by contrast, no subsequent appellate opinion has negated the aggravating circumstances, particularly

the especially powerful heinous, atrocious, or cruel aggravating circumstance found by the trial court

but specifically rejected by the appellate court in *Porter*. Nor is petitioner's case supported by the

sort of uniquely powerful mitigating evidence Porter presented about his military service. As the

Supreme Court observed,

> Our Nation has a long tradition of according leniency to veterans in recognition of
> their service, especially for those who fought on the front lines as Porter did.[]

---

[32] The two aggravating circumstances applicable to both murders in *Porter* were that "the defendant
was previously convicted of another capital felony or a felony involving the use or threat of violence to that
person" and that "the capital felonies were committed while the defendant was engaged in the commission
of a burglary." *Porter v. State*, 564 So. 2d 1060, 1062 n.2 (Fla. 1990). The two additional circumstances
applicable to the murder for which Porter received a death sentence were the HAC aggravating circumstance
and that "the murder was committed in a cold, calculated, and premeditated manner without any pretense of
moral or legal justification[.]" *Id.*

> Moreover, the relevance of Porter's extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on Porter.

*Id.* at 43-44 (footnotes omitted).   In sum, in *Porter* the totality of the mitigating evidence, when weighed against "the appropriately reduced [] ballast on the aggravating side of the scale," established a "reasonable probability that the advisory jury–and the sentencing judge–'would have struck a different balance,' and it is unreasonable to conclude otherwise."  *Id.* at 42 (citing *Wiggins*, 539 U.S. at 537).   Based upon a review of the mitigating evidence and aggravating circumstances in this case, this court cannot conclude that the CCA's failure to find prejudice is an unreasonable application of *Strickland* in light of *Porter*.

The final Supreme Court case cited by petitioner in support of his prejudice argument is *Sears v. Upton*, __ U.S. __, 130 S.Ct. 3259, 3261 (2010).   In that case, the Supreme Court held that the state courts had "failed to apply the correct prejudice inquiry" in deciding Sears' ineffective assistance of counsel claim.   In relevant part, the state courts had found Sears' counsel performed deficiently with respect to his mitigation investigation, but "found itself unable to assess whether counsel's inadequate investigation might have prejudiced Sears" because Sears' counsel had presented some mitigating evidence during the penalty phase and that, therefore, the state court was unable to speculate about the possible effects had a different mitigation theory been presented.  *Id.* at 3261, 3264.   Thus, even though the Court discussed the mitigation evidence counsel could have presented had counsel conducted a reasonable investigation, *see id.* at 3262-63, the Court did not render any finding about whether Sears was actually prejudiced.  *See id.* at 3267 ("It is for the state court–and not for either this court or even Justice Scalia–to undertake this reweighing in the first

105

instance.").  Accordingly, this court cannot conclude that *Sears* somehow illustrates the CCA's failure to reasonably apply *Strickland* in this case.[33]

Recent Eleventh Circuit cases in which the Court of Appeals has found that the habeas petitioner was prejudiced by counsel's failure to investigate and present mitigating evidence are likewise distinguishable from petitioner's case due to the totality of the mitigating evidence found in those cases.  For example, in *Johnson*, 643 F.3d at 935-937, the Eleventh Circuit, without applying AEDPA deference to a state court's decision, found prejudice.  The evidence counsel should have presented included that Johnson's parents were "abusive alcoholics" rather than the moderate drinkers depicted at trial, that Johnson was "singled-out" for physical and emotional abuse and torment by his mother, that Johnson's grandparents, rather than being the nurturing safe-haven portrayed to the jury, also "inflicted horrible physical and emotional abuse on [Johnson] in a home he described as 'pure hell,'" that Johnson's grandparents psychologically tormented him by rubbing his face in his own urine when he wet the bed, and that Johnson's mother and brother died in the same manner–drug overdose–and that when petitioner found his mother after her suicide she was clutching a picture of his dead brother.  *Id.* at 936-37.  If for no other reason, *Johnson* is plainly

---

[33]   The court does note, however, that, as with the numerous other Supreme Court cases cited by petitioner, the mitigating evidence counsel failed to discover and present in *Sears* presents a more compelling case than that omitted by counsel in this case.  The mitigating evidence in *Sears* included, *inter alia*, that Sears "suffered sexual abuse at the hands of an adolescent male cousin," was subject to severe and humiliating verbal abuse by both of his parents, including in front of his teachers and others, and that Sears was described in high school as "severely learning disabled and as severely behaviorally handicapped." *Sears*, 130 S.Ct. at 3262 (internal quotations and citations to the record omitted).  Even apart from this evidence, however, the Court found "more significant[]" evidence that "Sears suffered significant frontal lobe abnormalities" which were traceable, at least in part, to the "several serious head injuries he suffered as a child[.]"  *Id.* at 3262-63.  Even if this evidence were not more compelling than the evidence that petitioner has produced, it bears mentioning that on remand to the state courts in *Sears*, the Supreme Court of Georgia unanimously held, after a far more exhaustive review of the evidence than that conducted by the United States Supreme Court, that Sears was unable to establish prejudice.  *See Sears v. Humphrey*, 294 Ga. 117, 751 So. 2d  365, 377-95 (Ga. 2013).

distinguishable from the instant case because there is no doubt that, unlike in *Johnson*, petitioner's grandparents actually provided him with a caring and nurturing haven from whatever abusive circumstances he alleges were created by his own parents.

Likewise, in *Cooper v. Secretary, Department of Corrections*, 646 F.3d 1328, 1342-46 (11th Cir. 2011), a case which the Eleventh Circuit deemed "strikingly similar" to *Johnson*, *see* 646 F.3d at 1354, the Eleventh Circuit again found prejudice without the constraints of the AEDPA. The petitioner presented during post-conviction proceedings extensive evidence about, *inter alia*, the pervasive and extreme physical abuse inflicted by his father, which was corroborated by evidence of bruising that was observed by the petitioner's school principal, significant head trauma related to petitioner's abuse that caused neurological deficits, and the fact that he was "borderline mentally retarded." This evidence, combined with evidence establishing that the petitioner was under the substantial domination of another at the time of the murder, was sufficient to establish prejudice. *Id.* at 1354-56.

Finally, in *Ferrell*, 640 F.3d at 1234, the Eleventh Circuit found that the state court's judgment that petitioner did not suffer prejudice was unreasonable because the petitioner's "'new' mitigating evidence is consistent, unwavering, compelling, and wholly unrebutted." The evidence counsel should have presented in *Ferrell* had both a familial/home-life component and a mental illness component. As to the former, counsel failed to present evidence that

> Ferrell's father regularly abused his children, especially Ferrell, waking them in the middle of the night to beat them, sometimes stripped naked, with razor strops, fan belts, and old used belts. The family also lived in fear of loan sharks and those to whom their father owed gambling debts. And Ferrell's mother suffered from clinical depression, suicidal ideations, rage blackouts, and urges to physically hurt her children.

*Id.* at 1234.  As to the latter, three separate "mental health professionals averred that Ferrell suffers

from organic brain damage, bipolar disorder, an epileptic seizure disorder, and borderline mental

retardation."  *Id.* at 1234.  This mental health evidence "weakens the aggravating circumstances"

applied against Ferrell because, his experts opined,

> organic brain damage to Ferrell's frontal lobe has led to impaired insight, impaired
> judgment, increased impulsiveness and explosiveness, emotional and mental
> dysfunctions, decreased ability to plan and understand consequences, and inability
> to process information in stressful situations.  The experts further opined that due to
> Ferrell's temporal lobe epilepsy, he is hyperreligous and hypergraphic, has grandiose
> ideations, takes actions that are sudden, unplanned and undirected, is overtaken by
> powerful emotions (anger or fear), hallucinations or flashbacks, and has altered
> behavior after seizures that results in dullness, unawareness and confusion.
>
> Cumulatively, say the experts, Ferrell has increased impulsivity, decreased
> sound judgment, and takes actions that are not entirely volitional.  Thus, the mental
> health expert opinions would have served to reduce the volitional nature of the crime,
> as well as Ferrell's ability to plan and act rationally, and as a result, undercut the
> senselessness and cold-blooded nature of the crime as stressed by the prosecutor, and,
> importantly, explain Ferrell's odd, disaffected behavior afterwards.

*Id.* at 1235.

For the reasons already discussed elsewhere in this opinion, these cases are materially

distinguishable from petitioner's case despite the apparent stray similarities petitioner's case might

have with aspects of the cases.  Considering the mitigating evidence offered by petitioner, the court

simply cannot conclude that the CCA's determination that he was not prejudiced by his counsel's

investigation, preparation, and presentation of evidence at the penalty phase of trial unreasonably

applied clearly established federal law.  Rather, petitioner's case is consistent with a number of cases

where, although additional mitigating evidence was presented in postconviction proceedings, it

simply was not enough to undermine confidence in the outcome of petitioner's sentencing.  *See, e.g.,*

*Puiatti v. Sec'y, Fla. Dep't of Corr.*, 732 F.3d 1255, 1286-88 (11th Cir. 2013) (finding no prejudice,

despite that the petitioner presented new mitigating evidence including that he was "physically abused by his father and mother, sometimes with objects like wooden spoons, and sometimes without provocation," "verbally abused by his father," and "had a mother who was abused by [his] father and let men inside the family home," because of the strength of the aggravating circumstances and the possibility that additional mitigating evidence would have opened to door to negative information about the petitioner); *Lee*, 726 F.3d at 1194-96 (finding, without AEDPA deference, that petitioner's mitigating evidence was not cumulatively on par with that of *Rompilla, Wiggins,* or *Porter* because the evidence was not as compelling on the issues of poverty, abuse, and neglect presented in those cases, the petitioner's "new" substance abuse evidence, which was cumulative of evidence already presented at trial, and the mitigating evidence failed to link any asserted head trauma he suffered with any alleged mental illness); *Boyd*, 592 F.3d at 1294-1304 (finding, without AEDPA deference, and despite the fact that the trial court overruled the jury's recommendation of a life sentence, that petitioner's mitigating evidence about alleged abuse, neglect, and poverty, including that petitioner "had been abandoned by an alcoholic, violent father, beaten by an assaultive stepfather, raised by an ineffective mother in an impoverished environment, and looked after by alcoholic, if loving, grandparents," "does not reveal the kind of abuse and deprivation inherent in other cases where *Strickland* prejudice actually has been found").  *See also Rose*, 634 F.3d at 1245-46; *Suggs v. McNeil*, 609 F.3d 1218, 1229-33 (11th Cir. 2010); and *DeYoung*, 609 F.3d at 1290-91.

Petitioner's claim placed the state courts in the difficult position of surmising whether the new mitigating evidence he offered during post-conviction proceedings would have so re-calibrated the balance between the aggravating circumstances and the mitigating evidence adduced at trial that there is a reasonable probability that he would have received a different sentence had his counsel

109

discovered and presented the evidence.  There is no formula whereby petitioner's new facts can be plugged in and an answer to the court's inquiry is computed.  It is not an exercise in formalism or pedantry; petitioner should not win just because he can point to some similar factual elements between his case and those decided by the Supreme Court, and nor should he lose just because he cannot show that his case bears substantially all of the factual elements of any given case in which prejudice has been found.  The reviewing court's obligation is only to consider the totality of the mitigating evidence in conducting its required re-weighing.  Even if this court disagrees with the CCA's judgment or would strike a different balance if conducting its own reweighing of the aggravating and mitigating evidence, habeas relief must be denied unless petitioner can show that the CCA's judgment was unreasonable.  Based upon a review of the entire state court record, this court cannot conclude that the CCA's judgment that petitioner was not prejudiced by his counsel's failure to discover and present the mitigating evidence introduced during post-conviction proceedings was contrary to, or an unreasonable application of, clearly established federal law, as petitioner argues in his petition, *see* Pet. ¶ 81, and in his extensive briefing on the matter, *see* Pet'r's Br. (Doc. # 44) at 94 and Pet'r's Reply (Doc. # 53) at 19.  Accordingly, the court concludes that petitioner is not entitled to habeas corpus relief on his claim that counsel failed to adequately investigate and prepare for the penalty phase of his trial.

### *Petitioner's separate claims about counsel's investigation of mental health evidence and failure to hire an independent psychologist and social worker*

Petitioner's penalty phase claims about counsel's failure to investigate mental health evidence, retain an independent psychologist, and retain a social worker or other mitigation expert (*see* Pet. ¶¶ 82-84) are not separately addressed in his briefing.  Rather, it appears they are

incorporated into the discussion of his broader claim that counsel was ineffective in his investigation for the penalty phase. He makes explicit reference to the subject of the claims in his discussion of counsel's deficient performance. *See* Pet'r's Br. (Doc. # 44) at 50 ("He did not assemble a defense team, obtain co-counsel, or seek assistance from a mental health expert."). And, without explicitly referencing the conclusions of his experts, he appears to have incorporated them into at least one portion of his argument that he was prejudiced by counsel's failure to investigate and prepare for the penalty phase. *See, e.g., id.* at 69 ("Trial counsel was ineffective for failing to present mitigating evidence showing that Bobby's family history and early exposure to substance abuse made him particularly vulnerable to addiction and demonstrating that he became addicted to crack cocaine not as a result of recreational drug use but because he was predisposed by nature and nurture to use substances to shore up his limited capacity to cope with conflict and stress."). For the reasons already stated, to the extent these claims are subsumed within petitioner's larger penalty phase ineffective assistance claim, the court concludes that petitioner is not entitled to relief.

To the extent these claims present discrete allegations of ineffective assistance of counsel that are not incorporated into petitioner's larger claim about counsel's failure to investigate for the penalty phase, petitioner has failed to offer any discernible argument about whether the CCA's judgment on the claims is contrary to, or an unreasonable application of, clearly established federal law, or is based upon unreasonable factual determinations in light of the record before the state court, or even if it is entitled to AEDPA deference in these proceedings. As recounted above, the CCA addressed petitioner's claims about his counsel's failure to investigate mental health evidence and procure expert assistance for the penalty phase in the context of his argument that the circuit court incorrectly precluded him from offering the testimony of the experts at the evidentiary hearing on

his claim that counsel was ineffective at the penalty phase. *See Waldrop*, 987 So. 2d at 1190-93. The CCA articulated distinct bases for upholding the exclusion of petitioner's expert witnesses. As to counsel's failure to sufficiently investigate mental health evidence and failure to retain an independent psychologist for the penalty phase, the CCA held that, given the mental health opinion evidence already available to counsel and his strategic decision not to pursue a "mental-disease defense," counsel had no need for further mental health investigation and hiring an independent psychologist. *Id.* at 1193. The court has already construed this as a judgment on the merits of the performance prong of *Strickland*. As to counsel's failure to hire a social worker, the CCA concluded that petitioner's underlying ineffective assistance claim was meritless because the social worker's "testimony was cumulative of other evidence that had already been presented at the evidentiary hearing," which the CCA would go on to find insufficient to establish prejudice. *Id.*

The court must first determine whether the state court's judgment that counsel did not perform deficiently in his investigation of mental health evidence and failing to hire an independent psychologist and social worker for the penalty phase is contrary to, or an unreasonable application of, clearly established federal law. As discussed in relation to the guilt phase aspect of this claim, counsel initially investigated mental health issues by reviewing the pretrial forensic psychological evaluation and speaking with petitioner. He did not perceive any obvious mental health issues other than the possibility that petitioner's substance abuse and addiction might be relevant to both attacking the intent element at the guilt phase and establishing important statutory mitigating circumstances at the penalty phase. Moreover, he was mindful that Judge Segrest had overrode a jury's life recommendation in a previous, more compelling case in which he had presented a mental health defense utilizing expert opinion from an independent mental health expert. Accordingly, he

112

consulted with the SCHR and decided to retain an expert pharmacologist to testify before the jury

about how crack cocaine affects the brain and influences behavior, cognition, and decisionmaking.

At the penalty phase of the trial, counsel then elicited from Dr. Tackett the sort of pertinent

testimony about mitigating circumstances that counsel clearly had anticipated. Dr. Tackett testified

as follows:

> Basically what crack cocaine does is, not only when it hits the brain does it change the brain chemistry, but actually what happens is, in Mr. Waldrop's case, I think what is occurring, or what occurred was, is that basically with his addiction that his body–in an addictive state, your body has adapted to where it needs the drug, and the body considers having the drug present as normal functioning. So, that when the drug starts disappearing, the body starts rebelling in the sense of something that it thinks is normal, which is the crack cocaine, is missing; and, so, that changes people's behaviors.
>
> Q: Would that cause him to suffer extreme mental or emotional disturbance?
>
> A: I think so. That is many of the symptoms we see with people that not only are on crack cocaine, but that are going through withdrawal, and that is well-documented in the literature.
>
> Q: Based–would it be your opinion that back on April the 5th of 1998, that he was suffering extreme mental or emotional disturbance at the time?
>
> A: Yes. I think his body was–I think there was a conflict between what his moral values were. . . . [Y]our body normally has or your mind has several core values, and when a person becomes impaired, addicted with a substance of abuse, what happens is those core values get swapped out for the drug, because it changes the brain chemistry.

Trial Tr. 1017-18. Dr. Tackett also confirmed his opinion that, as to the other pertinent statutory

mitigating circumstance argued by counsel, due to the changes in petitioner's brain chemistry caused

by crack cocaine, petitioner was impaired in his capacity to conform his conduct to the requirements

of law. *See id.* at 1020, 1024. Dr. Tackett even offered testimony about the effect crack cocaine

could have on somebody with petitioner's "family history": "Well, I think that with the family

history that–you know, that I am aware of, there's already some emotional troubles that have

occurred, and that tends to be exacerbated by crack.  I think also there is some conflict between value systems, based upon some of the conflicts that he has." *Id.* at 1020.[34]

Thus, trial counsel reviewed the evidence, observed petitioner, considered already-available expert opinion about petitioner's mental state at the time of the offense, consulted with a reputable organization experienced in litigating capital cases in Alabama, and, relying upon SCHR's advice and his own prior experience with Judge Segrest in a separate case, determined that he could best explain the serious mitigating evidence implicated by petitioner's use of and addiction to crack cocaine through an expert in neuropharmacology.  He then utilized that expert to present compelling testimony about crack cocaine's effects on the brain and how it influences behavior.  He succeeded in procuring the expert's testimony that two key statutory mitigating circumstances were applicable.  Petitioner's claim, in effect, boils down to whether, in light of the circumstances described above, counsel can be found ineffective for choosing a neuropharmacologist rather than a psychologist to present his overriding mitigation theory.  It is certainly plausible that an expert psychologist who

---

[34]   On the vital issue of crack cocaine's affect on petitioner at the time of the offense, Dr. Tackett's testimony resembles the opinion of the expert psychologist petitioner faults counsel for failing to retain. Petitioner's expert psychologist opined in the Rule 32 proceedings that petitioner

> was in cocaine withdrawal in the immediate period prior to the homicide. . . .  Accordingly, he was under emotional distress and was in a diminished state of self-control . . . .  Cocaine withdrawal is distinguishable from being 'high' on cocaine in that the withdrawal state is aversive.  It is not readily observable by others but experienced nonetheless by the person as impaired social, occupational or psychological functioning.  Whereas euphoria is the predominant response while under cocaine influence, the withdrawal period is featured by agitation, fatigue, and sleep disturbance.

Rule 32 C.R. at 355-56.  Likewise, petitioner's Rule 32 expert, even if more authoritatively, similarly opined that the applicability of the same two mitigating circumstances advanced by Dr. Tackett at the trial.  *See id.* at 357 ("I therefore conclude that the offense was committed while Mr. Waldrop was under the influence of extreme mental or emotional disturbance and that his capacity to conform his conduct to the requirements of law was substantially impaired at the time of the homicide.").

conducted a clinical evaluation of petitioner might have better explained petitioner's actions in the global context of his biological and environmental influences, substance abuse, and other stressors.[35] The state court may even have erred in concluding that counsel reasonably decided not to further investigate mental health evidence or retain such an expert. But it is patently debatable among jurists of reason whether no competent counsel would have done what counsel did in this case.[36] Accordingly, the state court's judgment finding that petitioner cannot show deficient performance is not contrary to, or an unreasonable application of, clearly established federal law and he is not entitled to habeas corpus relief.[37]

---

[35]  In this respect, the court is mindful that in his Revised Sentencing Order the trial judge found, contradicting his own prior findings before remand, that neither of the two statutory mitigating circumstances discussed by Dr. Tackett were supported by the evidence. In rejecting the applicability of the "extreme mental or emotional disturbance" mitigating circumstance, the trial judge reasoned that "Dr. Tackett is neither a psychologist nor a psychiatrist. His expertise is not in the mental health field. He has no clinical experience that qualifies him as an expert concerning *mental or emotional disturbances*" R.-69 at 8 (emphasis in original). However, Dr. Tackett's perceived lack of qualifications to opine on the subject is not the only, or even the most important, factor which influenced the trial judge to reject the mitigating circumstance. Rather, it appears the trial judge rejected the mitigating circumstance primarily because he did not believe it could ever be supported merely by evidence of drug addiction, intoxication, or withdrawal. *See id.* ("Voluntary chemical addiction with its highs and lows is simply not the kind of extreme mental or emotional disturbance that the legislature had in mind when it enacted statutory mitigating circumstance No. 2."). While it is likely that a hypothetical reasonable sentencer might find that this statutory mitigating circumstance could be supported by substance addiction evidence, it is also possible that a reasonable sentencer would not reject out-of-hand Dr. Tackett's opinions about how crack cocaine was affecting petitioner's behavior and decision making at the time of the offense merely because he is not a psychologist or a psychiatrist.

[36]  *See, e.g., Gissendaner*, 735 F.3d at 1331-32 (concluding that state court's finding that counsel adequately investigated mental health evidence was not unreasonable where counsel obtained the petitioner's mental health records, relied upon a mental health exam which might have concerned more than just "mental retardation and insanity," and, importantly, the petitioner did not exhibit the sort of "red flags" calling for further investigation of her mental health–including talking about religion excessively, speaking directly to God, hallucinating, suffering seizures, shaking, speaking gibberish, "or otherwise behaving strangely"–which have been recognized in other cases to compel more stringent investigation into mental health issues).

[37]  Furthermore, the court is not convinced that, were this claim not denied on deficient performance grounds, petitioner could show prejudice. The petition states that counsel should have hired an independent
(continued...)

Petitioner's final allegation in support of his claim about counsel's failure to sufficiently investigate and prepare for the penalty phase is his claim that counsel failed to hire a social worker or other mitigation expert to prepare a social history of petitioner or otherwise assist with counsel's investigation and preparation of mitigating evidence.  The court has already determined that, to the extent this claim is separate from the larger claim about counsel's failure to investigate, it is not procedurally barred because it was presented to the CCA in the context of the circuit court's exclusion of petitioner's expert at the Rule 32 evidentiary hearing.  The CCA merely held that the circuit court's exclusion of the expert's testimony was permissible because it would have been cumulative of the lay testimony already presented at the evidentiary hearing.  The CCA therefore at least implicitly found that petitioner's ineffective assistance claim was without merit for two reasons: 1) as to deficient performance, the state court observed that "'the decision to hire a social worker appears to be second-guessing by current counsel, rather than identification of a defect in trial

---

[37](...continued)

psychologist to testify that "this tragedy resulted from a chemical dependency on crack cocaine."  Pet. ¶ 83. However, such testimony would have been markedly similar to the testimony counsel did offer through Dr. Tackett who testified that "the deaths resulted as a result of wanting to get the necessary funds to buy the drug.  That the individuals were killed in order to get the money in order to purchase enough drugs to get out of the craving stage."  Trial Tr. (R.-10) at 819; *id.* at 829 ("I think that the necessity of getting the drug was the motivating factor for the murder.").  Dr. Tackett described petitioner's addiction as a "psychological addiction" in that, although the addict's body can function without the drug, withdrawal from the drug typically causes severe psychological symptoms, including depression, paranoia, and extreme agitation, irrationality, confusion, and hyperactivity.  *Id.* at 820-21.  Perhaps a reasonable sentencer would have been better swayed by such testimony if coming from a psychologist.  But the court cannot conclude that it was folly to offer the testimony from Dr. Tackett, or that there is a reasonable probability that petitioner's sentence would have been different merely had counsel offered such an expert.

Likewise, "the mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial."  *Reed*, 593 F.3d at 1242.  *See also Gissendaner*, 735 F.3d at 1332.  Indeed, new or improved expert opinion evidence about the applicability of the type of statutory mitigating circumstances petitioner's psychological expert would have testified about in this case has been held in analogous circumstances insufficient to establish prejudice, even under a *de novo* standard of review.  *See Ponticelli v. Secretary, Florida Dep't of Corrections*, 690 F.3d 1271, 1301-02 (11th Cir. 2012).

counsel's strategy[,]'" *Waldrop*, 987 So. 2d at 1193 n.5 (quoting *Gudinas v. State*, 816 So. 2d 1095, 1108 (Fla. 2002)); and 2) as to prejudice, the state court found that the social worker's testimony would have been cumulative of the evidence petitioner presented at the Rule 32 hearing, including, *inter alia*, the evidence of childhood abuse, neglect, family violence, social isolation and alienation, and substance abuse, which the court would go on to find insufficient to establish prejudice.

Other than his more general argument that counsel failed to sufficiently investigate and prepare for the penalty phase of trial, petitioner has not presented any argument that the state court's judgment on this claim is contrary to, or an unreasonable application of, clearly established federal law.  As to deficient performance, for the reasons this court has already articulated, the court finds that the state court's judgment that counsel did not perform deficiently is not contrary to, or an unreasonable application of, clearly established federal law.  Indeed, while counsel is certainly obligated to undertake a reasonable investigation of mitigating evidence in preparation for the penalty phase, there is no general requirement that counsel retain a social worker or any other expert for the penalty phase, even if doing so is a sensible and widely accepted practice.

Petitioner did not ask counsel at the evidentiary hearing why he chose not to hire a social worker or other mitigation expert.  Counsel did testify that petitioner did not tell him that "he had been abused in any manner by any individual" in their interviews.  Rule 32 Tr. (R.-60) at 67.  Rather, petitioner only indicated that his parents had often been uninvolved in his life, and that "his grandparents were his providers and raised him mainly his entire life."  *Id.*  Counsel further testified at the Rule 32 evidentiary hearing that his efforts to speak with petitioner's family were not very fruitful because "much of the family was not very cooperative and did not want to assist Bobby in any way."  Rule 32 Tr. (R.-60) at 48.  He attributed this reluctance to the fact that petitioner's family

was the victims' family as well.  *Id.* at 60.  To the extent counsel might have been unable to gather substantial mitigating evidence about petitioner's childhood and family history from petitioner or a diverse range of family members that might have persuaded him to seek a social worker to compile a social history because petitioner was not forthcoming[38] and his family members were understandably aggrieved by their loss and harboring resentment toward petitioner,[39] his strategic decision to pivot his defense onto the substance abuse and addiction evidence is only made more reasonable.  It is certainly debatable among jurists of reason, therefore, whether in similar circumstances no competent attorney would devote his limited resources and time to retaining and working with a social worker to craft a social history, especially where, as here, counsel perceives his stronger argument lies in explaining the significance of drug abuse and addiction.  To the extent the state court found that counsel did not perform deficiently in failing to hire a social worker, the state court's judgment is not contrary to, or an unreasonable application of, clearly established federal law.

As to prejudice, petitioner has failed to present any argument in his briefing about why he was prejudiced by counsel's failure specifically to hire a social worker.  Petitioner's brief describes the generations of abuse, neglect, and chemical dependence that he argues precipitated the

---

[38]   Petitioner did not testify at the Rule 32 evidentiary hearing and has not challenged counsel's contention that he did not inform counsel of the abuse and neglect evidence that was presented in the Rule 32 proceedings.  The Eleventh Circuit has recognized that counsel's strategy is very reasonably informed by the information conveyed by the client, and that, in particular, "'an attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.'"  *Newland v. Hall*, 527 F.3d 1162, 1202 (11th Cir. 2008) (quoting *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999)).  *See also De Young*, 609 F.3d at 1288; *Stewart v. Secretary, Dep't of Corrections*, 476 F.3d 1193, 1210-11 (11th Cir. 2007).

[39]   *See DeYoung*, 609 F.3d at 1285-86 (recognizing that the reluctance of family member witnesses to support the defendant/petitioner because the victims were also family members is an important factor in assessing attorney performance).

circumstances under which he killed his grandparents, but he does not intimate, specifically, how a social worker was uniquely essential in conveying the mitigating value of this information. The court has reviewed the affidavit of his social worker, *see* Rule 32 C.R. at 335-44, in which he presents the social history he faults counsel for having failed to present. The court observes that the social history largely rehashes the evidence introduced in the Rule 32 proceedings, as well as the hearsay evidence the circuit court excluded, and, in interpreting this evidence, offers a theory to explain petitioner's behavior as a function of his environment and the "risk factors" he accumulated over his lifetime leading up to the murders. Even if the context it provides is informative, a state court could reasonably conclude that it is not sufficiently compelling that, due to its absence at trial, confidence in the outcome of the petitioner's sentence is undermined. Accordingly, any state court decision finding that petitioner was not prejudiced by counsel's failure to hire a social worker was not contrary to, or an unreasonable application of, clearly established federal law.

       **3.**     ***Specifically alleged errors in counsel's performance at trial***

In addition to his allegations about counsel's investigation and preparation for the guilt and penalty phases of trial, petitioner presents a number of allegations that counsel was ineffective in his performance at trial. *See* Pet. ¶¶ 85-92. However, petitioner does not discuss the merits of these claims in his briefing, instead relying on the petition to present the entirety of his argument. The court will address these claims in the order in which they are presented in the petition.

       **a.**     **Failure to challenge the admission of petitioner's statement as the fruit of an illegal arrest**

Petitioner first claims that his attorney "was ineffective for not challenging the admission of Mr. Waldrop's statement as the fruit of an illegal arrest." Pet. ¶ 85 (citing *Payton v. New York*, 445

U.S. 573, 590 (1980)).  He incorporates his argument on the overlying substantive claim set forth in Claim M of his petition to demonstrate prejudice.  *Id.*  Respondents argue that this claim was exhausted in the state courts, and that petitioner cannot show that the state court's judgment denying this claim was contrary to, or an unreasonable application of, Supreme Court precedent, or that it was based upon unreasonable factual determinations in light of the record before the state courts.  Resps.' Br. (Doc. # 50) at 61.

Petitioner first raised this claim in his Rule 32 petition.  He argued that, because police officers entered his home and forcibly arrested him without a warrant or exigent circumstances, the subsequent custodial statement he gave was inadmissible.  R.-52 at 35.  The circuit court denied the claim on its merits, finding that, based upon the testimony at trial, petitioner was not arrested at his home because he was living with his grandparents in Alabama at the time of the murders and he was arrested at his mother's mobile home in Georgia.  R.-73 at 10.  He argued on appeal to the CCA that the circuit court erred in summarily denying his claim "without giving Mr. Waldrop an opportunity to prove his allegations."  R.-63 at 78.  The CCA affirmed.  987 So. 2d  at 1207.  Petitioner then raised the claim in his petition for certiorari review in the Alabama Supreme Court.  R.-67 at 67.  The Alabama Supreme Court denied certiorari.  R.-76.

Petitioner has not presented any argument that the CCA's decision denying relief on this claim is not entitled to AEDPA deference, that it is contrary to, or unreasonably applies, Supreme Court precedent, or that it is based upon an unreasonable finding of fact.  There is no appreciable argument in support of his illegal arrest contention in the portion of his brief discussing Claim M, and he has pointed to no evidence, in state court or in this court, which substantiates his claim that he was arrested in his own home.  *See* Pet'r's Br. (Doc. # 44) at 135-36.  In ¶ 139 of the petition, he

asserts that the "arrest took place in a mobile home where Mr. Waldrop resided with members of his family." But the portion of the trial record he cites to support this allegation consists only of the testimony of one of the arresting officers about the circumstances surrounding the arrest at the mobile home in Georgia. It offers nothing in support of any contention that petitioner lived at the mobile home at the time of the arrest.[40] Petitioner has failed to show, therefore, that the state court's finding of fact on this issue is not entitled to the presumption of correctness under § 2254(e)(1). Moreover, petitioner has not overcome the deference owed to the state court's judgment under § 2254(d), and he has not demonstrated deficient performance or prejudice. Accordingly, this claim is due to be denied.

### b.      Failure to move for a change of venue

Petitioner asserts that his attorney was "ineffective for not moving for a change of venue" considering the small, mostly rural population of Randolph County and the "extensive media and public attention" devoted to the murders. Pet. ¶ 86. Respondents argue that this claim is procedurally barred because it was not raised in petitioner's appeal of the denial of his Rule 32 petition, it is consequently unexhausted in the state courts, and petitioner would be precluded by state procedural rules from returning to state court to exhaust the claim. Resps.' Br. (Doc. # 41) at 18-19. Petitioner has asserted, without specific argument, that the claim is not procedurally barred because

---

[40] Indeed, as the state courts concluded, the trial evidence consistently demonstrated that petitioner lived with his grandparents, not his mother, at the time of the murders. *See* Trial Tr. 363-64 (petitioner's aunt testifying that petitioner had lived with his grandparents for two weeks at the time of the murders, that he had lived with Clara's parents before that, that he had lived with Mrs. Irelan before that, and that he had lived with his grandparents before that). Petitioner's mother testified that he and Clara came to her home on Tuesday morning, and that they were brought there by Clara's mother. *Id.* at 739-40. She testified that petitioner had last lived in her home in "the last part of November" in the year before the murders, and that that had lasted for six or eight weeks. *Id.* at 741-42. She confirmed that petitioner had lived with his grandparents for a few weeks before the murders. *Id.* at 742. Even petitioner testified that he was living with his grandparents at the time of the murders. *Id.* at 1029-30.

he did exhaust the claim in the state courts.  Pet'r's Br. (Doc. # 44) at 95-96; Pet'r's Reply (Doc. # 53) at 19-20.

Petitioner raised this issue in his Rule 32 petition.  R.-52 at 36-37.  The circuit court summarily denied the claim on its merits, relying on the trial court's statement at the conclusion of *voir dire* that, although many of the potential jurors had been exposed to some pretrial publicity about the case, there was no indication that the potential jurors responded emotionally to the publicity or that they could not cooly and impartially judge the evidence and apply the law.  R.-73 at 11.  Despite this determination on the merits of his claim, petitioner did not specifically reference this claim in his larger objection on appeal about the circuit court's summary denial of his claim of ineffective assistance at the guilt phase.  *See* R.-63 at 77-79.  For this reason, the CCA did not address the circuit court's denial of the claim.  *Waldrop*, 987 So. 2d  at 1205.

Petitioner has not directed the court to any portion of the record which demonstrates that he presented this claim in his state court appeals of the denial of his Rule 32 petition.  Thus, because petitioner did not raise this claim in his appeal of the circuit court's denial of his Rule 32 petition, he did not fairly present the claim at all levels of the state court's review process and, consequently, he has not exhausted the claim.  Because petitioner would likewise now be barred by state procedural rules from returning to state court to exhaust the claim, the claim is procedurally defaulted from federal habeas corpus review and is due to be dismissed.

> **c.    Failure to conduct an adequate voir dire, failure to obtain necessary information to support peremptory and cause challenges to jurors, and failure to move to strike a biased venireperson**

Petitioner next claims that his attorney "did not conduct an adequate voir dire and thereby deprived Mr. Waldrop of a fair and impartial jury," (Pet. ¶ 87), did not "obtain the information

necessary to remove biased jurors for cause and to make effective use of peremptory challenges," (*id.* at ¶ 88), and "did not move to strike" juror M.S. for cause (*id.* at ¶ 89). Respondents contend that these claims are procedurally barred because petitioner did not raise any of the claims in his appeal of the denial of his Rule 32 petition. Resps.' Br. (Doc. # 41) at 19-23.

Petitioner raised these claims in his Rule 32 petition. R.-52 at 38-40. The circuit court summarily denied the claims on their merits, citing to the juror questionnaires and instructions to the jury as indicating that petitioner could not show prejudice. R.-73 at 12-13. Despite this determination on the merits of his claim, petitioner did not specifically reference these claims in his larger objection on appeal about the circuit court's summary denial of his claim of ineffective assistance at the guilt phase. *See* R.-63 at 77-79. For this reason, the CCA did not address the circuit court's denial of the claims. *Waldrop*, 987 So. 2d at 1205.

Petitioner has not directed the court to any portion of the record that demonstrates that he presented these claims in his state court appeals of the denial of his Rule 32 petition. Thus, because petitioner did not raise these claims in his appeal of the circuit court's denial of his Rule 32 petition, he did not fairly present them at all levels of the state court's review process and, consequently, he has not exhausted the claims for federal habeas review. Because petitioner would likewise now be barred by state procedural rules from returning to state court to exhaust the claims, they are procedurally defaulted from federal habeas corpus review and are due to be dismissed.

### d.    Failure to object to prejudicial evidence

Petitioner claims that his attorney was ineffective because he "did not object to evidence that Mr. Waldrop and his co-defendant Clara stole and illegally pawned a riding lawnmower earlier on the day of the offense." Pet. ¶ 90. He asserts that counsel's objection to "evidence regarding the

pawning of other stolen items was sustained" because such evidence was prejudicial, and, had counsel similarly objected to evidence about the lawnmower, it too would have been excluded.  *Id.* Respondents assert that this claim is procedurally barred because petitioner did not raise it in his direct appeal of the circuit court's denial of his Rule 32 petition.  Resps.' Br. (Doc. # 41) at 23-24.

Petitioner first raised this claim in his Rule 32 petition.  R.-52 at 40-41.  The circuit court denied the claim on its merits, finding that "counsel is not required to make every possible objection to be effective."  R.-73 at 13.  On appeal to the CCA, petitioner only argued that the circuit court erred in denying this claim to the extent the court based its decision on the fact that it was determined on direct appeal that admission of the lawnmower evidence did not constitute plain error.  R.-63 at 79.  Citing a decision of the Alabama Supreme Court, petitioner argued that the circuit court applied the "wrong legal standard."  *Id.*  The CCA did not specifically refer to or discuss this claim in its opinion affirming the denial of the Rule 32 petition.

Given all of the above, it is arguable whether this claim was fairly presented and exhausted in the state courts.  However, the court ultimately need not resolve that question because, even assuming that the claim is not procedurally defaulted and is entitled to *de novo* review in this court, petitioner is not entitled to habeas relief.  First, as to deficient performance, petitioner has not shown that the circumstances surrounding the pawning or selling of the lawnmower were not so different from those of the other items counsel succeeded in having excluded such that his failure to object to evidence about the lawnmower could be deficient.  That is, while evidence about other items stolen and pawned by petitioner might have been inadmissible as prior bad acts because those events were not necessarily temporally related to the crime for which petitioner was on trial, petitioner has not rebutted the CCA's conclusion on direct appeal that evidence about the lawnmower was part of

124

the "corpus delicti of a robbery committed during a murder," *Waldrop*, 859 So. 2d at 1167, since it occurred on the same day as the murders.  More importantly, though, petitioner has not presented any argument or rationale for how he suffered cognizable *Strickland* prejudice due to counsel's failure to object to the evidence about the lawnmower.  The evidence of petitioner's guilt, even absent any testimony about the lawnmower, is overwhelming.  There simply is no reasonable probability that the jury would have had a reasonable doubt about petitioner's guilt had counsel objected to the testimony about the lawnmower.  *See, e.g.*, *Peoples v. Campbell*, 377 F.3d 1208, 1236-37 (11th Cir. 2004) (denying conclusory ineffective assistance claim based upon counsel's failure to object to certain evidence because petitioner could not show prejudice); *Duren v. Hopper*, 161 F.3d 655, 662-63 (11th Cir. 1998) (finding no prejudice on petitioner's claim that counsel failed to object to improper prosecutorial remarks because evidence of guilt, including petitioner's confession, was "overwhelming"); *McKenzie v. Sec'y, Fla. ep't of Corr.*, 507 F. App'x 907, 908-09 (11th Cir. 2013) (citing *Strickland*, 466 U.S. at 697) (finding that habeas petitioner was not prejudiced by counsel's failure to object to the admission of prejudicial hearsay statements given the totality of the other evidence admitted at trial).  Because petitioner cannot establish deficient performance or prejudice, he is not entitled to habeas corpus relief on this claim.

### e.      Failure to adequately cross-examine Ricky Whaley

Petitioner next claims that his attorney failed to cross-examine "Ricky Whaley, a crucial state witness who is related to one of the victims' daughters, about his interest in the outcome of the trial." Pet. ¶ 91.  Respondents contend that this claim is procedurally barred because it was not raised in petitioner's appeal of the denial of his Rule 32 petition.  Resps.' Br. (Doc. # 41) at 25-26.

Petitioner first raised this claim in his Rule 32 petition.  R.-53 at 41-42.  The circuit court denied the claim on its merits.  R.-73 at 14-15.  Petitioner did not discuss or otherwise mention this claim in the portion of his appellate brief challenging the circuit court's denial of his guilt phase ineffective assistance claims.  R.-63 at 77-80.  For this reason, the CCA did not address the circuit court's denial of the claim in its opinion.  *Waldrop*, 987 So. 2d  at 1205.

Petitioner has not directed the court to any portion of the record that demonstrates that he presented this claim in his state court appeals of the denial of his Rule 32 petition.  Thus, because petitioner did not raise the claim in his appeal of the circuit court's denial of his Rule 32 petition, he did not fairly present it at all levels of the state court's review process and, consequently, he has not exhausted the claim for federal habeas review.  Because petitioner would likewise now be barred by state procedural rules from returning to state court to exhaust the claim, it is procedurally defaulted from federal habeas corpus review and is due to be dismissed.

### f.  Failure to prepare Shirley Irelan for her testimony

Petitioner next claims that his attorney "did not prepare . . . Shirley Irelan for cross-examination by the State and never discussed with her techniques for effective communication." Pet. ¶ 92.  Petitioner appears to allege that this failure manifested itself when Mrs. Irelan was interrupted in her testimony by the trial judge, "admonished and intimidated" by him about her testimony, and then forced to continue with her testimony "while she was shaken and unprepared."  *Id.* Respondents contend that this claim is procedurally barred because it was not raised in petitioner's appeal of the circuit court's denial of his Rule 32 petition.  Resps.' Br. (Doc. # 41) at 26-27.

Petitioner first raised this claim in his Rule 32 petition.  R.-53 at 42.  The circuit court denied the claim on its merits, concluding that it was insufficiently pleaded because petitioner had failed

to allege how he was prejudiced.  R.-73 at 15.  Petitioner did not discuss or otherwise mention this claim in the portion of his appellate brief challenging the circuit court's denial of his guilt phase ineffective assistance claims.  R.-63 at 77-80.  Consequently, the CCA did not address the circuit court's denial of the claim in its opinion.  *Waldrop*, 987 So. 2d  at 1205.

Petitioner has not directed the court to any portion of the record that demonstrates that he presented this claim in his state court appeals of the denial of his Rule 32 petition.  Thus, because petitioner did not raise the claim in his appeal of the circuit court's denial of his Rule 32 petition, he did not fairly present it at all levels of the state court's review process and, consequently, he has not exhausted the claim for federal habeas review.  Because petitioner would likewise now be barred by state procedural rules from returning to state court to exhaust the claim, it is procedurally defaulted from federal habeas corpus review and is due to be dismissed.

### 4.  *Cumulative Error*

Petitioner's final claim of ineffective assistance is that all of the errors he identifies in the petition "individually and collectively denied Mr. Waldrop the effective assistance of counsel[,]" and that his attorney's "performance in its entirety was so lacking it undermined the reliability of Bobby Waldrop's conviction and sentence."  Pet. ¶ 93.  He asserts that the "state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent."  *Id.*  Respondents assert that this claim is procedurally barred because it was not raised in petitioner's appeal of the denial of his Rule 32 petition.  Resps.' Br. (Doc. # 41) at 27-29.

In his Rule 32 petition, petitioner alleged that counsel's individual and cumulative errors in both the guilt and penalty phases of trial denied him the effective assistance of counsel.  R.-52 at 41-

127

42, 49-50.  The circuit court first denied the claim with respect to the guilt phase based upon its finding that petitioner had failed to present any meritorious guilt phase ineffective assistance claim in the Rule 32 petition.  R.-73 at 15.  After the evidentiary hearing, the court denied petitioner's ineffective assistance claims related to the penalty phase.  R.-74.  On appeal, petitioner argued that he had alleged that his counsel was ineffective at both phases of the trial, but that the circuit court "failed to respond to the claim as a whole and ignored the cumulative nature of the ineffectiveness analysis[.]" R.-63 at 77.

Even assuming that petitioner did fairly present and exhaust a claim that he was denied the effective assistance of counsel due to counsel's cumulative error, the court finds that, contrary to petitioner's assertion in ¶ 93 of the petition, the state court's adjudication of that claim was not contrary to, or an unreasonable application of, United States Supreme Court precedent.  Petitioner has presented no substantial argument in support of any claim of cumulative error, and "he has not shown that in this case the cumulative effect of counsel's alleged errors amounted to ineffective assistance."  *Hunt*, 666 F.3d at 731-32.  *See also Borden*, 646 F.3d at 823 (declining to "elaborate further on the concept of 'cumulative effect'" where the petitioner did not plead sufficient facts to establish prejudice with respect to any single ineffectiveness claim or on such a "cumulative effect" claim).

## C.   Claim F

Claim F is petitioner's claim that his due process rights were violated because the trial judge failed to recuse himself on the basis of personal bias against petitioner.  Pet. ¶¶ 94-101.  Petitioner cites a number of instances as examples of the trial judge's bias, including the following: his denial of petitioner's application for youthful offender status (¶ 95); his involvement in a pretrial meeting

with petitioner's sister in which he sought to intimidate her and secure testimony helpful to the State (¶ 96); his prejudicial comments about whether petitioner had the requisite intent to kill the victims (¶ 97); his conduct in scolding, intimidating, or circumscribing witnesses testifying on petitioner's behalf (¶¶ 98-99); and his appearing to prejudge petitioner's sentence and rely upon evidence not introduced at trial to support the death sentence he imposed (¶ 100).

Respondents first assert that this claim is procedurally defaulted because petitioner did not raise it at trial or on direct appeal, and because the state court found it procedurally barred in collateral review.  Resps.' Br. (Doc. # 41) 29-31.  Petitioner replies that, as to his allegations related to the trial judge's conduct with petitioner's sister, the state courts' imposition of a procedural bar was erroneous and, as to his other allegations in support of his claim, he "fairly presented" such claims in his petition for discretionary review in the Alabama Supreme Court.  *See* Pet'r's Br. (Doc. # 44) 101-04.  In light of petitioner's reliance on his briefing in discretionary review before the Alabama Supreme Court, respondents assert that raising any components of this claim for the first and only time in the petition for certiorari review failed to "fairly present" those components in the state courts and they are procedurally defaulted on that basis in addition to the other asserted procedural bars.  Resps.' Reply (Doc. # 50) 8 n.2.  Notwithstanding his prior representations about having presented at least a portion of his claim for the first and only time in his petition for discretionary review, petitioner clarifies that his "claim was raised in postconviction at the trial court, the Court of Criminal Appeals, and the Alabama Supreme Court."  Pet'r's Reply (Doc. # 53) 1 n.1.

Petitioner first presented a claim in his brief in support of his petition for discretionary review in the Alabama Supreme Court under the header "The Trial Judge Erred by Failing to Recuse Himself on the Basis of Personal Bias or Prejudice and Personal Knowledge of Disputed Evidentiary

Facts." R.-39 at 66.  Petitioner did not present this claim in the Court of Criminal Appeals.  In his

brief in support of the petition, he offered several of the same examples of trial judge conduct that

are set forth in the petition as indicative of the judge's personal bias.  *See id.* at 67-71.  As detailed

in previous sections of this opinion, this claim was not among those the Alabama Supreme Court

considered when it granted certiorari review in this case.  Any component allegations of petitioner's

claim, therefore, that were presented for the first and only time in his petition for discretionary

review were not "fairly presented" in the state courts and, therefore, were not exhausted in the state

courts and are now procedurally defaulted from federal habeas review.  The factual allegations set

out in paragraphs other than ¶ 96 of the petition are subject to this procedural default on this basis.

The allegation of judicial bias in ¶ 96 of the petition, that the trial judge coerced petitioner's

sister to testify against him at trial, was first presented in collateral review in Waldrop's Rule 32

petition.  R.-52 at 58.  The circuit court found this claim procedurally barred because it could have

been raised at trial or on appeal.  R.-73 at 20-21.  The court also found that the claim was not stated

with sufficient specificity, pursuant to Ala. R. Crim. P. 32.6(b), and that it failed to state a claim,

pursuant to Ala. R. Crim. P. 32.7(d), because of other evidence in the record tending to demonstrate

the trial judge's impartiality.[41]  *Id.* at 21.  On appeal, petitioner argued that the trial judge's alleged

conduct violated his constitutional rights, that he was improperly denied the opportunity to prove the

claim by the circuit court, that the claim was sufficiently pleaded and specific, and that there is no

requirement that he prove a claim at the pleading stage in Rule 32.  R.-63 at 71-74.  In denying this

claim, the Court of Criminal Appeals quoted from the circuit court's order and held that the "court

---

[41]   As this court has already noted, this determination by the state court pursuant to Rules 32.6(b) and 32.7(d) is an adjudication on the merits for purposes of applying § 2254(d).  *See Lee*, 726 F.3d at 1208.

correctly found that this claim was procedurally barred because it could have been raised at trial or on appeal." *Waldrop*, 987 So. 2d at 1203-04. In addition, after recounting the testimony of petitioner's sister at the Rule 32 hearing, the Court of Criminal Appeals found as follows: "There was no indication that Judge Segrest had had any unlawful contact with Fortenberry, much less that he coerced Fortenberry to testify. Thus, relief was properly denied on this claim." *Id.* at 1204. Petitioner further raised this claim in his petition for certiorari in the Alabama Supreme Court, *see* R.-67 at 59-62, which denied certiorari review, *see* R.-76. Respondents contend that, due to the Court of Criminal Appeals' finding of a state procedural bar, the judicial bias claim supported by ¶ 96 of the petition is procedurally defaulted. Resp.'s Br. (Doc. # 41) 30-31.

Petitioner argues that, contrary to the Court of Criminal Appeals' holding, he could not have raised his claim of bias based on the judge's conduct toward his sister at trial or on appeal and, in any event, the procedural bar applied in this context is not regularly and consistently applied by the state courts. Pet'r's Br. (Doc. # 44) 101-02. As discussed above, in order for a state court's finding of a state procedural bar to preclude federal habeas review of a claim, the state court must "clearly and expressly say that it is relying on state procedural rules[,]" "the state court decision must rest solidly on state law grounds," and, most pertinent here, the state law procedural rule must be "adequate." *Boyd*, 697 F.3d at 1335-36. A state procedural rule is "adequate" if it is not "applied in an arbitrary or unprecedented fashion." *Id.* at 1336. Importantly, "[t]he state court's procedural rule cannot be 'manifestly unfair' in its treatment of the petitioner's federal constitutional claim to be considered adequate for purposes of the procedural default doctrine." *Id.*

Applying these principles, the court is troubled by respondents' assertion of procedural default as to this claim. While there is no doubt that the Court of Criminal Appeals "clearly and

expressly" stated its intent to impose a state procedural bar,[42] and that its decision rested firmly on state law grounds, the court is not persuaded that the procedural ground utilized by the state courts is "adequate" because it is not clear that the state courts have regularly and consistently imposed a similar procedural bar to claims premised on allegations of judicial bias or misconduct[43] and, more concerning, the state court's treatment of this claim arguably is "manifestly unfair" considering the nature of petitioner's allegations.

To be sure, federal courts have previously recognized that the Alabama state courts' imposition of a procedural bar due to a Rule 32 petitioner's failure to raise his claim at trial or on appeal, *see* Ala. R. Crim. P. 32.2(a)(3) & (5), constitutes an adequate and independent state procedural ground for purposes of procedural default. *See, e.g. Boyd*, 697 F.3d at 1335 ("We have squarely held that claims barred under Rule 32.2(a)(3) and (a)(5) are procedurally defaulted from federal habeas review.") (listing cases). However, in this instance petitioner persuasively argues that he could not have raised this particular claim of judicial bias at trial or on appeal "because neither Bobby Waldrop nor trial counsel knew about the facts underlying the claim." Pet'r's Br. (Doc. # 44) 101. Petitioner alleges that the trial judge "engaged in a coordinated, *ex parte* effort with the District Attorney to secure the testimony of Bobby Waldrop's sister," which allegedly included threats of jail time should she refuse to testify. Pet. ¶ 96. Petitioner rightfully argues that, by virtue of the Canons

---

[42] Notably, a claim may be procedurally defaulted in federal habeas review even where, as here, the state court reaches a merits determination in the alternative to its procedural ruling. *See Philmore v. McNeil*, 575 F.3d 1251, 1260 (11th Cir. 2009).

[43] To this end, petitioner cites a number of cases for the proposition that Alabama has failed to consistently apply the procedural bar imposed on this claim because "Alabama postconviction courts have, on numerous occasions, considered the merits of claims involving previously unknown judicial bias." Pet'r's Br. (Doc. # 44) 102. Respondent does not rebut petitioner's assertion or cited cases. *See* Resps.' Br. (Doc. # 50) 8 n.2.

of Judicial Ethics, he and his counsel were entitled to rely upon the trial judge's fidelity to his essential obligation to remain impartial or, at a minimum, to avoid participating in a clandestine, *ex parte* meeting where, in collusion with prosecutors, he will intimidate reluctant witnesses into testifying for the State's benefit.

The state courts, however, would afford criminal defendants no such reasonable accommodation.  Despite that nothing in the trial record suggests that counsel should have suspected that petitioner's sister was coerced into testifying by the trial judge,[44] in concluding that petitioner could have raised his claim at trial or on appeal, the circuit court found as follows:  "If the witness remained unwilling to testify against Mr. Waldrop, then the most logical participant in the trial to report this to would have been her brother's lawyer.  If the event occurred and she told Waldrop's attorney, this could have been raised at trial or on appeal."  R.-73 at 21.  The circuit court's explanation, wholly endorsed and adopted by the Court of Criminal Appeals, *see Waldrop*, 987 So. 2d at 1203-04, unfairly assumes that petitioner's then teenaged sister, or any reasonable witness who has just been threatened with incarceration in the presence of both the prosecutor and a powerful judge, would immediately report the judge's conduct to the very entity whose interests are apparently adverse to that of the judge.

Moreover, the state court's rationale also unfairly imposes on defendants and their counsel the obligation to inquire of each witness testifying at trial whether he or she has been coerced into testifying by the improper and intimidating actions of the judge presiding over the trial.  Not only would this tact bog down the trial and distract jurors, it would needlessly antagonize trial judges who

---

[44]   At trial, petitioner's sister testified both within and without the presence of the jury concerning her acquisition of a letter that was admitted as evidence at trial.  *See* Trial Tr. (R.-11) at 840-847, 857-64. She did not offer any testimony suggesting that her testimony was the result of coercion by the trial judge.

have not engaged in such behavior.  Assuming this sort of vigilance by unsophisticated lay witnesses, and requiring this sort of vigilance by counsel, is fanciful and unfair to the litigant who very understandably does not reap the benefit of such extraordinary vigilance in everyday criminal proceedings.  Accordingly, the court cannot conclude that, in this case, the state court's application of the procedural rule was not "'manifestly unfair' in its treatment of the petitioner's federal constitutional claim."  *Boyd*, 697 F.3d at 1336.  The court finds that this claim, as set forth in ¶ 96 of the petition, is not procedurally defaulted and will review the state court's alternative merits ruling on the claim pursuant to § 2254(d).

Petitioner's allegation in ¶ 96 of the petition is as follows:

Judge Segrest further demonstrated his lack of impartiality when prior to trial he engaged in a coordinated, *ex parte* effort with the District Attorney to secure the testimony of Bobby Waldrop's sister, Kristy Fortenberry, against Mr. Waldrop. Mrs. Fortenberry did not want to testify, but after the District Attorney and Judge Segrest threatened her with jail time, she felt pressured and ultimately took the stand at trial.

This allegation was first presented in petitioner's Rule 32 petition.  *See* R.-52 at 58-59.  Although the Rule 32 court summarily dismissed the claim prior to the evidentiary hearing, *see* R.-73 at 20-21, petitioner nevertheless procured Fortenberry's testimony about the meeting with Judge Segrest at the evidentiary hearing.  *See* R.-60 at 391-97.  In making its alternative merits determination, the Alabama Court of Criminal Appeals found Fortenberrry's testimony about the event unpersuasive:

Moreover, Fortenberry testified at the Rule 32 hearing that she met with the prosecutor before trial, that he encouraged her to testify, and that she felt coerced. She said that at the meeting "It was just me and him for a little while, and then I seen Mr. Segrest."  There was no indication that Judge Segrest had had any unlawful contact with Fortenberry, much less that he coerced Fortenberry to testify.  Thus, relief was properly denied on this claim.

*Waldrop*, 987 So. 2d at 1204.  Petitioner argues "[t]his assertion 'was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Pet'r's Br. (Doc. # 44) at 100 (citing 28 U.S.C. § 2254(d)(2)).  He contends that the Court of Criminal Appeals misapprehended Fortenberry's Rule 32 testimony:

> Mrs. Fortenberry clearly and unequivocally testified that she was summoned for a meeting with the District Attorney "[a]nd at some point in the meeting, Judge Segrest was present" and, upon leaving the meeting, Mrs. Fortenberry felt that "they tricked [her] into [testifying]." She explained that "they told [her] if [she] didn't [testify she] could go to jail."[] These facts establish Judge Segrest's involvement in an *ex parte* meeting with the District Attorney and Mrs. Fortenberry during which he assisted in securing her testimony at trial.

*Id.* (citations to the record and footnote omitted).  Because respondents only assert that this claim is procedurally defaulted, they have not responded to petitioner's argument that the state court's adjudication of this claim is based upon an unreasonable determination of the facts pursuant to § 2254(d)(2).

> To review, in determining

> whether a state court's decision was based on an "unreasonable determination of the facts" under § 2254(d)(2), [this court must] presume the state court's factual findings are correct, and the petitioner has the burden to rebut those facts by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).  This statutory presumption of correctness applies to the factual determinations of both state trial and appellate courts. *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003).

*Wellons*, 695 F.3d at 1206.  Upon review of the state court record, and considering the deference and the presumption of correctness owed to the Court of Criminal Appeals' findings of fact, the court cannot conclude that the CCA's decision is based upon an unreasonable determination of the facts in light of the record before the state courts.

135

Because of the circuit court's prior ruling that this claim is procedurally barred, the State sought to exclude and then limit Fortenberry's testimony at the evidentiary hearing about her alleged meeting with Judge Segrest. Thus, the hearing testimony utilized by the CCA in its denying this claim is sparse, equivocal, and is often interrupted with objections and argument about the relevance of the testimony.[45]  Nevertheless, petitioner was able to elicit sufficient testimony such that he voluntarily ceased his questioning on the matter. Rule 32 Tr. (R.-60) at 397. In pertinent part, Fortenberry testified that she was asked by the prosecutor and investigator James Bailey to testify about her recovery of a letter, written by petitioner and intended for his co-defendant wife, which the prosecution intended to introduce into evidence at trial. Rule 32 Tr. (R.-60) at 390. She stated that she had sought to have the letter provided to Bailey, who assured her "that it would be used against Clara, and that it would never be known that I turned it in." *Id.* After ongoing pressure from the prosecutor and Bailey, whom she testified visited her house several times to speak with her about testifying, she went to the courthouse during the trial to discuss the matter with the prosecutor. She testified that at some point during the meeting with the prosecutor she saw Judge Segrest. *Id.* at 391. She testified that Judge Segrest "came into" the meeting. *Id.* at 394. She clarified that neither petitioner or his attorney were present for the meeting. *Id.* at 396-97. Fortenberry did not provide any testimony about Judge Segrests' specific conduct or statements at the meeting. Rather, when asked what happened at the meeting, Fortenberry testified as follows:

---

[45]  Notably, the entirety of the testimony at issue was elicited in redirect examination of Fortenberry at the evidentiary hearing. Petitioner devoted his entire direct examination of Fortenberry to eliciting evidence about the circumstances of petitioner's childhood and his relationship with the victims and other family members. Petitioner questioned Fortenberry about the meeting with Judge Segrest only after the State had questioned her about the circumstances of her trial testimony on cross-examination.

> A.    First when I talked to Mr. Clark [the prosecutor], I was upset because I didn't want to testify because I felt like they tricked me into it any way because of the letter.  Like I said, they ensured me about the letter.  And he showed me a picture of my grandpa and asked me if it changed my mind.
>
> Q.    Were you pressured to testify?
>
> A.    I felt like I was, because they told me if I didn't I could go to jail.

*Id.* at 397.  After this exchange, petitioner concluded his examination of Fortenberry.  *Id.*

It is apparent from the above summary that Fortenberry's testimony at the Rule 32 hearing was, at most, equivocal and vague as to the precise actions or role of Judge Segrest during the meeting about which she testified.  Nowhere did Fortenberry specifically testify that Judge Segrest directly pressured her into testifying, much less that he threatened her with jail for refusing to testify.  The most she says of Judge Segrest is that he appeared at a meeting involving her and the prosecutor and that she felt she had been pressured to testify due to the actions of the unspecified "they."  Petitioner relies upon his own interpretation of the meaning behind Fortenberry's use of "plural pronouns" to substitute for the lack of direct testimony about specific words or actions by Judge Segrest.  *See* Pet'r's Br. (Doc. # 44) at 100 n.25 ("In contrast with Mrs. Fortenberry's use of plural pronouns to refer to the actions of both Judge Segrest and the District Attorney, she used a singular pronoun when referencing statements or actions undertaken only by the District Attorney.").  However, from a fair reading of the transcript, it is not clear that when Fortenberry testified that she felt pressured to testify because "they" told her she could go to jail if she refused, that she was referring to Judge Segrest.  Fortenberry testified that she didn't want to testify but felt tricked into doing so "because of the letter.  Like I said, *they* ensured me about the letter."  Rule 32 Tr. (R.-60) at 397 (emphasis supplied).  However, her earlier testimony makes clear that any assurances about "the letter," including whether it would be used against petitioner and whether it would be disclosed

that she had provided the supposedly crucial evidence, were advanced by the prosecutor and Bailey, the investigator who had repeatedly visited her at her home prior to trial.[46]  Thus, it is far from clear that Fortenberry is referring specifically to Judge Segrest when she complains that she felt tricked or pressured into testifying by unspecified persons.  While it is possible that Fortenberry was referring to Clark and Bailey with her first and second "they" and Clark and Judge Segrest with her third "they," such a conclusion certainly is not compelled by the state court record.  It is equally plausible that Clark or Bailey may have told her that she could go to jail for refusing to testify, especially considering her unambiguous testimony that the two men visited her often to discuss her testimony and made her promises about how and against whom the letter would be used.  The record simply is not clear.  Fortenberry could have clarified the matter by offering direct and unequivocal testimony about Judge Segrest's specific words or deeds that caused her to feel tricked, pressured, or threatened into testifying, but she did not do so before counsel ceased questioning her about the meeting.

Ultimately, the fact that petitioner's claim hinges on the ambiguous diction of the witness and his own grammatical acrobatics to divine her intent is dispositive of this claim.  Considering Fortenberry's ambiguous testimony and the deference owed to the state court's findings of fact and the statutory presumption of correctness, the court simply cannot conclude that the Court of Criminal Appeals' factual finding that "[t]here was no indication that Judge Segrest had had any unlawful contact with Fortenberry, much less that he coerced Fortenberry to tesify" constitutes an unreasonable determination of the facts in light of the record before the state courts.  § 2254(d)(2).

---

[46] *See* Rule 32 Tr. (R.-60) at 391 ("And I called my aunt, and I asked her to take it to James Bailey because he was the investigator.  And so she did.  But it was, like I said, it was supposed to–he ensured me that it would be used against Clara, and that it would never be known that I turned it in.").

138

Accordingly, petitioner is not entitled to relief on his claim of judicial bias based upon the trial judge's purported coercion of Fortenberry's testimony.  To the extent Claim F is not procedurally defaulted, it is denied.

**D.    Claim M**

Claim M is petitioner's claim that his statement was erroneously entered into evidence at trial because it was the product of an illegal arrest, it was involuntary, and it was culled from interview notes that were unlawfully withheld by the State prior to trial.  Pet. ¶¶ 137-43.  Respondents contend that, to the extent this claim is predicated on *Brady v. Maryland*, 373 U.S. 83 (1963), in that petitioner is alleging that the State unconstitutionally withheld exculpatory information contained within the interview notes, the claim was exhausted in the state courts and decided on its merits. Resps.' Ans. (Doc. # 16) 69-70.  However, respondents maintain, the state court's decision is not contrary to, or an unreasonable application of, Supreme Court precedent and, moreover, is not based upon an unreasonable determination of the facts.  *Id.*  Respondents further contend that, to the extent petitioner is complaining that his statement should not have been admitted because it is the product of an illegal arrest, his claim is barred pursuant to the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976).  *Id.* at 71-72.  Finally, as to petitioner's claim that his statement was involuntary, respondents concede that the claim was exhausted and decided on its merits in the state courts, but argue that the state court's judgment denying the claim is not contrary to, or an unreasonable application of, Supreme Court precedent, and is not based upon an unreasonable determination of the facts before the state courts.  *Id.* at 72-73.  The court will examine each of petitioner's discrete arguments about the admission of his statement separately.

139

1.    *Failure to disclose interview notes*

Petitioner first appears to argue that his statement should not have been admitted at trial

because it was not complete.

> The document was not a verbatim account of what Bobby Waldrop said and it
> omitted portions of Mr. Waldrop's statement.  It was compiled from notes taken by
> Agent Wheeles, who destroyed them before providing them to defense counsel (who
> specifically requested them).    The notes contained potentially exculpatory
> information that Wheeles did not include in his typewritten report, which contained
> only statements that he believed were truthful.

Pet'r's Br. (Doc. # 44) at 133-34 (citations omitted).  He maintains that it was erroneous for the court

to admit the statement because the State's failure to turn over the notes "denied Bobby Waldrop his

rights to a fair trial and due process" in violation of *Brady.  Id.* at 134.  Petitioner presented this

claim on direct appeal of his conviction to the Alabama Court of Criminal Appeals, *see* R.-32 at 68-

75, which denied the claim on the merits.  *See Waldrop*, 859 So. 2d  at 1159-60.  Petitioner sought

discretionary review of this claim in the Alabama Supreme Court, *see* R.-38 at 64-67, which was

denied except as to unrelated claims.  Hence, the claim was exhausted in the state courts and the

Court of Criminal Appeals' opinion is the relevant state court decision for purposes of applying §

2254(d).  In denying this claim, the Court of Criminal Appeals observed as follows:

> Waldrop maintains that, under *Brady v. Maryland*, 373 U.S. 83 (1963), he
> was denied due process because, he says, the State failed to comply with the trial
> court's discovery order concerning alleged exculpatory evidence.  Specifically, he
> refers to notes written by Investigator Wheeles during his interview with him on
> April 7, 1998.  Waldrop argues that because Investigator Wheeles destroyed his notes
> containing allegedly exculpatory material, the trial court should not have admitted
> into evidence the signed statement summarizing the information contained in the
> notes taken during Waldrop's interview.
>
> The evidence at issue here was notes taken by Investigator Wheeles during
> an interview of Waldrop on April 7, 1998.  During a suppression hearing,
> Investigator Wheeles testified that, in accordance with a standard precautionary

procedure of the Alabama Bureau of Investigation, he destroyed those notes. Additionally, Investigator Wheeles stated that Investigator James Bailey compiled a statement summarizing the information contained in his and Investigator Bailey's notes taken during the interview. Investigator Wheeles indicated that the information contained in that statement did not vary from the destroyed notes. However, at trial, Investigator Wheeles testified that Waldrop had initially told him that he was in Georgia when his grandparents were killed. Waldrop's statement concerning his alleged absence from the state during the murders was not contained in the statement summarizing Waldrop's interview. Defense counsel objected and moved for a mistrial on the ground that the State had violated the trial court's discovery order and had failed to produce the statement concerning Waldrop's alleged absence from the state during the murders. The trial court overruled the objection and denied the motion for a mistrial. The trial court further determined that, because defense counsel was able to confer with Waldrop concerning any statements he had made, defense counsel had access to the information.

In *Freeman v. State*, 722 So. 2d  806 (Ala. Crim. App. 1998), this Court addressed the discovery of a defendant's statements to the police, wherein we stated:

> "To prove a *Brady* violation, a defendant must show that '(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; (3) the evidence was material to the issues at trial.'" *Johnson v. State*, 612 So. 2d  1288, 1293 (Ala. Crim. App. 1992), quoting *Stano v. Dugger*, 901 F.2d 898, 899 (11th Cir. 1990), *cert. denied, Stano v. Singletary*, 516 U.S. 1122 (1996). *See Smith v. State*, 675 So. 2d  100 (Ala. Cr. App. 1995). "'The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.'" *Johnson*, 612 So. 2d at 1293, quoting *United States v. Bagley*, 473 U.S. 667, 682, (1985)."
>
> ". . .
>
> ". . . As for the appellant's statement to the police, the appellant's counsel could have discovered from the appellant himself the fact that the appellant had given a statement. Thus, the appellant could have obtained all of the evidence in question by exercising due diligence. 'There is no *Brady* violation where the information in question could have been obtained by the defense through its own efforts.' *Johnson*, 612 So. 2d at 1294; *see also Jackson v. State*, 674 So. 2d  1318 (Ala. Cr. App. 1993), *aff'd in part and rev'd in part on other grounds*, 674 So. 2d  1365 (Ala. 1994). "Evidence is not 'suppressed' if the defendant either knew . . . or should have known . . . of the essential facts permitting him to take advantage of any exculpatory evidence."

> *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)[, *cert. denied*, 459 U.S. 1174 (1983)].  *Carr v. State*, 505 So. 2d 1294, 1297 (Ala. Cr. App. 1987) (noting, 'The statement the appellant contends was suppressed in this case was his own, and no reason was set forth to explain why he should not have been aware of it.')  Where there is no suppression of evidence, there is no *Brady* violation.  *Carr*, 505 So. 2d at 1297."

722 So. 2d at 810–11.

> Given that defense counsel was able to confer with Waldrop regarding the statement, Waldrop has failed to establish that he was injured by the destruction of Investigator Wheeles's notes.  Because a *Brady* violation did not occur, the trial court did not abuse its discretion in admitting into evidence the statement summarizing Waldrop's interview.

*Waldrop*, 859 So. 2d at 1159-60.  Petitioner argues that the CCA's decision "unreasonably applies *Brady*" and "is unreasonable in light of the record, which shows that Bobby had not slept or eaten for a long period and was laboring under extreme intoxication and/or withdrawal at the time of his statement and therefore could not recall what was said during his interrogation with police."  Pet'r's Reply (Doc. # 53) at 21.

Petitioner's argument that the state court's decision was contrary to or an unreasonable application of *Brady* is without merit.  It is evident that the only information encompassed within this particular *Brady* claim is petitioner's own purportedly exculpatory statements to law enforcement investigators.  The Eleventh Circuit has affirmed the denial of habeas corpus relief under similar circumstances.  In *Boyd v. Commisioner, Alabama Department of Corrections*, the habeas petitioner sought post-conviction relief in state court, alleging that "the State failed to provide exculpatory statements made by Boyd while he was in police custody and at the District Attorney's office prior to being charged."  697 F.3d at 1327-28.  The state court denied relief on procedural and

142

substantive grounds.  *Id.* at 1329.  In affirming the district court's denial of Boyd's petition for

habeas relief, the Court of Appeals held as follows:

> But even if the *Brady* claims, somehow, were not procedurally barred, the state court
> did not act contrary to or unreasonably apply clearly established Supreme Court law
> in rejecting them.  As for the first one–that Boyd's statement to police was
> suppressed–this is not *Brady* material.  Boyd was obviously present during this
> questioning and thus aware of anything he may have said.  Evidence is not
> suppressed "if the evidence itself . . . proves that [the petitioner] was aware of the
> existence of that evidence before trial."  *Felker[v. Thomas*, 52 F.3d 907, 910 (11th
> Cir. 1995)].

*Id.* at 1335.  Thus, it was not unreasonable in this case for the Court of Criminal Appeals to rely upon

petitioner's presence and presumed knowledge of his own statements to the investigators in

concluding that no *Brady* violation occurred.

To the extent petitioner claims that the Court of Criminal Appeals' opinion "is unreasonable

in light of the record," in that he could not have been aware of the possibly exculpatory content of

his own statements given his mental state and purported "extreme intoxication" at the time of the

statement, *see* Pet'r's Br. (Doc. # 53) at 21, the Court of Criminal Appeals separately addressed this

issue in its consideration of petitioner's *Miranda* claim, which the court will discuss below.  In short,

the state court rendered presumptively correct findings of fact in support of its conclusion that

petitioner's statement was voluntary which petitioner has not rebutted by clear and convincing

evidence.  Accordingly, the findings are entitled to deference under the AEDPA, and the court does

not find them, or the state court's legal conclusion based on those findings, unreasonable.  The court

concludes that, in accordance with *Boyd*, the CCA's judgment that petitioner's rights under *Brady*

were not violated by the State's failure to disclose the investigators' notes of petitioner's own

143

statements to the investigators is not contrary to, or an unreasonable application of, *Brady* or any other Supreme Court precedent.

### 2.     *Petitioner's claim of illegal arrest*

Petitioner claims that his "statement should have been suppressed because it was the product of an illegal arrest[,]" in that he was "arrested in his home without a warrant, without consent, and without exigent circumstances."  Pet. ¶ 139.  In response to respondents' argument that this claim is barred in habeas corpus by the doctrine of *Stone v. Powell*, petitioner argues that respondents "overlook[] the claim that counsel was ineffective for failing to challenge the statement as the fruit of Mr. Waldrop's illegal arrest."  Pet'r's Reply (Doc. # 53) at 22.  Indeed, petitioner did allege in the petition that "counsel was ineffective for not challenging the admission of Mr. Waldrop's statement as the fruit of an illegal arrest."  Pet. ¶ 85.  He maintains that *Stone* "does not bar ineffectiveness claims."  Pet'r's Reply (Doc. # 53) at 22.  To the extent this may be accurate, it nonetheless appears petitioner concedes that any freestanding illegal arrest claim is barred by *Stone*.  To the extent petitioner argues that this claim remains viable due to his ineffective assistance claim, the court has already disposed of the ineffective assistance claim in a prior portion of this opinion.  Accordingly, the court finds that petitioner is not entitled to relief on his claim that his statement was erroneously admitted because it was the fruit of an illegal arrest.

### 3.     *Petitioner's claim that his statement was involuntary*

Petitioner also claims that his statement "should have been suppressed because it was involuntary."  Pet. ¶ 141.  He argues that he "was arrested and interrogated immediately after a period of several days during which he consumed cocaine and other drugs and had not slept or eaten regularly[,]" and that trial testimony "established that he was experiencing the effects of the cocaine

or the withdrawal symptoms associated with its use at the time he was subjected to the investigator's leading questions." *Id.* at ¶ 142. Thus, he maintains, "there is insufficient evidence to establish that his confession was voluntary or that it conforms with the commands of *Miranda* and its progeny." *Id.* Petitioner presented this claim on direct appeal of his conviction to the Alabama Court of Criminal Appeals, *see* R.-32 at 75-79, which denied it on the merits. *See Waldrop*, 859 So. 2d at 1155-59. Petitioner sought discretionary review in the Alabama Supreme Court, *see* R.-38 at 72-73, which was denied except as to unrelated claims. Hence, the claim was exhausted in the state courts and the CCA's opinion is the relevant state court decision for purposes of applying § 2254(d).

In denying this claim, the CCA thoroughly examined the governing law and the relevant evidence:

> Waldrop maintains that the trial court erred in denying his motion to suppress statements he made to the police. Specifically, he claims that he was unable to understand his *Miranda*[] rights and that he did not voluntarily waive those rights because, he says, at the time of the interrogation, he was under the influence of crack cocaine, he had been deprived of food and sleep, and he was emotional.

> In *Maples v. State*, 758 So. 2d  1 (Ala. Crim. App. 1999), this Court stated:

> "'In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court.'" *Kennedy v. State*, 640 So. 2d  22, 26 (Ala. Cr. App. 1993), quoting *Bradley v. State*, 494 So. 2d  750, 761 (Ala. Cr. App. 1985), *aff'd*, 494 So. 2d  772 (Ala. 1986), *cert. denied*, 480 U.S. 923 (1987). A trial court's ruling on a motion to suppress will not be disturbed unless it is "palpably contrary to the great weight of the evidence." [citations omitted]

758 So. 2d  at 41.

> It has long been the law that a confession is *prima facie* involuntary and inadmissible, and that before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a *Miranda* predicate. *Jackson v.*

145

*State*, 562 So. 2d 1373, 1380 (Ala. Crim. App. 1990).  A two-pronged test is used to determine whether an accused's statement is admissible.  First, the trial court must determine whether the accused was informed of his *Miranda* rights.  Second, the trial court must determine whether the accused voluntarily and knowingly waived his *Miranda* rights before making his statement.  *Holder v. State*, 584 So. 2d 872, 878 (Ala. Crim. App. 1991); *Carpenter v. State*, 581 So. 2d 1277, 1278 (Ala. Crim. App. 1991).

This Court addressed the voluntariness of a waiver of *Miranda* rights in *Click v. State*, 695 So. 2d 209 (Ala. Crim. App. 1996):

> "Whether a waiver is voluntary, knowing, and intelligent depends on the particular facts and underlying circumstances of each case, including the background, experience, and conduct of the accused—i.e., the totality of the circumstances. *Magwood v. State*, 494 So. 2d 124, 135 (Ala. Cr. App. 1985), *aff'd*, 494 So. 2d 154 (Ala.), *cert. denied*, 479 U.S. 995 (1986); *Chandler v. State*, 426 So. 2d 477 (Ala. Cr. App. 1982) (citing *Edwards v. Arizona*, 451 U.S. 477 (1981)); *Myers v. State*, 401 So. 2d 288 (Ala. Cr. App. 1981). The trial court need only be convinced from a preponderance of the evidence that a confession or inculpatory statement was voluntarily made. *Magwood v. State*, *supra*; *Harris v. State*, 420 So. 2d 812 (Ala. Cr. App. 1982). The finding of the trial court as to voluntariness will not be disturbed unless it appears contrary to the great weight of the evidence. *Dill v. State*, 600 So. 2d 343, 368 (Ala. Cr. App. 1991), *aff'd*, 600 So. 2d 372 (Ala. 1992), *cert. denied*, 507 U.S. 924 (1993); *Magwood v. State*, *supra*."

695 So. 2d at 218.

In *Jackson v. State*, 674 So. 2d 1318 (Ala. Crim. App. 1993), *aff'd as to conviction, rev'd and rem'd as to sentence*, 674 So. 2d 1365 (Ala. 1994), this Court stated:

> "'[U]nless intoxication, in and of itself, so impairs the defendant's mind that he is 'unconscious of the meaning of his words,' the fact that the defendant was intoxicated at the time he confessed is simply one factor to be considered when reviewing the totality of the circumstances surrounding the confession.'" *Carr v. State*, 545 So. 2d 820, 824 (Ala. Cr. App. 1989).  "The intoxicated condition of an accused when he makes a confession, unless it goes to the extent of mania, does not affect the admissibility and evidence of the confession, but may effect its weight and credibility."  *Callahan v.*

146

*State*, 557 So. 2d 1292, 1300 (Ala. Cr. App.), *affirmed*, 557 So. 2d 1311 (Ala. 1989)." [citations omitted]

*Jackson v. State*, 674 So. 2d at 1326. *See also Gaddy v. State*, 698 So. 2d 1100, 1117 (Ala. Crim. App. 1995), *aff'd*, 698 So. 2d 1150 (Ala.), *cert. denied*, 522 U.S. 1032 (1997). "'Mere emotionalism and confusion do not dictate a finding of mental incompetency or insanity' so as to render a statement inadmissible." *Callahan v. State*, 557 So. 2d 1292, 1300 (Ala. Crim. App. 1989), quoting *Sullivan v. Alabama*, 666 F.2d 478, 483 (11th Cir. 1982).

A trial court's determination that a defendant voluntarily waived his *Miranda* rights will not be overturned absent an abuse of discretion. *Thompson v. State*, 503 So. 2d 871, 877–78 (Ala. Crim. App. 1986); *Duncan v. State*, 278 Ala. 145, 176 So. 2d 840 (Ala. 1965). "Where the trial judge finds conflicting evidence that the confession was voluntarily made, its finding will not be disturbed on appeal unless found to be contrary to the great weight of the evidence." *Thompson*, 503 So. 2d at 878. "'When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal 'unless found to be manifestly contrary to the evidence.'" *A.W.M. v. State*, 627 So. 2d 1148, 1150 (Ala. Crim. App. 1993), quoting *Ex parte Matthews*, 601 So. 2d 52, 53 (Ala.), *cert. denied*, 505 U.S. 1206 (1992). *See, e.g.*, *Burks v. State*, 600 So. 2d 374, 380 (Ala. Crim. App. 1991); *Leonard v. State,* 551 So. 2d 1143, 1148 (Ala. Crim. App. 1989).

During the suppression hearing, Todd Wheeles, an agent for the Alabama Bureau of Investigations, testified that at 11:55 a.m. on April 7, 1998, in a room at the Coweta County sheriff's office, he read Waldrop his *Miranda* rights and the waiver-of-rights form. Investigator Wheeles stated that he did not speak to Waldrop before he read him his *Miranda* rights. Additionally, the record indicates that Waldrop was not handcuffed and that he had not been charged with the murder of his grandparents. Investigator Wheeles stated that Waldrop signed the waiver-of-rights form, which listed his *Miranda* rights. The form signed by Waldrop stated:

"I have been advised of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

Investigator Wheeles stated that James Bailey, an investigator for the Randolph County Sheriff's Department, was also present and took notes during the interview.

According to Investigator Wheeles, neither he nor Investigator Bailey threatened, coerced, or promised Waldrop anything in return for his making a statement.

Investigator Wheeles testified that, after Waldrop waived his rights, he asked Waldrop if he understood why he was being questioned, and Waldrop stated that he knew that the questioning was in reference to the deaths of Irene and Sherrell. Investigator Wheeles stated that, in his opinion, Waldrop did not appear to be under the influence of crack cocaine. According to Investigator Wheeles, Waldrop drank a soft drink and smoked cigarettes during the interview.

Additionally, Investigator Wheeles testified that, after initially questioning Waldrop, Investigator Bailey reviewed his notes and wrote a summary of Waldrop's statement. Investigator Wheeles stated that Investigator Bailey read the statement to Waldrop, and that, at 1:28 p.m., Waldrop signed the statement. In that statement, Waldrop indicated that, on the evening of April 5, 1998, he and Clara went to a friend's house and smoked crack cocaine for several hours. Waldrop stated that, later that evening, he and Clara returned to his grandparents' house, and that he and his grandfather argued about money. Waldrop gave a detailed statement relating the killing of his grandparents. Waldrop indicated that, during the early morning hours of April 6, he and Clara returned to his friend's house and that he purchased approximately $250 worth of crack cocaine, and that he and the friend smoked the crack cocaine. Waldrop stated that, after he finished smoking the cocaine, he purchased another $250 worth of crack cocaine and that he and a friend smoked it. The statement reveals that Waldrop stated that, later, on the evening of April 6, he smoked an additional amount of crack cocaine worth approximately $50.

The record indicates that, on April 7 at 1:05 p.m. in a room at the Coweta County Sheriff's Department, Investigator Wheeles and Investigator Bailey interrogated Waldrop and that Waldrop gave a second videotaped statement. In that videotape, Waldrop acknowledged that the officers had read to him his *Miranda* rights and that he understood that he had waived his rights. Additionally, Waldrop acknowledged that he understood he was being questioned about the deaths of his grandparents. Waldrop stated that, after killing his grandparents during the late evening of April 5 or the early morning hours of April 6, he and Clara went to a friend's house and smoked approximately $250 worth of crack cocaine. Additionally, Waldrop indicated that, after most of the crack cocaine was gone, he purchased approximately $200 worth of crack cocaine and smoked it with friends. Waldrop stated that, on the afternoon of April 6, he and Clara drove around and smoked approximately $40 worth of crack cocaine. Waldrop indicated that the car ran out of gas and that he and Clara remained in the car overnight. Waldrop stated that, on the early morning of April 7, Clara obtained gasoline from a nearby gas station and filled up their car. Waldrop further stated that they went to Clara's mother's house, and that Clara's mother told them about the incident, and told them

148

that they needed to give a statement to the police. Waldrop's videotaped interview ended at 1:25 p.m.

> The trial court made the following determination:

> "I have heard the evidence. There is no question that the defendant was properly Mirandized. There is no question that the statement was voluntarily made. I have looked at the tape. There's no visible evidence that he was under the influence of drugs so as to be impaired to the extent that he didn't know what he was doing or that he was subject to any—or being coerced or influenced by the police to do what he was doing. In fact, his statement was the epitome of voluntariness. He freely told everything that he did and said. And, of course, I'm not expert enough to know whether he might have had some drugs in his system or not. I think legally it didn't make too much difference even if he had some lingering effects of voluntarily ingested drugs in his system. I don't think that would effect the admissibility of the evidence. And, how much effect it has on the weight would be up to the trier of fact, not the Court. So, the motion to suppress is denied."

At trial, the videotaped statement was played to the jury.

> As did the trial court, we have reviewed the statement contained in the record and the videotaped statement. Although the record indicates that Waldrop was emotional and that he cried during the videotaped statement, a review of the videotape reveals that Waldrop answered the law-enforcement officers' questions in a coherent manner and that he appeared to understand their questions. We conclude that there is no indication that Waldrop was so intoxicated that he could not comprehend his circumstances or that his statements were rendered involuntary.

> Additionally, we reject Waldrop's argument that his statements were not voluntary because, he says, when he made them he had been deprived of food or sleep for a prolonged time. *See, e.g., Pardue v. State*, 695 So. 2d 199 (Ala. Crim. App. 1996). Indeed, there was no testimony from any officers indicating that Waldrop had not received any food or that he had been prevented from sleeping, or that he was exhausted to the point of being unable to give a voluntary statement. The record simply does not establish that Waldrop was deprived of food or sleep before he made the statement. Moreover, whether a defendant was physically exhausted when he gave his statement is merely one factor to be considered by the jury in determining the credibility and weight to afford the statement. *Burgess v. State*, *supra*.

149

Waldrop also appears to argue that there was no showing that he was able to read the waiver-of-rights form and the transcribed statement he signed. Although testimony during the suppression hearing did not reveal the level of Waldrop's education, Investigator Bailey testified at trial that Waldrop told him he had completed ninth grade, and that he could read, and write, and that he understood the English language. In *Ex parte Price*, 725 So. 2d  1063 (Ala. 1998), the Supreme Court of Alabama stated:

> "[W]e will apply the long-standing rule that, in considering whether the trial court properly overruled a defendant's motion to suppress an extrajudicial confession or other inculpatory statement, a reviewing court may consider both the evidence presented at the pretrial suppression hearing and the evidence presented at trial. *See, e.g., Henry v. State*, 468 So. 2d  896, 899 (Ala. Crim. App. 1984)."

725 So. 2d  at 1067 (some citations omitted.). Because Investigator Bailey's testimony revealed that Waldrop was capable of reading the waiver-of-rights form and the transcribed statement, the trial court did not err in admitting the statement.

There was ample evidence from which the trial court could conclude that Waldrop's statements were knowingly and voluntarily made. Thus, the trial court's determination was not palpably contrary to the great weight of the evidence.

*Waldrop*, 859 So. 2d  at 1155-59 (citations to record on appeal omitted).

Respondents maintain that the Court of Criminal Appeals' disposition of this claim is not contrary to, or an unreasonable application of, clearly established federal law, and is not based upon an unreasonable determination of fact in light of the record before the state court. Resps.' Br. (Doc. # 50) at 76-77. In response, petitioner argues that, given the trial evidence of his drug use, withdrawal symptoms, deprivation of food, water, and sleep, and obvious heightened emotional state and anxiety during the interview, respondents have not sufficiently rebutted his argument that he is entitled to relief pursuant to § 2254(d)(2) because the state court's factual findings are unreasonable in light of the evidence. Pet'r's Reply (Doc. # 53) 22-23. Petitioner also argues that the "state court's exclusive reliance on *Miranda* to resolve Mr. Waldrop's Fourteenth Amendment

voluntariness claim was unreasonable[,]" and that this court should "address the merits of the claim under" separate Supreme Court precedents concerning the due process requirements for determining the voluntariness of a statement. *Id.* at 23.

> The determination of a confession's voluntariness requires an examination of the totality of the circumstances and ultimately requires an inquiry into whether the statement was "the product of an essentially free and unconstrained choice." *Hubbard v. Haley*, 317 F.3d 1245, 1252-53 (11th Cir. 2003) (citation and quotation marks omitted). We consider a number of factors, and the presence of one alone is not determinative. *Id.* at 1253. A confession that was not the product of free will and rational[] intellect or that was made when the individual's will was "overborne" by physical, psychological, or drug-induced means, is inadmissible. *Townsend v. Sain*, 372 U.S. 293, 307 (1963), *overruled on other grounds by Keeney v. Tamayo–Reyes*, 504 U.S. 1, 5 (1992). In determining whether or not a confession is constitutionally voluntary, the truth or lack thereof of the statement is irrelevant. *See Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

> In Alabama, although a confession will be deemed inadmissible if the defendant's mind was "substantially impaired" at the time of the confession, "[i]ntoxication, short of . . . impairment of the will and mind as to make the individual unconscious of the meaning of his words, will not render a statement or confession inadmissible." *Free v. State*, 495 So. 2d 1147, 1156 (Ala. Crim. App. 1986) (citation and quotation marks omitted). The voluntariness determination is a matter of law for the trial court, and that court's decision will not be reversed unless it is manifestly wrong or contrary to the great weight of the evidence. *Id.*

*Parker v. Allen*, 565 F.3d 1258, 1280 (11th Cir. 2009). In short, a habeas petitioner claiming that his out-of-court statement was improperly admitted because it was involuntary due to intoxication or undue physical, psychological, or emotional influence must show that the affecting circumstance was so pervasive that it rendered him unable to exercise free will and unaware of the meaning and effect of his words and actions. Because this standard is so high, courts routinely deny claims alleging involuntary confessions based upon intoxication, mental defect, and emotional and psychological vulnerability. *See, e.g., Parker*, 556 F.3d at 1279-80 (holding that petitioner could not show prejudice from counsel's failure to challenge voluntariness of statement, despite that evidence

151

indicated petitioner had consumed several beers and smoked copious marijuana on the day he gave

a statement to police); *Hubbard*, 317 F.3d at 1251-52 (rejecting petitioner's claim that his statement

was involuntary due to his "'biologically coercive state,'" caused by his alcoholism and "low I.Q.[,]"

where he gave his statement at a time when he was either intoxicated by alcohol or suffering severe

withdrawal from alcohol); and *Grayson v. Thompson*, 257 F.3d 1194, 1230 (11th Cir. 2001) (denying

claim that confession should have been suppressed due to alcohol intoxication and "coercive

environment" of the interrogation). *See also United States v. Smith*, 322 F. App'x 876, 878-79 (11th

Cir. 2009) (holding that statement was voluntary where defendant showed only that, while he had

been intoxicated, "at least three hours elapsed" before questioning began); and *Duran v. Walker*, 223

F. App'x 865, 874 (11th Cir. 2007) (denying habeas relief on involuntary confession claim where

police officer testified at the suppression hearing that petitioner did not appear to be under the

influence of alcohol or narcotics, petitioner appeared to understand all questions and answer

coherently, and trial court viewed videotape of interrogation before determining that statement was

voluntary).

On the issue of voluntariness, petitioner does not appear to argue that the CCA's decision

was contrary to or unreasonably applied any clearly established federal law.  Indeed, it is apparent

that, consistent with the cases discussed above, the state court correctly identified the principles

governing its review of petitioner's claim.  *See Waldrop*, 859 So. 2d at 1155-58.  Rather, it appears

that petitioner is primarily arguing

> that the state court's decision is based on an unreasonable determination of the facts
> in light of the evidence presented at trial, 28 U.S.C. § 2254(d), specifically, the
> considerable evidence showing that at the time Mr. Waldrop was brought in for
> questioning, he had been using significant amounts of narcotic drugs, was reeling
> from the pangs of withdrawal, and had gone without sleep, food, and water.

Pet'r's Reply (Doc. # 53) 22-23.  However, even as to this issue, the state court's judgment survives review under § 2254(d)(2).

The Court of Criminal Appeals reviewed the entire record and determined that, although petitioner was clearly emotional as he recounted his actions during the interview, he nevertheless "answered the law-enforcement officers' questions in a coherent manner and . . . appeared to understand their questions." *Waldrop*, 859 So. 2d at 1159.  Thus, the state court held that "there is no indication that Waldrop was so intoxicated that he could not comprehend his circumstances or that his statements were rendered involuntary."  *Id.*  This conclusion, as a finding of fact that petitioner challenges pursuant to § 2254(d)(2), is entitled to a presumption of correctness under § 2254(e)(1) which petitioner can rebut only by presenting "clear and convincing evidence" that the state court erred in its fact finding.  *Burgess v. Comm'r, Ala. Dep't of Corr.*, 723 F.3d 1308, 1315 (11th Cir. 2013).  To meet this burden, petitioner only provides a handful of citations to the state court record, *see* Pet'r's Br. (Doc. # 44) at 135 & Pet'r's Reply (Doc. # 53) at 22-23, consisting of testimony and the statement itself, in support of his sweeping claim that he was so overcome by intoxication or the symptoms of withdrawal that his statement must be considered involuntary. Indeed, there is no dispute that petitioner consumed crack cocaine and possibly other drugs between the time he murdered his grandparents and when he gave his statement.  The statement itself indicated that he and his co-defendant purchased $400-$500 dollars worth of crack cocaine in the day after the murders.  R.-2 at 225-27.  Petitioner indicated that they had consumed all of their drugs by the end of the day after the murders, which was the day before petitioner gave his statement to investigators.  R.-27 at 32-33.  Petitioner also cites to the trial testimony of his expert witness that his behavior during the interview–characterized by "a lot of remorse and emotional

153

fluctuations"–exhibited signs of someone "on the downside of being on crack cocaine." R.-10 at 825.

Thus, while there is evidence that petitioner consumed significant quantities of drugs prior to his statement, there is essentially no evidence that he remained intoxicated at the time of his statement, much less that he was intoxicated to a degree that his statement was involuntary. Agent Wheeles testified that he did not observe any evidence that petitioner was intoxicated at the time he gave his statement, R.-27 at 17, and he attributed petitioner's emotional state during the interview to petitioner's coping with what he had done, not the influence of drugs or withdrawal. *Id.* at 31-32. Moreover, petitioner's own expert testified that petitioner did not appear to be under the "direct" influence of the drug at the time of his statement. R.-10 at 825. While the expert did opine that the drug had altered petitioner's "brain chemistry" such that he was "still experiencing the effects of the drug" without manifest intoxication, he surmised only that petitioner's emotional state was consistent with someone "on the downside of being on crack cocaine." *Id.; id.* at 833. Whatever the lingering effects of crack cocaine or withdrawal might have had on petitioner, the expert conceded that petitioner answered investigators' questions, offered lengthy narrative accounts on his own, and, in general, appropriately engaged in the conversation with investigators. *Id.* at 833-34.[47] Petitioner has not presented any compelling evidence that his emotional behavior during the interview was the result of intoxication or withdrawal from narcotics, as opposed to his own attempt to cope with his actions and grasp their implications, or that his physical, psychological, or emotional

---

[47]   Petitioner's expert psychologist in the Rule 32 proceedings offered a similar opinion: "In the videotaped statement taken by law enforcement, Mr. Waldrop was distraught and emotional and unable to withhold information.  He answered every question posed by the interviewer, was not evasive, and demonstrated appropriate emotional response." Rule 32 C.R. at 356.

state–whatever its provenance–overcame his ability to exercise his free will.  Finally, petitioner failed to present any evidence that he was so deprived of food or sleep prior to making the statement that he was incapable of rendering a voluntary confession.  Indeed, the evidence indicates that petitioner was at least provided with soft drinks and cigarettes during the interview, R.-27 at 36-37, and, according to petitioner's own statement, he had slept in his car the night before the interview. Trial Tr. (R.-2) at 226.

Considering all of this evidence, this court cannot conclude that petitioner has sufficiently rebutted the presumption of correctness to be afforded the state court's findings supporting its conclusion that his statement was voluntarily given.  The court finds that the state court's judgment was not based upon an unreasonable determination of the facts in light of the record before the state courts, and petitioner is therefore not entitled to relief pursuant to § 2254(d)(2).

Petitioner's final argument related to this claim is that the state courts erred in failing to address his argument "that his statement was obtained unlawfully under the Fourteenth Amendment line of cases which includes *Jackson v. Denno*, 378 U.S. 368 (1964), and *Brown v. Mississippi*, 297 U.S. 278 (1936)."  Pet'r's Reply (Doc. # 53) at 23.  Petitioner does not afford this court with a more detailed description of any claim or argument premised on these authorities.  Neither petitioner's petition for writ of certiorari review to the Alabama Supreme Court nor his brief in support of the petition cites *Jackson* or *Brown* in support of his argument that the trial court erred in admitting his statement because it was involuntarily given.  *See* R.-38 at 72-73; R.-39 at 106-08.  Both of these filings present the claim straightforwardly as a voluntariness claim premised on *Miranda* and its

155

progeny.  *Id.*[48]  Thus, while petitioner's brief to the Court of Criminal Appeals included a citation to *Jackson*, *see* R.-32 at 79, it is not clear that any discrete argument predicated on this line of cases was fully exhausted in the state courts.  Ultimately, though, whether petitioner exhausted any such argument is inconsequential because, even assuming he did, the state court's decision is not contrary to, or an unreasonable application of, Supreme Court precedent.

As if petitioner's silence on the matter was not sufficiently confounding, the court fails, on its own, to discern the specific relevance of *Jackson* and *Brown* to his case.  In *Brown*, which was decided in 1936, the Supreme Court reversed a state conviction where the only evidence against the defendant consisted of a statement that, indisputably, was the product of "[c]ompulsion by torture to extort a confession[.]" 297 U.S. at 285.  The Court simply held that due process forbids a state to "contrive[] a conviction resting solely upon confessions obtained by violence." *Id.* at 286.  Petitioner fails to explain how *Brown* compels the conclusion that his own due process rights were violated by the admission of his confession, or how the state court's judgment was otherwise contrary to, or an unreasonable application of, *Brown*.

Likewise, in *Jackson*, which also predated *Miranda*, the Supreme Court rejected the State of New York's trial procedure for determining the voluntariness of confessions, pursuant to which the trial judge "submitted that issue to the jury along with the other issues in the case" and instructed the jury that "if it found the confession involuntary, it was to disregard it entirely" but that "if it found the confession voluntary, it was to determine its truth or reliability and afford it weight accordingly." 378 U.S. at 374-75.  Ultimately, the Court held that this procedure did not comport

---

[48]   At most, petitioner's supporting brief only includes a boilerplate reference to the Fourteenth Amendment in the conclusion of the claim and does not present any specific argument outside of his *Miranda* claim.  R.-39 at 108.

with due process where the voluntariness of the confession is a disputed issue: "In our view, the New York procedure employed in this case did not afford a reliable determination of the voluntariness of the confession offered in evidence at the trial, did not adequately protect Jackson's right to be free of a conviction based upon a coerced confession and therefore cannot withstand constitutional attack under the Due Process Clause of the Fourteenth Amendment." *Id.* at 377.

The essential problem with New York's procedure, according to the Court, was that because "the New York jury returns only a general verdict upon the ultimate question of guilt or innocence[,] . . . [i]t is impossible to discover whether the jury found the confession voluntary and relied upon it, or involuntary and supposedly ignored it." *Id.* at 379. This uncertainty was problematic because due process requires that a "defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." *Id.* at 380; *id.* at 387 ("The admixture of reliability and voluntariness in the considerations of the jury would itself entitle a defendant to further proceedings in any case in which the essential facts are disputed, for we cannot determine how the jury resolved these issues and will not assume that they were reliably and properly resolved against the accused. And it is only a reliable determination on the voluntariness issue which satisfies the constitutional rights of the defendant and which would permit the jury to consider the confession in adjudicating guilt or innocence.").

At its core, then, *Jackson* is concerned with the process employed by a court to reach a reliable determination about the voluntariness of the confession. *See id.* at 391 ("The procedures used in the trial court to arrive at its conclusions on the coercion issue progressively take on added significance as the actual measure of the protection afforded a defendant under the Due Process

Clause of the Fourteenth Amendment against the use of involuntary confessions. These procedures must, therefore, be fully adequate to insure a reliable and clear-cut determination of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend.").  It is evident that courts applying *Jackson* have recognized this as the decision's import; courts often refer to a "*Jackson-Denno* hearing" as a sort of shorthand for a separate hearing where the parties litigate the issue of voluntariness before the trial court.  *See, e.g., Jones v. Walker*, 540 F.3d 1277, 1295 (11th Cir. 2008); *United States v. Woodard*, 531 F.3d 1352, 1363 (11th Cir. 2008); and *Hagins v. United States*, 267 F.3d 1202, 1205 (11th Cir. 2001).  Petitioner's allegations establish, at most, only that he disagrees with the ruling of the state courts on whether his confession was voluntary.  He does not appear to argue that he was afforded insufficient due process by the state courts in reaching its determination on the matter.  Petitioner has not shown that the state court's decision is contrary to or an unreasonable application of *Jackson*.

Petitioner has not shown that the state court's judgment that his statement was voluntary is contrary to or an unreasonable application of clearly established federal law, or that it is based upon an unreasonable determination of fact.  Accordingly, he is not entitled to habeas corpus relief on his claim that his statement should not have been admitted on that basis.

## E.   <u>Claim N</u>

Claim N is petitioner's claim that his rights to a fair trial and due process were violated by the failure of certain jurors to truthfully answer questions during voir dire and otherwise disclose pertinent information.  The majority of these jurors' alleged failures to truthfully answer questions relate to their supposed relationships with prosecutors, court employees, members of the victims' (and, by extension, petitioner's) family, and law enforcement officers.  Other jurors are alleged to

158

have failed to relate information like a juror's motivation to serve on the jury, past involvement with law enforcement, "preoccupation" with crime-scene photographs, and failure to disclose pretrial familiarity with the case.  Pet. ¶¶ 145-150.

Petitioner first raised this claim in his Rule 32 petition.  *See* R.-52 at 50-57.  The trial court found the claim procedurally barred, pursuant to Ala. R. Crim. P. 32.2(a)(3) & (5), because petitioner could have, but did not, raise the claim at trial or on direct appeal.  The court reasoned that "nothing prohibited counsel from speaking with the jurors after their deliberations were completed and they were excused.  This could have occurred prior to the sentencing hearing before the judge or before the time for a Motion for New Trial expired."  R.-73 at 18-19.  In addition to its procedural ruling, the court determined that the claim was due to be dismissed as insufficiently specific, pursuant to Rule 32.6(b), and that, given petitioner's insufficient allegations, the claim was also due to be dismissed pursuant to Rule 32.7(d) because "there is no material issue of fact or law that would entitle the petitioner to relief[,]"  *Id.* at 19.  The circuit court thus summarily dismissed this claim without affording petitioner an evidentiary hearing.  Petitioner appealed this judgment to the Court of Criminal Appeals, *see* R.-63 at 75-76, which affirmed.  *Waldrop*, 987 So. 2d  at 1205.  Petitioner then sought discretionary review in the Alabama Supreme Court, R.-67 at 64-66, which was denied.  R.-76.

Respondents contend that this claim is procedurally defaulted because of the procedural bar imposed by the Court of Criminal Appeals.  Resps.' Br. (Doc. # 41) at 40.  Petitioner argues that the CCA's procedural ruling conflicts with state law, as made clear by the Alabama Supreme Court's subsequent opinion in *Ex parte Burgess*, 21 So. 3d 746, 754 (Ala. 2008).  Pet'r's Br. (Doc. # 44) 139-41.  Petitioner also argues that Alabama state courts do not regularly or consistently apply the

159

procedural bar in similar juror misconduct cases.  *Id.* a 141-42.  Respondents then maintain that Alabama's state courts continue to bar juror misconduct claims in collateral review, even after *Ex parte Burgess*.  Resps.' Br. (Doc. # 50) 77-79.

### 1.    *Procedural default*

Once again, in order for a state procedural rule that barred review of a claim in state court to suffice for procedural default purposes in federal habeas corpus, the rule must be "adequate" in that the rule is "'firmly established and regularly followed.'"  *Boyd*, 697 F.3d at 1336 (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).  And, as noted above, federal courts generally have recognized that Alabama's procedural bars resulting from a Rule 32 petitioner's failure to raise his claim at trial or on appeal are adequate and independent state law grounds for imposing procedural default.  *Id.* at 1335.  Thus, the court must determine whether, in this instance, the procedural bar imposed is firmly and consistently followed in the context of claims like petitioner's.  Upon reviewing relevant case law, the court simply cannot conclude that Alabama's state courts regularly have applied the relevant procedural bars as in this case.

Petitioner's trial occurred in August of 1999.  At that time, the law in Alabama on whether a claim of juror misconduct predicated on a failure to truthfully answer voir dire questions could be barred in a Rule 32 petition was on the precipice of a period of considerable flux.  In 1992, the Court of Criminal Appeals had decided, in *State v. Freeman*, 605 So. 2d  1258 (Ala Ct. Crim. App. 1992),

> that a Rule 32 petitioner's claim alleging a juror's misconduct in failing to truthfully answer questions on voir dire examination was not procedurally barred by Rule 32.2, where defense counsel was not aware of the juror's failure to truthfully answer until one week before the court conducted the evidentiary hearing on the defendant's Rule 32 petition.[]  In *Freeman*, the defendant's counsel uncovered the information during juror interviews.  Thus, the Court of Criminal Appeals held that the issue was not procedurally barred because "the fact that the juror had been a policeman [that fact

160

was the information withheld] was not known at the time of trial or at the time of direct appeal."

*Ex parte Pierce*, 851 So. 2d  606, 616 (Ala. 2000) (citation omitted).  Then, on October 1, 1999, shortly after the conclusion of petitioner's trial, the Court of Criminal Appeals reversed its holding in *Freeman* and held that "[b]efore a claim of juror misconduct may be addressed on the merits in a postconviction petition the petitioner must meet the requirements for newly discovered evidence contained in Rule 32.1(e), Ala.R.Crim.P."  *Brown v. State*, 807 So. 2d  1, 8 (Ala. Crim. App. 1999).  Then, approximately eleven months later, in *Ex parte Pierce*, the Alabama Supreme Court held that, in presenting a claim of juror misconduct based on the failure to truthfully answer questions during voir dire, a Rule 32 petitioner is not required to satisfy the requirements for presenting a Rule 32 petition premised on "newly discovered material facts" pursuant to Rule 32.2(e).  851 So. 2d  at 613.  Rather, because such claims are brought pursuant to Rule 32.1(a), they may be excluded only if they "could have been raised at trial or on appeal," but were not so raised.  *Id.*  In *Ex parte Pierce*, the Alabama Supreme Court clearly envisioned that, in order for a petitioner to be able to show that he could not have raised his juror misconduct claim at trial or on appeal, meaningful evidentiary development was essential to a court's ability to resolve the issue.  *Id.* at 614-17.  In the following years, Alabama courts sometimes found similar claims barred in collateral review due to the petitioner's failure to raise them at trial or on appeal[49] and sometimes concluded otherwise.[50]

---

[49]  *See, e.g., Jenkins v. State*, 972 So. 2d  165, 167-68 (Ala. Crim. App. 2005).  Notably, in *Jenkins*, the Rule 32 petitioner was afforded the opportunity to establish at an evidentiary hearing whether or not his counsel could have raised his juror misconduct claim at trial or on direct appeal prior to the claim being dismissed by the circuit court.  Because Jenkins failed to offer any "evidence indicating why this claim was raised in the Rule 32 petition and not in earlier proceedings[,]" the procedural bar was upheld.  *Id.*

[50]  *See, e.g., McGahee v. State*, 885 So. 2d  191, 201-03 (Ala. Crim. App. 2003).  McGahee, too, was provided with an evidentiary hearing during which he introduced evidence concerning his counsel's inability
(continued...)

Finally, in *Ex parte Burgess*, 21 So. 3d 746 (Ala. 2008), the Alabama Supreme Court greatly clarified the viability of applying the Rule 32.2(a)(3) & (5) procedural bars to claims of this type, and, in doing so, unambiguously repudiated the reasoning employed by the circuit court and Court of Criminal Appeals in this case. The Court explicitly rejected the notion that counsel should be required to engage in a "fishing expedition" to obtain evidence that jurors failed to truthfully answer questions during voir dire in time to present such claims in a motion for new trial or on direct appeal. The Court held as follows:

> Burgess reasonably expected that potential jurors answered accurately the questions posed to them during the voir dire examination. It is unreasonable to hold that a defendant must uncover any and all juror misconduct in the form of inaccurate responses to voir dire examination in time to raise such claims in a motion for a new trial or on appeal. Requiring a defendant to raise such claims of juror misconduct during the interval between the voir dire examination and the filing of posttrial motions places an impracticable burden on defendants. In this case, there is no evidence before us indicating that Burgess suspected or should have suspected that any jurors did not accurately answer a question during the voir dire examination. Burgess particularly did not have any reason to suspect that a juror allegedly had a personal relationship with the district attorney because before trial his counsel had moved for the district attorney to disclose any relationships he had with potential jurors.

> The trial court, in finding that Burgess's claims were procedurally barred by Rule 32.2(a)(3) and (a)(5), found "that the information obtained from the jurors was available to newly appointed appellate counsel and could have been raised in [Burgess's] Motion for New Trial. All counsel had to do was to interview the jurors in post-trial interviews just as was done by petitioner's counsel herein." However, it is unreasonable to require that a defendant, unaware of any failure to answer correctly questions posed during the voir dire examination, must contact each juror and ask whether he or she accurately and truthfully answered such questions. Jury service is sufficiently disruptive of a citizen's regular activities without this Court announcing a rule that would routinely subject jurors to potentially insulting postverdict

---

[50](...continued)

to present his juror misconduct claim at trial or on appeal. Although the circuit court nevertheless found the claim barred, the Court of Criminal Appeals reversed as to this finding, concluding that McGahee had "sustained his burden of disproving the grounds of preclusion pleaded by the State." *Id.* at 203.

interrogation concerning their veracity. Absent any evidence that a telephone call to some or all the jurors would have been nothing more than a mere fishing expedition, we cannot hold on this record that Burgess's claims are precluded.

21 So. 3d at 754-55.

Thus, it is clear that the procedural bar imposed in this case is not to be imposed where counsel reasonably has no cause to believe that jurors have failed to truthfully answer questions and that, moreover, counsel is not required to "speak[] with the jurors after their deliberations [are] completed and they [are] excused[,]" R.-73 at 18-19, in order to fish for hints of juror misconduct to be presented in time for a motion for new trial. Importantly, the Alabama Supreme Court made clear that its opinion in *Ex parte Burgess* was not a recalibration of existing law but was, instead, merely based upon the CCA holdings in *Freeman* and *DeBruce v. State*, 890 So. 2d 1068 (Ala. Crim. App. 2003), and, especially, its own opinion in *Ex parte Pierce*. *Id.* at 754. In addition, after *Ex parte Burgess*, the Alabama Supreme Court has clarified that a Rule 32 petitioner is not required to show in his Rule 32 petition "why he could not have reasonably discovered the alleged juror misconduct in time to assert that claim in his motion for a new trial or on appeal." *Ex parte Harrison*, 61 So. 3d 986, 990-91 (Ala. 2010). Rather, where the trial record does not indicate that the petitioner "should have been aware before he filed his motion for a new trial or his direct appeal that some jurors had provided untruthful or inaccurate answers during voir dire examination[,]" a claim of juror misconduct discovered during post-conviction investigation will not be procedurally barred. *Id.* at 991.

In sum, it is apparent that, at the time petitioner's trial was ongoing and in the months following trial, Alabama's law concerning the viability of certain procedural defenses in the context of juror misconduct claims like petitioner's was in a considerable state of flux. However, it is now

163

clear that the Alabama Supreme Court explicitly rejects the twin premises relied upon by the state courts in finding petitioner's claim procedurally barred.  The Court has made clear that, where there was nothing in the trial court record that reasonably should have caused counsel to question the veracity of jurors,[51] petitioner's counsel was not obliged to undertake a "fishing expedition" in the form of interviews with the jurors in time to raise his claim in a motion for new trial or on direct appeal.  Likewise, where the record evinced no reason to suspect that jurors had misled counsel, petitioner was not required to show in his Rule 32 petition why he could not have raised his juror misconduct claims at trial or on direct appeal.  Moreover, even assuming that petitioner was required to show that he could not have raised his juror misconduct claims at trial or on direct appeal–despite the apparency of this circumstance in the trial record itself–petitioner was not afforded an evidentiary hearing by the circuit court before this claim was summarily dismissed.[52]  All of these facts compel the court to conclude that the state courts' imposition of a procedural bar in this instance is not "adequate" for procedural default purposes because it was not fairly imposed and, furthermore, is not firmly established and regularly followed in the state courts.  The court finds, therefore, that petitioner's juror misconduct claim is not procedurally defaulted.

---

[51]  Petitioner asserts that "[t]he trial record in this case contains no indication counsel should have known jurors were not being truthful during voir dire."  Pet'r's Resp. (Doc. # 44) 140 n.33.  Respondents do not dispute this assertion and do not point to any part of the record which should have caused trial counsel to question the veracity of jurors during voir dire.  Nor is this court aware of anything after its own review of the record.

[52]  To be sure, when the State first argued that the circuit court should summarily dismiss petitioner's juror misconduct claims pursuant to Rule 32.2(a)(3) & (5), petitioner vehemently objected, arguing that his "trial counsel could not have had any information that jurors had failed to disclose information during voir dire" and that the voir dire transcript was not even prepared until "nearly two months after the date upon which the motion for new trial was due."  R.-54 at 15-16.  Nevertheless, the circuit court adopted the State's proposed order dismissing this claim as procedurally barred prior to the evidentiary hearing.

2.       *Application of § 2254(d)*

The court's conclusion that this claim is not procedurally defaulted does not entitle petitioner to *de novo* review of his juror misconduct claim on its merits. Rather, as the parties concede, the state courts also dismissed petitioner's juror misconduct claims on the grounds that they were insufficiently specific, pursuant to Rule 32.6(b), and that, therefore, petitioner failed to show any material issue of fact or law that, if proven, would entitle him to relief, as required by Rule 32.7(d).[53] This court must treat this determination as an adjudication on the merits for purposes of applying §

---

[53]  In fairness, the parties agree only that the circuit court also dismissed this claim pursuant to Rules 32.6(b) and 32.7(d). Petitioner maintains that "the Court of Criminal Appeals did not adopt the trial court's finding that the juror misconduct allegations were insufficiently specific under Rule 32.6(b)." Pet'r's Resp. (Doc. # 44) 142. Petitioner arrives at this conclusion despite that the Court of Criminal Appeals never explicitly limited its adoption of the circuit court's judgment and, furthermore, it quotes verbatim from that portion of the circuit court's order dismissing the claim pursuant to Rules 32.6(b) and Rule 32.7(d) and ultimately concludes that petitioner "failed to meet his burden under Rule 32.3" to sufficiently plead his claim. *See Waldrop*, 987 So. 2d at 1205. Indeed, the portion of the CCA's opinion recounting the circuit court's "alternative" holding constitutes the greatest portion of its discussion of this claim, as it includes the circuit court's numerous factual findings about the supposed inadequacies of petitioner's claims about several different jurors' alleged misconduct. *Id.*

Petitioner offers no compelling justification for his proposition that the Court of Criminal Appeals did not adopt the circuit court's full judgment. Rather, he only asserts that "[t]hough the court did reference Rule 32.3, it did so only on [sic] to the extent that Mr. Waldrop failed to allege in CCA is petition that his juror misconduct claim could not have been raised at trial or on appeal (as opposed to the trial court's finding that the claim was not specific for various other reasons)." Petr's' Resp. (Doc. # 44) 142-43 n.34. But petitioner does not explain why or how he draws this conclusion, and it is not self-evident, or even implicit, on the face of the opinion itself. In order to accept petitioner's argument, the court would have to conclude that the CCA deliberately but superfluously included a lengthy excerpt from the circuit court's opinion which provides many factual findings about the merits of petitioner's allegations but which was wholly irrelevant to the court's singular procedural ruling. Lacking any indication of such intent, the court believes that the CCA is entitled to the benefit of doubt. In any event, at most, the opinion is only ambiguous on this point. A more reasonable reading, however, is that, where the CCA did not expressly limit its adoption of the circuit court's opinion to its procedural bar judgment, and it further devoted the greatest portion of its discussion of this claim to a verbatim quote of the lower court's application of Rules 32.6(b) and 32.7(d), and where it concluded its analysis by upholding the lower court's finding that petitioner failed to fulfill his sufficient pleading obligations under Rule 32.3, the CCA also adopted the circuit court's finding that petitioner failed to sufficiently plead his claim and that it was therefore due to be dismissed pursuant to Rules 32.6(b) and 32.7(d).

2254(d).  *Lee*, 726 F.3d at 1208; *Borden*, 646 F.3d at 816.  Thus, the circuit court rendered, and the Court of Criminal Appeals later adopted, numerous factual findings related to the underlying merit of petitioner's juror misconduct claims before denying them on their merits.  As the court has determined that petitioner's claim is not procedurally defaulted, the court is required to review the state court's merits determinations pursuant to the AEDPA.

The court will first summarize petitioner's specific allegations of juror misconduct. Petitioner's allegations respecting each juror are as follows: a) juror A.W. failed to disclose that she "knew the prosecutor and her husband[,]" that she knew "Sheriff Jeff Fuller and his wife on a personal basis[,]" and that "she knew the victims' son-in-law and Mr. Waldrop's uncle, Darrell Boyd" (Pet. ¶ 145); b) juror H.S. failed to disclose that he or she had met Circuit Clerk Kim Benefield "when she spoke at the juror's community club[,]" and that he or she knew Sheriff Fuller (*Id.* at ¶ 146); c) juror W.W. failed to disclose that she had previously "spoken to Ms. Benefield when filing legal papers" (*Id.*); d) juror A.M. failed to disclose that she knew "deputy district attorney Baldwin and had worked at a Movie Gallery video rental store, which Ms. Baldwin frequented" (*Id.*); e) juror C.S. "did not reveal that he knew Sheriff Fuller" (*Id.*); f) juror M.S. failed to "disclose that he knew several members of victim Irene Prestridge's family[,]" from whom he had frequently purchased moonshine, failed to disclose that his interest in serving on the case stemmed from guilt he felt for previously lying to escape jury duty in a separate murder case, failed to disclose that he knew Deputy District Attorney Baldwin and Sheriff Fuller, failed to disclose that he had a DUI conviction, and failed to disclose supposedly relevant information about his own preconceived notions regarding the presumption of innocence, the defendant's right to remain silent, and the need for trial "since Bobby plead guilty" (*Id.* at ¶ 147); g) juror L.W. failed to disclose that her brother had

166

"repeated run-ins with the Randolph County Sheriff's Department and recently had been prosecuted, convicted, and sent to jail" for DUI (*Id.* at ¶ 148); h) juror S.N. failed to disclose–apparently before having seen any of the crime scene photographs–that she would be preoccupied by the gore depicted in the photographs (*Id.* at ¶ 149); and i) juror D.C. failed to disclose that she "had been neighbors with Sheriff Fuller's parents and had met Sheriff Fuller socially on several occasions" and failed to disclose that she[54] had heard of the case prior to being called for jury service (*Id.* at ¶ 150).

All material allegations in support of petitioner's juror misconduct claim were raised in his Rule 32 petition in the state courts. *See* R.-52 at 50-57. In addition to finding the claim procedurally barred because petitioner did not raise it at trial or on direct appeal, the circuit court found as follows:

> In addition to the procedural bar discussed above, the Court further finds that these claims are not sufficiently specific and are subject to being denied for that reason. Waldrop's petition discusses an individual juror in each section of this claim. Most of the allegations concern the juror "knowing" some named person, but not disclosing that information. For example, Juror A.W. is suppose to know the Assistant District Attorney Melody Baldwin and her husband, while juror H.S. is suppose to know Sheriff Jeff Fuller. However, Waldrop does not indicate how or when he discovered "the relationships" existed, when they occurred, or whether they might have had any effect on the juror's ability to remain unbiased. Also juror W.H. acknowledged that he knew Sheriff Fuller (R. 275), but was not struck. Similarly, juror W.W. is suppose to know Circuit Clerk Kim Benefield through "filing legal papers." A relationship such as this is not the kind of "knowledge" that would influence a juror. Additionally, two people who remained on the jury acknowledged knowing Ms. Benefield–juror A.K. (R. 206) and alternate C.S. (R. 90). It should also be noted that two of the Sections (D and G) concern the two alternates, juror C.S. and juror M.S. A juror who is dismissed before deliberations begin would not be in a position to improperly influence those deliberations. . . . For these reasons, this claim is denied because it is not sufficiently specific, Rule 32.6(b), and because there is no material issue of fact or law that would entitle the petitioner to relief. Rule 32.7(d).

---

[54] The petition uses both "he" and "she" as pronouns referring to juror D.C. *See* Pet. ¶ 150. Upon review of the trial transcript, the court believes that D.C. is female.

R.-73 at 19.  As discussed above, the Court of Criminal Appeals wholly included and adopted the circuit court's finding.  *See Waldrop*, 987 So. 2d  at 1205.

Petitioner argues that the failure of the subject jurors to truthfully answer questions or disclose requested information violated his "rights to due process, a fair and impartial jury, and a reliable conviction and sentence as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution."  Pet'r's Br. (Doc. # 44) at 136-37 (citing *Morgan v. Illinois*, 504 U.S. 719, 727 (1992); *Irwin v. Dowd*, 366 U.S. 717, 722 (1961); and *Rogers v. McMullen*, 673 F.2d 1185, 1188 (11th Cir. 1982)).  He asserts that he was prevented from "challenging [the jurors] for cause or using a peremptory challenge to remove them from the venire[,]" and, therefore, he was "not tried before a panel of 'impartial, indifferent jurors.'" *Id.* at 144 (quoting *Irwin*, 366 U.S. at 722).  Petitioner therefore argues that "the state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent."  Pet. ¶ 151; Pet'r's Br. (Doc. # 44) at 144.  Despite that the court entered an order instructing respondent to submit briefing addressing the merits of petitioner's claims in addition to raising any applicable procedural defenses, respondents have not addressed the merit of petitioner's juror misconduct claim and , instead, have only argued that the claim is procedurally defaulted.  *See* Resp.'s Br. (Doc. # 41) at 39-41; Resp.'s Br. (Doc. # 50) at 77-80.

The Supreme Court has recognized that "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment."  *Morgan*, 504 U.S. at 727.  Moreover, "part of the guarantee of a defendant's right to an impartial jury is an

adequate *voir dire* to identify unqualified jurors." *Id.* at 729.  Of course, truthful responses by jurors during voir dire are essential to vindicating the defendant's right to a fair trial.

> *Voir dire* examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on voir dire may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.

*McDonough Power Equip., Inc., v. Greenwood*, 464 U.S. 548, 554 (1984).  Given the interests at stake, each instance of alleged juror misconduct must be considered in its own context, as not all errors, mistakes, or obfuscations require a retrial.

> A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination. . . .  We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id.* at 555-56.

Thus, assuming the veracity of petitioner's allegations that certain jurors failed to adequately respond to voir dire questions or otherwise disclose pertinent information, the question becomes at what point did such "juror misconduct" deprive petitioner of a fair trial as required by the Constitution?  This inquiry–whether the juror failed to disclose information that would have provided grounds supporting a for-cause challenge–requires the court to assess whether the withheld information establishes or suggests "a showing of bias that would disqualify the juror." *United States v. Ervin*, 517 F. App'x 734, 743 (11th Cir. 2013).  "Actual bias may be shown either by

169

express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed." *Id.* (citing *United States v. Carpa*, 271 F.3d 962, 967 (11th Cir. 2001)).  Furthermore, a "juror's bias may be implied if the juror has a special relationship with a party, such as a familial or master-servant relationship." *Id.* (citing *United States v. Rhodes*, 177 F.3d 963, 965 (11th Cir. 1999)).

Applying these standards to petitioner's allegations of juror misconduct, the court cannot conclude that the state court's finding that petitioner's claim is inadequate or insufficient on the merits is contrary to, or an unreasonable application of, the Supreme Court precedents discussed above.  To begin, the great majority of petitioner's allegations of misconduct concern jurors who failed to disclose their supposed relationships or familiarity with Assistant District Attorney Baldwin, Sheriff Fuller, or Circuit Clerk Benefield.  None of these relationships is described as anything more substantive than just "knowing" the respective person, as in having met them at some social or political event, through work encounters such as at a movie rental store, or through ordinary and perfunctory interactions like filing legal papers.  These jurors' mere familiarity with one of these persons would not have supported a for-cause challenge of the respective jurors and, indeed, many jurors who disclosed their familiarity or relationship with the same individuals were not challenged for cause on that basis.[55]  In addition, petitioner does not even allege that any of the subject jurors were rendered biased due to their supposed familiarity with Baldwin, Fuller, or Benefield.  In sum,

---

[55]  For example, potential jurors C.H., M.A., B.C., P.R., W.H, and L.T. all indicated that they knew Sheriff Fuller but were not challenged for cause on that basis.  Likewise, numerous potential jurors indicated that they knew Clerk Benefield, including eventual jurors C.S., L.W., and A.K., yet also were not challenged on that basis.  Notably, in contrast to his voir dire questioning of the other panels, counsel did not even inquire of the second panel of potential jurors whether they knew Baldwin, Fuller, or Benefield.  *See* Trial Tr. (R.-4) at 120-140.

none of the attenuated relationships or interactions with the persons described in the petition demonstrate "actual bias" on the part of the juror or even suggest that the juror enjoyed a "special relationship" with a party or otherwise had "such a close connection to the circumstances at hand that bias must be presumed."  *Ervin*, 517 F. App'x at 743.

Petitioner also alleges that certain jurors failed to disclose their familiarity or relationships with the victims or their families.  *See* Pet. ¶¶ 145, 147, and 150.  Depending on the strength or character of any such relationships, the prospect of actual or implicit bias is certainly more acute where the victims or their close family members are concerned, and is therefore deserving of heightened scrutiny.  However, even in this respect, petitioner's allegations are insufficient, as none of the information supposedly withheld by the jurors would have supported a for-cause challenge of the juror.  First, petitioner claims that juror A.W. "knew the victims' son-in-law and Mr. Waldrop's uncle, Darrell Boyd."  *Id.* at ¶ 145.  Petitioner does not describe the circumstances of this juror's relationship with Mr. Boyd, and the mere fact that A.W. may have known an in-law of the victims does not compel the conclusion that the juror had a "special relationship" with the victims or, for that matter, any other party, or was otherwise closely connected to the circumstances of the case.[56]  Likewise, petitioner claims that juror M.S. failed to "disclose that he knew several members of victim Irene Prestridge's family[, from whom] he had purchased moonshine . . . on numerous occasions."  *Id.* at ¶ 147.  Petitioner does not more fully describe these members of Irene Prestridge's

---

[56] Petitioner contends that "[t]rial counsel struck both jurors who disclosed during voir dire that they knew one or both of the victims." Pet. ¶ 145.  Even if true, this does not resolve the court's inquiry.  The withheld information must be sufficient to support a for-cause strike.  *Greenwood*, 464 U.S. at 556.  Trial counsel did not lodge a for-cause challenge to all jurors who knew the victims.  For example, potential juror C.H. testified that she knew Mr. Prestridge from his having purchased auto insurance at her place of employment.  Trial Tr. (R.-4) at 113-14.  She was not challenged for cause by trial counsel.

family so that a court could attempt to discern whether M.S. even arguably could have had a "special relationship" with the victim or was otherwise closely connected with the circumstances of the case. Nor is the court persuaded that M.S.'s purported purchasing of moonshine from these family members could establish any such "special relationship" were the family members better described in the petition.[57]  Finally, petitioner claims that juror D.C. failed to disclose that she had "heard of the Prestridge and Waldrop families" because she had grown up near where they lived."  *Id.* at 150. This allegation is plainly inadequate, as it does not indicate a relationship of any sort with the victims, petitioner, or any of their close family members.

Petitioner claims that juror L.W. failed to disclose that her brother had multiple run-ins with the Randolph County Sheriff's Department and had recently been convicted of DUI in Randolph County.  Pet. ¶ 148.  During voir dire of the panel that included L.W., the prosecutor asked, "Have you, or any member of your family, ever been prosecuted by me personally or member of my staff?"  Trial Tr. (R.-4) at 76.  A follow-up question was whether "any member of your immediate family, that is, mother, father, brother, sister, or children, ever been charged with or convicted of a crime? . . .  I will be interested in knowing if you, or some immediate member of your family, has been arrested for DUI, for example."  *Id.*  As an initial matter, the court struggles to perceive how L.W.'s alleged failure to disclose information concerning her brother's conviction could have prejudiced petitioner, considering that any implicit bias resulting from the conviction would most logically be directed at the State.  This is why it was the prosecutor, not petitioner's counsel, who asked the question during voir dire in hopes of discovering potential sources of bias against his office.  In any

---

[57]   In addition, as will be discussed below, M.S. was an alternate juror and was dismissed prior to deliberations.  *See* Trial Tr. (R.-15) at 988-89.  Petitioner has not shown, or even alleged, that the jury's deliberations could have been affected by M.S.'s alleged "misconduct."

event, had L.W. fully disclosed her brother's legal entanglements or conviction during voir dire, she would not have revealed any information establishing ground for a for-cause challenge.[58]  Petitioner does not allege that L.W. was somehow biased against him as a result of her brother' conviction, such that she was unable to impartially consider the evidence and make findings of fact.  Thus, at most, had L.W. fully responded to the prosecutor's voir dire examination, she would have provided additional information for petitioner to consider in using his peremptory challenges.  However, "it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination."  *Greenwood*, 464 U.S. at 555.  Because L.W.'s failure-to-disclose did not result in actual or even suggested bias to petitioner, the state court's conclusion that this claim is insufficient and without merit is not contrary to or an unreasonable application of Supreme Court precedent.

Petitioner also faults juror S.N. for failing to respond to "counsel's question whether any of the prospective jurors thought the gore of the crime scene and autopsy pictures would preclude them from fairly considering the evidence."  Pet. ¶ 149.  He claims that S.N. "was so disturbed by the pictures that she discussed them with another juror at night and felt like the pictures were out of a horror movie."  *Id.*  He asserts that none of the prospective jurors who suggested that they might be unable to fairly consider the evidence due to the photographs actually served on the jury.  During voir dire examination, petitioner's trial counsel repeatedly asked the juror panels whether

---

[58]   Indeed, other potential jurors disclosed their or their family members' criminal convictions and were not challenged for cause. For example, prospective juror A.Y. disclosed her own conviction for "a bad check" and her father's assault conviction in Randolph County, while prospective juror L.T. disclosed his grandsons' drug charges in Randolph County. *See* Trial Tr. (R.-4) at 261-64. Neither was challenged for cause by petitioner or the State.

photographs depicting the gory results of his client's actions might so affect the jurors that they would not be able to consider all of the evidence introduced at trial.  Of course, at this point, none of the jurors had actually seen the photographs.  During examination of the panel that included S.N., panel two, trial counsel again attempted to query the jurors about the photographs.  Trial Tr. (R.-4) at 137.  The trial court interjected that counsel was "asking them to judge the evidence in advance" and asked that counsel rephrase his question.  *Id.* at 137-38.  Trial counsel rephrased the question and the prosecutor requested a sidebar at which he argued that the pictures were important evidence that the jury should consider.  *Id.* at 138.  Trial counsel then attempted again to probe the jury on whether they would be so "inflamed" by the pictures that they would be unable to consider other evidence.  *Id.*  No member of the panel responded.  The trial judge then queried the jury as follows:

> If you see a picture of two elderly people with their throats cut and a puddle of blood, gory pictures, horrible pictures, would that inflame your passions so much that you would not consider the other evidence, corroborating evidence, being so angry and upset about those pictures that you wouldn't require the full measure of proof that you would have required in the absence of [the] gory picture[s]?

*Id.* at 139.  At this point, it appears that prospective juror M.L. responded to the judge's questions but was not further examined by counsel before moving on to his next question for the entire panel. *Id.*

Petitioner's claim about the alleged misconduct of S.N. is problematic in several respects. First, it is difficult to fault S.N. for purportedly failing to truthfully answer a question about how affecting certain gory pictures might be without her having been afforded the opportunity to actually view the pictures.  In effect, S.N. is accused of "misconduct" for failing to accurately anticipate her reaction to visceral stimuli that she had not yet experienced.  Even being asked to assume the worst by the trial judge may not have prepared her for what was depicted in the photographs.  Second,

174

given the back-and-forth that occurred between the attorneys and the judge when this question was put to S.N.'s panel, any confusion about the question and how to answer is perhaps understandable. Third, other prospective jurors who suggested some uncertainty about their ability to dispassionately consider the evidence despite the photographs were not challenged for cause. For example, prospective juror M.L. responded to the trial judge's question about the photographs but was not challenged for cause on that basis. Instead, she was challenged-for-cause by the State because her answers to certain questions indicated that she could not participate in a decision resulting in a death sentence. *See* Trial Tr. (R.-4) at 163-64. In panel one, L.W. (not the L.W. who eventually served on the jury), H.T., and C.S. (who served as an alternate juror) all initially indicated that the photographs might affect their ability to impartially and dispassionately consider the evidence. *Id.* at 87-89. After the trial judge elicited their assurances that they could fairly consider the evidence at trial, none of these prospective jurors were challenged for cause by counsel. Finally, petitioner's allegations with respect to S.N. are simply insufficient. Petitioner states that S.N. was "preoccupied" with the photographs because she found them "disturbing," and that she discussed them with another juror and felt like they were something "out of a horror movie." Petitioner does not allege that S.N. was unable to fairly and impartially consider other evidence introduced at trial when deliberating on a verdict. Thus, petitioner alleges nothing more substantial than that S.N. was very understandably affected by the gore depicted in the photographs of his dead grandparents, and that she likely remained so whenever she discussed the matter with persons acting on petitioner's behalf years later. Because petitioner does not allege that S.N. was unable to fairly perform her role as a juror due to her purported preoccupation with crime scene photographs, the state court's judgment that this

allegation of juror misconduct is insufficient and without merit is not contrary to, or an unreasonable application of, Supreme Court precedent.

Petitioner alleges that juror D.C. failed to disclose that she "had heard about the crime before she was called for jury service." Pet. ¶ 150. Petitioner alleges only that D.C. had "heard" of the crime, not that her pretrial exposure to information about the crime rendered her biased against petitioner or otherwise affected her ability to fairly and impartially consider the evidence at trial. Petitioner does not even provide specific allegations about the form or depth of D.C.'s pretrial knowledge of the crime. Most of the prospective jurors across all four panels disclosed some familiarity with the crime from local newspaper accounts or through conversations with others in the community. Overwhelmingly, these prospective jurors were not challenged for cause on this basis. Thus, had D.C. disclosed that she had simply "heard" of the crime during voir dire, she would not have revealed any information that would have supported a for-cause challenge. Moreover, for the reasons discussed above, petitioner's argument that "[h]ad trial counsel been aware of Juror D.C.'s knowledge, counsel would have been able to ask follow up questions to determine the extent to which Juror D.C. could fairly and impartially apply the law" is unavailing. Because D.C.'s failure to disclose at most then deprived trial counsel of "an item of information which objectively he should have obtained" for purposes of considering peremptory strikes, but did not deny counsel the opportunity to challenge D.C. for cause, the state court's judgment that this claim is insufficient and lacks merit is not contrary to, or an unreasonable application of, Supreme Court precedent. *Greenwood*, 464 U.S. at 555.

Petitioner's final allegation of juror misconduct concerns alternate juror M.S., whom, he alleges, in addition to the allegations discussed above with respect to M.S.'s relationships with the

176

victims' family, A.D.A. Baldwin, and Sheriff Fuller, failed to disclose his motive for wanting to serve on the jury, failed to disclose his rejection of the presumption of innocence and petitioner's right to remain silent, failed to disclose his apparent belief that the trial was a "waste" "'since Bobby plead guilty[,]'" and failed to disclose a prior conviction for DUI.  Pet. ¶ 147.  Petitioner's allegations with respect to M.S. are similarly insufficient.  First, petitioner does not explain why M.S.'s purported motive to serve on the jury would have rendered him biased or subject to a for-cause strike.  He also does not indicate when or how M.S. should have disclosed his supposed motive.  There was no question in voir dire for which such disclosure would have been expected.  As for M.S.'s feelings about the presumption of innocence, petitioner's right to remain silent, and the "waste" of holding a trial, petitioner fails to show how these views affected his trial considering, as the state courts noted, that M.S. was an alternate juror who did not participate in deliberations.  *See* Trial Tr. (R.-15) 988-89.  Petitioner does not allege that M.S.'s views somehow influenced the jurors who did serve on the jury.  Ultimately, the Constitution is concerned only that the jury which decides the defendant's fate be "impartial and indifferent to the extent commanded by the Sixth Amendment."  *Morgan*, 504 U.S. at 727.  While M.S.'s alleged failure to disclose several important beliefs, relationships, or a prior conviction could be concerning in some contexts, any constitutional concerns are mitigated by the fact that M.S. did not participate in the jury's deliberations and petitioner has made no allegation that M.S.'s alleged "misconduct" somehow influenced the jury or otherwise deprived him of a fair trial.  Accordingly, the state court's conclusion that this aspect of petitioner's juror misconduct claim is insufficient and without merit is not contrary to, or an unreasonable application of, Supreme Court precedent.

177

In sum, each of petitioner's claims of juror misconduct concerning jurors who actually participated in deliberations is insufficient because it faults the juror for failing to disclose some item of information that would not have alone supported a for-cause challenge of the juror but, rather, would have at most only provided an item of information for consideration in making peremptory challenges.   Petitioner does not allege that the items of information withheld by the jurors represented actual biases held by those jurors against petitioner.  Rather, he only argues that he was prevented "from challenging them for cause or using a peremptory challenge to remove them from the venire."  Pet'r's Br. (Doc. # 44) at 144.  However, as shown above, with respect to each category of withheld information, petitioner did not challenge for cause other prospective jurors with similar disclosures and, as to any restriction on his ability to make peremptory challenges, the Constitution does not require a new trial "simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination."  *Greenwood*, 464 U.S. at 555-56.   Accordingly, the court concludes that the state court's judgment that petitioner's juror misconduct claim is insufficient and without merit is not contrary to, or an unreasonable application of, Supreme Court precedent.

## F.    Claim P

Claim P is petitioner's claim that the State failed to disclose exculpatory evidence to him at trial.  Specifically, he alleges that the State failed to turn over the investigator's notes which were later used in composing his statement, as discussed in conjunction with Claim M, *supra*, and that the State failed to disclose "evidence that Bobby Waldrop's mother had been arrested."  Pet. ¶ 156.  As the court has already concluded that petitioner is not entitled to habeas corpus relief with respect to the *Brady* component of Claim M, Claim P will be denied to the extent that it relies upon the same

allegations already addressed in the disposition of Claim M.  Thus, the remainder of the court's discussion of Claim P will concern only petitioner's *Brady* claim about the State's alleged suppression of the records of contacts, arrests, and/or convictions of his mother.

According to petitioner, information about his mother's arrests "would have led to a wealth of mitigation evidence, including information relating to her incessant adultery, maternal abandonment, and all-around inadequate parenting skills[,]" and ultimately would have "prompted more jurors to vote for life and tipped the scales in favor of preventing the trial judge from overriding."  Pet'r's Br. (Doc. # 44) at 147, 149.  He contends that the State's actions denied "his rights to due process, a fair trial and a reliable sentencing proceeding in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution."  *Id.* at 149.  Respondents maintain that the state courts addressed this claim on the merits, and that the Court of Criminal Appeals' decision is not contrary to, or an unreasonable application of, clearly established federal law, and is not based upon an unreasonable determination of the facts in light of the record before the state courts.  Resps.' Br. (Doc. # 50) 80-82.

Petitioner first raised this claim in his Rule 32 petition, in which he claimed that the State violated his due process rights by withholding "exculpatory information favorable to the defense, including facts about Shirley Irelan's prior dealing with the prosecutor's office."  R.-52 at 57-58.  The Rule 32 court denied the claim, concluding that information pertaining to the arrests of petitioner's mother was not exculpatory: "Ms. Irelan testified as a defense witness in the guilt phase of the trial.  During the cross examination of Ms. Irelan, the State did not bring out any 'prior dealings with the prosecutor's office.'  Therefore no harm befell Waldrop at the trial."  R.-73 at 20.  Thus, the Rule 32 court held that petitioner had failed, pursuant to Ala. R. Crim. P. 32.7(d), to show

that a material issue of fact or law existed that would entitle him to relief.  *Id.*  On appeal, petitioner

challenged the summary nature of the Rule 32 court's denial of his claim, faulting the Rule 32 court

for accepting the "State's assumptions" that the withheld material was not exculpatory and arguing

that his *Brady* claim could not be denied "based on assumptions about what the withheld material

contains."  R.-63 at 74-75.  The Court of Criminal Appeals affirmed, citing its own previous holding

that "'a defendant is not entitled to the general disclosure of the criminal records of the state's

witnesses.'"  *Waldrop*, 987 So. 2d at 1204 (quoting *Hardy v. State*, 804 So. 2d 247, 286 (Ala. Crim.

App. 1999)).  Petitioner subsequently raised this claim in his petition for certiorari to the Alabama

Supreme Court, *see* R.-67 at 63-64, which was denied.  *See* R. 76.

   In this court, petitioner contends that, in denying the claim, the state courts

"misapprehend[ed] the nature" of the claim, thereby resulting in a decision that is "contrary to and

an unreasonable application of *Brady*."  Pet'r's Br. (Doc. # 44) at 148-49.  He maintains that his

*Brady* claim about the withholding of information about his mother's arrests "pertains to the

sentencing phase," in that it supposedly would have provided insight about petitioner's dysfunctional

upbringing, not any need to impeach petitioner's mother during her guilt phase testimony.  *Id.*

Respondents contend that any misapprehension of petitioner's claim is his own fault, not that of the

state courts.[59]  In any event, even assuming that petitioner "fairly presented" and thus exhausted this

---

  [59]  Notably, petitioner did not articulate at all levels of the state courts the rationale he now argues
in support of this claim.  In his Rule 32 petition, he did not plead that information about his mother's prior
arrests was essential to his preparation for the sentencing phase of his trial.  *See* R.-52 at 57-58.  Even after
the State asked that the Rule 32 court summarily dismiss this claim as insufficiently specific because, in part,
the Rule 32 petition did not "contain any information about . . . how this information would have been
helpful to Waldrop[,]" R.-55 at 18, petitioner still failed to argue that such information was material to his
preparation for the sentencing phase.  *See* R.-56 at 15-16.  In the portion of his brief before the Court of
Criminal Appeals which concerned this claim, petitioner again failed to describe how the supposedly
suppressed information would have been helpful to him.  Instead, petitioner argued only that summary
(continued...)

claim in the state courts, the claim is due to be denied because the Court of Criminal Appeals'

decision is not contrary to or an unreasonable application of *Brady*, as argued by petitioner.

The Eleventh Circuit recently recited the burden to be carried by a habeas petitioner alleging

a *Brady* violation:

> To prove a *Brady* violation, a defendant must establish three elements: (1) the
> evidence at issue is "favorable to the accused, either because it is exculpatory, or
> because it is impeaching"; (2) this favorable evidence was "suppressed by the State,
> either willfully or inadvertently"; and (3) the defendant suffered prejudice as a result.
> *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 745–46 (11th Cir. 2010) (internal
> quotation marks omitted).  To establish prejudice (also referred to as materiality), a
> defendant must demonstrate "'a reasonable probability that, had the evidence been
> disclosed to the defense, the result of the proceeding would have been different.'"
> *Id.* at 746 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  "A
> 'reasonable probability' is a probability sufficient to undermine confidence in the
> outcome." *Parker v. Allen*, 565 F.3d 1258, 1277 (11th Cir. 2009) (internal quotation
> marks omitted).

*Downs v. Sec'y, Fla. Dep't of Corr.*, 738 F.3d 240, 258 (11th Cir. 2013).  As a preliminary matter,

the court finds that petitioner has failed to sufficiently describe the evidence that he accuses the State

of unlawfully suppressing.  Petitioner alleges only that the State suppressed "evidence that Bobby

Waldrop's mother had been arrested."  Pet. ¶ 156.  In his brief, he alludes to "evidence of his

mother's convictions" and other evidence of her contacts with law enforcement, "including that she

had been arrested or had the authorities called on her when Bobby was a child[.]" Pet'r's Br. (Doc.

# 44) at 148.  However, the habeas petition does not provide the particulars of these various arrests,

---

[59](...continued)
dismissal of his claim was inappropriate, and that he was entitled to "full process," including presenting
evidence in support of the claim, in the lower court.  R.-63 at 74-75.  It was only in his subsequent petition
for certiorari review in the Alabama Supreme Court that petitioner finally argued that the purportedly
suppressed material was pertinent to his effort to investigate mitigation evidence for the sentencing phase.
*See* R.-67 at 63-64.  Thus, it is apparent that much of the state courts' "misapprehension" of petitioner's
claim in the relevant state court decision is attributable to petitioner's own failure to properly describe the
contours of his claim, even when the State's arguments and the lower court's ruling implored him to do so.

contacts, or convictions, including their number, the circumstances of any such event, or how any of them might have uniquely caused or influenced the dysfunctional home environment that they are purported to have evidenced.[60]  However, even if the court assumes that evidence about petitioner's mother's arrests was indeed "favorable" to his mitigation case, and that such information was also "suppressed" by the State[61], petitioner's claim still must fail.  Because petitioner cannot satisfy the prejudice or materiality requirement, he cannot show that the state court's conclusion that information about his mother's arrests or convictions was not *Brady* material is contrary to or an unreasonable application of *Brady*.

Petitioner cannot show that, had he been privy to information about his mother's law enforcement contacts, arrests, or convictions–and it strains credulity to suggest that he was not aware of at least some this information anecdotally or through his own observation, independent of the prosecution–there is a reasonable probability that the outcome of his trial and sentencing would have been different.  First, it is not reasonably probable that evidence about petitioner's mother's

---

[60]  In his Rule 32 petition, petitioner described frequent law enforcement contacts at his home for "domestic violence calls" and also alleged that, during her marriage to his father, petitioner's mother "was repeatedly arrested for disorderly conduct and disturbing the peace."  R.-52 at 12, 13.  He also alleged that his mother was arrested, in separate incidents, for throwing a sledgehammer at her sister's boyfriend and "shooting into an occupied vehicle," the latter of which resulted in criminal charges, a guilty plea, and a probationary sentence for his mother.  *Id.* at 14-15.

[61]  This assumption is made for the purposes of argument.  As with his omission of specific allegations about the information allegedly suppressed, petitioner also omits any allegations in the petition indicating that prosecutors knew or should have known about each and every of his mother's various "contacts," "arrests," or "convictions."  This alone is a basis for denying this claim.  *See Parker*, 565 F.3d at 1277-78.  Furthermore, petitioner's extensive allegations about counsel's ineffective pretrial investigation describe several of his mother's "contacts" with law enforcement as events which counsel should have discovered and presented as mitigation at the penalty phase.  *See* Pet. ¶ 77; Pet'r's Br. (Doc. # 44) at 62.  To the extent counsel indeed should have uncovered evidence of these events in his pretrial investigation, the court fails to see how the State could have violated *Brady* in failing to disclose evidence which could have been obtained by counsel with reasonable diligence.  *Ponticelli*, 690 F.3d at 1292.

interactions with law enforcement or convictions would have, on its own, seriously mitigated the aggravating evidence admitted at trial. Petitioner himself concedes this point when he argues that evidence of his mother's arrests was critical to his case not because it was uniquely momentous but, rather, because it would have "led to a wealth of mitigation evidence, including information relating to her incessant adultery, maternal abandonment, and all-around inadequate parenting skills." Pet'r's Br. (Doc. # 44) at 147; *id.* at 148-49 ("Evidence of law enforcement contact with family members and particularly Shirley Irelan (Bobby's mother), including that she had been arrested or had the authorities called on her when Bobby was a child, would have provided critical insight into the type of dysfunctional familial environment in which Bobby was reared.").

However, information about Shirley's Irelan's "inadequate parenting skills" and petitioner's "dysfunctional familial environment" was available to petitioner through far more immediate, profound, and affecting sources, including his own recollection and that of his family members. Any of these sources would have provided the sort of "leads" or "insight" of which petitioner complains he was deprived due to the purported suppression of his mother's arrest records. Petitioner substantiates this point when he faults counsel for failing to contact family members, excepting his mother, as well as "friends, neighbors, [petitioner's] minister, teachers, or employers," all of whom could have "testified about his violent and impoverished upbringing . . . ." Pet. ¶ 67. Even without the arrest records, or, apparently, sufficient contacts with other potential mitigation witnesses, petitioner alleges that his counsel nevertheless "obtained leads about mitigating evidence that any competent attorney would pursue, including cues about physical abuse, domestic violence, and neglect." *Id.* at ¶ 73. Thus, even according to petitioner, counsel had other means of gaining the sort of "insight" that could have been provided by the records, and indeed he apparently succeeded in

uncovering some of the "leads" that he believes the records would have provided for the punishment phase.  At most, then, the records would have served as a gateway to more substantial information that was already known or available to petitioner or, on their own, as a small and mostly inconsequential piece of petitioner's larger sentencing phase presentation.  In either respect, any assumed failure to disclose the records simply does not undermine confidence in the outcome of petitioner's sentencing.

In addition, as this court has discussed in conjunction with petitioner's claim that he was prejudiced by his counsel's failure to investigate and present mitigating evidence at the penalty phase, it is not reasonably likely that, had the information about petitioner's mother's arrests been disclosed, the outcome of petitioner's sentencing would have been different.  Petitioner opines that the "critical insight into the type of dysfunctional familial environment" provided by the arrest records "would have prompted more jurors to vote for life and tipped the scales in favor of preventing the trial judge from overriding."  Pet'r's Br. (Doc. # 44) at 149.  Of course, the trial judge, or any presumed "reasonable sentencer," was not prevented by Alabama law from overriding the jury's sentencing recommendation, and imposing a death sentence, even if the jury unanimously recommended life imprisonment.  For all of the foregoing reasons, the court concludes that the state court's decision denying petitioner's *Brady* claim related to records detailing his mother's arrests and/or convictions is not contrary to, or an unreasonable application of, clearly established federal law, and is not based upon an unreasonable determination of the facts in light of the record before the state courts.

## V.  CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  As this court has determined that petitioner is not entitled to habeas corpus relief, the court must now consider whether petitioner is entitled to a certificate of appealability.

In a habeas corpus case involving a state prisoner, the district court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  If the petitioner seeks a certificate of appealability concerning a district court's procedural ruling on a given claim, he must show that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  If the district court grants a certificate of appealability, it "shall indicate which specific issue or issues satisfy" the required showing.  § 2253(c)(3).

Upon review of the record, the court concludes that, for good cause shown, petitioner is entitled to a certificate of appealability on the following claims or issues alleged in the petition: Claim E, petitioner's ineffective assistance of counsel claim, but only to the extent he alleges that he was denied the effective assistance of counsel due to counsel's allegedly deficient investigation and preparation for the penalty phase of trial, including counsel's failure to adequately investigate

185

mental health evidence for mitigation purposes and failure to hire or retain an independent psychologist for use at the penalty phase of trial (*see* Pet. ¶¶ 69-84).

## VI.  CONCLUSION

For all of the foregoing reasons, petitioner is not entitled to habeas corpus relief. Accordingly, it is ORDERED that the petition for habeas corpus relief (Doc. # 1) is DENIED.  It is further ORDERED that Petitioner is GRANTED a limited certificate of appealability as described in this order.

An appropriate judgment will be entered separately.

DONE this 31st day of March, 2014.

            /s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE