IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

|  |  |  |
|---|---|---|
| BOBBY WAYNE WALDROP, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:08-CV-515-WKW |
| | ) | [WO] |
| KIM T. THOMAS, | ) | |
| Commissioner, Alabama Department | ) | |
| of Corrections, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is petitioner's Motion to Alter or Amend Judgment (Doc. # 59) pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. Petitioner requests that the court reconsider several portions of its March 31, 2014, Memorandum Opinion and Order (Doc. # 57) in which it denied his petition for habeas corpus relief. Alternatively, petitioner seeks expansion of the limited certificate of appealability granted by the court in the Memorandum Opinion and Order. For the reasons that follow, the court finds that the motion is due to be denied.

## I. STANDARD OF REVIEW

Rule 59(e) authorizes a party to file a motion to alter or amend a judgment within twenty-eight days of the entry of judgment. The Rule does not provide any

standard to guide the court's consideration of such a motion.  However, the United States Court of Appeals for the Eleventh Circuit has stated that "'[t]he only grounds for granting [a Rule 59(e)] motion are newly-discovered evidence or manifest errors of law or fact.'" *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (quoting *In re Kellogg*, 197 F.3d 1116, 1119 (11th Cir. 1999)).  Furthermore, a party "cannot use a Rule 59(e) motion to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Vill. of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005).

Petitioner does not predicate his motion to alter or amend judgment on his discovery of new evidence.  Rather, he appears to argue that he is entitled to Rule 59(e) relief because the court has committed manifest errors of law and fact.  Pet'r's Mot. (Doc. # 59) at 2.  The court will discuss each of petitioner's separately numbered contentions of error in deciding his motion.

## II.  DISCUSSION

### A.    Petitioner's contention that the court committed manifest error in concluding that certain of his claims were not "fairly presented" in the state courts

Petitioner first argues that the court committed "several errors" in finding that, pursuant to *Castille v. Peoples*, 489 U.S. 346, 349 (1989), claims which he presented for the first and only time in state court during discretionary review in the Alabama

2

Supreme Court were not "fairly presented" in the state courts, and, to the extent such claims were not considered by that Court, they were not exhausted for purposes of federal habeas review.  *See* Mem. Op. (Doc. # 57) at 11-25.  The court need not recapitulate all of the reasons why it found several of petitioner's claims unexhausted and procedurally defaulted.  It is sufficient for present purposes to note that petitioner's claim of manifest error rests predominantly on his argument that the court failed to properly recognize and defer to Alabama's ordinary appellate review process in capital cases and that the court's reliance on *Castille* was misplaced because there is a "fundamental difference between certiorari review in Alabama and allocutor review in Pennsylvania."  Pet'r's Mot. (Doc. # 59) at 3-6.  Petitioner presented these arguments in his briefing in response to respondents' assertion of procedural default, and the court addressed them in its prior order.  It is not the purpose of a Rule 59(e) motion to relitigate matters already decided.  Thus, petitioner's arguments are unavailing.

Nevertheless, the court notes the following in response to petitioner's arguments in the motion.  Petitioner maintains that "raising claims for the first time in a petition for certiorari to the Alabama Supreme Court is 'a normal, simple, and established part of the State's appellate review process[,]'" *id.* at 5 (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)), because "the Alabama Supreme

3

Court has routinely reviewed issues raised for the first time in a petition for writ of certiorari." *Id.* at 4. He also asserts that "Alabama's appellate rules, unlike the rules governing allocatur review at issue in *Castille*," distinguish Alabama's capital appellate review process because there is a "*requirement* that counsel in a capital case file a petition for writ of certiorari in the Alabama Supreme Court," and because "the Alabama Supreme Court may consider *any* issue in a death penalty case, whether raised in the petition or not." *Id.* at 5-6 (emphasis in original). According to petitioner, these differences render *Castille* inapposite. *Id.* at 6-7. However, as discussed in the Memorandum Opinion, the fact that the Alabama Supreme Court may sometimes consider claims first presented in certiorari proceedings, as well as the cited provisions of Alabama's rules, does not alter the fundamentally discretionary nature of certiorari review by the Alabama Supreme Court. This is the crux of *Castille*. *See* 489 U.S. at 349 (rejecting the premise that "the presentation of claims to a State's highest court on *discretionary* review, without more, satisfies the exhaustion requirements") (emphasis supplied).

In *Castille*, the Supreme Court quite clearly stated that, "where the claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless 'there are special and important reasons therefor[,]'" the claim has not been fairly presented and will not satisfy the exhaustion requirement.

4

*Id.* at 351.   Alabama employs essentially identical language in defining the circumstances under which the Alabama Supreme Court may grant discretionary review, even in capital cases.   *See* Ala. R. App. P. 39(a).   None of the Rules provisions cited by petitioner has the effect of rendering the Alabama Supreme Court's scope of review in certiorari proceedings anything other than "discretionary." Thus, the "more" argued once again by petitioner as distinguishing Alabama's discretionary review is immaterial.

In addition to reiterating arguments already rejected, petitioner attacks the court's opinion in other respects deserving of a brief response.   First, petitioner accuses the court of misconstruing his citation of *Trawick v. Allen*, 520 F.3d 1264 (11th Cir. 2008).   Pet'r's Mot. (Doc. # 59) at 5 n.2.   In his brief, petitioner cited *Trawick* for the proposition that "Eleventh Circuit precedent recognizes that claims presented in a certiorari petition at the Alabama Supreme Court *are* fairly presented in state court and thus cognizable in federal court.   This is true even if the petitioner did not raise the claim at trial or at the Court of Criminal Appeals."   Pet'r's Br. (Doc. # 44) at 9 (emphasis in original).   The court distinguished *Trawick*, finding that it "simply does not hold, or even imply, that *all* claims presented in a certiorari petition to the Alabama Supreme Court, whether considered by that court or not, are fairly presented for purposes of applying the exhaustion requirement."   Mem. Op. (Doc.

# 57) at 15. Whatever petitioner intended with his citation to *Trawick*, the fundamental point remains unaffected: *Trawick* is simply inapposite for a host of reasons. If anything, *Trawick* recognized – unremarkably, in light of language in *Castille* and explicit authority from other circuits, which this court discussed in its Memorandum Opinion – that claims that were first presented in discretionary review to the Alabama Supreme Court and that were indeed considered and adjudicated on the merits by that Court, as happened with the gender-discrimination-in-jury-selection claim in *Trawick*, were properly regarded as exhausted by federal courts in habeas corpus. As the court noted in the Memorandum Opinion, *Trawick* "did not even arguably endorse the proposition that a claim first presented in discretionary review to the state's highest court is fairly presented, and thus exhausted, even if the state court does not consider the claim," because that question, unlike in this case, was not before the federal courts in *Trawick*. Mem. Op. (Doc. # 57) at 15-16.[1] And, as the

---

[1] Other important factors regarding the Alabama Supreme Court's review in *Trawick* distinguish it from this case. First, the petition for certiorari review in the Alabama Supreme Court was filed at a time when such review was mandatory pursuant to Alabama law. *Trawick* was decided in 1997, before Alabama's rules governing certiorari review in the Alabama Supreme Court made such review discretionary. The Court Comment to Rule 39 of the Alabama Rules of Appellate Procedure states that the Rule was amended in 2000 to remove "the provision in the former Rule 39(c) that provided that a petition for a writ of certiorari to the Supreme Court in a case in which the death penalty was imposed would be granted as a matter of right." Moreover, as the court noted in the Memorandum Opinion, in *Trawick* the Alabama Supreme Court stated that it had considered and rejected all issues raised by Trawick, not just those discussed in its opinion. In *Waldrop*, however, the Alabama Supreme Court limited its consideration during certiorari review to only two issues and did not similarly indicate that it had considered any other issues raised by petitioner. *See* Mem. Op. (Doc. # 57) at 16 n.7.

6

court further observed in the Memorandum Opinion, in his briefing petitioner did not "cite any case, much less one involving Alabama, in which a habeas court has found a claim fairly presented, and thus exhausted, where it was first presented in discretionary review in the state's highest court and the state court explicitly limited its consideration to unrelated claims." *Id.* at 16.  Tellingly, for all his insistence about the court's manifest error, petitioner still has not done so.

Petitioner next contends that the "Court's comity concerns are misplaced." Pet'r's Mot. (Doc. # 59) at 7 (citation omitted).  In fact, petitioner appears to assert that the court's Memorandum Opinion damages comity because it "fails to give the appropriate deference to Alabama's chosen appellate review process." *Id.* at 8.  This is a curious argument for several reasons.  First, Alabama is almost certainly more concerned with upholding comity than is petitioner, and has urged that petitioner's claims were not fairly presented pursuant to Alabama's ordinary appellate review process.  *See, e.g.*, Resps.' Br. (Doc. # 41) at 2-8.

Second, and more importantly, petitioner ignores the substance of the court's discussion of comity.  While it is indisputably true that the Alabama Court of Criminal Appeals has previously "reversed capital convictions and death sentences," Pet'r's Mot. (Doc. # 59) at 7, petitioner's apparent argument that a defendant can forego presenting all of his claims in that court, then raise his omitted claims in

7

discretionary review before the Alabama Supreme Court, and, even if those new claims are not considered by that court, proceed to then raise them in federal collateral review, presents alternative scenarios for the federal courts' adjudication, both of which would pervert comity. If, as urged repeatedly by petitioner, the federal court construes the Alabama Supreme Court's denial of certiorari as a "failure to recognize" the merit of those claims that petitioner omitted in the Court of Criminal Appeals as a ruling on the merits for purposes of applying 28 U.S.C. § 2254(d), then the court is treating the Alabama Supreme Court's denial of certiorari as exactly what that Court has declared it is not: a ruling on the merits of the issue presented. *See* Mem. Op. (Doc. # 57) at 21-22. However, if the federal court properly recognizes that the Alabama Supreme Court's denial of certiorari review on a given claim is not a determination of the merit of that claim, yet that claims not presented in the Court of Criminal Appeals and denied certiorari review are still somehow exhausted for federal habeas review, then the petitioner would avoid the deferential standard of review of § 2254(d), which is itself a product of comity, and would be entitled to *de novo* review in federal court precisely because he failed to raise his claims at all levels of the state's appellate review process. Comity – respect for the independence and integrity of the state's judicial process – could not countenance such a result because it would establish a clear loophole through which defendants could avoid both

8

substantive state court review and the restrictive scope of federal habeas review for claims decided on their merits in the state courts.

Finally, despite petitioner's assurance that the court's concern about "gamesmanship" or "'sandbagging'" is unwarranted because the "failure to raise claims before the Court of Criminal Appeals is more often attributable to the inadequate representation provided to capital defendants by the State of Alabama[,]" Pet'r's Mot. (Doc. # 59) at 7, the court notes that petitioner has not alleged that the ineffective assistance of his appellate counsel provides "cause" for the default of any of the claims that this court found procedurally defaulted due to his failure to fairly present the claims in the Court of Criminal Appeals.

For all of the foregoing reasons, the court finds that petitioner is not entitled to Rule 59(e) relief with respect to those claims that the court found procedurally defaulted because petitioner did not fairly present and exhaust the claims in the state courts. Moreover, while petitioner argues that "reasonable jurists could debate" the propriety of the court's procedural ruling, he has failed to identify any instance, be it a district or appellate court opinion distinguishing *Castille* in an analogous situation or even a judge reasonably dissenting from an appellate court's application of *Castille* in an analogous situation, illustrating that, indeed, reasonable jurists could debate this matter. As the court has discussed, the holding of *Castille* is clear and the points on

9

which petitioner seeks to distinguish that decision do not affect the circumstances germane to the Supreme Court's holding.  Raising a claim for the first and only time in state court discretionary review does not fairly present the claim and it will not be exhausted for purposes of federal habeas review if the state court, in its discretion, declines to consider the claim.  Petitioner is not entitled to an expansion of the certificate of appealability with respect to the court's procedural ruling on this issue.

**B.      Petitioner's contention that the court committed manifest error in finding that two of his sentencing-related claims were unexhausted because, even if they were not fairly presented, the state appellate courts decided the claims on their merits**

Petitioner next argues that, with respect to two of the claims that the court found procedurally defaulted pursuant to *Castille*, "[e]ven if [he] had not fairly presented his claims to the state courts, he would still be entitled to federal review on his claims of defects in his sentencing because *both* the Court of Criminal Appeals and the Alabama Supreme Court reviewed the sentence and found it to be without error."  Pet'r's Mot. (Doc. # 59) at 8 (emphasis in original).  Specifically, petitioner argues that Claims A and B in his petition – that the trial court refused to consider compelling mitigating evidence and sentenced him to death on the basis of his race – were considered and denied by the Court of Criminal Appeals when it "examined the propriety of the sentence, reviewing the resentencing hearing for plain error under

10

Ala. R. App. P. 45A and reviewing the sentence under Ala. Code § 13A-5-53." *Id.* at 9; *id.* at 15. Moreover, petitioner argues, because he specifically presented the claims in his subsequent petition for discretionary review, the Alabama Supreme Court was aware of the claims and implicitly reviewed them when it affirmed the Court of Criminal Appeals' judgment that petitioner's sentence was appropriate. *Id.* at 10; *id.* at 15-16. In addition, petitioner claims that, with respect to his claim that the trial court sentenced him to death on the basis of his race, any procedural default of the claim is excused by the "fundamental miscarriage of justice" exception to procedural default. *Id.* at 13-14.

Rule 45A of the Alabama Rules of Appellate Procedure establishes the scope of the Court of Criminal Appeals' review in capital cases. It provides that the court "shall notice any plain error defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant." Alabama Code § 13A-5-53 instructs the Court of Criminal Appeals to "review the propriety" of each death sentence before it, to include considering "whether an error adversely affecting the rights of the defendant was made in the sentence proceedings, whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence, and

11

whether death was the proper sentence in the case." § 13A-5-53(a). As part of this review, the Court of Criminal Appeals must determine, *inter alia*, whether "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." § 13A-5-53(b)(1). Petitioner argues that, in effect, these provisions establishing the scope of the Court of Criminal Appeals' review and mandating that the court make specific determinations prior to affirming a death sentence necessarily required that it consider, and it therefore implicitly rejected, the sentencing-related claims that he has conceded he did not specifically present to the Court of Criminal Appeals.

Petitioner's argument is problematic for several reasons. First, petitioner did not present the theory that his claims were addressed by both the Court of Criminal Appeals and the Alabama Supreme Court, despite any failure to fairly present them, in his briefing prior to judgment. *See* Pet'r's Br. (Doc. # 44) at 9-14 & 19-20. Indeed, in his brief, petitioner conceded "the fact that the Alabama Supreme Court did not address the claim." *Id.* at 10. Petitioner may not employ a Rule 59(e) motion to present arguments or theories that could have and should have been presented prior to judgment. *Michael Linet, Inc.*, 408 F.3d at 763. If petitioner believed that the Court of Criminal Appeals' or Alabama Supreme Court's review of the propriety of his sentence necessarily encompassed consideration of the issues articulated in

Claims A and B, nothing prevented him from pressing that argument so that the State could respond prior to judgment.

Petitioner's failure to argue prior to judgment that Claims A and B were considered by the Court of Criminal Appeals, despite his failure to present the claims to that court, is understandable considering that petitioner provides no compelling, persuasive authority that the Court of Criminal Appeals' mandatory review of the propriety of a death sentence encompasses consideration of specific claims not presented to that court.  Petitioner asserts only that "[d]istrict courts within the Eleventh Circuit have recognized that a finding that a death sentence was not imposed 'under the influence of passion, prejudice, or any other arbitrary factor' . . . is a merits ruling for federal habeas purposes."  Pet'r's Br. (Doc. # 59) at 10.  However, petitioner's authority for this proposition, two federal district court cases out of Alabama, simply do not establish that the Court of Criminal Appeals' mandate to make "specific determinations" about the circumstances of each death sentence it reviews necessarily entails consideration of specific sentencing-related claims that could be derived from the record but that are not presented to the Court of Criminal Appeals.

In *Williams v. Alabama*, No. 07cv1276, 2012 WL 1339905, at *24 n.20 (N.D. Ala. Apr. 12, 2012), the district court merely applied § 2254(d) and determined that,

inasmuch as it must be treated as a merits determination, the Rule 32 court's finding

that petitioner's ineffective assistance of counsel claim about counsel's failure to

request individual voir dire was insufficiently pleaded was not unreasonable because

petitioner had failed to identify "specifically what facts trial counsel would have

discovered through individual *voir dire* and how those undiscovered facts prejudiced

Williams."  In *McGahee v. Campbell*, No. 05cv42, 2007 WL 3037451, at *44 (S.D.

Ala. Oct. 15, 2007), *rev'd and remanded on other grounds sub nom. McGahee v. Ala.

Dep't of Corr.*, 560 F.3d 1252 (11th Cir. 2009), the respective habeas petitioner had

in fact raised on direct appeal in the Court of Criminal Appeals the specific claim that

petitioner posits was disposed of by that court during its review pursuant to § 13A-5-

53.  These district court cases do not support the proposition that the Court of

Criminal Appeals' mandatory review of the propriety of a death sentence entails

review and consideration of all conceivable sentencing-related claims, regardless of

whether they are specifically articulated in the Court of Criminal Appeals.  While this

court indeed did recognize, pursuant to authority from another Circuit, that "a claim

is exhausted if the State's highest court expressly addresses the claim, whether or not

it was fairly presented," Pet'r's Br. (Doc. # 59) at 10, in the cases cited by the court

in support of that principle, the claims had at least been "presented" to the respective

state appellate courts, even if not "fairly" so, such that, when those state courts

exercised discretion to consider those claims, they were exhausted for federal habeas purposes.   Here, there is no doubt that petitioner did not present his specific sentencing-related claims to the Court of Criminal Appeals.

If the Court of Criminal Appeals' opinion should not be construed as having reached specific sentencing-related claims not presented to it, petitioner maintains that the Alabama Supreme Court's opinion affirming the Court of Criminal Appeals' judgment should be treated as having reached those issues because he made that Court aware of the claims in his petition for discretionary review.   However, the Alabama Supreme Court did not purport to grant certiorari over either of the instant sentence-related claims.   Indeed, in its opinion, the Alabama Supreme Court merely stated its approval of and quoted verbatim from the Court of Criminal Appeals' conclusion in its review pursuant to § 13A-5-53.   *See Ex parte Waldrop*, 859 So. 2d 1181, 1193 (Ala. 2002) (stating, "We agree with the conclusion reached by the Court of Criminal Appeals" and quoting from the lower court's mandatory findings pursuant to § 13A-5-53).   As discussed above, the Court of Criminal Appeals ("CCA") was not confronted with either of the sentencing-related claims petitioner now presents, and petitioner has not provided any persuasive authority that the CCA's statutory review of his sentence should be read to encompass specific challenges that he did not present to that court.   The Alabama Supreme Court's subsequent verbatim

15

"approval" of the CCA's review, which had been performed without apprisal of petitioner's specific claims, similarly should not be construed as having reached the merits of claims not before the CCA, especially where the Alabama Supreme Court, in its discretion, specifically declined to grant certiorari review of those claims when it was "made aware" of them.

Petitioner's final argument in this portion of his motion is that, "even assuming that Mr. Waldrop's race claim was procedurally defaulted, this Court should have excused the default because imposing the death penalty based on the defendant's race constitutes a 'fundamental miscarriage of justice.'" Pet'r's Mot. (Doc. # 59) at 13 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Petitioner did not present this argument prior to judgment, and he may not employ a Rule 59(e) motion to do so after judgment. *Michael Linet, Inc.*, 408 F.3d at 763. Nor has petitioner provided any authority in support of his contention that the "fundamental miscarriage of justice" exception may be applied to excuse the procedural default of a claim of sentencing error like his race claim. Indeed, the "fundamental miscarriage of justice" exception has historically been reserved for exceedingly rare, "extraordinary" cases in which the complained-of "fundamental miscarriage of justice" has resulted in the conviction of one who is actually innocent. *See, e.g., Schlup v. Delo*, 513 U.S. 298, 321 (1995) ("To ensure that the fundamental miscarriage of justice exception would

16

remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence."). *See also Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1180 (11th Cir. 2010). Petitioner has not attempted to satisfy this standard, and if he would seek to expand the "extraordinary" class of cases in which this exception might be applicable to encompass claims like his race claim, he should have made such an argument in response to respondents' initial assertion of procedural default so that respondents could address the argument, and the court could give it appropriate consideration, prior to judgment.

In any event, upon review of the record, the court is not persuaded that, even assuming the "fundamental miscarriage of justice" exception applies to a claim that the defendant was sentenced to death because of his race, the exception would apply in this instance. The Court of Criminal Appeals remanded to the trial court with instructions to compose a new sentencing order in which it was to "reweigh the mitigating and aggravating circumstances and to apply the appropriate weight to each circumstance," "clarify its findings by specifically detailing the facts in support of its findings that the offenses were especially heinous, atrocious or cruel," "clarify its consideration of Dr. Tackett's testimony with regard to the applicable mitigating

17

circumstance determinations," and make "*specific* written findings pursuant to § 13A-5-47(d)." *Waldrop v. State*, 859 So. 2d 1138, 1152 (Ala. Crim. App. 2000). The trial court issued a revised sentencing order in response to the Court of Criminal Appeals' instructions. *See* R.-69. The revised sentencing order makes no mention of petitioner's race as any factor having to do with his death sentence. Instead, it summarizes the evidence, provides the trial court's findings about aggravating and mitigating circumstances, and concludes with the trial court's judgment that the aggravating circumstances outweighed the mitigating circumstances. R.-69 at 3-14. While it is certainly true that, at a hearing ordered by the trial court in response to the remand, the trial judge alluded to petitioner's race, it does not necessarily follow that petitioner was sentenced to death because of his race, much less that his death sentence was the product of racial "discrimination" or "prejudice" against white people like petitioner, as he appears to argue. *See* Pet'r's Br. (Doc. # 44) at 14-16; Pet'r's Mot. (Doc. # 59) at 13.

Petitioner relies on a brief, isolated remark by Judge Segrest at the hearing on remand in support of his race discrimination claim. However, because petitioner accuses Judge Segrest of willfully consigning him to be executed because of his race, the entirety of Judge Segrest's remarks deserves thorough consideration before a court should attribute such a motive to him, much less treat his actions as a

18

"fundamental miscarriage of justice" on par with convicting someone who is innocent.  In the relevant portion of the hearing, Judge Segrest appeared to be offering lengthy exposition about the legality and wisdom of Alabama's judicial override system.  He noted that the United States Supreme Court had previously approved of Alabama's judicial override and remarked that the "wisdom of that position is that judges can be in a position to have a broader range of experience in dealing with capital cases."  R.-30 at 35.  Judge Segrest then transitioned into discussing his history of presiding over capital cases.  He mentioned that he had imposed a death sentence in five cases, but that one of those cases "came back" and was subsequently reduced by agreement of the prosecutor to life-without-parole because, according to Judge Segrest, it was "purely a circumstantial evidence case."

*Id.*  Judge Segrest then remarked as follows:

> So, that left four cases in which I have imposed a death sentence.  In two of those cases I have overridden the jury, and this has to be understood, it has nothing to do with why you do things, you know.  The why is, on imposing the death sentence, is because the aggravating circumstances outweigh the mitigating circumstances, and the person did it, and that's all you take into account.  Nothing else.  If I had not imposed the death sentence, I would have sentenced three black people to death and no white people.  And, that's the reason that the Supreme Court of the United States trusts the judgment of judges, perhaps, a little bit more.

*Id.* at 36.  Judge Segrest went on to reaffirm his adamance that, "if there's going to be a death penalty in the State of Alabama, and it is going to be judged based on

19

weighing the aggravating circumstances against the mitigating circumstances, then

. . . Bobby Waldrop needs to get the death sentence" because the offense "was a cold,

heinous, atrocious, and cruel killing." *Id.* at 36-37.  He concluded as follows:

> We have a sacred trust to enforce the law.  I am comfortable with the
> decision in this case and it is the right decision if we are going to have
> a death penalty in the State based upon statutory circumstances of
> aggravation and statutory circumstances of mitigation, and I don't have
> any inclination to change the ruling.  I will reword the order to include
> those things that may be missing that the Court of Criminal Appeals
> wants to see, but I'm not willing to take the responsibility for not
> applying the law equally in this case.  And, I would not be applying the
> law equally to everybody if Bobby Waldrop doesn't get the death
> sentence in this case.

*Id.* at 38.

As can be seen from a more comprehensive review of the transcript, it is

evident that, notwithstanding Judge Segrest's brief allusion to petitioner's race, he

plainly believed that the aggravating circumstances outweighed the mitigating

circumstances in this case and correctly recognized that as the fundamental question

before him.  Immediately before the remarks identified by petitioner, Judge Segrest

specifically disclaimed that anything other than the weighing of aggravating and

mitigating circumstances caused him to impose a death sentence.  *Id.* at 36 (emphasis

supplied) ("The why is, on imposing the death sentence, is because the aggravating

circumstances outweigh the mitigating circumstances, and the person did it, and

*that's all you take into account.  Nothing else.*").  Certainly, then, Judge Segrest was aware that petitioner's race was not a constitutionally cognizable consideration when determining his sentence.  Were it truly his intent to so dramatically subvert the Constitution and impose a death sentence based upon petitioner's race rather than his faithful weighing of aggravating and mitigating circumstances, he surely was more savvy than to baldly announce that intent in open court, especially considering that there was no similar mention of petitioner's race at any prior hearing or in either of the trial court's sentencing orders.

Petitioner describes Judge Segrest's remarks as demonstrating his intent to "'balance out' his record."  Pet'r's Br. (Doc. # 44) at 16.  In other words, according to petitioner, Judge Segrest believed he needed to sentence a white person to death because he had already sentenced three African-Americans to death.[2]  Judge Segrest's remarks may certainly be described as inartful, awkward, clumsy, or superfluous. And, in fairness, in the simplest sense, they may lend themselves to the more sinister

---

[2]  Petitioner does not explain why Judge Segrest would be possessed by some need to "balance out his record" by sentencing a white person to death.  It is not as if Judge Segrest had a quota or prescribed ratio he was required to meet.  Rather, petitioner appears to believe that Judge Segrest sentenced him to death because of nothing but the need to appear "fair."  But, why?  So that he could continue disproportionately sentencing African-Americans to death without exciting widespread attention or outrage or appellate scrutiny?  This rationale is all the more implausible considering the fact that Judge Segrest announced at the hearing that he was planning to retire a few months later.  *See* R.-30 at 37 ("Now, I'm going out of office in January.").  The court is not prepared to accept the premise that Judge Segrest would sentence a white person to die to provide cover for his purported discriminatory sentencing tendencies against African-Americans, especially where there was no objective reason for Judge Segrest to do so and, as he remarked at the hearing, he was soon to retire anyway.

interpretation that petitioner advances.  But the court is not required to accept petitioner's interpretation without scrutiny.[3]  Indeed, in the court's estimation, petitioner's interpretation is not the only, or even most, viable one.[4]  Given the full context of Judge Segrest's remarks, in which he without equivocation repeatedly states his belief that the balance of aggravating and mitigating circumstances tipped in favor of death in petitioner's case, his comment about petitioner's race relative to the race of others he had sentenced to death does not compel the conclusion that Judge Segrest sentenced petitioner to death because of his race.  Therefore, the court

---

[3]  In *Hays v. State of Alabama*, 85 F.3d 1492, 1502 (11th Cir. 1996), for example, the habeas petitioner similarly argued that "the Alabama Supreme Court's mention of the number of white defendants on death row in Alabama for the killing of blacks (zero) indicates an intention to 'balance the books' by considering the petitioner's race in determining sentence, in violation of his right to equal protection."  The Eleventh Circuit rejected the petitioner's argument, concluding that the Alabama Supreme Court's discussion of petitioner's race "was only part of an extended discussion of elements favoring the imposition of the death penalty[,]" and that "even if the Alabama Supreme Court did look at historical statistics, it might just as well not have been to 'balance the books' but to find some motivation to explain the jury's failure to impose the death penalty.  That is, the Alabama Supreme Court was attributing a racial motive to the *jury's* decision, rather than setting out a racial motive for its *own* decision to reinstate the sentence imposed by the trial judge."  *Id.*

[4]  Judge Segrest's remarks are susceptible to other interpretations.  On the one hand, they could reflect a simple, extemporaneous, and innocuous recognition of the races of those he had previously sentenced to death which occurred to him at the time he uttered it.  Or perhaps, as in *Hays*, Judge Segrest was trying to "find some motivation to explain the jury's failure to impose the death penalty[,]" that he was "attributing a racial motive to the *jury's* decision, rather than setting out a racial motive for [his] *own* decision[.]" 85 F.3d at 1502.  This interpretation dovetails with both Judge Segrest's repeated, explicit affirmations that the weighing of aggravating and mitigating circumstances was his only permissible consideration in capital sentencing and the larger point he had set out to discuss: his belief that Alabama's judicial override is not just constitutional, but that it is a worthwhile policy instrument because, given their experience, judges are more likely than jurors to weigh aggravating and mitigating circumstances without regard to impermissible considerations like the race of the defendant.  Indeed, this appears to be how his remarks were interpreted by petitioner's attorneys at the hearing.  *See* R.-30 at 39 ("The court is aware, and I appreciate the Court wanting to treat, and going out of its way to treat, people fairly, equally, without deference to race, as far as race and the death penalty, . . . .").

cannot conclude that, even if the "fundamental miscarriage of justice" exception extended to claims of sentencing error like the instant claim, such a "fundamental miscarriage of justice" occurred in this case.

For all of the foregoing reasons, the court finds that petitioner is not entitled to Rule 59(e) relief or an expansion of the certificate of appealability respecting the court's disposition of Claims A and B.

### C.   Petitioner's contention that the court committed manifest error in concluding that his equal protection claim was procedurally defaulted

In Claim D of his habeas petition, petitioner claimed that it violated his Equal Protection rights for the trial judge to override the jury's sentencing recommendation and sentence him to death because judicial override in Alabama is "standardless," the death penalty is "imposed disproportionally on defendants convicted of killing white people," and the trial judge based his decision on "inappropriate considerations" including "personal bias" and "inappropriate personal and political considerations." Pet. ¶¶ 53-54.  He further alleged that Alabama's failure to provide trial judges with a uniform standard for considering the jury's verdict and failure to adopt a standard of appellate review in judicial override cases violates the Equal Protection Clause. *Id.* at ¶¶ 59-61.  Respondents argued that petitioner failed to exhaust Claim D because he did not fairly present it in the state courts and, accordingly, it was procedurally

defaulted.  Resps.' Br. (Doc. # 41) at 10-11.  Petitioner countered that he fairly presented the claim by raising it in his petition for certiorari review on direct appeal in the Alabama Supreme Court, and that the Court "addressed" his "arguments pertaining to the unconstitutionality of Alabama's standardless override system[,]" thereby exhausting the claim for federal habeas purposes.  Pet'r's Br. (Doc. # 44) at 45-46.  The court found that the claim championed by petitioner as having "fairly presented" his Equal Protection claim in the state courts was not among the two claims granted certiorari review by the Alabama Supreme Court and that, furthermore, the Alabama Supreme Court did not address or decide any of petitioner's arguments within Claim D of the habeas petition in its opinion affirming his conviction and sentence.  Mem. Op. (Doc. # 57) at 25-29.  Thus, the court found that the claim was not exhausted in the state courts and was procedurally defaulted in federal habeas corpus review.

Petitioner now argues that the court misconstrued his claim and the state court decision, *Ex parte Taylor*, 808 So. 2d 1215(Ala. 2001), which was at issue in the Alabama Supreme Court's adjudication of one of the claims for which it had granted certiorari.  Pet'r's Mot. (Doc. # 59) at 16-17.  He asserts that the Alabama Supreme Court was "on notice that Mr. Waldrop was raising due process and equal protection claims regarding the trial court's override of the jury's life recommendation[,]" and

24

that it "responded to these claims and addressed the trial court's override with reference to *Taylor*." Pet'r's Mot. (Doc. # 59) at 17.  However, as the court discussed in its Memorandum Opinion and again in this order, the mere fact that petitioner put the state courts "on notice" of a particular claim by raising it in a petition for discretionary review is not sufficient to "fairly present" the claim for purposes of exhaustion.

Likewise, petitioner's assertion that the "Alabama Supreme Court responded to" the equal protection arguments in Claim D is disingenuous.  If any response may be attributed to the Alabama Supreme Court, it is that the Court specifically declined to respond to the claim when it did not grant certiorari review of the claim.  Again, the Alabama Supreme Court's order granting certiorari review succinctly states that "consideration of the petition for writ of certiorari, and briefing, shall be limited to whether the trial court's order states sufficient reasons for overriding the jury's sentencing recommendation[,]" as required by *Ex parte Taylor*.  Petitioner does not even attempt to argue that this grant of certiorari was not related to Claim XVI of his petition for certiorari, in which he urged the court to grant certiorari "because the trial court did not state its reasons for giving the jury's life without parole recommendation the consideration that he gave it," as required by *Ex parte Taylor*. R.-38 at 68.  The order granting certiorari does not say that the Alabama Supreme

25

Court would consider, in addition to this issue, whether petitioner's Equal Protection rights were violated because the trial court's override "was based on a statute which does not specify what weight the trial court should have given to the jury's recommendation, as petitioner argued in the separate claim, Claim XXVII, which he proffers as having "fairly presented" Claim D in the state courts. *See* R.-38 at 78-79.

Petitioner's brief in support of his petition for certiorari further distinguishes his two separate challenges to the trial court's override. *Compare* R.-39 at 99-100 *with* R.-39 at 110-115. In support of Claim XVI, upon which the Alabama Supreme Court would eventually grant certiorari, petitioner argued simply that the trial court was required by Alabama's capital sentencing statute to consider the jury's life recommendation, but that the judge failed to comply with *Ex parte Taylor*'s mechanism for assuring such consideration when he failed to state the specific reasons he gave the jury's recommendation the consideration which he gave it. In contrast, in support of Claim XXVII, petitioner presented a lengthy argument challenging Alabama's judicial override on, essentially, the grounds articulated in ¶¶ 52-61 of the federal habeas petition. Because there is no doubt that the Alabama Supreme Court did not grant certiorari on the latter claim, petitioner's argument that the court was "made aware" of his claims and "responded" to them misses the mark.

Nor can it be fairly argued that the Alabama Supreme Court decided the Equal Protection claim he presents in his federal petition on its merits notwithstanding both his failure to "fairly present" the claim and the state court's decision not to grant certiorari on it.  As this court explained in its Memorandum Opinion, the Alabama Supreme Court merely recounted the origin of *Ex parte Taylor*'s requirement that a trial judge "state specific reasons for giving the jury's recommendation the consideration he gave it," discussed when *Ex parte Taylor* was released relative to the procedural developments in petitioner's case, and, because remand to correct any failure to satisfy *Ex parte Taylor*'s specific requirement was "not an option" due to Judge Segrest's retirement, endeavored to "perform its own review of the propriety of the death sentence" by determining "whether the aggravating circumstances outweigh the mitigating circumstances."  *Ex parte Waldrop*, 859 So. 2d at 1191-92. Thus, although petitioner argues that the "Alabama Supreme Court responded" to his present Equal Protection claims and "addressed the trial court's override with reference to *Taylor*," Pet'r's Mot. (Doc. # 59) at 17, it only addressed his claim about the trial court's failure to provide specific written findings regarding the weight it afforded to the jury's recommendation, which, the Alabama Supreme Court noted, is required by Alabama's capital sentencing statute, not the Eighth Amendment or any

27

United States Supreme Court authority. *See Waldrop*, 859 So. 2d at 1191 (quoting *Ex parte Taylor*, 808 So. 2d at 1218).

The Alabama Supreme Court did not purport to address, much less decide on its merits, any argument that judicial override violates equal protection because there is "no consistent standard to guide trial courts in their consideration of a jury's life verdict," Pet. ¶ 54, or because "the death penalty in Alabama is imposed disproportionally on defendants convicted of killing white people," *id.*, or because "the override in this case was based on inappropriate considerations," *id.*, or because Alabama's appellate courts do not evaluate a "judicial override against any objective measure of propriety and . . . determine whether similarly situated persons [are] being treated alike," *id.* at ¶ 60. Because such claims were not "fairly presented" to the state courts, were not considered in discretionary proceedings in the Alabama Supreme Court, and were not decided on their merits by the state courts, they are unexhausted for federal habeas purposes.

In sum, in his petition for certiorari review, petitioner presented one claim challenging the trial court's failure to adhere to Alabama's statutory requirement, as construed in *Ex parte Taylor*, that it render specific written findings detailing what consideration it afforded the jury's advisory verdict, and a separate claim consisting of the Equal Protection arguments presented in his federal habeas petition. It is clear

28

from the Alabama Supreme Court's order granting certiorari and its subsequent opinion that the Court considered, and decided, only the former claim. As petitioner has conceded that he only presented the latter claim in discretionary review before the Alabama Supreme Court, it was not "fairly presented" in the state courts and thus was not exhausted for federal habeas purposes. For the reasons given in the Memorandum Opinion, the claim is therefore procedurally defaulted from federal habeas review. Likewise, for the reasons discussed in section II.A of this order, petitioner is not entitled to an expansion of the certificate of appealability on this issue.

### D.   Petitioner's contention that the court committed manifest error in denying his *Ring* claim

Petitioner next contends that the court committed manifest error when it denied his claim that the "trial court's fact-finding violated *Ring v. Arizona*, 536 U.S. 584 (2002)." Pet'r's Mot. (Doc. # 59) at 18-23. He faults the court for relying upon recent Eleventh Circuit precedent in its decision, overlooking one of his arguments in conjunction with his *Ring* claim, and misconstruing another of his related arguments. The court will address each contention in turn.

Petitioner first argues that the court's reliance on the Eleventh Circuit's decision in *Lee v. Commissioner, Alabama Department of Corrections*, 726 F.3d 1172 (11th Cir. 2013), was manifest error because, in his estimation, *Lee* does not

29

"accurately reflect the holding of *Ring*." Pet'r's Mot. (Doc. # 59) at 19. He argues that *Lee*'s holding is based upon an "overly narrow reading of *Ring* and is inconsistent with *Ring* itself." *Id.* He points to other circuits which he asserts have rejected the Eleventh Circuit's interpretation and also asserts that the Eleventh Circuit's reasoning has been "superseded by intervening Supreme Court precedent." *Id.* (citing *Murdaugh v. Ryan*, 724 F.3d 1104, 1115-17 (9th Cir. 2013), and *Alleyne v. United States*, 133 S. Ct. 2151, 2158-62 (2013)). Petitioner's arguments about the court's reliance on *Lee* are unavailing. This court is not in the position to overrule or ignore Eleventh Circuit precedent that is directly on-point about an issue before the court. Thus, the court will not ignore *Lee* because petitioner perceives it as an "overly narrow reading of *Ring*." Likewise, it is irrelevant that the Ninth Circuit or any other Circuit may have decided this issue differently. This court is required to apply Eleventh Circuit precedent where it controls. Finally, petitioner's contention that "intervening"[5] Supreme Court authority has "superseded" *Lee* is an argument best presented to the Eleventh Circuit. Petitioner's objections to the court's reliance on *Lee* do not establish any manifest error on the court's part.

---

[5] In point of fact, *Alleyne* is not "intervening" in the sense for which petitioner appears to have offered it. *Alleyne* was decided on June 17, 2013. 133 S. Ct. at 2151. *Lee* was decided later, on August 1, 2013. 726 F.3d at 1172. The court fails to grasp petitioner's argument that *Lee* was somehow "superseded" by a Supreme Court decision that preceded it. Certainly, were *Alleyne*, which is concerned with judicial fact-finding that has the effect of increasing the mandatory minimum sentence applicable to certain federal offenses, at all relevant to this issue, the Eleventh Circuit was capable of applying it in *Lee*.

Petitioner next argues "the Court largely overlooked an argument raised by Mr. Waldrop that was not an issue in" *Lee*.  Pet'r's Mot. (Doc. # 59) at 20.  Namely, that the Alabama Supreme Court's decision was "contrary to clearly established law requiring that the jury in a capital case be aware of the impact of its decisions and that the defendant be given notice of what he must defend against."  *Id.*  Petitioner argues that, because this argument was not raised by the petitioner in *Lee*, the court's reliance on *Lee* in denying this portion of his claim was manifest error.  But the court is not persuaded that, even if petitioner more vigorously raised the issue in this court, the petitioner in *Lee* did not raise a similar argument that was at least implicitly rejected by the Eleventh Circuit.

Petitioner cites pages 26-29 of his brief as setting forth the argument that he faults the court for overlooking.  In that portion of his brief, petitioner first argued as follows:

> The Alabama Supreme Court's decision in this case also violates the requirements of due process and the Sixth Amendment, as well as the integrity of the jury's judgment.  Despite the fact that the jury was essentially performing a sentencing duty, the jury was never informed of this process, which was invented for the first time by the Alabama Supreme Court more than three years after the trial judge sentenced Mr. Waldrop to death.  The jury that convicted Mr. Waldrop could not have known that its first-phase verdict alone would authorize a death sentence.  Indeed, the trial court instructed Mr. Waldrop's jury at the first phase that it was not to consider the possible penalty during that phase.  The trial court told the jury that:

31

> [A]t this point in time, the purpose of the trial is to
> determine whether the defendant is guilty of any offense
> . . . .   And, only if the defendant is convicted of capital
> murder is there a second phase to the trial.

Pet'r's Br. (Doc. # 44) at 25-26 (citations omitted).  Petitioner then argued that the

"Alabama Supreme Court's decision is contrary to Supreme Court precedent holding

that, where the State puts the issue of whether death is an appropriate sentence in

issue, due process entitles the defendant to inform the jury about the nature and

consequences of that decision."  *Id.* at 26.

In *Lee*, the habeas petitioner did argue before the Eleventh Circuit that the jury

was not just uninformed that its "first-phase verdict alone would authorize a death

sentence," but that it was affirmatively instructed that its first-phase finding would

not be sufficient to render Lee eligible for the death penalty:

> In these jury instructions the trial court made clear that the jury would
> have to separately find an aggravator *during the penalty phase* because
> Lee's conviction was not itself a finding of the necessary aggravator.
> The jury presumably followed these instructions, and the State never
> argues otherwise.  *United States v. Lopez*, 649 F.3d 1222, 1237 (11th
> Cir. 2011). The jury's 7-5 vote against the death penalty means that it
> either did not find the aggravator per the instructions, or found that the
> minimal mitigating facts that were presented outweighed this
> aggravator. The trial court, however, went on to ignore its own jury
> instructions and rely on the guilt-phase verdict for the necessary finding
> of an aggravator, and then weigh the evidence itself.
> . . .
> Here, in *effect*, the judge instructed the jury that its verdict did not
> authorize the death penalty; rather, the jury would have to make

32

> additional findings – including finding an aggravator beyond a
> reasonable doubt. The jury must be presumed to have found otherwise.

Reply Br. of Appellant at 25-26, *Lee v. Thomas*, No. 12-14421-P (11th Cir. March
5, 2013) (citations to record omitted) (emphasis in original).  Certainly, petitioner's
instant argument that the jury should have been informed about the potential reach
of its first-phase verdict does not describe a different or greater due process violation
or derogation of the "integrity of the jury's judgment" than what the petitioner in *Lee*
argued before the Eleventh Circuit.  Thus, the Eleventh Circuit's decision denying
Lee's *Ring* claim must be construed by this court as having embraced, and rejected,
petitioner's argument that his jury was unconstitutionally left unaware "of the impact
of its decisions."  *See, e.g., Lee*, 726 F.3d at 1198 ("Nothing in *Ring* – or any other
Supreme Court decision – forbids the use of an aggravating circumstance implicit in
a jury's verdict.  Indeed, *Ring* itself specifically left open and did not decide the
question of whether the aggravator used to impose a death sentence could be implicit
in the jury's verdict.").

Petitioner also argues that the court "misconstrued the argument that the
Alabama Supreme Court's reconstruction of the capital statute caused the jury
effectively to determine the sentence at the guilt phase[,]" which, according to
petitioner, "violated longstanding, clearly established Supreme Court precedent

requiring that juries considering a death sentence be fully informed of the 'truly awesome responsibility' and nature of that decision."  Pet'r's Mot. (Doc. # 59) at 20 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985)).  As the court discussed in the Memorandum Opinion, the difficulty with adjudicating any claim that the Alabama Supreme Court separately violated petitioner's constitutional rights by "retroactively reconstructing" Alabama's death penalty statute was that no such claim was clearly delineated in the petition.  Instead, this claim was presented within the subheading of petitioner's *Ring* claim titled "The Record Does Not Reliably Establish a Finding of Penalty Phase Aggravation in Violation of *Ring*."  *See* Pet. ¶ 37.1; *id.* at ¶¶ 39, 43.  However, as discussed in *Lee*, the jury's finding of guilt on petitioner's capital murder charge "necessarily includes a finding that the aggravating circumstance in § 13A-5-49(4) is present."  726 F.3d at 1198.  Thus, petitioner's larger argument, that there was no reliable jury finding of fact about the existence of any aggravating circumstance, has been rejected by Circuit precedent.

To the extent petitioner intended a separate claim about the constitutionality of the Alabama Supreme Court's "revision" or "reconstruction" of the statute, the court noted that petitioner "fails to cite any authority holding that a jury's findings of fact at the guilt phase cannot, alone, establish an aggravating circumstance which is implicit in the jury's verdict and is subsequently applied by the trial judge."  Mem.

Op. (Doc. # 57) at 36 n.13.   Petitioner argues that he cited numerous cases establishing such precedent that the court has ignored "because it has not been applied to the exact factual scenario at issue in Mr. Waldrop's case."   Pet'r's Mot. (Doc. # 59) at 22.   He asserts that this court's "requirement of factual identity between clearly established federal law and Mr. Waldrop's case is at odds with the Supreme Court's admonitions and approach to analyzing habeas corpus petitions under AEDPA."   *Id.*   But, the court's observation was hardly inappropriate in this context.   Indeed, the Eleventh Circuit said essentially the same thing in *Lee*, in which it too was analyzing the petitioner's claims under the AEDPA.   *See* 726 F.3d at 1198 ("Nothing in *Ring* – or any other Supreme Court decision – forbids the use of an aggravating circumstance implicit in a jury's verdict.   Indeed, *Ring* itself specifically left open and did not decide the question of whether the aggravator used to impose a death sentence could be implicit in the jury's verdict.").   If there is no Supreme Court decision that "forbids the use of an aggravating circumstance implicit in a jury's verdict," then the Alabama Supreme Court's decision effecting such a result in this instance could not have been contrary to, or an unreasonable application of, clearly established federal law, at least as interpreted by the Eleventh Circuit.

Petitioner is not entitled to relief from judgment or an expansion of the certificate of appealability with respect to his *Ring* claim.

35

**E.    Petitioner's contention that the court committed manifest error in denying relief on his ineffective assistance of counsel claim**

Petitioner next argues that the court committed manifest error in concluding that the state court's rejection of his claim that counsel rendered ineffective assistance in investigating and preparing for the penalty phase of trial was not contrary to, or an unreasonable application of, clearly established federal law and was not based upon an unreasonable determination of fact in light of the record before the state courts. The court will address each of petitioner's supporting arguments in turn.

Petitioner first argues that, based upon his interpretation of this court's "findings," he is "entitled to *de novo* review of the prejudice prong because the state court did not actually reach the merits on that prong." Pet'r's Mot. (Doc. # 59) at 23. Of course, petitioner did not argue prior to judgment that he was entitled to *de novo* review of the prejudice prong of his ineffective assistance of counsel claim. Rather, he spent several pages of his briefing arguing that, pursuant to § 2254(d)(1)'s standard of review, the state court's decision that he was not prejudiced by counsel's failure to investigate and present mitigating evidence was contrary to, or an unreasonable application of, Supreme Court precedent. *See* Pet'r's Br. (Doc. # 44) at 88-94. Petitioner bases this new argument on this court's observation that the state court decided the prejudice inquiry against him when it concluded that the testimony

36

he offered at the Rule 32 evidentiary hearing was not "particularly credible or relevant[,]" and that a subsequent portion of the Court of Criminal Appeals' opinion, in which it was contrasting counsel's performance with that of the attorneys in another case and explaining the strategy undergirding counsel's performance at the penalty phase, pertained to the state court's assessment of the reasonableness of his attorney's performance in light of the case petitioner had cited to show that he was entitled to a new sentencing hearing.  According to petitioner, the portion of the Court of Criminal Appeals' opinion that this court has construed as, at least in part, reflecting the state court's judgment on prejudice does not, in fact, do so because it does not "address[ ] the prejudice prong" and, instead, "clearly focuses on deficient performance." Pet'r's Mot. (Doc. # 59) at 24.[6]  However, in his prejudgment briefing,

---

[6]  To be clear, the relevant portion of the Court of Criminal Appeals' opinion includes a lengthy quotation from the circuit court's opinion denying petitioner's Rule 32 petition.  In the excerpted portion, the circuit court determined that Shirley Irelan's testimony about her father's abuse was not credible because it was not corroborated by documentation or another witness alleged to have also been abused, questioned the relevance of testimony about violence allegedly inflicted on petitioner's father and aunt which predated petitioner's birth and of which he was unaware, questioned the relevance of evidence about Shirley Irelan's grandfathers' alleged bootlegging activities and the drinking habits of petitioner's father's aunt and uncle, found allegations about petitioner's father's own drinking "a gross overstatement of the evidence" actually adduced at the hearing, and speculated that evidence about abuse inflicted on petitioner was "greatly exaggerated" considering the lack of corroboration from witnesses other than petitioner's mother and sister. *Waldrop v. State*, 987 So. 2d 1186, 1197–99 (Ala. Crim. App. 2007).  The circuit court summarized its belief that petitioner's evidence was not "particularly credible or relevant[,]" and that, had trial counsel presented the evidence offered at the Rule 32 hearing, "the result of Mr. Waldrop's trial would not have been different." *Id.* at 1200.  The Court of Criminal Appeals then adopted the circuit court's findings and remarked that few of petitioner's witnesses had "offered any negative insight into Waldrop's upbringing except his mother[,]" whose testimony mostly "consisted of detailing the abuse that she had suffered at the hands of her father, one of the victims, and her husband." *Id.*

petitioner also treated the circuit court's credibility findings as pertinent to the state court's judgment on the prejudice prong. *See* Pet'r's Br. (Doc. #44) at 88-90 (arguing that, "[i]n assessing prejudice, the state court unreasonably discounted mitigating evidence because it was presented through family member witnesses," and citing circuit court's credibility finding as to Shirley Irelan's testimony about her father's abusive behavior). It is not unusual that this court, and petitioner himself, previously construed the state court's discussion of witness credibility, probative value, or relevance as reflecting its findings on prejudice; federal courts have routinely recognized that a habeas petitioner cannot show prejudice due to counsel's failure to offer incredible, irrelevant, or insufficiently compelling testimony at trial. *See, e.g., Johnson v. Upton*, 615 F.3d 1318, 1341-44 (11th Cir. 2010). Thus, petitioner's present contention that the state courts did not reach the prejudice prong is puzzling. In any event, the court concludes that, where petitioner himself did not previously argue this point, and where the record does not manifestly support his conclusion, the court did not commit manifest error in concluding that the state courts decided the prejudice prong of his claim on the merits and, consequently, in applying § 2254(d) rather than conducting a *de novo* review.

Petitioner next contends that, even assuming that the state court did reach the prejudice prong when it evaluated the evidence introduced at the Rule 32 hearing, the

state court's decision was contrary to, or involved an unreasonable application of, *Strickland*, or it rested on an unreasonable determination of the facts in light of the record before the state courts.  Pet'r's Mot. (Doc. # 59) at 25.  For the reasons stated in the Memorandum Opinion, the court does not agree.  Nevertheless, the court will address petitioner's discrete supporting arguments in turn.  He first argues that "the state court did not evaluate whether, but for counsel's deficiency, there was a reasonable probability that Mr. Waldrop would have received a different sentence." *Id.*  Petitioner submits that, although the Court of Criminal Appeals "quoted cases that recite the proper prejudice standard," it adopted the circuit court's use of "a standard – requiring proof that 'the result of Mr. Waldrop's trial *would have been different*,' – that is inconsistent with *Strickland*."  *Id.* (citation omitted) (emphasis petitioner's).  Petitioner thus faults the Court of Criminal Appeals for adopting the circuit court's judgment because it failed to incorporate the words "reasonable probability" in the portion of its prejudice analysis in which it concluded that, had counsel offered the evidence presented at the Rule 32 hearing, the result of his "trial would not have been different."  *Waldrop*, 987 So. 2d at 1200.

Of course, if petitioner believed that the state court did not actually evaluate prejudice or that, to the extent it did so, it failed to correctly apply the "reasonable probability" standard, he should have presented such argument prior to judgment.

39

Nevertheless, petitioner concedes, as he must, that the Court of Criminal Appeals recited and, therefore, was aware of the correct standard. *See id.* at 1194 (quoting *Stafford v. Saffle*, 34 F.3d 1557, 1564 (10th Cir. 1994) ("When the ineffective assistance claim relates to the sentencing phase of the trial, the standard is whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.") (internal quotation and citation omitted); *id.* at 1195 (quoting *Gaddy v. State*, 952 So. 2d 1149, 1170-71 (Ala. 2006) ("'In *Strickland* [the Supreme Court], made clear that, to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.") (internal quotation and citation omitted).  Thus, it is evident that the Court of Criminal Appeals was cognizant of the correct standard to be applied in assessing prejudice.

Likewise, because petitioner bases his charge that the state courts applied an incorrect standard on the Court of Criminal Appeals' adoption of offending language

40

from the circuit court's opinion denying this claim in his Rule 32 petition, it is worthwhile to review that opinion as well.  In its opinion, the circuit court also correctly set out the *Strickland* prejudice standard:

> The standard articulated by the <u>Strickland</u> Court requires that Mr. Waldrop show that his trial counsel's representation fell below an *objective* standard of reasonableness ("deficient performance") *and* that there was a reasonable probability that, but for his attorney's unprofessional errors, the result of the proceeding would have been different ("prejudice").  In this Rule 32 proceeding, Mr. Waldrop has shown neither deficient performance or prejudice.

R.-74 at 1-2.  Thus, although the circuit court later omitted the "reasonable probability" language when making its prejudice findings, which were then adopted by the Court of Criminal Appeals, it is evident that the circuit court, too, was aware of the correct standard to be applied in assessing petitioner's claim of prejudice. Petitioner's argument has less to do with the state court's application of the correct standard than with its failure to recite every word of the standard where it is applied. This insistence on formalistic, mechanical consistency "'smacks of a 'grading papers' approach that is outmoded in the post-AEDPA era.'"  *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1329 (11th Cir. 2013) (quoting *Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1255 (11th Cir. 2002)).  Where it is clear that, at all levels, the state courts were aware of the correct standard and endeavored to apply it, this court will not deem the state court's decision contrary to or an unreasonable application of Supreme

41

Court precedent based only on its failure to fully recite the given standard in every instance in which it is invoked, and petitioner has not cited any case in which a court has done so in similar circumstances.

Petitioner next claims that the state court's decision on the prejudice prong is contrary to, or involved an unreasonable application of, *Strickland* because it did not assess prejudice by "considering the totality of the available mitigation evidence presented at trial and in postconviction because it considered *none* of the mitigating evidence adduced in the Rule 32 proceeding." Pet'r's Mot. (Doc. # 59) at 26 (emphasis in original). In support of this argument, petitioner had argued in his brief, in pertinent part, that the state courts unreasonably failed to credit the testimonies of his family member witnesses at the Rule 32 hearing because they were family members and unreasonably failed to find evidence about his background mitigating because he killed his grandparents. Petitioner apparently now argues that the court committed manifest error in rejecting these contentions, asserting that the court's "analysis leaves no basis for the state court's wholesale exclusion of the mitigating evidence presented in Rule 32 except its conclusion that it was not 'relevant.'" *Id.* at 27-28.

To the contrary, all that this court did was address petitioner's arguments as they were presented in his briefing. As the court discussed in the Memorandum

42

Opinion, *see* Doc. # 57 at 66-67, in his brief, petitioner faulted the Court of Criminal Appeals for adopting the "circuit court's order refusing to credit the testimony of family members because they were related to Bobby." Pet'r's Br. (Doc. # 44) at 88. In support of this contention, he cited to a single sentence of the CCA's opinion in which the court, quoting from the circuit court's order, found Shirley Irelan's testimony about severe beatings and abuse inflicted on her by her father "incredible" because of her "interest in the outcome" of the proceeding and, importantly, because her testimony was not corroborated by reasonably expected sources including medical documentation or the testimony of other witnesses – in particular, Mrs. Irelan's sister – who were alleged to have similarly experienced such violence at the hands of Mr. Prestridge. *See Waldrop*, 987 So. 2d at 1198. As this court noted,

> In questioning the reliability of this portion of Mrs. Irelan's testimony, the state court did not somehow refuse to credit the entirety of the testimony of petitioner's family member witnesses, including the remaining aspects of Mrs. Irelan's testimony. The court did not, for example, question the veracity of any testimony about Mrs. Irelan's adultery or promiscuity, her violent outbursts against others, her suicide attempts, or whether petitioner loved and was loved by his grandparents, all of which were important points in petitioner's case during Rule 32 proceedings, and much of which was established by the testimony of petitioner's family members.

Mem. Op. (Doc. # 57) at 66-67. The court fails to see how it could have committed manifest error in demonstrating that the single instance petitioner cited as indicating

43

that the state courts unreasonably discounted his family members' testimonies because of their relationship with him did not, in fact, do so.[7]  It is petitioner's burden to support his arguments about the purported actions of the state courts, and, in this instance, he failed to provide persuasive support for his contention that the state courts unreasonably failed to credit the testimony of his family member witnesses because of their familial relationship with petitioner.  What is clear from the state court opinions is that, apart from any explicit credibility or relevance findings by those courts, the state courts mostly did not find that the evidence introduced at the hearing reliably established, in number or severity, the myriad allegations of petitioner's Rule 32 petition,[8] and that the totality of the mitigating evidence

---

[7]  Petitioner's charge that "[t]his Court determined that the only evidence excluded from the state court's consideration on the basis of lack of credibility was 'Mrs. Irelan's testimony about severe beatings by her father[,]'" Pet'r's Mot. (Doc. # 59) at 27, is inaccurate.  What the court actually determined was that the only instance petitioner cited for his proposition did not, in fact, support it, and that, moreover, his related argument that other witnesses corroborated the testimony of his family members was, for the most part, not especially probative of that point.  *See* Mem. Op. (Doc. # 57) at 65-71.

[8]  For example, in portions of the circuit court's order that were not excerpted in the Court of Criminal Appeals' opinion, the circuit court found that the evidence actually introduced at the hearing did not support petitioner's allegation that his mother "ever engaged in 'flagrantly adulterous' activities," did not reliably establish petitioner's mother's alleged history of repeatedly attempting suicide, and did not preponderate in favor of petitioner's allegations that he was continuously neglected or deprived of food and clothes.  *See* R.-74 at 4-6.  *See also Waldrop*, 987 So. 2d at 1198-1200 (quoting and adopting circuit court's findings that evidence of petitioner's purported family history of substance abuse was either irrelevant or insufficient to support his exaggerated allegations, finding evidence of alleged "daily" abuse inflicted on petitioner unreliable because the sources of such evidence were petitioner's mother – whom the court found generally incredible [*see* R.-#74 at 6] – and his sister – whom, the court noted, had "been convicted of crimes that affect the credibility of a witness" – *and* because no witness, including petitioner's "preacher, teacher, neighbor, and aunt" testified about observing common indicators of such abuse, and finding evidence offered to show  petitioner's alleged "promise" in "structured environments" counterbalanced by other evidence in the record, including that he had to repeat a grade in school and that he was fired from work three times due to excessive absences).

introduced by petitioner at trial and in collateral proceedings simply was not sufficient to outweigh the aggravating circumstances proven at trial. Petitioner understandably disagrees with this conclusion. But, having reviewed the subject opinions and the state court record, this court cannot conclude that the state courts acted unreasonably in reaching this determination.

Likewise, petitioner's argument that the court committed manifest error in concluding that the state courts did not unreasonably discount evidence about his background because of the identity of his victims is unavailing. As the court noted in the Memorandum Opinion, by the time the Court of Criminal Appeals speculated that it was "conceivable that evidence of an abusive childhood environment would have hurt Waldrop given that he was charged with killing his grandparents – the two people who were his primary caregivers during his childhood[,]" it had already adopted the circuit court's findings respecting the credibility, relevance, and probative value of the childhood and background evidence introduced by petitioner in Rule 32 proceedings, as well as the lower court's conclusion that, had the evidence been introduced, "the result of Mr. Waldrop's trial would not have been different." *Waldrop*, 987 So. 2d at 1200. Thus, it simply does not follow that the state courts wholly discounted petitioner's childhood and background evidence because of the

45

identity of his victims.  At most, this was a secondary, supporting reason why the

state courts did not believe that petitioner was prejudiced.[9]

_____

[9] Nor, in this court's estimation, was it unreasonable for the Court of Criminal Appeals to speculate, which – in surmising that the described result was "conceivable" – is all that it did, that petitioner's background evidence could have been interpreted by the jury or the ultimate sentencer as "double-edged." In the Memorandum Opinion, the court acknowledged that, while "evidence of petitioner's family background could be generally mitigating and not objectively damaging to his case[,]" "it was reasonable to speculate that evidence of petitioner's difficult childhood, mitigated as it was by the considerable evidence of petitioner's grandparents' substantial role in balancing his own parents' failings, might conceivably have angered the jury and distracted from the substance abuse evidence, which counsel reasonably considered his strongest point of mitigation."  Mem. Op. (Doc. # 57) at 72 n.27.  Petitioner now charges the court with having conflated the deficient performance and prejudice inquiries, improperly requiring that "mitigating evidence directly 'connect' to the crime," and unreasonably refusing to "find evidence of abuse and domestic violence mitigating unless it is proportionate to the capital offense."  Pet'r's Mot. (Doc. # 59) at 27-28 n.8. However, the court has done none of these things.

First, it was petitioner who argued that his Rule 32 evidence was not simply generally mitigating, but that counsel should have used "evidence that Bobby grew up in a family that habitually used extreme violence against each other in response to conflict and stress to help the jury understand Bobby *and his acts*[.]"  Pet'r's Br. (Doc. # 44) at 91 (emphasis supplied).  The court was simply observing that, to the extent petitioner was analogizing his family members' alleged violent, stress-induced actions with his own as a means of explaining those actions, it was not reasonably persuasive because of the overwhelmingly disproportionate nature of petitioner's violent actions and the scant evidence that they were the result of any conflict or stress involving the victims other than that petitioner wanted their money so he could buy drugs. In any event, the court acknowledged in its order that "evidence of petitioner's family background could be generally mitigating and not objectively damaging to his case[,]" and that "[s]uch evidence might even have "'help[ed] the jury understand Bobby'" and "sympathize with him as a person."  Mem. Op. (Doc. # 57) at 72-73 n.27.  Thus, the court recognized the potential mitigating value of such evidence and in no way did it require a connection between mitigating evidence and the crime or impose some proportionality requirement in order for evidence to achieve some minimal threshold of cognizable mitigation, and nor did it endorse any perceived similar state court position.

Moreover, the court's observations pertain also to the potential counterweight of the mitigating evidence and conclude, ultimately, that the state courts' speculation in this regard, even if shortsighted or incorrect, was not unreasonable.  The trial evidence showed that petitioner gruesomely butchered his elderly and infirm grandparents to get money so he could buy drugs.  Morever, the trial and post-conviction evidence showed – in devastating detail, considering the trial evidence of petitioner's grandmother's declarations as she was being attacked – that, whatever hardships petitioner had endured in his life, his grandparents loved and provided for him up to the very moment that he murdered them.  It is not unreasonable to question whether otherwise ostensibly mitigating evidence of childhood abuse and neglect which, as in this case, is inextricably intertwined with evidence showing the loving and nurturing nature of the victims toward the defendant might negate the intended impact of the abuse and neglect mitigating evidence – especially where, in the state courts' estimation, evidence of such abuse and neglect is mostly weak, irrelevant, and

(continued...)

Given all of the above, petitioner's argument that "[t]his Court's analysis leaves no basis for the state court's wholesale exclusion of the mitigating evidence presented in Rule 32 except its conclusion that it was not 'relevant'" Pet'r's Mot. (Doc. # 59) at 28, is problematic.  All that the court did was consider whether petitioner's sweeping arguments about the state court's decision were supported by his citations to the record and decide that, ultimately, they were not.  This court's analysis did not purport to identify or constrain all of the various bases on which the state courts might have "excluded," rejected, or simply not have been persuaded by the mitigating evidence petitioner presented in Rule 32 proceedings.  Certainly, the state courts questioned the relevance of some of petitioner's evidence.  *See Waldrop*, 987 So. 2d at 1198 (concerning evidence of "violent acts allegedly perpetrated on [petitioner's] father and his father's sister . . . by the uncle they were raised by" because "it all happened before Mr. Waldrop's birth and apparently Mr. Waldrop was not aware of it"); *id* (concerning evidence about petitioner's mother's grandfathers' bootlegging activities "or that she had seen an uncle of hers 'driving drunk' or that the aunt and uncle who raised Mr. Waldrop's father drank, all of whom were apparently deceased before Mr. Waldrop's birth or shortly thereafter").  And, in those

_____

(...continued)

unpersuasive – or might otherwise distract from other mitigating evidence that counsel perceived as stronger and more essential to his defense.

limited circumstances, petitioner might rightfully question whether the state courts unreasonably "excluded" that evidence or otherwise overlooked its mitigating value. But, as discussed in detail above, in addition to the state courts' explicit issues with credibility and relevance, the state courts variously found petitioner's evidence largely unpersuasive, insufficient to establish the severity of the allegations in his Rule 32 petition, and lacking in reasonable corroboration from anticipated sources. Thus, the state courts did not effect a "wholesale exclusion" of petitioner's mitigating evidence premised on either unreasonable credibility findings or an unreasonable assessment of what constitutes relevant mitigating evidence, and his argument that it is "patently unreasonable and contrary to Supreme Court precedent to determine that mitigating evidence of the type presented in this case is not relevant mitigating evidence," *see* Pet'r's Br. (Doc. # 59) at 28-29, is therefore unavailing.[10]

---

[10] In a lengthy footnote, petitioner presents what is presumably an argument ancillary to this point when he contends that the court erroneously denied his requests for an evidentiary hearing. Pet'r's Mot. (Doc. # 59) at 29-30 n.9. The court denied petitioner's request for an evidentiary hearing in a separate order entered prior to the parties' briefing on merits and procedural issues. *See* Order (Doc. # 39). Of course, because the court was required to apply the provisions of 28 U.S.C. § 2254(d)(1) & (2) to petitioner's claim of ineffective assistance of counsel, the court was not permitted to hold an evidentiary hearing – at which, presumably, petitioner would seek to introduce evidence not presented in the state courts – unless and until the court determined either that the state court's decision denying his ineffective assistance claim was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based upon a determination of fact that was unreasonable in light of the record before the state courts. *See Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."); *id.* at 1400 ("evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court"). Because the court ultimately decided these two inquiries against petitioner, there was no cause for a federal evidentiary hearing.

Petitioner further appears to fault the court for treating his "allegations about counsel's failure to obtain adequate expert assistance as separate claims" and finding that the state courts decided these claims on their merits despite that, with respect to his allegations about counsel's failure to hire an independent psychologist, the "state court did not identify or evaluate whether counsel's performance fell short of prevailing professional norms [namely, the ABA Guidelines]," the state court's opinion "exclusively addresses expert mental health evidence at the guilt/innocence phase and renders no determination about counsel's failure to retain an independent psychologist for the penalty phase," and, purportedly, "it unreasonably overlooks" aspects of trial counsel's testimony at the Rule 32 hearing. Pet'r's Mot. (Doc. # 59) at 29-30 n.9. In the Memorandum Opinion, the court noted the arguably disjointed manner in which the Court of Criminal Appeals dealt with petitioner's claim about counsel's failure to hire an independent psychologist for use at the guilt and penalty phases of his trial. *See* Mem. Op. (Doc. # 57) at 53 n.23 (noting that the Court of Criminal Appeals "may have conflated petitioner's separate guilt and penalty phase ineffective assistance claims concerning counsel's failure to retain a psychological expert."). As to the penalty phase aspect of the claim, the court determined that the state court decided the claim on the merits of *Strickland*'s deficiency prong. *Id.* at 112-16. Although it appears petitioner now contends that the Court of Criminal

Appeals did not intend to render any merits determination about his claim as to the penalty phase, it is indisputable that the Court of Criminal Appeals was aware that his claim concerned the exclusion of his mental health expert's penalty-phase-related testimony. *See Waldrop*, 987 So. 2d at 1192-93 (quoting Rule 32 hearing transcript discussion of petitioner's expert's anticipated testimony about "statutory mitigating circumstances," including that he "suffered from a mental disease or defect at the time of the offense").  Thus, when, in the next paragraph, the Court of Criminal Appeals reasoned that trial counsel was not ineffective for failing to locate an independent psychological expert because the pretrial report available to counsel indicated petitioner "was not suffering from a mental disease at the time he committed the murders," *id.* at 1193, it does not follow that the Court of Criminal Appeals was addressing petitioner's claim only as it related to the guilt phase.[11]  Furthermore, the Court of Criminal Appeals' failure to address whether the ABA Guidelines supported counsel's decision or counsel's own musings in hindsight do not compel the conclusion that the state court did not decide the claim on its merits, or that any merits determination was contrary to, or an unreasonable application of, clearly established federal law.

---

[11] Indeed, the fact that the Court of Criminal Appeals separately recognized and discussed petitioner's claim that counsel failed to adequately investigate mental health evidence for use at the guilt phase, *see Waldrop*, 987 So. 2d at 1206, strongly suggests that the state court intended its earlier discussion in pages 1192-93 of its decision to apply to petitioner's penalty phase claim.

In affording this level of deference to the state court's decision, the court is not unmindful of the Eleventh Circuit's very recent decision in *DeBruce v. Commissioner, Alabama Department of Corrections*, 758 F.3d 1263 (11th Cir. 2014), and the extent to which it could be argued that decision counsels against conferring such deference in this instance.  However, critical distinctions  between the instant case and *DeBruce* limit that case's utility here and, in any event, do not illustrate any manifest error in this court's judgment that the state courts did not act unreasonably in denying petitioner's claim that his counsel was ineffective in failing to investigate mental health evidence or procure expert assistance for the penalty phase of his trial.

In *DeBruce*, the habeas petitioner alleged that his trial counsel rendered ineffective assistance in their investigation and preparation for the penalty phase of his trial.  Specifically, he argued "that a pre-trial report created by a social worker at [one of his counsel's] request, which assessed DeBruce's competence to stand trial, should have alerted [counsel] of the need to make further inquiry into DeBruce's mental health and background."  758 F.3d at 1271.  This report indicated, *inter alia*, that DeBruce had attempted suicide four times, that he had "refused special education," that he "had dropped out of school at the age of sixteen," that his "intelligence was in the 'low average' range," and that he had a history of substance abuse.  *Id.* at 1271-72.  In pertinent part, the majority of the panel in *DeBruce* found

51

that counsel had no strategic reason to fail to further investigate DeBruce's mental health and background considering the leads suggested in the pretrial report. *Id.* at 1272. Moreover, the panel found that the Court of Criminal Appeals denied DeBruce's claim because counsel had testified that "the information he received did not lead him to question DeBruce's competence to stand trial or to consider defending DeBruce based upon a lack of mental capacity." *Id.* at 1273. Thus, the panel held that the Alabama Court of Criminal Appeals' "determination that [counsel] acted strategically in failing to conduct a mitigation investigation" was unreasonable because it was "based upon its erroneous conflation of the issues of guilt-phase mental health defenses and competence to stand trial with the separate issue of whether to conduct a mitigation investigation." *Id.*; *see also id.* at 1274 ("Because no lawyer could reasonably have made a strategic decision to forego the pursuit of mitigation evidence based on the results of the pre-trial report governing competency to stand trial, the Alabama Court of Criminal Appeals' conclusion to the contrary constitutes an unreasonable application of *Strickland*'s performance prong."). In short, then, the majority in *DeBruce* held that, as to deficient performance, given the troubling information in the pretrial report and several inconsistencies between the report and information conveyed by DeBruce and his mother, DeBruce's attorneys unreasonably abandoned any further investigation into DeBruce's mental health and

background and the Court of Criminal Appeals unreasonably endorsed this failure to conduct further investigation as a strategic choice worthy of deference under *Strickland*.

In this case, apart from the arguably similar and disjointed manner in which the Court of Criminal Appeals addressed petitioner's claim about counsel's failure to investigate mental health evidence for use at the penalty phase,[12] it is clear that the competency report counsel reviewed prior to trial simply did not contain the sort of "troubling leads," *DeBruce*, 758 F.3d at 1275, upon which the majority of the *DeBruce* panel based its decision that no reasonable attorney could have justified a strategic decision to forego further investigation into petitioner's mental health. As discussed in the Memorandum Opinion (*see* Doc. # 57 at 48-49), the pretrial competency report in this case revealed that the clinical psychologist's impressions of petitioner – apart from apparent substance abuse and addiction concerns – were overwhelmingly ordinary. Petitioner described himself, his mother, his father, and his siblings as, essentially, "free of physical and psychiatric problems." R. 31 at 2.

---

[12] *DeBruce* at least superficially suggests that, to the extent the Court of Criminal Appeals indeed conflated petitioner's guilt and penalty phase ineffective assistance claims in ruling that counsel did not perform deficiently in his investigation of petitioner's mental health for penalty phase purposes, the state court erred in doing so. 758 F.3d at 1272-73. However, even if the Court of Criminal Appeals erred in its analysis, for the reasons discussed in this Order, the circumstances of the respective pretrial competency reports so materially distinguish this case and *DeBruce* that, even in light of that decision, this court cannot conclude that the state court's ultimate judgment – that Waldrop's counsel did not perform deficiently in failing to further investigate petitioner's mental health for penalty phase purposes–is contrary to, or an unreasonable application of, Supreme Court precedent.

53

His "[m]ental status examination" was uniformly normal.  *Id.*  He was alert, demonstrated excellent memory, was properly oriented as to "person, place, and time," was able to concentrate and engage in abstract thought, and he denied "hallucinations, delusions, depersonalization, . . . derealization" and "current or past suicidal or homicidal ideation or intent."  *Id.*  Indeed, the pretrial report, which noted petitioner's "lengthy history of dependence on crack cocaine and marijuana as well as narcotics" and surmised that he was "voluntarily intoxicated" at the time of the offense, *see id.* at 4, likely had the effect of confirming counsel's prevailing theory of defense based upon his interviews with petitioner and review of the available evidence.  That is, the pretrial report would have only reinforced how imperative it would be for counsel to illustrate to the jury how petitioner's addiction caused him to commit the crimes, both to challenge the intent element of the crime and, in the event of a conviction, lessen his moral culpability.

Considering all of the above, not only did counsel not ignore or fail to follow-up on any "troubling leads" in the report, as did counsel in *DeBruce*, he quickly focused his defense on the only "troubling lead" reliably suggested in the report: petitioner's "lengthy" history of substance abuse and addiction.  Accordingly, as described in the Memorandum Opinion (Doc. # 57) at 49-50 & 112-14, counsel then set about mining that aspect of the case for value at both the guilt phase and penalty

phase by consulting with the Southern Center for Human Rights, retaining Dr. Tackett, and offering Dr. Tackett's testimony at both the guilt and penalty phases of the trial. Counsel did not unreasonably choose to cease any further investigation into petitioner's mental health and background after his review of the report, as did counsel in *DeBruce*, and the state court's judgment denying that counsel did not perform deficiently therefore is not contrary to, or an unreasonable application of, Supreme Court precedent as it is interpreted in *DeBruce*.

Petitioner next argues that the court committed manifest error in addressing his claim that the state court unreasonably "failed to consider the jury's 10-2 verdict for life in assessing the totality of mitigating circumstances." Pet'r's Mot. (Doc. # 59) at 30-32. In doing so, petitioner ignores precedent that does not support his argument[13] and mischaracterizes the court's findings.[14]

---

[13] As the court discussed in the Memorandum Opinion, *see* Doc. # 57 at 73-74, there plainly exists authority in this circuit that conflicts with petitioner's argument that a jury's life recommendation necessarily weighs in favor of a finding of sentencing phase prejudice under *Strickland*. *See Lee*, 726 F.3d at 1196 ("Indeed the fact that the jury recommended life imprisonment counsels against a determination that Lee was prejudiced under *Strickland*."). Petitioner makes no mention of this authority in the instant motion. Instead, he continues to cite *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008), as "[w]ell-established precedent in this circuit," which he asserts mandates that, where a jury recommended a life sentence without the benefit of the mitigating evidence subsequently introduced in postconviction proceedings, a finding of prejudice is especially justified. However, as this court previously noted, *Williams* is distinguishable because, unlike in this case, the finding of prejudice in *Williams* was predicated in significant part on the Court of Appeals' conclusion that the case was not "highly aggravated." 542 F.3d at 1343. Petitioner argues that, in distinguishing *Williams*, the court has "overlooked the reasoning" of *Williams* because the "relative weight of the aggravating circumstances in *Williams* went to the reasonableness of the ultimate finding of prejudice, not to the necessity of including the jury's life verdict on the mitigating side of the scale in the prejudice analysis." Pet'r's Mot. (Doc. # 59) at 31-32 n.10.

Even if the Eleventh Circuit determined in *Williams* that the jury's life recommendation "weighs heavily in favor of a finding of prejudice," nothing in that case establishes that, as a matter of "necessity,"

(continued...)

The court's Memorandum Opinion adequately addresses petitioner's underlying claim, and petitioner has failed to show any manifest error of law in this regard.

Petitioner next argues that, "[r]ather than evaluate the reasonableness of the state court's failure to assess the reasonable probability of a different sentence by

---

[13](...continued)

a jury's life recommendation must always be treated that way. To suggest such an absolute position is counterintuitive at best. If anything, the value of a jury's life recommendation in a reviewing court's prejudice analysis should be determined on a case-by-case basis. In a case like *Williams*, where the trial attorneys' only discernible strategy at sentencing was to offer a presentation of mitigating evidence about the defendant's background that was revealed in postconviction proceedings to be overwhelmingly thin and, in some vital respects, contradictory, it was perhaps reasonable to conclude that the jury's life recommendation supports a finding of prejudice. However, in other cases, such as *Lee*, where the postconviction evidence was found to be "simply too general and conclusory" and "cumulative" of evidence introduced at trial, a court is perhaps justified in concluding that the jury's life recommendation does not necessarily support a finding of prejudice. Likewise, as in this case, where trial counsel ably presented a penalty phase defense focused on showing the effects of petitioner's drug addiction on his actions, the jury's life recommendation may very well speak to the effectiveness of counsel's strategy, not necessarily what would have been the utility of presenting more of the sort of background mitigating evidence eventually introduced in postconviction proceedings.

In any event, even if *Williams* should be read as petitioner proposes, he points to no Supreme Court authority establishing that a jury's life recommendation necessarily supports a finding of prejudice or that it otherwise establishes that "the State's case for the death penalty was 'only weakly supported by the record.'" Pet'r's Mot. (Doc. # 59) at 31. Certainly, nothing in *Strickland* requires such a conclusion. To the extent petitioner's argument is therefore dependent on language in *Williams* that appears contradicted by language in *Lee*, the court believes that the Eleventh Circuit is better left to resolve any ambiguity in this area of the law.

[14] Contrary to petitioner's belief, this court did not find "that the state court did not consider the jury's life verdict for purposes of prejudice." Pet'r's Mot. (Doc. # 59) at 30-31. Instead, what the court did was conclude that the lone citation petitioner offered in his brief in support of his contention that the "state court's decision weighed *against* a finding of prejudice the jury's 10-2 verdict for life," Pet'r's Br. (Doc. # 44) at 92, did not, in fact, conclusively support his argument. *See* Mem. Op. (Doc. # 57) at 74-77. The most that can be said of the state courts' actual weighing of the jury's life recommendation is that state courts explicitly found it to be "significant," but "not controlling" of the prejudice analysis. *See Waldrop*, 987 So. 2d at 1199-1200 (quoting, and adopting, the circuit court's order finding no prejudice). If *Lee* is to be taken at face value, this was not error on the state court's part. Nevertheless, because, as set forth above, petitioner has not shown that clearly established federal law requires a reviewing court to treat a jury's life recommendation as a substantial factor in favor of a finding of prejudice, petitioner failed to show any unreasonable action on the part of the state courts.

56

considering the totality of the mitigating circumstances and aggravating circumstances, this Court conducted a different analysis that contains critical factual and legal mistakes." Pet'r's Mot. (Doc. # 59) at 33. Petitioner first accuses the court of using "the wrong legal standard" because, "[r]ather than 'consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweig[h] it against the evidence in aggravation' to assess the probability of a different outcome under *Strickland*, this Court found 'there is little for the court to do but compare the cases cited by petitioner with his own.'" Pet'r's Mot. (Doc. # 59) at 33 (internal quotations and citations omitted).

However, the court did not purport to apply any "standard" other than that of § 2254(d)(1) & (2). The court reviewed the CCA's decision denying petitioner's ineffective assistance claim, specifically discussing the state court's findings on prejudice. *See* Mem. Op. (Doc. # 57) at 60-62. The court addressed each of petitioner's discrete arguments that the state court unreasonably decided the prejudice inquiry against him. *Id.* at 65-79. Then, in response to petitioner's claim that the state court unreasonably failed to evaluate the totality of the mitigation evidence, this court summarized the mitigating evidence introduced at both trial and in Rule 32 proceedings, *id.* at 80-92, reviewed the aggravating evidence relied upon by the state

courts, *id.* at 93-94, and decided that, ultimately, "the court cannot conclude that the CCA's failure to find that the totality of this mitigating evidence is sufficient to undermine confidence in the outcome of petitioner's sentencing is contrary to or an unreasonable application of Supreme Court precedent, especially considering the formidable evidence in aggravation." *Id.* at 95.  Only then, in response to the abundant citations in petitioner's briefing to several Supreme Court cases which, he argued, established that the state court's decision was contrary to, or involved an unreasonable application of, Supreme Court precedent, did this court explain why, in its view, those cases, as well as others decided by the Eleventh Circuit, did not require such a conclusion in this case.  *Id.* at 96-110.

Thus, the court plainly sought only to apply § 2254(d) review to the state court's decision denying petitioner's claim of prejudice because this court was not charged with conducting a *de novo* review of petitioner's ineffective assistance claim. Rather, the court was only concerned with the reasonableness of the state court's decision finding no prejudice. *See Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland*'s standard.  Were that the inquiry, the analysis would be no different from if, for example, this Court were adjudicating a *Strickland*

58

claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different."). To the extent petitioner therefore faults the court for conducting some flawed version of a *de novo* review, his argument misses the mark. And, to the extent petitioner would argue that this court somehow committed manifest error or applied the wrong legal standard in comparing his case to those in which the Supreme Court has found *Strickland* prejudice both within and without the confines of AEDPA, the court would again direct petitioner to the court's citation of numerous Eleventh Circuit cases performing a similar exercise. *See* Mem. Op. (Doc. # 57) at 97 (citing *Lee*, 726 F.3d at 1194 ("A comparison of Lee's allegations of childhood poverty and his parents' fights to the types of 'powerful' mitigating evidence that the Supreme Court has found sufficient to establish prejudice under *Strickland* is instructive as Lee's evidence pales in comparison."); *Rose v. McNeil*, 634 F.3d 1224, 1245-46 (11th Cir. 2011) (explaining that "[i]n any event, Rose's 3.850 testimony falls far short of the powerful evidence that has been held sufficient to satisfy the prejudice prong in a brutal murder case" and reviewing pertinent Supreme Court cases); *Boyd v. Allen*, 592 F.3d 1274, 1299-1300 (11th Cir. 2010) ("Moreover, while we do not seek to minimize the adversities Boyd has faced, the record, including the evidence introduced at his post-conviction hearing, does not reveal the kind of abuse or

59

deprivation inherent in other cases where *Strickland* prejudice actually has been found."). The court's purpose in reviewing the pertinent evidence in each of the relevant Supreme Court cases was merely to show that, by comparison, the evidence petitioner adduced in support of his allegations of abuse and neglect was not on par with those cases in which the Supreme Court or Court of Appeals has found prejudice.

At the heart of petitioner's argument in this regard appears to be an assumption – not even an argument or a position considered worthily of debate – that the state court did not actually consider the totality of the mitigating evidence when it concluded that he was not prejudiced by counsel's alleged deficient performance. *See* Pet'r's Br. (Doc. # 59) at 33 ("Rather than evaluate the reasonableness of the state court's failure to assess the reasonable probability of a different sentence by considering the totality of the mitigating circumstances and aggravating circumstances, this Court conducted a different analysis . . . ."). It seems, according to petitioner, that this court was not to assess the reasonableness of the state court's evaluation of the totality of mitigating evidence, but instead was to assess the reasonableness of the state court's failure to do so. But petitioner's "proof" that this actually occurred in the state court was unpersuasive. He first argued that the state "court's unreasonable failure to consider the evidence adduced in post-conviction

together with the evidence at trial is apparent from its failure to recognize that its speculative theory about the negative effect of mitigating information was disproven when, in response to hearing just a small amount of the available mitigating evidence about Bobby Waldrop's background – including evidence about his relationship with his grandparents – the jury returned a *life verdict*."  Pet'r's Br. (Doc. # 44) at 93.  But this supposition fails to credit the very reasonable likelihood that the strategy employed by counsel – to focus on presenting expert opinion evidence about crack cocaine's effects on petitioner's behavior – was successful before the jury.  It simply does not follow, indeed, it strains credulity to posit, that the jury's life verdict was the product of counsel's presentation of "just a small amount of the available mitigating evidence," especially where petitioner has so vehemently assailed counsel's efforts in this regard throughout state post-conviction and federal proceedings.

Petitioner also argued that the Court of Criminal Appeals "unreasonably failed to weigh entire categories of powerful mitigating evidence, including evidence of the extreme physical abuse and neglect Bobby suffered at the hands of his parents, because witnesses who were not privy to what happened inside the Waldrop household 'never saw anyone hit or strike him.'"  Pet'r's Br. (Doc. # 44) at 93-94.  But the state court's assessment of testimony about abuse, neglect, and violence inflicted on petitioner was more nuanced than is portrayed by petitioner.  The state

court observed that several of petitioner's own witnesses, persons who had sustained, sometimes daily interactions with him over a period of years, "never saw any marks or bruises on Mr. Waldrop, never saw anyone hit or strike him, and never observed Mr. Waldrop appear to be hungry or without proper clothing." *Waldrop*, 987 So. 2d at 1199. Thus, the state court based its overall impression that petitioner's abuse and neglect evidence "appears to be greatly exaggerated" on more than just his failure to produce a witness – outside of his mother, sister, or brother – who actually saw him being hit or struck. The court reasonably expected that there would be some indication of the "extreme physical abuse and neglect Bobby suffered" such that witnesses like his teachers, pastor, aunt, or a lifelong neighbor would be able to support the testimony of his family members. *See id.* ("If there had been 'daily fights' between Mr. Waldrop and his father involving hitting with fists and hands and choking or being hit with belt buckles someone would have noticed something."). But these witnesses uniformly testified that they did not see signs of abuse, neglect, violence, or privation in their interactions with petitioner. The state court's judgment about the value of this evidence was plainly based on more than just petitioner's failure to produce a witness who did not live in petitioner's home yet still witnessed instances of violence against petitioner in the home.

At bottom, and as discussed above, petitioner's evidence was in the record before the state court. The state court indisputably reviewed the evidence but, in several instances, found it to be lacking credibility, relevance, or probative value. Just because the state court did not accept without scrutiny every detail of every witness's testimony and did not catalogue every item of testimony or evidence in its opinion does not mean that the state courts "did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing." Pet'r's Br. (Doc. # 44) at 94. Nor does it follow that this court was required to assume that the state court did so and then proceed to evaluate the reasonableness of the state court's failure to consider the evidence, as petitioner has argued the court failed to do in this instance.

Petitioner next argues that the court "employed the wrong standard with respect to aggravating circumstances by deciding that the trial court's finding of the 'heinous, atrocious, or cruel' aggravating circumstance makes it virtually impossible to establish prejudice in this case." Pet'r's Mot. (Doc. # 59) at 34.[15] Petitioner then imputes to the court some "assertion that a reviewing court may decline to give full weight and consideration to mitigating circumstances and instead base its prejudice

_____

[15] Petitioner concedes that the court identified the proper standard, but insists that it nevertheless failed to "'correctly conceptualize how that standard applies to the circumstances of this case.'" Pet'r's Mot. (Doc. # 59) at 34 n.12 (quoting *Sears v. Upton*, 561 U.S. 945, 952 (2010) (per curiam)).

determination on the aggravating circumstances alone," which, he argues "is contrary to established precedent." *Id.* However, as with numerous of petitioner's other representations about the content of the court's Memorandum Opinion, the court did not say this. In fact, all the court did was note the state court's obligation, in assessing prejudice, "to weigh the mitigating evidence adduced by the petitioner at trial and in collateral proceedings against the aggravating circumstances." Mem. Op. (Doc. # 57) at 93. The court then cited and discussed relevant Eleventh Circuit authority that instructs that the heinous, atrocious, or cruel aggravating circumstance applicable in this case is a "particularly powerful" and "immense" factor to be weighed against the mitigating evidence. *Id.* The court then reviewed the trial court's basis for applying the heinous, atrocious, or cruel aggravator and simply concluded that, "while it is certainly possible that a habeas petitioner can show prejudice even in a case involving the heinous, atrocious, or cruel aggravator . . . , it is clear that petitioner's burden in overcoming the powerful aggravating circumstances in this case is substantial." *Id.* at 93-94.

Nowhere did the court intimate that it is "virtually impossible to establish prejudice" where this aggravator applies. The court explicitly said it is "certainly possible." Likewise, the court in no way "asserted" that the state court in this case was free to "decline to give full weight and consideration to mitigating circumstances

and instead base its prejudice determination on the aggravating circumstances." Thus, petitioner's attempt to recast the court's assessment of the relative weight of the heinous, atrocious, and cruel aggravating circumstance is unavailing.

Petitioner next argues that, even if the "approach" he erroneously attributes to the court "were condoned by Supreme Court precedent, this case is not so uniquely aggravated relative to other capital murder cases that a reviewing court could rationally find that no amount of mitigation would have made a difference in the outcome." Pet'r's Mot. (Doc. # 59) at 34. In support, petitioner cites a number of Supreme Court cases in which prejudice was found despite the gruesome nature of the underlying murders. *Id.* at 34-35. However, as discussed above, the court did not intimate "that a reviewing court could rationally find that no amount of mitigation would have made a difference in the outcome," and petitioner's citation to *Rompilla, Wiggins, and Williams v. Taylor* is not helpful because, as the court discussed extensively in its Memorandum Opinion, the mitigating evidence that outweighed the aggravating evidence and established prejudice in those cases was far more compelling than that adduced by petitioner in Rule 32 proceedings.

Petitioner next contends that "this Court's factual findings with respect to mitigating circumstances are incomplete, inconsistent, and inaccurate." Pet'r's Br.

(Doc. # 59) at 35.  He appears to fault the court for failing to make certain findings of fact based on evidence that was produced during state postconviction proceedings.

> The Court provides no explanation for failing to find that Bobby was traumatized and shamed by his mother's neglect, abandonment, suicidal behavior, and reputation for infidelity; that his family history and early exposure to substance abuse left him vulnerable to addiction; that . . . he showed promise in structured environments and was not only loved by his grandparents but loved and caringly nursed them; that Bobby's crack cocaine addiction was precipitated by traumatic events with which he could not otherwise cope; and that Bobby is loved and valued by his family and members of the community.  These mitigating circumstances are amply supported by the unrebutted evidence adduced and proffered in Rule 32 but despite purporting to "credit[ ] the evidence as true," this Court overlooked them.

Pet'r's Mot. (Doc. # 59) at 35-36 (internal citation omitted).  The short answer to petitioner's charge of manifest error in this regard is that this court was not required to make any specific findings of fact about his mitigating evidence in conducting its review under § 2254(d).  *See Harrington*, 131 S. Ct. at 785.  Rather, the court was required only to assess the reasonableness of the state court's weighing of aggravating and mitigating evidence when it concluded that he was not prejudiced by the errors he attributed to his counsel.  Thus, the court was not obliged to make factual findings about whether petitioner's evidence supported his allegations, and certainly was not required to provide an "explanation" for its failure to make such unnecessary factual findings.

To provide context for the court's assessment of the reasonableness of the state court's judgment, the court set out in the Memorandum Opinion a streamlined recital of the totality of the mitigating evidence adduced at trial and in Rule 32 proceedings. Mem. Op. (Doc. # 57) at 80-92.  After discussing the aggravating evidence before the state courts, the Memorandum Opinion continued with a couple summary paragraphs acknowledging the mitigating nature of some of petitioner's evidence, but also discussing some of the inherent limitations of that evidence.  *Id.* at 94-96.  These paragraphs are not intended, and should not be construed, as specific "findings of fact" about the existence or nonexistence of mitigating circumstances.  Petitioner has failed to show manifest error due to any failure of the court to make specific factual findings regarding his mitigating evidence.[16]

Petitioner next argues that the court's observation that "evidence about the severity and frequency of any violence inflicted on petitioner by his family members is mostly vague," Mem. Op. (Doc. # 57) at 95, and is "inconsistent" with the court's recital of the mitigating evidence in pages 80-92 of the Memorandum Opinion.  *See* Pet'r's Mot. (Doc. # 59) at 36-37.  As an initial matter, the court emphasizes that, although it still considers "evidence about the severity and frequency of any violence

---

[16]   Moreover, the court's recital of the totality of the mitigating evidence recounts the testimonies of the various witnesses petitioner offers to substantiate the mitigating circumstances that he accuses the court of having "overlooked."

inflicted on petitioner" to be "mostly vague," the court's larger point should not be ignored:  The court expressly acknowledged that "it appears clear that petitioner was sometimes the target of violent actions by his parents."  Mem. Op. (Doc. # 57) at 95.  Thus, petitioner appears to be quibbling over semantics.  At any rate, a fair review of the evidence indicates that most of the testimony about violence inflicted on petitioner is indeed general and vague as to frequency and severity.  With a few exceptions, there is little testimony about specific incidents of violence involving petitioner or specific injuries inflicted on him.[17]  There is no evidence about petitioner needing or seeking medical attention as a result of any of this violence.  Nor is there appreciable specific testimony about how often petitioner was subjected to violence by his mother or father.[18]  Thus, the court did not commit manifest error in observing that "evidence about the severity and frequency of any violence inflicted on petitioner by his family members is mostly vague."

---

[17]  Petitioner's mother testified that petitioner's father would hit petitioner with his fist, that she had seen him choke petitioner, and that "several times" she also hit him with a broom handle.  R.- 60 at 332-33.  Notably, although she testified that being beaten and choked by her husband often left her with visible marks and bruises, *see id.* at 329, as set forth above, witnesses did not observe similar markings on petitioner despite his mother's testimony that he too was often hit and choked by his father.

[18]  Petitioner's mother testified that it seemed like "it was on a daily basis" that petitioner and his father would have some sort of altercation.  R.- 60 at 332.  But she did not testify that, specifically, petitioner was hit, choked, or otherwise physically abused on a daily, or even regular, basis.  Petitioner's brother only testified, without specifics as to frequency or severity, that he had seen their mother hit petitioner.  *Id.* at 366.  Likewise, petitioner's sister only testified, without specifics as to time or frequency, that she had seen petitioner's mother hit petitioner with various items, and that she had seen her father also hit and choke petitioner.  *Id.* at 374, 378.

Petitioner also asserts that "this Court's determination that Mr. Waldrop's claim of prejudice is undercut by the fact that his siblings grew up in the same circumstances and have not resorted to criminal behavior is refuted by the state court decision itself," Pet'r's Mot. (Doc. # 59) at 37, which notes that his sister "has been convicted of crimes that affect the credibility of a witness." *See Waldrop*, 987 So. 2d at 1199. As with many other instances in his motion, petitioner misrepresents what the court actually said in the Memorandum Opinion. The court simply observed, with citation to relevant Eleventh Circuit authority that petitioner has ignored, that his claim of prejudice was undercut because his "two younger siblings grew up in the same circumstances [which he stridently described as 'nightmarish'] and are not alleged to have resorted to *similar* criminal behavior, or even to have succumbed to the substance abuse which he has described as essentially an inevitable consequence of genetics and environment in his family." Mem. Op. (Doc. # 57) at 95 (emphasis supplied). The court plainly did not determine that neither of petitioner's siblings had ever "resorted" to any "criminal behavior" as petitioner appears to suggest. Thus, while it is certainly true that petitioner's sister testified that she had been "convicted of negotiating a worthless negotiable instrument," R.-60 at 389, the court fails to see how such a conviction could in any way be construed as "similar" to, or in the same universe of criminal behavior as, capital murder. *See, e.g., Reed v. Sec'y, Fla. Dep't*

69

*of Corr.*, 593 F.3d 1217, 1247 (11th Cir. 2010) (finding omitted evidence of childhood abuse evidence "damaging" to the extent it revealed that the petitioner's siblings "were affected by the same childhood abuse and neglect, . . . but acknowledged that [petitioner] was the only one of the siblings who had ever been arrested for a ***violent*** crime") (emphasis supplied).  Petitioner's contention that the court's "determination" in this regard is "refuted by the state court decision itself" is inaccurate.

For all of the foregoing reasons, the court finds that petitioner has failed to demonstrate any manifest error of law in the Memorandum Opinion's adjudication of his ineffective assistance of counsel claim.  Consequently, he is not entitled to Rule 59(e) relief.[19]

> ### F.    Petitioner's contention that the court committed manifest error in denying his claim challenging the trial judge's failure to recuse himself on the basis of personal bias

Petitioner's final argument that the court has committed manifest error warranting altering or amending the court's judgment concerns the court's disposition of his claim of judicial bias.  He first argues that, for the reasons he presented in the first portion of his motion, the court should reconsider that portion of its judgment

---

[19]    The court has already granted a certificate of appealability respecting petitioner's claim that he received ineffective assistance of counsel at the penalty phase of his trial.  As none of petitioner's guilt phase ineffective assistance claims is the subject of the instant motion, the court has not been asked to, and does not hereby, expand the certificate of appealability already granted on petitioner's ineffective assistance claim.

that found several of his allegations of judicial bias procedurally defaulted because they were not fairly presented and exhausted in the state courts.  Pet'r's Mot. (Doc. # 59) at 38.  However for the reasons discussed by the court in section II.A of this order, the court finds that petitioner has not shown manifest error in the court's application of the relevant procedural default principles.  Thus, petitioner is not entitled to Rule 59(e) relief.

Turning to the portion of petitioner's judicial bias claim that the court did not find procedurally defaulted and proceeded to review pursuant to the AEDPA, petitioner presents a number of sub-arguments that the court will address in turn.  By way of review, petitioner claimed in his habeas petition that the trial judge "demonstrated his lack of impartiality when prior to trial he engaged in a coordinated, *ex parte* effort with the District Attorney to secure the testimony of Bobby Waldrop's sister, Kristy Fortenberry, against Mr. Waldrop.  Mrs. Fortenberry did not want to testify, but after the District Attorney and Judge Segrest threatened her with jail time, she felt pressured and ultimately took the stand at trial."  Pet. ¶ 96.[20]  The court rejected respondents' assertion of procedural default as to this claim and reviewed the state court's merits determination pursuant to § 2254(d).  In his brief, petitioner

---

[20]  Petitioner's blunt account of Judge Segrest's alleged conduct was similarly damning in his brief: "During that meeting, Judge Segrest entered the room and assisted the District Attorney in securing the testimony of Mrs. Fortenberry by threatening her with the prospect of jail time."  Pet'r's Br. (Doc. # 44) at 97.

specifically argued that the state court's determination that this claim lacked merit

"'was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding'" pursuant to § 2254(d)(2).  Pet'r's Br. (Doc.

# 44) at 100.  After reviewing the state court record, the court concluded otherwise.

Mem. Op. (Doc. # 57) at 134-39.

Petitioner first argues that the Court of Criminal Appeals found that the trial

judge had no contact with Mrs. Fortenberry, and that such finding is unreasonable in

light of the record.  *See* Pet'r's Mot. (Doc. # 59) at 42-43 ("The Court of Criminal

Appeals' decision that 'relief was properly denied on this claim' because Judge

Segrest had no contact with Kristy 'was based on an unreasonable determination of

the facts' . . . [because] the record shows Judge Segrest was present and had contact

with Kristy at the meeting.").  But the Court of Criminal Appeals did not find that

there was "no contact" between Judge Segrest and Mrs. Fortenberry.  Rather, the

Court of Criminal Appeals simply determined that Mrs. Fortenberry's testimony

about the matter did not indicate "that Judge Segrest had unlawful contact with Mrs.

Fortenberry, much less that he coerced Fortenberry to testify."  *Waldrop*, 987 So. 2d

at 1204.  The court need not once again parse Mrs. Fortenberry's testimony about the

meeting in search of the version petitioner divines, and it may not favor his

interpretation of the plainly ambiguous testimony of his sister at the expense of the

72

presumption of correctness owed to the Court of Criminal Appeals' factual findings without the benefit of clear and convincing evidence rebutting the state court's findings.[21]  For the reasons stated in the Memorandum Opinion, the court concludes that this determination was not unreasonable in light of the record before the Court of Criminal Appeals, *see* Mem. Op. (Doc. # 57) at 136-39, and that petitioner has not shown that the court committed manifest error.

---

[21]  Petitioner's only substantive response to the court's previous analysis of the reasonableness of the state court's factual findings in light of the record is to essentially "double-down" on his contention that the record supports his allegations.  That is, where the court finds ambiguity in Mrs. Fortenberry's use of plural pronouns in her testimony, petitioner finds sufficient certainty to render the state court's contrary interpretation unreasonable.  He "maintains that, fairly read in the context of her testimony, 'they' refers to Mr. Clark and Judge Segrest – not to persons who were not at the meeting or conversations that did not 'happen[ ] at that meeting.'" Pet'r's Mot. (Doc. # 59) at 45.  Even if such an interpretation could be "fairly read" into Mrs. Fortenberry's testimony, that does not entail that the state court's contrary interpretation, even if improbable or incorrect, was unreasonable within the meaning of § 2254(d)(2).  In any event, Mrs. Fortenberry used "they" three separate times when asked what happened at the meeting.  It is clear that, with respect to the first two times she used it – specifically, when she referred to persons who "tricked" her into testifying by making promises about how the letter she provided the prosecution would be used – she had previously testified that investigator James Bailey had engaged in that conduct toward her by assuring her that the letter would only be used against petitioner's co-defendant and that it would not be known that she had provided him with the letter.  Thus, when she used it a third time in testifying that "they told me if I didn't [testify] I could go to jail," R.-60 at 397, it was not at all clear that Mrs. Fortenberry was referring to Judge Segrest, especially in light of the fact that, up to that point, she had only testified that she had "seen" Judge Segrest during the course of her meeting with the prosecutor.  Indeed, Mrs. Fortenberry never testified about any specific words or actions on the part of Judge Segrest.  If the court understands petitioner's position correctly, in order for Mrs. Fortenberry's testimony about her conversations regarding the letter and her testimony to have been limited only to persons who he alleges were at the meeting and conversations that occurred at that time, that would mean that when Mrs. Fortenberry testified that she felt like "they tricked [her] into [testifying] any way because of the letter . . . they ensured [her] about the letter[,]" that she was stating that the prosecutor and Judge Segrest were making assurances to Mrs. Fortenberry at the same time that they were breaking them by forcing her to testify against her brother's benefit about her own actions in securing the letter.  Such an interpretation makes little sense.  Thus, accepting, as a reasonable reader must, that Mrs. Fortenberry's use of "they" in the key part of her testimony when she was referring to persons who made her promises is at least ambiguous, the state court's factual findings simply are not unreasonable in light of the record.  This ambiguity could have easily been cured, but Mrs. Fortenberry was not asked any of the imminently reasonable follow-up questions that would have clarified her testimony.

Petitioner next argues that the court failed to consider his argument that the Court of Criminal Appeals' judgment was contrary to, or an unreasonable application of, Supreme Court precedent. Pet'r's Mot. (Doc. # 59) at 43. He further accuses the court of having "imposed on petitioner a heavy burden to present specific testimony 'that Judge Segrest directly pressured [Kristy] into testifying.'" *Id.*[22] He argues that this "standard" is not supported by law and that it indeed "contravenes Supreme Court precedent that a defendant shows that his due process rights were violated by establishing the facts that indicate a likelihood of bias against him or in favor of the prosecution." *Id.* at 43-44. As an initial matter, even if the court could fairly be described as having failed to consider whether petitioner's claim entitled him to relief pursuant to § 2254(d)(1), such failure was a consequence of petitioner's own discussion of his claim. In the portion of his brief in which he challenged the state court's decision on the merits of his judicial bias claim related to the trial judge's alleged pressuring of Fortenberry, petitioner only argued that the Court of Criminal Appeals' "assertion" that there was no indication of "unlawful contact" "'was based

---

[22] Of course, it was petitioner who alleged that "after the District Attorney *and* Judge Segrest threatened her with jail time, she felt pressured and ultimately took the stand at trial." Pet. ¶ 96 (emphasis supplied). *See also* Pet'r's Br. (Doc. # 44) at 97 ("During that meeting, Judge Segrest entered the room and assisted the District Attorney in securing the testimony of Mrs. Fortenberry by threatening her with the prospect of jail time."); *id.* at 99 ("Judge Segrest's pretrial conduct in pressuring Kristy Fortenberry to testify . . . ."). Thus, it was petitioner who presented his claim as one predicated on his ability to show that Judge Segrest assisted the prosecutor by "threatening" Mrs. Fortenberry and that his "pretrial conduct" "pressured" her. Petitioner does not explain why the court should not reasonably expect the evidence actually adduced in state court proceedings to correspond with the substance and tenor of his allegations and argument.

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  *See* Pet'r's Br. (Doc. # 44) at 99-100.

Nevertheless, petitioner has not demonstrated manifest error because the Court of Criminal Appeals' decision is not contrary to, or an unreasonable application of, Supreme Court precedent.[23]  His argument appears to be predicated on his contention that, "even if Judge Segrest uttered no words at all, his presence during this *ex parte* meeting required his recusal under *Murchison*" because "the purpose and effect of the judge's presence during this meeting was to benefit the State" and "the judge's participation in the *ex parte* meeting gave him personal knowledge of disputed evidentiary facts concerning the proceeding."  Pet'r's Mot. (Doc. # 59) at 45, 47. However, in making this new argument in support of his claim pursuant to § 2254(d)(1), petitioner's reasoning suffers from the same flaw that precluded his claim for relief under § 2254(d)(2):  He makes assumptions that are unsupported by the meager evidence in the record and, consequently, falls short of demonstrating the

---

[23]  The relevant Supreme Court precedent relied upon by petitioner in his prejudgment brief and in the instant motion is *In re Murchison*, 349 U.S. 133 (1955).  In that case, the Supreme Court addressed a peculiar provision of Michigan law which empowered the judges of Michigan courts "to act as a so-called 'one-man grand jury.'" *Id.* at 133.  The question before the Court was whether due process permitted a judge to preside over a contempt hearing where the judge "had also served as the 'one-man grand jury' out of which the contempt charges arose." *Id.* at 134.  The Court held that such contempt proceedings violated the due process rights of the petitioners. *Id.* at 139.  In reaching this result, the Court espoused generalized principles about how due process is concerned not just that a trial be fair, but with eliminating the "probability of unfairness" and maintaining "'the appearance of justice.'" *Id.* at 136 (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).  Thus, the court observed, "no man can be judge in his own case and no man is permitted to try cases where he has an interest in the outcome."  *Id.*

sort of "likelihood of bias" which he argues is forbidden by *Murchison*, much less that the Court of Criminal Appeals' judgment denying this claim is contrary to, or an unreasonable application of, that decision.

For example, petitioner argues that "the purpose and effect of the judge's presence during this meeting was to benefit the State." Pet'r's Mot. (Doc. # 59) at 45. He asserts that Judge Segrest "lent the credibility of his office to the prosecutor's threats, and by failing to contradict the prosecutor when he told Kristy she could go to jail if she did not testify against her brother, Judge Segrest endorsed and magnified those threats" when he acted as a "silent partner in the prosecutor's ethically questionable efforts to obtain evidence critical to the State's case." *Id.* at 47. But, as this court discussed in the Memorandum Opinion, the record is simply too slight to presume that Judge Segrest participated in any meaningful way in the meeting Mrs. Fortenberry described in her testimony, that he was a willing "silent partner" to the prosecutor's alleged threats and intimidation, or even that he knowingly relinquished an opportunity to "contradict" the prosecutor's alleged threats. The most that Mrs. Fortenberry definitively stated in her testimony about Judge Segrest is that she saw him during her meeting with the prosecutor, and she later affirmed that he "came into" the meeting and was "present." R.-60 at 392, 394, 396. She simply does not describe any circumstances of the meeting and Judge Segrest's presence within it

76

with sufficient detail to compel the sinister conclusions about Judge Segrest reached by petitioner.[24]  It is not the fault of the Court of Criminal Appeals that the record is not clear on this matter.  As much as petitioner would argue that Mrs. Fortenberry's testimony was "circumscribed . . . through no fault of petitioner," Pet'r's Mot. (Doc. # 59) at 44, petitioner voluntarily ceased his questioning of Mrs. Fortenberry without asking any question about what, specifically, Judge Segrest did that caused her to feel threatened or intimidated or what was his role in the meeting that allegedly left her feeling that way.  *See* R.-60 at 397.  Without even appreciably diminishing the possibility of some innocent contact, interaction, or other happenstance, petitioner has not shown that the state court's implicit conclusion that he failed to demonstrate a

---

[24] A multitude of reasonably anticipated questions could have established at least some of the factual basis necessary to support the assumptions inherent in petitioner's allegations.  Mrs. Fortenberry does not describe where the meeting occurred.  Did it occur in a place Judge Segrest would not ordinarily have visited during trial?  Would it have required a concerted effort on his part to "come into" the meeting?  Or, was it in a hallway or other room through which he was passing?  Other than her testimony that she had been meeting with the prosecutor for "awhile" before she saw Judge Segrest (R.- 60 at 394), she does not temporally relate Judge Segrest's alleged presence to any of the threats or intimidation she described.  When did Judge Segrest appear in the course of the meeting?  Was it before, during, or after the prosecutor allegedly threatened Mrs. Fortenberry?  Most significantly, there is no testimony about the specifics of any actions by Judge Segrest.  Did Judge Segrest expressly threaten or intimidate Mrs. Fortenberry?  Did he nod solemnly while the prosecutor issued his threats?  Did he say or do anything?  Did he start to enter a room and retreat when he saw the prosecutor speaking with Mrs. Fortenberry?  Did he step into a room looking for something or someone else?  Did he approach the two as their meeting appeared to be concluding so that he could speak with the prosecutor about some extrajudicial matter?  Any of these actions – the good and the bad – could lead to him being "seen" by Mrs. Fortenberry and could also fairly be described as him "coming into" or being "present" at some point during the meeting.  Petitioner's failure to ask these and numerous other reasonably conceivable questions about the circumstances of the meeting and Judge Segrest's actions before he voluntarily ceased questioning Mrs. Fortenberry leaves the record substantially ambiguous on the essential points of his claim and begs the question whether that resulting ambiguity was indeed the desired result.

constitutionally unacceptable "likelihood of bias" is contrary to, or an unreasonable application of, *Murchison*.

Likewise, petitioner's argument that "the need for recusal here meets or exceeds that in *Murchison* because the judge's participation in the *ex parte* meeting gave him personal knowledge of disputed evidentiary facts concerning the proceeding" is similarly unavailing. Because the record does not establish when Judge Segrest was present during the meeting, that he participated in any meaningful way, or even that he knew anything about what purportedly happened at the meeting, it simply does not follow that he was aware of "disputed evidentiary facts" concerning the letter. The court cannot conclude, therefore, that the state court's decision was contrary to, or an unreasonable application of, *Murchison* or any other Supreme Court precedent.

Petitioner's final contention with respect to the court's adjudication of this portion of his judicial bias claim is that "this Court should reconsider its characterization of the state court's language at page 1204 as an 'alternative merits ruling on the claim' and find that the Court of Criminal Appeals affirmed the circuit court's ruling that the claim was procedurally barred without adjudicating the claim on the merits[ ]" because "it cited no law and engaged in no analysis that would support a merits determination on the substantive claim challenging the trial judge's

unconstitutional failure to recuse himself on the basis of personal bias." Pet'r's Mot. (Doc. # 59) at 48-49 (citation omitted). Thus, he asserts, the court should find "its review is not limited to the record before the state court because the state court did not adjudicate the federal habeas claim on the merits and, accordingly, it is not subject to § 2254(d)." *Id.* at 49. Petitioner did not present this argument in his prejudgment briefing. Indeed, he argued the opposite, contending that the state court did address the merits of his claim, but that its adjudication was based upon an unreasonable determination of the facts. *See* Pet'r's Br. (Doc. # 44) at 99-100 ("In addressing the merits of this claim, the Court of Criminal Appeals . . . ."); *id.* at 100 ("As the State asserts, aside from addressing the issue on the merits . . . ."). Petitioner will not now be heard to complain that the state court failed to address his claim on its merits, and instead only decided it on state procedural grounds.

Petitioner also argues that, minimally, he is "entitled to a federal hearing on this claim because he did not receive a full and fair hearing in state court and was diligent in his attempts to present this evidence." Pet'r's Mot. (Doc. # 59) at 49. However, as discussed previously in this order, because petitioner presented this claim and, as he has acknowledged, the state court decided it on the merits, a federal habeas court is constrained in review under § 2254(d) by the factual record that was before the state court. *See Cullen*, 131 S. Ct. at 1398 ("We now hold that review under

79

§ 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."); *id.* at 1400 ("evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court"); *id.* at n.7 (explaining that review under § 2254(d)(2) is even more clearly limited to the state court record). Thus, there was no cause for a federal evidentiary hearing on this claim unless and until petitioner demonstrated that the state court's decision denying his claim was contrary to, or involved an unreasonable application of, clearly established federal law, or was based upon an unreasonable determination of fact in light of the record before the state court. Because the court has determined that petitioner has not satisfied this burden, he is not entitled to an evidentiary hearing.

Finally, the court finds that petitioner is not entitled to a certificate of appealability on this claim. It is perhaps conceivable that reasonable jurists could interpret to varying degrees whether petitioner demonstrated any likelihood of bias with his ambiguous evidence about Judge Segrest's involvement in some meeting between the prosecutor and a witness. However, given the highly deferential standard of the AEDPA, and the presumption of correctness owed to the state court's fact finding, reasonable jurists would not dispute whether, on the record before the state

court, "the petition should have been resolved differently," *Slack v. McDaniel*, 529

U.S. 473, 483-84 (2000), because reasonable jurists would not debate whether the

state court's decision was contrary to, or involved an unreasonable application of,

clearly established law, or was based upon an unreasonable determination of fact.

### III.  CONCLUSION

For the foregoing reasons, it is ORDERED that petitioner's Rule 59(e) motion

to alter or amend judgment (Doc. # 59) is DENIED.  It is further ORDERED that

Petitioner's request to expand the limited certificate of appealability already granted

by the court is DENIED.

DONE this 5th day of February, 2015.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE
